IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TINA M. UBALDI, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SLM CORPORATION,<br><br>Defendant. | No. C 11-01320 EDL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |

Before the Court is Defendant SLM Corporation's motion to dismiss the First Amended Complaint ("Mot."). The Court held a hearing on Defendant's motion on December 13, 2011, at which the parties were represented by counsel. For the reasons stated at the hearing and set forth below, Defendant's motion to dismiss is GRANTED IN PART AND DENIED IN PART.

**I.  Background**

Plaintiff Tina Ubaldi filed a putative class action asserting various claims against Defendant SLM Corporation d/b/a Sallie Mae, Inc., d/b/a Sallie Mae Servicing, arising from late charges incurred for failing to make timely payments on student loans. Sallie Mae, Inc., a subsidiary of Defendant SLM Corporation, is engaged in the business of originating, servicing and purchasing loans to finance the cost of students' education. First Amended Complaint ("FAC") ¶ 13. For purposes of this motion, Defendant SLM Corporation and its subsidiaries are referred to herein as "Sallie Mae." See Mot. at 1 n.1. Plaintiff alleges that the late charges she was assessed are improper liquidated damages under California Civil Code section 1671 and that the charges are unfair because they exceed the actual costs associated with a late payment. Ubaldi asserts claims against Sallie Mae

for: (1) "unlawful" business practices under California's Unfair Competition Law, California Business and Professions Code section 17200 et seq. (the "UCL"); (2) "unfair" business practices under the UCL; and (3) unjust enrichment/quasi contract.

Sallie Mae "Private Education Loans" are loans made by Sallie Mae to students to pay for the students' cost of education, including tuition, fees, and associated costs and living expenses, commonly known and marketed by such Sallie Mae brand names as CEC Signature Loans. FAC ¶ 2. Plaintiff alleges that on June 24, 2003, she took out a CEC Signature Loan in the amount of $22,765, which she used to pay for her education at the California Culinary Academy in San Francisco, California. FAC ¶ 44 & Ex. 1. The Stillwater National Bank and Trust Company ("Stillwater"), a national bank located in Stillwater, Oklahoma, is identified as the lender on Plaintiff's application form. FAC ¶ 37; RJN Exs. A, B; FAC ¶ 44 & Ex. 3. However, Plaintiff alleges that the loan was actually made by Sallie Mae, pursuant to a forward purchase commitment agreement with Stillwater National Bank intended to disguise Sallie Mae's role as the de facto lender. FAC ¶ 44. The "CEC Loan Application" listed Sallie Mae's name and telephone number prominently on the top of the form, and directed Plaintiff to "Mail application to: Sallie Mae Servicing" in Panama City, Florida." FAC ¶ 46. Defendant does not appear to dispute that Sallie Mae at all times has serviced Plaintiff's loan. Mot. at 3 (citing FAC ¶ 44).

Plaintiff's loan is a fixed term loan to be repaid in monthly installments of equal amounts. FAC ¶ 25. Like other fixed term installment loans, the payments are due within 15 days of the due date. In contrast to other fixed term installment loans, the FAC alleges that Sallie Mae computes and charges daily interest on its Private Education Loans. In addition to the daily interest on the outstanding principal that Sallie Mae earns every day, the promissory note provides that if a payment is not received within the 15 day period, Sallie Mae may assess a late charge of the greater of $5.00 or 5% of the payment amount not received. Plaintiff alleges that as a result of assessing a $5.00 or 5% fee for nonpayment and also continuing to charge the borrower daily interest for use of the funds, the borrower pays Sallie Mae twice - in two different ways - for being late on a single loan payment. FAC ¶ 25.

Defendant moves to dismiss the complaint pursuant to FRCP 12(b)(6) on the grounds that the claims are preempted under the National Bank Act, 12 U.S.C. § 21 et seq. ("NBA") and that the First, Second and Third causes of action fail to state a claim under state law.

## II. Analysis

### A. Legal Standard

A complaint will survive a motion to dismiss if it contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007)). The reviewing court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).

A court need not, however, accept as true the complaint's "legal conclusions." Iqbal, 129 S. Ct. at 1949. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 1950. Thus, a reviewing court may begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

Courts must then determine whether the factual allegations in the complaint "plausibly give rise to an entitlement of relief." Id. Though the plausibility inquiry "is not akin to a probability requirement," a complaint will not survive a motion to dismiss if its factual allegations "do not permit the court to infer more than the mere possibility of misconduct . . . ." Id. at 1949 (internal quotation marks omitted), 1950. That is to say, plaintiffs must "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

### B. Discussion

Defendant seeks dismissal on the ground that Plaintiff's claims are preempted by federal law or, alternatively, on the ground that Plaintiff's claims fail to state a claim under California law.

#### 1. Preemption

Defendant contends that the state law claims for unlawful business practices, unfair business practices and unjust enrichment are preempted by federal law because the original lender on

1 Plaintiff's loan, Stillwater, is a national bank and the late charges challenged in this lawsuit are
2 governed by the NBA.

3 "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts
4 state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative
5 field to such an extent that it is reasonable to conclude that Congress left no room for state
6 regulation in that field." Chae v. SLM Corp., 593 F.3d 936 (9th Cir. 2010), cert. denied, 131 S.Ct.
7 458 (Oct. 12, 2010). Defendant here relies on express preemption.

8 In Chae, the Ninth Circuit affirmed summary judgment for Sallie Mae on the claims of
9 student loan borrowers under the UCL and CLRA alleging fraudulent misrepresentations and other
10 state law claims. Unlike the "Private Education Loans" at issue here, commonly known as CEC
11 Signature Loans, which are not guaranteed by the federal government, FAC ¶ 2, the student loans at
12 issue in Chae were made under the Federal Family Education Loan Program. In Chae, the court of
13 appeals held that "the plaintiffs' allegations that Sallie Mae makes fraudulent misrepresentations in
14 its billing statements and coupon books are expressly preempted by the [Higher Education Act
15 ("HEA")], and conflict preemption prohibits the plaintiffs from bringing their remaining claims
16 because, if successful, they would create an obstacle to the achievement of congressional purposes."
17 593 F.3d at 950. As Defendant in this case recognizes, Chae was decided under a "different
18 regulatory scheme." Mot. at 4 n.4. The parties have not identified any statutory authority for Sallie
19 Mae's "Private Education Loans" at issue here. The Court thus limits its preemption analysis to the
20 NBA.

21 Pursuant to the NBA and federal banking regulations promulgated thereunder by the Office
22 of the Comptroller of the Currency ("OCC"), loans originated by a national bank may include late
23 charges and other forms of interest at the rate allowed by the laws of the state where the bank is
24 located. See 12 U.S.C. § 85 ("Any association may take, receive, reserve, and charge on any loan
25 or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest **at the**
26 **rate allowed by the laws of the State**, Territory, or District **where the bank is located**, or at a rate
27 of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the
28 Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the

greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under title 62 of the Revised Statutes.") (emphasis added); 12 C.F.R. § 7.4001(a) (defining interest as "any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended[, including] late fees"); 12 C.F.R. § 7.4001(b) ("A national bank located in a state may charge interest at the maximum rate permitted to any state-chartered or licensed lending institution by the law of that state."). Defendant contends that the late charges on Ubaldi's loan are expressly allowed by applicable state law and are therefore authorized as a matter of federal law under the NBA. Mot. at 6 (under Oklahoma law, a lender may assess a late charge at greater of $5.00 or 5% of unpaid installment). See Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 744-47 (1996) (holding that interest provision of NBA includes late fees and expressing "no doubt that § 85 preempts state law"). Plaintiff concedes that under Smiley, the regulations defining "interest" to include late fees for purposes of the NBA § 30, 12 U.S.C. § 85, are reasonable and entitled to deference. Opp. at 11 n.4 (citing Smiley, 517 U.S. at 744-745; 12 C.F.R. § 7.4001).

Defendant contends that because Stillwater National Bank, located in Oklahoma, is identified as the lender on the loan documents, Section 85 expressly preempts Plaintiff's state law claims. Mot. at 5 (citing Marquette Nat'l Bank v. First of Omaha Serv. Corp., 439 U.S. 299, 313-14 (1978) (holding that Section 85 of NBA permits national bank to charge out-of-state credit card customers an interest rate authorized by law of its home state)). Defendant argues that the NBA was "enacted to establish a national banking system, free from excessive state regulation," Mot. at 4, and that "[u]niform rules limiting the liability of national banks and prescribing exclusive remedies for their overcharges are an integral part of a banking system that needed protection from 'possible unfriendly State legislation.'" Beneficial Nat. Bank v. Anderson, 539 U.S. 1, 10-11 (2003) (citation omitted). See Marquette, 439 U.S. at 313-14 (recognizing that "the plain language of § 85 provides that the bank may charge 'on any loan' the rate 'allowed' by the state" in which the bank is located). Plaintiff "does not dispute that § 85 encompasses late charges." Opp. at 9 n.2. Plaintiff also

5

concedes that Section 85 preempts state laws that limit the amount of interest, including late charges, that may be charged on loans made by a national bank. Opp. at 11-12 ("This provision preempts contrary state laws **only** as applied to national banks and loans 'made' by national banks."). However, Plaintiff disputes that her loan was "made" by a national bank, Stillwater, within the meaning of Section 85, arguing instead that Sallie Mae made the loan pursuant to a forward purchase commitment agreement with Stillwater, such that Sallie Mae, not Stillwater, is the de facto actual lender. FAC ¶¶ 36, 38. Plaintiff argues that because Sallie Mae is not a national bank, the NBA does not preempt Plaintiff's claims. Thus, the issue of whether Section 85 expressly preempts Plaintiff's claims turns on whether the imprimatur of a national bank on the loan documents automatically triggers preemption, foreclosing inquiry into the real nature of the loan, or whether the debtor may invoke the protection of state consumer laws if she proves that the actual lender in substance is not a national bank.

Plaintiff bases her argument on the theory that Sallie Mae is the lender who made Plaintiff's and other class members' Private Education Loans, while Stillwater does nothing more than monetize or rent out its bank charter by allowing Sallie Mae to use its name. Opp. at 9. Plaintiff contends that "Sallie Mae pays to use the name of the bank so that it may evade and violate California law." FAC ¶ 35. The FAC alleges that Stillwater's parent company, Southwest Bancorp, Inc., makes private student loans that are self-insured by Sallie Mae. FAC ¶ 37. Plaintiff alleges that Stillwater Bank acted as the lender of record for these Private Education Loans, but that Stillwater Bank did not actually supply the funds for the loans, since Sallie Mae provided it with "lines of credit" that it could "draw upon for the purpose of funding" the loans. FAC ¶ 38 ("national or state-chartered banks such as Stillwater have no true role or relationship to the loans that are made by Sallie Mae in their names"). Plaintiff also alleges that Stillwater Bank did not dictate the terms on which the loans were made, since all of the underwriting (i.e., the decisions to lend or not lend to a particular applicant) was performed by Sallie Mae and all of the forms used were developed and copyrighted by Sallie Mae. FAC ¶ 39. As Stillwater Bank's parent company has allegedly acknowledged, Stillwater Bank is "substantially dependent" upon Sallie Mae, which allegedly provides all of the servicing and funding for the loans, and insures Stillwater against loss

6

on the loans. FAC ¶¶ 36-38.

The FAC alleges that Sallie Mae has carried out all interactions with the borrowers applying for the Private Education Loans, has established and controlled the terms and conditions under which the Private Education Loans were offered, has approved or decided not to approve Private Education Loan applications in accordance with its own underwriting policies, has used its own copyrighted forms, promissory notes, brands and platforms, and has disbursed the payments to those borrowers whom it approved for Private Education Loans. FAC ¶¶ 38-39. The FAC also alleges that Sallie Mae has collected and kept the vast majority of fees and interest on the loans, has borne the credit risk on all the Private Education Loans, provided credit lines to fund the loans, has insured and/or guaranteed the Private Education Loans so that Sallie Mae bears the risk of loss on the loans even prior to purchasing them, and has assumed the risk of loss directly when it executes the assignments of the Private Education Loans pursuant to the forward purchase commitment agreements. FAC ¶¶ 40-41. Plaintiff contends that these allegations demonstrate that Stillwater Bank is not the lender for the Private Education Loans, but instead that Sallie Mae is the de facto actual lender. Plaintiff acknowledges, however, that the disclosure document for Plaintiff's Signature Student Loan, Plaintiff's loan application and promissory note purportedly identify Stillwater National Bank & Trust as the lender. FAC Ex. 2; doc. no. 30 (RJN), Ex. A. See FAC ¶ 37.

Whether or not the Court may consider what entity is the actual "de facto" lender when a national bank is listed on the loan documents to decide whether the NBA preempts state law appears to be a question of first impression within this circuit, and indeed has not yet been directly addressed by any federal appellate court. The parties rely on cases from other jurisdictions addressing somewhat different legal issues, none of which are directly on point. Generally, Plaintiff argues that the Court should allow her claims to proceed based on the economic reality rather than form of the loans, as courts do in other contexts such as challenges to "pay day" loans under state usury laws where a bank is the lender in name only, while a non-bank entity is the true de facto lender. Defendant counters primarily that in the absence of direct authority for looking beyond the loan documents, form should trump substance, or the courts will be drawn into difficult line-drawing.

7

1  Plaintiff responds that her allegations of a completely sham transaction are sufficient to overcome a
2  motion to dismiss at this early stage of the litigation, especially because, in the absence of
3  controlling authority, "the court should be especially reluctant to dismiss on the basis of the
4  pleadings when the asserted theory of liability is novel or extreme, since it is important that new
5  legal theories be explored and assayed in the light of actual facts rather than a pleader's
6  suppositions." McGary v. City of Portland, 386 F.3d 1259, 1270 (9th Cir. 2004).

7  Plaintiff cites SPGGC, LLC v. Blumenthal, 505 F.3d 183 (2d Cir. 2007), for the proposition
8  that the Court should look to the substance of the transaction to identify the actual or de facto lender,
9  rather than the formal loan documents. There, the seller of prepaid gift cards sued the Connecticut
10 Attorney General to prevent enforcement of a state consumer protection law regulating gift cards.
11 The gift card seller, which was not a bank, contended that based on its association with the national
12 bank (Bank of America) that issued the gift cards, the state gift card law was preempted by the NBA
13 and OCC regulations. The court recognized that the OCC regulations authorized national banks to
14 issue gift cards, and the OCC as amicus took the position that the conflict preemption analysis
15 should focus on the extent to which the gift card represented an exercise of the bank's powers. 505
16 F.3d at 190. The court noted as significant the OCC's view that the regulation of the card seller's
17 collection of fees would not encroach on the national bank's powers. Id. at 190-91. The court held
18 that the state law restricting monthly service fees on gift cards was not preempted by Section 24 of
19 the NBA, which authorizes national banks to exercise certain enumerated powers as well as "all
20 such incidental powers as shall be necessary to carry on the business of banking." Id. at 190-91.
21 The court noted that the seller bore the costs of administering the program, collected all the fees, and
22 established the terms and conditions, while the bank only received Visa interchange fees on a per
23 transaction basis, and only had authority to review and approve, but not establish, the terms and
24 conditions of the gift cards. Id. at 191. The court did not reach the issue of whether preemption
25 would apply if the bank set and collected the fees at issue. Id. Blumenthal held, however, that the
26 state law's prohibition on expiration dates may be preempted because "an outright prohibition on
27 expirations dates could have prevented a Visa member (such as BoA) from acting as the issuer of the
28 Simon Giftcard," remanding on that limited conflict preemption claim. Id. at 191-92. The

8

1  Blumenthal court did not construe or apply the express preemption provision of Section 85 of the
2  NBA governing loans, which is at issue here. However, Blumenthal does provide some support for
3  looking beyond the form to the reality of the financial transaction to decide whether preemption
4  applies.

5        In further support of her argument that federal preemption is determined by the "true lender"
6  who made the student loans, Plaintiff relies on Flowers v. EZPawn Oklahoma, Inc., 307 F.Supp.2d
7  1191, 1205 (N.D. Okla. 2004). Opp. at 13-14. In Flowers, the defendant pawn shops removed a
8  class action that alleged state law usury claims in violation of Oklahoma law on the ground that the
9  claims were completely preempted by federal law because the true lender was a federally insured
10 bank, County Bank. The court remanded the action for lack of subject matter jurisdiction after
11 determining that the plaintiff's allegations did not support a legal or factual finding that County
12 Bank was the true lender. 307 F. Supp. 2d at 1205. The Flowers court determined that the state law
13 claims were brought only against the pawn shops, which were non-bank entities, not against County
14 Bank, and declined to reach the issue of complete preemption. Flowers, 307 F. Supp. 2d at 1206.
15 Thus, Flowers held that the complete preemption doctrine did not apply to state law usury claims
16 against non-bank entities and remanded those actions for lack of federal subject matter jurisdiction.
17 See also In re Community Bank of N.Va., 418 F.3d 277, 296 (3rd Cir. 2005) (holding that the state
18 law claims against non-bank entity in class action alleging lending scheme with two banks were not
19 completely preempted by the NBA or the Federal Depository Institutions Deregulation and
20 Monetary Control Act ("DIDA") where, "despite the provision in the loan agreement that loans were
21 made through a national or state-chartered bank (CBNV or GNBT), the loans were, in fact, made
22 and serviced by" a non-depository institution, then bought by the non-bank defendant, which was
23 entirely separate entity from the banks); West Virginia v. CashCall, Inc., 605 F. Supp. 2d 781 (S.D.
24 W.Va. 2009) (remanding usury claims against non-bank entity which allegedly participated in a
25 "rent-a-bank" or "rent-a-charter" scheme by marketing loans to consumers as an agent of a bank
26 because claims were not completely preempted by Federal Deposit Insurance Act governing state-
27 chartered banks).

28       Defendant distinguishes Flowers, In re Community Bank, and CashCall on the grounds that

those cases determined only that the complete preemption doctrine did not make the claims against non-banks removable, without reaching the substantive preemption issues presented here. As the Ninth Circuit recognized in Whitman v. Raley's Inc., 886 F.2d 1177 (9th Cir. 1989), the jurisdictional question of complete preemption is distinct from the substantive preemption defense:

> This jurisdictional issue of whether "complete preemption" exists is very different from the substantive inquiry of whether a "preemption defense" may be established. The jurisdictional question concerning "complete preemption" centers on whether it was the intent of Congress to make the cause of action a federal cause of action and removable despite the fact that the plaintiff's complaint identifies only state claims. The latter inquiry, concerning a "preemption defense," is a substantive inquiry as to whether a legal defense exists. . . . The federal court's ruling on "complete preemption" has no preclusive effect on the state court's consideration of the substantive preemption defense.

Whitman, 886 F.2d at 1181. By contrast, this action was not removed from state court and the issue whether the NBA completely preempts the state law claims to confer federal jurisdiction is not in dispute here. However, these cases do bolster Plaintiff's argument that courts should look to the substance and not just the form of the financial transaction when it is alleged that a federally-regulated bank has rented out its charter to a non-bank entity which acts as the true lender.

Plaintiff also relies on cases rejecting challenges by Goleta National Bank (Goleta) to state regulation of "payday lending" by check cashing businesses, which purportedly acted as Goleta's agents. In those cases, the courts held that enforcement of state laws restricting payday lending against such non-bank entities does not implicate the federal banking laws, recognizing a "de facto lender" theory under the applicable state usury laws but not under the NBA or other federal statutes. In Goleta Nat'l Bank v. O'Donnell, 239 F.Supp.2d 745 (S.D. Ohio 2002), Goleta, located in California, sought to enjoin as preempted by the NBA a state regulatory action against Ace Cash Express, Inc. (Ace), its purported agent, for making payday loans in Ohio. There, the Superintendent of Financial Institutions of the Ohio Department of Commerce attempted to enforce the Ohio Small Loan Act (OSLA) against Ace, a check-cashing business, for charging interest on loans in excess of that permitted by Ohio law. 239 F. Supp. 2d at 748. The court held that Goleta lacked standing to challenge the state administrative action, noting that "there is nothing in the NBA that prevents Ohio from regulating the activities of a lending institution located in Ohio and making

10

1  loans to Ohio citizens if such loans are in fact made by that lending institution and not by a national
2  bank." Id. at 753. The O'Donnell court held that the NBA was not implicated by the state
3  administrative action to determine whether Ace was the true lender on the payday loans and declined
4  to reach Goleta's argument that the NBA preempted the state's regulatory authority over Ace. Id. at
5  750, 755.

6  Similarly, in Goleta Nat'l Bank v. Lingerfelt, 211 F.Supp.2d 711 (E.D.N.C. 2002), Goleta
7  and Ace filed a federal action to enjoin North Carolina officials from enforcing state payday lending
8  laws against Ace in an ongoing state court proceeding on the ground that Goleta's rights under the
9  NBA would be impaired if the State were to enforce its consumer protection laws against Ace. The
10 district court held that Younger abstention warranted dismissal of the federal action and refused to
11 interfere in the state enforcement action, finding that "the state proceeding would provide an
12 adequate forum to present its federal preemption argument." Id. at 715. The court also held that
13 Goleta lacked standing because it was not a party to the state enforcement action and it had therefore
14 not suffered any actual or threatened injury. Id. at 719. The Lingerfelt court dismissed the federal
15 injunctive action, noting that "there is no controversy surrounding Goleta's rights to make loans at
16 California interest rates" and that the State "agrees that such rights are fixed by the NBA." Id.

17 Plaintiff also cites State of Colorado ex rel. Salazar v. Ace Cash Express, Inc., 188 F.Supp.2d
18 1282, 1285 (D.Colo. 2002). There, Ace sought to remove to federal court a state court action which
19 alleged that Ace was acting as an unlicensed supervised lender under Colorado law. Ace argued
20 there that Goleta was the true lender and that the NBA therefore completely preempted the State's
21 claims against Ace. The Salazar court held that the NBA did not apply to Ace because it was not a
22 national bank, and that removal was therefore improper under the complete preemption doctrine. Id.
23 Neither O'Donnell, Lingerfelt nor Salazar reached the question whether the state law claims were
24 preempted by the NBA.

25 In support of her contention that the "de facto lender doctrine is not only established in case
26 law, but it is endorsed by federal banking officials," Opp. at 16, Plaintiff also cites a vacated opinion
27 by the Northern District of Georgia, BankWest, Inc. v. Baker, 324 F. Supp. 2d 1333 (N.D. Ga.
28 2004), vacated by BankWest, Inc. v. Baker, 446 F.3d 1358 (11th Cir. 2006) (per curiam). There, the

11

district court denied a preliminary injunction sought by out-of-state banks to bar the state of Georgia from enforcing laws against prohibiting payday lending, including "[a]ny arrangement by which a de facto lender purports to act as the agent for an exempt entity." Id. at 1341. In recognizing that the Georgia law's "impact is focused on non-bank entities that receive a predominant share of the revenues from payday loans, but, in an effort to avoid Georgia's usury laws, contract with out-of-state banks to play the role of the lender," the district court noted as follows:

> Federal banking regulators have also recognized that non-bank entities which partner with banks in an effort to avoid state usury laws are not entitled to the protection of the federal banking laws. In June 2000, the Chairman of the FDIC expressed concern "about so-called 'charter renting' - that is to say, allowing a lender in another state to use the bank's authority to circumvent state caps on interest rates in exchange for a fee." Remarks of Donna Tanoue, FDIC Chairman (June 13, 2000) (App. to Defs.' Br. in Opp. to Pls.' Mot. for Prelim. Inj., Ex. 14). According to the FDIC Chairman, "[t]his is not what this 'authority' was intended to do."

324 F. Supp. 2d at 1348. The district court's opinion was later vacated and the appeal dismissed as moot. BankWest, 446 F.3d 1358. Further, as Defendant points out, the quoted FDIC official was criticizing the specific practice of charter renting by payday lenders but even then noted that the practice was legally permitted. Reply at 7. See Remarks of Donna Tanoue, FDIC Chairman (June 13, 2000) (available at http://www.fdic.gov/news/news/speeches/archives/2000/sp13June00.html) ("The practice of renting a charter merely to collect a fee to allow a high-cost payday lender to circumvent state law is inappropriate. It is legal – but I don't like it.").

Plaintiff also relies on Terry v. Community Bank of Northern Virginia, 255 F.Supp.2d 817, 822 (W.D.Tenn. 2003) to support her argument that the express preemption defense does not defeat claims against a non-bank entity that is the de facto lender. In Terry, the plaintiffs obtained a home equity loan originated by the Virginia state-chartered bank, CBNV, brokered by a defendant mortgage broker, and purchased by a non-bank entity, GMAC-Residential Financial Corporation. The district court denied defendant CBNV's motion to dismiss the claim alleging excessive interest in violation of Tennessee law, over the bank's argument that as a state-chartered bank it was entitled to preemption under the Federal Depository Institutions Deregulation and Monetary Control Act (DIDA). The Terry court determined that the complaint sufficiently alleged that the bank did not fund plaintiffs' loan and was therefore not entitled to preemption at the motion to dismiss stage:

12

"Plaintiffs allege that CBNV did nothing to provide the loan to Plaintiffs, and therefore, incurred no expenses, losses or risks associated with the origination of the loan. [ ] Plaintiffs further allege that CBNV was merely 'renting' its state-charter to brokers to assist them in subverting Tennessee's interest rate ceiling statutes." 255 F.Supp. 2d at 822 (internal quotation marks omitted). The court recognized there that the bank "concedes that it is entitled to invoke DIDA preemption only if it is the bank that funded Plaintiffs' 1998 loan. Although Plaintiffs do not explicitly state that CBNV did not fund their 1998 loan, they are not required to do so to survive dismissal." 255 F. Supp. 2d at 822. Defendant points out that Terry was decided under the more liberal pleading standard in place before the current pleading standard was announced in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Reply at 8. Further, unlike here, in Terry the regulated bank was named as a defendant and conceded that it was not entitled to a preemption defense if it did not fund the loan at issue. Thus, the precise issue presented here was not in dispute in Terry.

Plaintiff also cites Easter v. American West Financial, 381 F.3d 948, 957 (9th Cir. 2004), where the court applied the de facto lender doctrine under Washington state law, recognizing that "Washington courts consistently look to the substance, not the form, of an allegedly usurious action." Opp. at 16 n.6. The Ninth Circuit did not address preemption issues in Easter, which concerned claims under Washington's usury statute, but Easter lends some support to Plaintiff's argument that form should not trump substance.

Defendant counters that the Court should look to the "originating entity (the bank), and not the ongoing assignee," in determining whether the NBA applies to the student loans, citing Krispin v. May Dept. Stores, 218 F.3d 919, 924 (8th Cir. 2000). Mot. at 9. Krispin addressed complete rather than express preemption by the NBA in the context of removal. It held that class actions brought in state court against a department store company by holders of department store credit cards were subject to complete preemption by the NBA, making removal proper. There, the national bank that issued the credit extensions on the store credit cards was a wholly owned subsidiary of the store. In other words, in Krispin, the store had a very close corporate relationship with the bank, unlike Stillwater and Sallie Mae here. See 218 F.3d at 921-23. Furthermore, Krispin noted that after the store made a valid assignment to the bank in 1996 of the credit accounts that it originally

13

1 issued, "the store's purchase of the bank's receivables does not diminish the fact that it is now the
2 bank, and not the store, that issues credit, processes and services customer accounts, and sets such
3 terms as interest and late fees." Id. at 924. The court recognized "that the NBA governs only
4 national banks," but "**in these circumstances** we agree with the district court that it makes sense to
5 look to the originating entity (the bank), and not the ongoing assignee (the store), in determining
6 whether the NBA applies." Id. (emphasis added) (citation omitted). "Accordingly, for purposes of
7 deciding the legality of the late fees charged to appellants' credit accounts, we find that the **real**
8 **party in interest** is the bank, not the store." Id. (emphasis added). Thus, the Krispin court looked
9 at the underlying reality of the credit accounts, not just their form, in its determination that "the real
10 party in interest is the bank." Id. Finding that the usury claims against the store implicated the
11 NBA, Krispin upheld removal based on the complete preemption doctrine. Id. Unlike Plaintiff here,
12 the Krispin plaintiffs never disputed that the credit extensions at issue were "made" by a national
13 bank. Opp. at 18 n.7.

14 Krispin is distinguishable from this case, both because it decided the issue of removal based
15 on complete preemption, rather than express preemption, and also because the parties there did not
16 dispute whether the national bank issued the credit and processed and serviced the accounts. Here,
17 by contrast, Plaintiff contends that Stillwater did not retain all such rights and duties as the lender
18 after Plaintiff's loan was purchased by Sallie Mae. See FAC ¶ 42 ("Sallie Mae owns and markets
19 the Private Education Loans brands, and underwrites the loans, directs the terms of the loans, funds
20 the loans directly or indirectly, does all of the work to service the loans, bears the credit risk, and
21 reaps **most or all** of the fees and profits from the Private Education Loans.") (emphasis added). The
22 Krispin court relied, in part, on the fact that the bank was responsible for issuing credit, processing
23 and servicing customer accounts, and setting terms such as interest and late fees, 218 F.3d at 924,
24 whereas Plaintiff here alleges that Sallie Mae exerts such control and ownership of the student loans
25 at issue. FAC ¶¶ 36-42.

26 Defendant also cites Federal Deposit Ins. Corp. v. Lattimore Land Corp., 656 F.2d 139, 147-
27 49 (5th Cir. 1981) in support of its argument that the Court need not look beyond the originating
28 lender to determine whether the NBA applies. In Lattimore, the obligors took out a $1.45 million

14

1  mortgage loan from a non-regulated lender which later assigned a 91.48% interest in the note to a
2  national bank, Hamilton National Bank. The issue presented there was whether the partial
3  assignment to the national bank, located in Tennessee, implicated the NBA and rendered usurious a
4  note that was non-usurious under applicable state law when it was originated by the non-regulated
5  entity. The obligors argued that the interest charged on the loan, which was not usurious under
6  Georgia law, became subject to the more restrictive Tennessee usury law by operation of the NBA
7  when the bank partially acquired the note. The court held that Section 85 of the NBA, specifically
8  the provision that national banks may charge interest rates allowed in the state of their location, did
9  not apply to the mortgage loan which originated with the non-regulated lender where "the bank only
10 later, after the making of the loan, took part of the note as a partial assignment." Lattimore, 656
11 F.2d at 147. "The non-usurious character of a note should not change when the note changes
12 hands." Id. at 148-49. See also DeLeon v. Wells Fargo Bank, N.A., 749 F. Supp. 2d 1119, 1126
13 (N.D. Cal. 2010) (preemption analysis under Home Owners' Loan Act, which governs federally
14 chartered savings bank, applies to claims against a national banking association [Wells Fargo] after
15 it merged with the loan originator, which was a federally chartered savings bank [World Savings
16 Bank] organized under HOLA); Garrison v. First Federal S. & L. Assoc. of S.C., 241 Va. 335, 344-
17 45 (1991) (National Housing Act did not preempt state law claims against federally chartered
18 savings and loan that is only the assignee of a usurious note issued by unregulated lender) (following
19 Lattimore). Though neither opinion is directly on point, Krispin lends some support to the
20 proposition that the NBA governs a loan originated by a national bank after determining whether the
21 bank is the real party in interest, whereas under Lattimore, the NBA does not apply where a loan is
22 later only partially assigned to the bank. Thus, where a plaintiff has alleged that a national bank is
23 the lender in name only, courts have generally looked to the real nature of the loan to determine
24 whether a non-bank entity is the de facto lender.

25    Defendant also urges the Court to adopt the reasoning of an unpublished opinion, Hudson v.
26 Ace Cash Express, Inc., 2002 WL 1205060, *5 (S.D. Ind. May 30, 2002), rejecting the argument
27 that a non-bank entity, rather than a bank, was the actual lender on a loan issued by the bank. There,
28 the district court recognized that Goleta, the originating bank, retained a 5% stake in the plaintiff's

15

consumer loan and held that the sale of a 95% participation interest to Ace did not destroy the debtor-creditor relationship between Goleta and the plaintiff. 2002 WL 1205060, *5 (citing Cottage Savings Ass'n v. C.I.R., 499 U.S. 554, 557 n.3 (1991) ("By exchanging merely participation interests rather than the loans themselves, each party retained its relationship with the individual obligors. Consequently, each S & L continued to service the loans on which it had transferred the participation interests and made monthly payments to the participation-interest holders. See 90 T.C. 372, 381 (1988).")). Hudson recognized the public policy concerns arising from the "rental" of national bank charters as potentially suitable for regulatory redress, but reasoned that the federal banking regulatory scheme required uniform application rather than fact-intensive difficult line drawing by the courts:

> While Hudson acknowledges the preemptive force of § 85, she contends the statute should be construed so as not to apply to national bank loans made for the purpose of evading state usury laws, or to loans in which a national bank "rents" its charter to some other entity. The position has some superficial appeal, but the court rejects it. Hudson invites the courts to draw boundaries between federal and state bank regulation depending upon the subjective purpose of those engaged in the transaction and/or the precise extent of financial risk accepted by the national bank. The court sees no basis for drawing jurisdictional boundaries in such an uncertain and unpredictable way, at least as a matter of statutory construction, although these arguments may well appeal to federal banking regulators concerned about the "rental" of national bank charters.

Hudson, 2002 WL 1205060 at *6. The Hudson court granted the defendants' motion to dismiss the state law claims as preempted by Section 85, with leave to amend. The court concluded that "[a]s a matter of law, § 85 governs the fees and interest rate that Goleta charged Hudson in this case." Id. Where the pleadings "show that Goleta made the loan to Hudson and then sold a participation interest to ACE[,] [u]nder 12 U.S.C. § 85, that fact is dispositive." Id. at *7.

Here, however, Plaintiff does not concede that Stillwater kept any ownership interest in the student loan, distinguishing this case factually from Hudson. Opp. at 19. See FAC ¶ 42 ("In reality, Sallie Mae is the de facto actual lender for its Private Education Loans. Sallie Mae owns and markets the Private Education Loans brands, and underwrites the loans, directs the terms of the loans, funds the loans directly or indirectly, does all of the work to service the loans, bears the credit risk, and reaps most or all of the fees and profits from the Private Education Loans.") In Hudson,

1  the bank "made the loan to Hudson and then sold a participation interest to ACE," retaining a 5%
2  stake in the loan. 2002 WL 1205060 at *7. The Hudson court noted: "The record shows that Goleta
3  actually made the loan and retained an even greater financial interest in its loan to Hudson than the
4  national bank in Krispin, which the Eighth Circuit held sufficient to invoke the National Bank Act in
5  that case." Id. at *5-6 (citing Krispin, 218 F.3d at 924). Hudson concluded as a matter of law that
6  the usury claims were expressly preempted because "§ 85 of the National Bank Act governs the fees
7  and interest rate that Goleta charged Hudson in this case." Id. While Hudson's reasoning has some
8  persuasive force, the Court declines to dismiss at this early stage in the proceedings where, among
9  other things, and unlike Hudson, it is not clear whether or to what extent Stillwater retained any
10 significant stake in or control over Plaintiff's loan.

11 In summary, none of the authorities cited by either party squarely address the issue presented
12 here: whether Sallie Mae is subject to state law as the de facto lender, rather than merely a loan
13 servicer, such that express preemption by the NBA does not apply. Plaintiff contends that the
14 allegations of the FAC present a dispute of fact as to whether Sallie Mae is the de facto lender,
15 rather than Stillwater, so that preemption by the NBA cannot be decided on the present motion. On
16 the legal issue presented, neither party offers persuasive authority as to whether Section 85 of the
17 NBA expressly preempts state law claims against a loan servicer that is alleged to have actually
18 "made" the loan, rather than the bank named on the loan documents. At this early pleading stage,
19 where Plaintiff contends that the national bank may have retained no significant interest in her
20 student loan, presenting a factual dispute over the identity of the actual lender, the Court will permit
21 Plaintiff to conduct discovery on this limited issue to determine whether her de facto lender theory
22 has factual support. Defendant's motion to dismiss is therefore DENIED.

### 2. Failure to State a Claim

Having determined at this juncture that Plaintiff's claims may not be subject to express
preempted by the NBA, the Court denies in part Defendant's motion to dismiss on the alternative
ground that the FAC fails to state a claim against Sallie Mae. The FAC alleges three causes of
action: unlawful business practices in violation of UCL; unfair business practices in violation of
UCL; and unjust enrichment/quasi-contract.

Under the UCL, Cal. Bus. & Prof. Code § 17200, a business practice is "unlawful" if it violates an underlying state or federal statute or common law. See Cal-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999). Under § 17200, an act is "unfair" if the act "threatens an incipient violation of a [competition law], or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law." Id. at 187. Plaintiff contends that Sallie Mae's late fees amount to liquidated damages prohibited by Civil Code § 1671(a), which by its own terms "does not apply in any case where another statute expressly applicable to the contract prescribes the rules or standard for determining the validity of a provision in the contract liquidating the damages for the breach of the contract." Because the validity of the late charges may not be governed by the NBA, the motion to dismiss the UCL claims for unlawful and unfair business practices is DENIED.

With respect to her third claim for relief, Plaintiff contends that a quasi-contract action for unjust enrichment is pled in the alternative in the event that an express agreement does not govern her loan. Opp. at 24. Not only does Plaintiff fail to allege in the alternative that there is no written agreement, but under California law, there is no claim for unjust enrichment; rather, it is an equitable remedy. See Melchior v. New Line Productions, Inc., 106 Cal. App.4th 779, 793 (2003) ("there is no cause of action in California for unjust enrichment"); see also Hafiz v. Greenpoint Mortgage Funding, 652 F. Supp. 2d 1039 (N.D. Cal. 2009) ("Unjust enrichment, also known as restitution, is not a theory of recovery but is instead a result thereof."). Thus, the FAC fails to state a claim for unjust enrichment and that claim is DISMISSED WITH PREJUDICE.

**III.     Conclusion**

For the reasons set forth above, Defendant's motion to dismiss is GRANTED IN PART AND DENIED IN PART.

**IT IS SO ORDERED.**

Dated: February 13, 2012

ELIZABETH D. LAPORTE
United States Magistrate Judge