IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TINA M. UBALDI, and CHANEE THURSTON | No. C 11-01320-EDL |
| Plaintiffs, | **ORDER DENYING MOTION TO DISMISS** |
| v. | |
| SLM CORPORATION, SALLIE MAE, INC.; and SLM PC STUDENT LOAN TRUST 2004-A | |
| Defendants. | |

Pending before the Court is Defendants' Motion to Dismiss Third Amended Complaint. (Dkt.132.) For the reasons set forth below, the Court denies Defendants' motion.

## I. Background

In this putative class action, Plaintiffs allege that Defendants SLM Corporation, Sallie Mae, Inc. ("Sallie Mae"), and SLM PC Student Loan Trust 2004-A assessed unlawful late charges and interest on student loans. According to the allegations in the Third Amended Complaint ("TAC"), Plaintiff Thurston, a California citizen and resident, took out Private Education Loans known as CEC Signature Loans on October 10, 2001 and October 16, 2002. (TAC ¶¶ 21, 94.) Plaintiff Thurston used these loans to help pay for her education at Brooks College in Long Beach, California. Plaintiff does not dispute that the loan applications listed Stillwater National Bank ("Stillwater") in Oklahoma as the lender. (Id. ¶¶ 63, 86.) Plaintiff Thurston learned that she was approved for these loans by way of letters sent from Panama City, Florida. (Id. ¶ 97, Ex. 12, Ex. 14.) The letters had "Stillwater National" printed on the top but notified Plaintiff that she could check her disbursements at www.salliemae.com. (Id. Ex. 12, Ex. 14.) The loans were serviced by Sallie Mae and were assigned to Sallie Mae shortly after disbursement. (Id. ¶¶ 95, 96.) Plaintiff

Thurston was assessed late charges on her loans, and she has paid late charges. (Id. ¶ 110.) The interest rates on Plaintiff Thurston's loans were the prime rate plus 8% and 1.5%, respectively. (Id. ¶¶ 97, 104.) Since 2001, the prime rate has never been below 3.25% and has been as high as 9.5%. (Id. ¶ 112.)

Plaintiff Ubaldi is also a California citizen and resident who took out a Private Education Loan known as a CEC Signature Loan to finance her education, which in her case was at the Culinary Academy in San Francisco. (Id. ¶¶ 20, 88.) Plaintiff applied for her loan on May 18, 2003. (Id. Ex. 10.) The application appears to have listed Stillwater National Bank in Stillwater, Oklahoma as the lender. (Id.) The name Sallie Mae was printed on the top of the application, as was Sallie Mae's phone number, and the application directed Plaintiff Ubaldi to mail the application to Sallie Mae Servicing in Panama City, Florida. (Id. ¶ 92, Ex. 10.) Plaintiff learned that her loan was approved on May 30, 2013 via a letter from Panama City, Florida that had "Stillwater National Bank" printed at the top and www.salliemae.com in the body. (Id. ¶ 93, Ex. 11.) Plaintiff does not dispute that the promissory note listed Stillwater as the lender. (Id. ¶ 86.) Part of the loan was disbursed on June 24, 2013, and the remainder on October 13, 2003. (Id. ¶ 88, Ex. 8.) Sallie Mae serviced the loan, and the loan was assigned to Sallie Mae on or before December 18, 2013. (Id. ¶ 88.) It was then sold to Defendant SLM PC Student Loan Trust 2004-A. (Id.) Plaintiff Ubaldi was assessed late charges on her loan, which she paid. (Id. ¶¶ 108-09.)

According to Plaintiffs, borrowers taking out Private Education Loans are required to sign a promissory note substantially similar to Exhibit 1 and Exhibit 2 to the Complaint. (Id. ¶ 32 n.1.) The promissory note states that "I [the above signed borrower] understand that you [the lender as listed on the front of the application] are located in the State listed on the front of the attached application and this Note will be entered into in the same State." (Id. Ex. 1 at 1-2 ¶ L.3, Ex. 2 at 1-2 ¶ L.3.) The promissory note further provides that "[c]onsequently, the provisions of this Note will be governed by federal laws and the laws of that State, without regard to conflict of law rules." (Id.; see also id. ¶ 101.) If the promissory note is assigned, the assignee becomes the owner and has all the rights of the lender to enforce the note against the borrower. (Id. at 2 ¶ L.2.) The promissory

2

note provides for a late charge of the greater of 5% of the late installment payment or $5.00. (Id. ¶ 103, Ex. 3, Ex. 8 (Ubaldi document), Ex. 14 (Thurston document).) According to the promissory note, interest is determined by adding a margin to the prime rate. (Id. ¶ 104, Ex. 1 ¶ C.2.)

On July 1, 2002, before all but one of Plaintiffs' loans were made, Stillwater entered into an ExportSS Agreement with Student Loan Marketing Association, a predecessor to Sallie Mae. (Id. ¶ 76, Ex. 7.) "The ExportSS® is a form agreement that Sallie Mae used with multiple of its lender-partners in connection with the origination of the Private Education loans." (Id. ¶ 76.) The purpose of the ExportSS Agreement was to define how Sallie Mae would provide services to originate Stillwater's loans and the conditions under which Sallie Mae would purchase them. (Id. Ex. 7 at 1.) The ExportSS Agreement provided that only Sallie Mae or its affiliates would originate and process Private Education Loans on Stillwater's behalf. (Id. ¶ 77, Ex. 7 at 3.)

Under the ExportSS Agreement, Stillwater was required to sell Sallie Mae its eligible loans, subject to certain limitations, within 90 days of disbursement. (Id. Ex. 7 at 17-18.) Additionally, the ExportSS Agreement required Stillwater to, among other things: (1) prepare, review, and distribute loan application materials to assure compliance with all state laws and regulations; (2) repurchase unenforceable loans that violated state law; and (3) indemnify Sallie Mae for violations of applicable state laws. (Id. at 11, 26, and 15, respectively.) As for the application materials, Sallie Mae provided the design template. (Id. at 11.) Stillwater agreed not to alter the content of the application materials without Sallie Mae's consent. (Id.)

Plaintiffs' primary theory in this case is that despite the terms of the loan documents, Sallie Mae is the *de facto* lender of the student loans at issue, and banks such as Stillwater simply rent their charters to Sallie Mae so it can avoid California law. (Id. ¶¶ 2, 17, 19, 61.) Plaintiffs allege that Sallie Mae enters into forward purchase agreements with lender-partner banks. (Id. ¶ 62.) Under such an agreement, the lender-partner bank purports to act as the lender, but Sallie Mae actually makes the loans via standing credit and purchase agreements with the lender-partner. (Id.) Because of these credit arrangements and pre-arranged purchases, Plaintiffs allege, the lender-partner banks never undertake any risk of loss. (Id. ¶ 64.) Moreover, the Private Education Loans at issue use

3

Sallie Mae's "underwriting, copyrighted forms, promissory notes, brands and/or proprietary platforms to initiate the loans." (Id. ¶ 62.) Plaintiffs further allege that Sallie Mae services the Private Education Loans. (Id.) Additionally, Plaintiffs allege that Sallie Mae carries out all interactions with the borrowers, controls the terms and conditions of the loans, approves or denies the loans, and keeps the majority of the fees and interest on the loans. (Id. ¶¶ 65, 66.) Plaintiffs allege that Sallie Mae's *de facto* lender status is confirmed by the Department of the Treasury, which determined that Sallie Mae's predecessor was originating loans and incorrectly attributing the loans to its banking partners. (Id. ¶ 70.)

Here, Plaintiffs allege that Stillwater is one of these lender-partner or nominee lender banks and that Sallie Mae was the *de facto* lender. (Id. ¶¶ 63, 81.) Plaintiffs allege that Stillwater's parent acknowledged that its student lending is "substantially dependent" on Sallie Mae, which provides all of the servicing for student loans and provides liquidity by purchasing them and providing lines of credit. (Id.) Plaintiffs also allege that the ExportSS Agreement confirms that Salle Mae was the *de facto* lender on Plaintiffs' loans. According to Plaintiffs, the ExportSS Agreement provides that Sallie Mae is the entity that originates the loans and Stillwater never undertook any risk because Sallie Mae was required to buy the entire interest in the loans. (Id. ¶¶ 77, 78.) The ExportSS Agreement shows that Sallie Mae controlled the terms and conditions of the loans, supplied the design template for the loan materials, and disbursed the loan monies from its own accounts. (Id. ¶¶ 79-80.) Plaintiffs further allege that Stillwater has no relationship with the Plaintiffs or other borrowers because "the identity of individual borrowers only becomes known to Stillwater (if ever) after the loan is made by Sallie Mae and after the funds have been disbursed by Sallie Mae. (Id. ¶ 86.)

## II. Procedural History

Plaintiff Ubaldi filed a putative class action against Defendant SLM Corporation on March 18, 2011. In her first amended complaint, Plaintiff brought claims for unlawful business practices under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., unfair business practices under the UCL, and unjust enrichment/quasi contract. The claims arose from the

4

late charges Defendants assessed, which Plaintiff characterized as improper liquidated damages that exceeded the actual costs associated with a late payment.

Defendant SLM Corporation moved to dismiss the first amended complaint on the grounds that Plaintiff's claims were preempted by federal law and failed to state a claim under California law. Defendant argued that because Stillwater is a national bank, under the National Bank Act, 12 U.S.C. § 21 et seq., and relevant regulations, loans originated by a national bank may include late charges allowed by the laws of the state where the bank is located, which it contended was Oklahoma. Defendant argued that Plaintiff's claims under California law were thus preempted by the National Bank Act. In response, Plaintiff argued that the her loan was not made by Stillwater, but rather was made by Sallie Mae, which was the *de facto* lender. Plaintiff argued that because the loan was not made by a national bank, her California claims were not preempted.

The Court denied Defendant's motion to dismiss Plaintiff's claims as preempted by the National Bank Act. (Dkt. 43.) The Court noted that "where a plaintiff has alleged that a national bank is the lender in name only, courts have generally looked to the real nature of the loan to determine whether a non-bank entity is the de facto lender." (Id. at 15.) The Court found that "[a]t this early pleading stage, where Plaintiff contends that the national bank may have retained no significant interest in her student loan, presenting a factual dispute over the identity of the actual lender, the Court will permit Plaintiff to conduct discovery on this limited issue to determine whether her de facto lender theory has factual support." (Id. at 17.) [2]

After naming Sallie Mae and SLM Student Loan Trust 2004-A as defendants in a second amended complaint, Plaintiff sought leave to file a third amended complaint. Plaintiff sought leave to amend to: (1) name an additional plaintiff; (2) assert claims for usury; (3) bring a claim for declaratory relief that the choice-of-law provisions in those loans were unenforceable; (4) add additional facts supporting her "*de facto*" lender theory; and (5) modify the class definition and extend the class period for the current late charge class. The Court granted in part and denied in part Plaintiff's motion. The Court granted Plaintiff leave to amend to assert usury claims and add

---

[2] The Court dismissed with prejudice Plaintiff's claim for quasi-contract/unjust enrichment. (Id. at 18.)

Plaintiff Thurston. (Dkt. 131 at 4.) The Court also allowed Plaintiff to amend to add a declaratory relief claim regarding choice of law provisions in the promissory notes. (Id.) Additionally, the Court granted Plaintiff leave to amend to add new background factual allegations relating to the usury and declaratory relief claims. (Id. at 6.) The Court denied, however, Plaintiff leave to amend her complaint to add "tolling" allegations to expand the class definition. (Id. at 5.) The Court similarly denied Plaintiff leave to amend to add factual allegations regarding tolling. (Id. at 6.)

The TAC contains two claims related to late charges (First and Third Claims); four claims related to interest rates (Second, Fourth, Fifth and Sixth Claims); and one claim for a declaratory judgment that the choice-of-law provisions in the promissory notes are unenforceable (Seventh Claim). Defendants have moved to dismiss the TAC under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 132.)[3] Defendants argue that Plaintiffs' claims under California law fail because the promissory notes are governed by Oklahoma law under choice-of-law provisions. Defendants also move to dismiss Plaintiffs' declaratory relief claim as moot and improperly duplicative. Plaintiffs oppose dismissal.

**III. Discussion**

    A. <u>Legal Standard</u>

        1. Motion to Dismiss Standard

A complaint will survive a motion to dismiss if it contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The reviewing court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).

A court need not, however, accept as true the complaint's "legal conclusions." Iqbal, 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679. Thus, a reviewing court may begin "by identifying

---

[3] Defendants point out that Plaintiffs' have not yet filed the TAC.

6

pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

Courts must then determine whether the factual allegations in the complaint "plausibly give rise to an entitlement of relief." Id. Though the plausibility inquiry "is not akin to a probability requirement," a complaint will not survive a motion to dismiss if its factual allegations "do not permit the court to infer more than the mere possibility of misconduct." Id. at 678 (internal quotation marks omitted). That is to say, plaintiffs must "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

On a motion to dismiss, a court's analysis is generally limited to the contents of the complaint. Dichter-Mad Family Partners, LLP v. United States, 709 F.3d 749, 762 (9th Cir. 2013.) A court may also consider, however, exhibits the plaintiff has attached to the complaint. Id. This is because under Federal Rule of Civil Procedure 10(c), "[a] copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes." A court may consider such exhibits without converting a Rule 12 motion into one for summary judgment under Rule 56. Fed. R. Civ. P.12(d); Dichter-Mad, 709 F.3d at 762.

### 2. Choice of Law

"A federal court sitting in diversity applies the forum state's choice of law rules." Bridge Fund Capital Corp. v. Fastbucks Franchise Corp., 622 F.3d 996, 1002 (9th Cir. 2010). In California, courts assess contractual choice-of-law provisions under the framework set forth in § 187 of the Restatement (Second) of Conflicts of Laws ("Restatement"). Nedlloyd Lines B.V. v. Superior Court of San Mateo Cnty., 3 Cal. 4th 459, 464-65 (Cal. 1992). "Such choice of law provisions are usually respected by California courts," and the Restatement "reflects a strong policy favoring enforcement of such provisions." Id.

Section 187(2) of the Restatement provides that the law chosen in a choice-of-law provision will be applied unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement § 187(2). A court applying this framework is "first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." Nedlloyd, 3 Cal. 4th at 466. If neither test is met, the court will not enforce the choice-of-law provision. Id. If either test is met, "the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California." Id. (emphasis in original). If there is a fundamental conflict with California law, the court must determine whether California "has a materially greater interest than the chosen state in the determination of the particular issue." Id.

The proponent of the choice-of-law provision bears the burden of showing that the chosen state has a substantial relationship to the parties or their transaction or that there is a reasonable basis for the choice of law. Wash. Mutual Bank, FA v. Sup. Ct. of Orange Cnty., 24 Cal. 4th 906, 917 (Cal. 2001). If this burden is met, the party opposing application of a choice-of-law provision bears the burden of establishing that the chosen law is contrary to a fundamental California policy and that California has a materially greater interest in the determination of the particular issue. Id.

Although the court in Nedlloyd emphasized that the parties in that case were sophisticated commercial entities that negotiated the choice-of-law provision in an arm's length transaction, Id. at 464-65, 468, the Nedlloyd analysis applies in the context of consumer adhesion contracts as well. Wash. Mutual Bank, 24 Cal. 4th at 918. Choice-of-law provisions in adhesion contracts are usually respected, though courts should scrutinize such contracts with care to make sure that applying such a choice-of-law provision would not result in substantial injustice. Restatement § 187, cmt. b.

B.  Substantial Relationship/Reasonable Basis

1.  Substantial Relationship

The first question is whether Defendants have established that Oklahoma has a substantial relationship to the parties or their transactions. Defendants argue that Oklahoma has a substantial relationship to the parties because Stillwater is one of the parties to the promissory notes and is

8

located in Oklahoma. Defendants also point out that the promissory notes recite that they are "entered into" in Oklahoma and that under California Evid. Code § 622, this recitation is conclusively presumed to be true. Defendants further assert that Plaintiffs' allegations that Stillwater had no involvement in making or servicing the loans and no relationship with Plaintiffs are conclusory and are contradicted by the terms of the ExportSS Agreement and the promissory notes. According to Defendants, these documents actually establish that Stillwater was not a "straw man," but was involved with the loans because it was a party to the loans, it designated Sallie Mae as its agent, and it had responsibilities under the ExportSS Agreement. Plaintiffs counter that there is no substantial relationship between Oklahoma and the parties or the loans. Plaintiffs assert that Stillwater's Oklahoma location is not determinative and that Defendants' arguments ignore Plaintiffs' allegations that the *de facto* lender was Sallie Mae, not Stillwater. Plaintiffs maintain that the allegations in the TAC are not conclusory but are supported by, among other things, the ExportSS Agreement, which Plaintiffs believe show that Sallie Mae controlled the loan transactions from their inception.

Defendants have not established that Oklahoma has a substantial relationship with the parties or the loans. Oklahoma does have a relationship with Stillwater, and Stillwater was listed as the lender on the promissory notes and assigned some duties under the ExportSS Agreement. These facts would usually suffice to meet the Restatement's "substantial relationship" prong. See, e.g., Nedlloyd, 3 Cal. 4th at 471. Plaintiffs have alleged, however, that Stillwater was not truly a party to the loan transactions because Sallie Mae was the *de facto* lender. These *de facto* lender allegations are not conclusory. Moreover, unlike the cases cited by Defendants, Plaintiffs have not attached exhibits that completely negate their allegations that Stillwater was renting its charter to Sallie Mae, the *de facto* lender, so the Court is still required to assume the truth of their allegations. Plaintiffs in fact rely on some of these exhibits in support of their allegations. That the ExportSS Agreement might be also be evidence against the *de facto* lender theory does not mean that the Court should ignore Plaintiffs allegations altogether. United States ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 377 (5th Cir. 2004) ("Even if Riley's exhibits called into question one or more of the

9

examples she alleged, they did not call into question all her allegations of false claims.") The *de facto* lender theory has already survived one motion to dismiss, and Defendants have not provided compelling reasons for the Court to reverse course.

If Plaintiffs' *de facto* lender allegations are true, then Oklahoma does not have a substantial relationship to Sallie Mae or Plaintiffs or the loans. Defendants do not contend that there is a substantial relationship in the absence of Stillwater. As Plaintiffs point out, "Plaintiffs were provided the application and promissory notes in California, they executed the notes in California,[4] returned the notes and applications to Florida where they were approved, they made their payments to Sallie Mae, the funds were used to attend schools in California, the Plaintiffs had no interaction with Oklahoma whatsoever and the loans were and are serviced outside Oklahoma." (Dkt. 134 at 9.)

There is a factual dispute regarding the identity of the actual lender. In light of this dispute, the Court cannot find on a motion to dismiss that there is a substantial relationship between Oklahoma and the parties and loans.

### 2. Reasonable Basis

Even in the absence of a substantial relationship, a court will enforce a choice-of-law provision if the proponent establishes that there is a reasonable basis for the choice of law. Wash. Mutual Bank, 24 Cal. 4th 906, 917. Defendants argue that Stillwater had a reasonable basis for selecting Oklahoma because it had contractual obligations to assure that loan documents complied with applicable state law and was required to indemnify Salle Mae for violations of applicable state law. According to Defendants, Stillwater, as an Oklahoma corporation, had a reasonable basis to pick Oklahoma law as the applicable state law. Defendants also argue that "a reasonable basis exists

---

[4] Defendants argue that the loans were entered into in Oklahoma because the promissory notes state "that this Note will be entered into in the [State listed on the front of the application]." (TAC Ex. 2 ¶ L.3.) According to Defendants, under California Evidence Code § 622, this fact is presumed conclusively to be true. At least one court, however, has held that § 622 should not be used to permit impermissible bootstrapping in contracts of adhesion. Bruni v. Didion, 160 Cal. App. 4th 1272, 1291 (Cal. Ct. App. 2008). Although Defendants cite one case where Bruni was criticized, Vasquez v. Greene Motors, Inc., 214 Cal. App. 4th 1172, 1191 (2013), that criticism had nothing to do with its analysis of the effect of § 622. As in Bruni, it would be impermissible bootstrapping if Defendants could guarantee enforcement of a choice-of-law provision in a contract of adhesion by including a rote recital solely for the purpose of establishing a substantial relationship under the Restatement.

10

to select Oklahoma law because both Stillwater (as the original lender) and Salle Mae (as the assignee) have an obvious interest in the loans being governed by the laws of a single state." (Dkt. 132 at 10.) Defendants similarly contend that Sallie Mae had a reasonable interest in ensuring that the loans complied with a body of state law known to Stillwater. (Dkt. 137 at 6.) Plaintiffs respond that there is no reasonable basis for the designation of Oklahoma law because Stillwater was not the true lender. (Dkt. 134 at 12.)

Defendants' argument that Oklahoma law was a reasonable choice because Sallie Mae has an interest in choosing known and uniform state law is ultimately unpersuasive at this stage of the proceedings, where Plaintiff has alleged that the true lender was Sallie Mae. Defendants have not established that Sallie Mae, a Delaware corporation, has any greater familiarity with Oklahoma law than with the law of any other state. Further, Plaintiffs point out that the promissory notes themselves call for the application of the laws of numerous other states, the choice of law clause does not specifically state that Oklahoma law applies, but rather that the law of the state listed on the promissory note applies, and Sallie Mae used lender partners other than Stillwater. Thus, the choice of Oklahoma law did not establish a uniform national standard for Defendants' student loans. (Id. at 2.) Defendants counter that notwithstanding certain state-specific disclosures in the promissory notes, Sallie Mae reasonably sought to have the promissory notes governed by a single state's law to the maximum extent possible.

Defendants rely on cases upholding choice-of-law provisions because one of the parties was a large corporation that conducted transactions throughout the country and thus had an interest in having its agreements uniformly governed by a single state's law. See 1-800-Got Junk v. Sup. Ct. of Los Angeles Cnty., 189 Cal. App. 4th 500, 505 (Cal. Ct. App. 2010); Cayanan v. Citi Holdings, Inc., Case No. 12-1476, 2013 WL 784662 (S.D. Cal. Mar. 1, 2013); Mackey v. MBNA Am. Bank, N.A., 343 F. Supp. 2d 966 (W.D. Wash. 2004). These cases are distinguishable, however, because Defendants here have not met their burden of showing that the use of Oklahoma law with respect to Stillwater established that Oklahoma law applied to all of Sallie Mae's loans nationwide. In 1-800 Got Junk, the court determined that there was a reasonable basis for the choosing Washington law in

11

a choice-of-law provision because: (1) "a multi-state franchisor has an interest in having its franchise agreements governed by a uniform body of law"; and (2) Washington law in particular was appropriate because of the state's proximity to the defendant's headquarters in Vancouver. 189 Cal. App. 4th at 933. Similarly in Cayanan, the court found that the student loan agreement in that case was analogous to the franchise agreements in 1-800-Got Junk because "Citibank maintains a wide reach across the United States based on the large number of student loan transactions the company has entered in the past." 2013 WL 784662 at *8.

Defendants, however, have not shown that Oklahoma law provided a uniform national standard to govern Defendants' student loans or that Defendants chose Oklahoma so that it would provide a uniform national standard. As Plaintiffs note, the promissory notes themselves do not state that Oklahoma law applies, but instead provide that they will be governed by federal law and the laws of whatever state is listed on the front of the student loan applications at issue, and the promissory notes contain specific state law provisions that apply depending on where the borrower resides. (TAC Ex. 1.) Finally, Plaintiffs argue that Sallie Mae also used lender partners based in other states, so it cannot plausibly claim that it chose Oklahoma law to apply nationwide — a point that Defendants did not dispute in their briefs.

In sum, it is Defendants' burden to establish that there was a reasonable basis to choose Oklahoma law to govern student loans taken out by California residents for education in California schools that were serviced by a Delaware corporation. Assuming for the purposes of this motion that Stillwater was a sham lender, Defendants must meet this burden without relying on the presence of Stillwater. Defendants have not done so. Therefore, the Court need not address whether Oklahoma law is contrary to a fundamental policy of California or which state has the greater interest in the issues in this case.

**IV. Conclusion**

Defendants have not established that the choice-of-law provisions in the promissory notes bar Plaintiffs' claims at the pleading stage. Defendants' motion to dismiss is denied.

IT IS SO ORDERED.

Dated: August 5, 2013

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Chief Magistrate Judge