1  Janet Lindner Spielberg (SBN 221926)
   **LAW OFFICES OF JANET**
2     **LINDNER SPIELBERG**
   12400 Wilshire Boulevard, # 400
3  Los Angeles, California  90025
   Telephone: 310-392-8801
4  Email: jlspielberg@jlslp.com

   Michael D. Braun (SBN 167416)
   **BRAUN LAW GROUP, P.C.**
   10680 West Pico Boulevard, Suite 280
   Los Angeles, California 90064
   Telephone: 310-836-6000
   Email: service@braunlawgroup.com

5  Joseph N. Kravec, Jr. (*pro hac vice*)
   Stephen M. Pincus (*pro hac vice*)
6  Wyatt A. Lison (*pro hac vice*)
   Maureen Davidson-Welling (*pro hac vice*)
7  **STEMBER FEINSTEIN DOYLE**
      **PAYNE & KRAVEC, LLC**
8  429 Forbes Avenue
   Allegheny Building, 17th Floor
9  Pittsburgh, Pennsylvania 15219
   Telephone: 412-281-8400
10 Email: jkravec@stemberfeinstein.com
   spincus@stemberlfeinstein.com
11 wlison@stemberfeinstein.com
   mdavidsonwelling@stemberfeinstein.com

   William J. Genego (SBN103224)
   **LAW OFFICE OF WILLIAM**
   **GENEGO**
   2115 Main Street
   Santa Monica, California 90405
   Telephone: 310-399-3259
   Email: bill@genegolaw.com

13 ***Attorneys for Plaintiffs Tina M.***
14 ***Ubaldi and Chanee Thurston***

15            UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17            SAN FRANCISCO DIVISION

18 | TINA M. UBALDI and CHANEE | **Case No. 3-11-cv-01320-EDL** |
19 | THURSTON, on behalf of |
   | themselves and all others similarly | **CLASS ACTION** |
20 | situated, |
21 |                       Plaintiffs, | **[MODIFIED]** THIRD AMENDED COMPLAINT |
22 |                vs. | **FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO COURT** |
23 | | **ORDER [DKT. NO 169]** |
24 | SLM CORPORATION; a Delaware |
   | Corporation; SALLIE MAE, INC.; |
25 | and SLM PC STUDENT LOAN | **DEMAND FOR JURY TRIAL** |
   | TRUST 2004-A |
26 |                       Defendants. |

27

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1    Plaintiffs Tina Ubaldi and Chanee Thurston, by their attorneys, bring this class

2    action against SLM Corporation and Sallie Mae Inc., (collectively referred to as "Sallie

3    Mae"), and Plaintiff Ubaldi brings this action against SLM PC Student Loan Trust

4    2004-A, on their own behalf and on behalf of all others similarly situated, and allege

5    as follows based upon the investigation of their counsel:

6    **I.    INTRODUCTION**

7         1.    This class action seeks relief on behalf of Plaintiffs and others similarly

8    situated who, while residing in California, were provided Sallie Mae Private

9    Education Loans for which Sallie Mae was the *de facto* actual lender as described

10   below.  Plaintiffs Ubaldi and Thurston bring claims under California Law seeking

11   relief on behalf of borrowers who were assessed a late fee by Sallie Mae.  Plaintiff

12   Thurston also brings claims under California Law on behalf of borrowers who were

13   charged usurious interest, i.e., a rate in excess of 10 percent per annum.

14   Additionally, Plaintiffs seek declaratory relief on behalf of all California borrowers

15   who were provided Private Education Loans for which Sallie Mae was the *de facto*

16   actual lender, and, specifically, a ruling that the choice of law provision in the Sallie

17   Mae Private Education Loans is unenforceable.

18        2.    Sallie Mae has been allowed to commit the wrongs this suit seeks to

19   remedy by disguising and keeping secret from unsuspecting student borrowers its true

20   role as the *de facto* actual lender for Sallie Mae Private Education Loans. By making

21   it appear that the loans were made by lending institutions subject to federal

22   regulation, and the oversight that comes with that regulation, Sallie Mae has been

23   able to evade and violate state law by charging usurious rates of interest and

24   assessing punitive late fees. It was not until March of 2011 when the Department of

25   Treasury released a draft report on Sallie Mae which revealed Sallie Mae's true role as

26   the *de facto* actual lender that the information first became publicly available which

27   revealed Sallie Mae's true role as the *de facto* actual lender. Even then the

28

1

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1   information was buried and released without publicity, such that class members

2   continue not to have notice of facts that would allow them to pursue and enforce their

3   rights under state law. As a consequence of Sallie Mae's concealment, the class period

4   extends as far as back as Sallie Mae has engaged in its unlawful practices that are the

5   subject of this complaint and its heretofore successful effort at concealing them.

6       3.   As used herein, Sallie Mae "Private Education Loans" are loans made by

7   Sallie Mae to students to pay for the students' cost of education, including tuition,

8   fees, and associated costs and living expenses, commonly known and marketed by

9   such Sallie Mae brand names as CEC Signature Loans, and which are not Federal

10   Family Education Loans and are not guaranteed by the federal government. The loans

11   are made by Sallie Mae, in that Sallie Mae develops and markets the loans, creates

12   and copyrights the loan application forms and promissory notes, the loan applications

13   are returned to Sallie Mae, Sallie Mae underwrites and determines whether to

14   approve the loan to the borrower, Sallie Mae services the loans and receives all

15   payments, all payments are to be made to Sallie Mae as specified in the promissory

16   note, Sallie Mae provides the funding for the loans, directly and/or indirectly through

17   such means as credit extensions and forward purchase agreements, it directs and

18   controls the disbursement of the loan proceeds, and it insures the loans. In short,

19   Sallie Mae is the *de facto* actual lender.

20       4.   Sallie Mae charges class members a late fee of 5% of the payment amount

21   not received by the scheduled payment date or $5.00, whichever is greater, each time

22   any part of a payment is not received by Sallie Mae within 15 days of the scheduled

23   payment date.   This late fee, as determined and assessed by Sallie Mae, is a

24   liquidated damages penalty and is unlawful under California law.

25       5.   In order for a liquidated damages provision such as a late fee to be

26   lawful, it must be compensatory and not punitive, *i.e.*, it must compensate the lender

27   for the cost of not receiving a payment on the scheduled date, or represent a

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1  reasonable attempt to anticipate the cost.  Sallie Mae's revenue from late fees far

2  exceeds the costs it incurs as a result of late payments.

3        6.      The method by which Sallie Mae calculates the amount of a late fee – 5%

4  of the payment amount not received or $5.00, whichever is greater -- establishes that

5  it is not, nor is it intended to be compensatory, as the amount of the late fee increases

6  according to the amount of the payment, but the transactional servicing costs do not.

7  Moreover, the rate itself is exorbitant, as it is equivalent to an annual interest rate of

8  120%.

9        7.      For example, the transactional servicing costs for a monthly payment

10  $1,321.51 (the monthly installment payment on education debt of $100,000 at 10%

11  interest for a 10 year term) is the same as it is for a monthly payment of $330.38 (the

12  monthly payment on a debt of $25,000 with the same terms), yet Sallie Mae assesses a

13  late fee of $66.07 as to one, and $16.51 as to the other. Both are far in excess of what

14  implicitly represents the highest cost Sallie Mae actually incurs, $5.00, although it is

15  believed and therefore averred that $5.00 itself still exceeds Sallie Mae's actual costs

16  associated with a late payment on a Private Education Loan.

17        8.      Sallie Mae's late fee charges are punitive in another respect, as well.

18  Although Sallie Mae Private Education Loans are fixed term loans that are repaid in

19  monthly installments of equal amount, Sallie Mae computes and charges daily

20  interest on its Private Education Loans. Accordingly, Sallie Mae continues to earn

21  daily interest on the outstanding principal every day until it is actually repaid. This

22  means that Sallie Mae both assesses the borrower a $5.00 or 5% fee because s/he has

23  not repaid the funds, and, additionally, continues to charge the borrower daily interest

24  for use of the funds. The result is the borrower pays Sallie Mae twice – in two different

25  ways - for being late on a single loan payment.

26        9.      Sallie Mae's late fee liquidated damages provision serves to create a

27  revenue stream for Sallie Mae by unlawfully penalizing borrowers far in excess of its

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

true costs associated with the late payment. In other words, Sallie Mae's late fee does not serve to compensate Sallie Mae for its true damages resulting from not receiving a payment on the scheduled date.  The provision is nothing more than the illegal assessment of a penalty and is therefore unenforceable.

10.    Sallie Mae also violates the law and overcharges borrowers in other respects related to the Private Education Loans.  In particular, Sallie Mae charges interest on the Private Education Loans in excess of the maximum legal limit set by the California Constitution, which is 10 percent per annum.

11.    Sallie Mae determines the annual interest rate to be charged a borrower by taking the prime rate and increasing it by a set amount (referred to as the "margin") according to the credit tier in which Sallie Mae places the borrower at the time the loan is approved. The "margin" ranges from 1.5% to 9.85%.  For example, the margin for a borrower placed in credit tier 5 is 9.85%, and thus if the prime rate were 3%, the interest rate charged the borrower would be 12.85%, and if the prime rate were 10%, the interest charged the borrower would be $19.85%. The "margin" amount (i.e., the amount added to the prime rate) remains the same for the life of the loan.

12.    Because the prime rate fluctuates, the interest rate charged the borrower varies over time even though the margin set by Sallie Mae does not change. Depending upon the prime rate and the amount of the margin, the interest rate charged to student borrowers by Sallie Mae can and has exceeded the 10% legal limit established by the California Constitution   Given that the prime rate has been as high as 9% during the class period, even the most credit worthy borrowers (credit tier 1 with a margin of 1.5%) have been charged usurious interest. (*See* ¶50, Table 2, *infra*.) The interest rate charged student borrowers placed in credit tiers 4 and 5 have exceeded the lawful rate of 10% for the entire class period.

13.    In addition, the *effective rate of interest* on the Private Education Loans is often even higher than the stated annual rate because Sallie Mae assesses a variety

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1  of loan fees, including late fees and supplemental fees upon disbursement and
2  repayment of the loan.

3       14.    Both Sallie Mae's late fees and its supplemental fees charged upon
4  disbursal or repayment of funds constitute additional forms of interest charged by
5  Sallie Mae on the Private Education Loans. Cal. Const., art. XV, § 1.

6       15.    Thus, Sallie Mae has during the class period frequently charged student
7  borrowers usurious interest rates on the Private Education Loans, either directly
8  through the assessment of interest at the variable rate, or indirectly through the
9  assessment of interest at the variable rate in combination with late and/or
10 supplemental fees creating an effective rate of interest in excess of the 10 percent
11 annual limit.

12      16.    As a result of its illegal liquidated damage penalty and usurious interest
13 rates, Sallie Mae has collected and continues to collect millions of dollars from class
14 members to which it is not entitled.  This class action seeks to stop Sallie Mae from
15 continuing to assess these unlawful late payments and interest rates going forward,
16 and to restore to Plaintiffs and class members the amount of unlawful late fees and
17 interest paid on the Private Education Loans, or alternatively to disgorge Sallie Mae's
18 profits from its unlawful conduct to Plaintiffs and class members.

19      17.    Sallie Mae attempts to evade California law and the protections it
20 provides student loan borrowers against punitive, non-compensatory late fees and
21 usurious interest rates by making it appear as if the loans are made by a National
22 Bank or state chartered bank located in a different state, and subject to the laws of the
23 bank's home state, pursuant to the National Bank Act, 12 U.S.C. sections 85, 86, the
24 Federal Deposit Insurance Act, or similar laws. Sallie Mae does so by selecting a
25 National Bank or state chartered bank to include its name on Sallie Mae's preprinted
26 loan application and referring to it as the lender. According to the terms of the
27 promissory note, the loan contract is with the nominee lender.

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

18.     Further, Sallie Mae includes a one-sided assignment clause in its copyrighted promissory notes, and by advance agreement and understanding, the nominee lender assigns the loan contract to Sallie Mae.  Sallie Mae maintains the assignment includes a National Bank Act, Federal Deposit Insurance Act or similar laws' preemption defense, which allows it to charge late fees and interest according to nominee bank's home state laws. In effect, the nominee bank monetizes its National Bank or state bank charter by allowing its name to be used by Sallie Mae, and Sallie Mae pays to use the name of the bank so that it may evade and violate California law. The assignment, however, does not include a National Bank Act or a Federal Deposit Insurance Act preemption defense because the nominee bank did not make the loan and thus has no National Bank Act, Federal Deposit Insurance Act or similar laws preemption defense to assign in the first instance, as the loan is made by Sallie Mae, which is the *de facto* actual lender.

19.     Sallie Mae also attempts to evade California law and the protections it provides student loan borrowers by including in its promissory notes a choice of law provision selecting the law of the state in which the nominee bank is located. However, Sallie Mae's nominee banks have no substantial relationship to the student loan borrowers or the Private Education Loans transactions, as the nominee banks do not set or control the terms and conditions of the loans, do not approve or disapprove borrowers, do not direct disbursement of the loan monies, and do not originate the loans.  As such, there is no nexus sufficient to support or justify application of the choice of law clause and it is unenforceable.

## II.    PARTIES

20.     Plaintiff Tina M. Ubaldi is a citizen of the State of California residing in San Mateo County, California.  On June 24, 2003, Ms. Ubaldi entered into a Private Education Loan agreement in the State of California that has been owned for most or all of the loan's lifetime by Sallie Mae, and serviced since it was made by Sallie Mae,

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1  Inc. (or by Sallie Mae Servicing LLP until it was merged into Sallie Mae, Inc.), which

2  charged her late fees on several occasions. Ms. Ubaldi was a citizen and resident of the

3  State of California at the time she entered this loan on June 24, 2003, and has

4  continued to be a citizen and resident of the State of California at all times since then.

5       21.    Plaintiff Chanee Thurston is a citizen of the State of California residing

6  in Benicia in Solano County, California.  On October 10, 2001 and October 16, 2002,

7  Ms. Thurston entered into Private Education Loan agreements in the State of

8  California that have been owned for most or all of the life of the loans by Sallie Mae,

9  and serviced since they were made by Sallie Mae, Inc. (or by its predecessor that was

10  merged into Sallie Mae, Inc.), which charged her usurious interest as well as late fees

11  on multiple occasions.  Ms. Thurston was a citizen and resident of the State of

12  California at the time she entered into each of these Private Education Loan

13  agreements, and has continued to be a citizen and resident of the State of California at

14  all times since then.

15       22.    Defendant SLM Corporation is a publicly traded Delaware corporation

16  with its principle executive office at 300 Continental Drive,  in Newark, Delaware,

17  according to its 2012 Form 10-K.  Defendant SLM Corporation, directly and/or

18  through one or more of its subsidiaries, is engaged in the business of originating,

19  servicing and purchasing loans that finance the cost of a student's education.

20       23.    SLM Corporation, or its predecessor in interest, the Student Loan

21  Marketing Association, made, as the *de facto* actual lender, Plaintiffs' and other class

22  members' Private Education Loans and serviced them under the name Sallie Mae

23  Servicing LLP, which was a division of Defendant SLM Corporation until December

24  31, 2003, when Sallie Mae Servicing LLP was merged into Sallie Mae, Inc., and

25  thereafter Sallie Mae, Inc. serviced them. Sallie Mae owns Plaintiffs' and other

26  education loans under various names (*e.g.,* Sallie Mae Trust). Sallie Mae owns,

27  manages or services over 11 million student loans totaling more than $235 billion.

28

24.     Defendant Sallie Mae, Inc., a private company, is the corporate management and marketing subsidiary of Defendant SLM Corporation, and services Private Education Loans. Sallie Mae, Inc. has serviced Plaintiffs' loans and other class members' Private Education Loans since they were made to the present, either under its own name or through Sallie Mae Servicing LLP which was merged into Sallie Mae, Inc. in December, 2003. Sallie Mae, Inc. has assessed and collected Late Fees from Plaintiffs and other class members and has charged Plaintiff Thurston and other class members an annual interest rate in excess of 10 percent per annum.

25.     Defendant SLM PC Student Loan Trust 2004-A, purchased Plaintiff Ubaldi's loan on March 25, 2004 and remains the owner of her loan. As the owner of Plaintiff Ubaldi's loan and other Private Education Loans, SLM PC Student Loan Trust 2004-A has and continues to benefit from the assessment and collection of Late Fees and usurious interest.

## III.     JURISDICTION AND VENUE

26.     Jurisdiction of this Court is proper under 28 U.S.C. § 1332 as complete diversity between the parties exists.  Representative Plaintiff Tina M. Ubaldi is a citizen of California residing in San Mateo County.  Representative Plaintiff Chanee Thurston is a citizen of California residing in Solano County, California. Sallie Mae is incorporated in the State of Delaware and has its primary offices in Newark, Delaware.

27.     Upon information and belief, the amount in controversy exceeds $5,000,000 for Representative Plaintiffs and class members collectively, exclusive of interest and costs, by virtue of the revenue and profit reaped by Sallie Mae from its transactions with Plaintiffs and the class, as a direct and proximate result of the wrongful conduct alleged, and by virtue of the injunctive and equitable relief sought.

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

28.     Upon information and belief, based upon the number of Private Education Loans Sallie Mae services annually, the total number of class members is likely to number in the thousands if not hundreds of thousands.

29.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).  Sallie Mae has agents, transacts business or is found within this judicial district.  A substantial portion of the underlying transactions and events complained of occurred in this district, and affected persons who reside or resided, in this judicial district.  Sallie Mae has received substantial compensation from such transactions and business activity in this judicial district, including as the result of servicing student loans for persons residing in this judicial district.  Finally, Sallie Mae resides and/or may be found in this judicial district and the interstate trade and commerce described herein is and has been carried out in part within this judicial district.

IV.   **FACTUAL ALLEGATIONS**

30.     Sallie Mae makes "Private Education Loans" to students to pay for the students' cost of education, including tuition, fees, and associated costs and living expenses, commonly known and marketed by such Sallie Mae brand names as CEC Signature Loans, and which are not guaranteed by the federal government.

31.     Sallie Mae develops and markets its Private Education Loans, creates and copyrights the loan application forms and promissory notes, the loan applications are returned to Sallie Mae, Sallie Mae underwrites and determines whether to approve the borrower, Sallie Mae services the loans and receives all payments, all payments are to be made to Sallie Mae as specified in the promissory note, Sallie Mae provides the funding for the loans, directly and/or indirectly through such means as credit extensions and forward purchase agreements, it directs and controls the disbursement of the loan proceeds, and it insures the loans. In short, Sallie Mae is the *de facto* actual lender.

32.     Borrowers taking out Private Education Loans are required to sign a student loan promissory note.  These student loan promissory notes are standard form contracts of adhesion offered on a "take it or leave it" basis.  Borrowers taking out Private Education Loans have no opportunity to negotiate the terms of their student loan promissory notes.  Each promissory note for the Private Education Loans have the same or materially similar provisions, which, along with Sallie Mae's uniform loan servicing activities, form the basis of Plaintiffs' complaint.[1]

A.     SALLIE MAE CHARGES UNLAWFUL FEES

33.     Private Education Loans that Sallie Mae services require borrowers to make a payment on or before a specific date as established by their repayment schedule.  If a payment is not received by the scheduled date, it is a breach of the promissory note.  Upon a breach for failing to make a payment on time, the borrower is considered in default and Sallie Mae can assess a "Late Charge" as defined by the promissory note.  *See* Exh. 1, ¶¶ A, D5, E and J.

34.     The Private Education Loans define "Late Charge" as follows:  "I will pay a Late Charge if I fail to make any part of an installment payment within 15 days after it becomes due.  The amount of the Late Charge will be identified on my Disclosures."  Exh. 1, ¶ E.  Sallie Mae's Disclosure Statement identifies the Late Charge as follows:  "If any part of an installment is more than 15 days late, you may have to pay a late charge of $5.00 or 5% of the installment, whichever is greater."  While the language in Sallie Mae's Disclosure Statement is *permissive*, Sallie Mae *always* assesses this Late Charge each time a payment is more than 15 days late in the amount of 5% of the amount due, with a minimum charge of $5.00.

---

[1]    An example of a promissory note from the time period in which Plaintiffs took out their loans is attached as Exhibit 1.  Plaintiff Ubaldi's substantively identical promissory note is attached at Exhibit 2.

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

35.    Sallie Mae's transactional servicing costs of a late payment are unaffected by, and have no relationship to, the amount of the payment. For example, the transactional servicing costs for a monthly payment of $1,321.51 (the monthly installment payment on education debt of $100,000 at 10% interest for a 10 year term) is the same as it is for a monthly payment of $330.38 (the monthly payment on a debt of $25,000 with the same terms), yet Sallie Mae assesses a late fee of $66.07 as to one, and $16.51 as to the other. Both of which are far in excess of what implicitly represents the highest cost Sallie Mae actually incurs, $5.00, although it is believed and therefore averred that $5.00 itself still exceeds Sallie Mae's actual costs associated with a late payments on a Private Education Loan.

36.    Although Sallie Mae Private Education Loans are fixed term loans that are repaid in monthly installments of equal amount, Sallie Mae computes and charges daily interest on its Private Education Loans. Accordingly, Sallie Mae continues to earn daily interest on the outstanding principal every day until it is actually repaid. This means that Sallie Mae both assesses the borrower a $5.00 or 5% fee because s/he has not repaid the funds, and, additionally continues to charge the borrower daily interest for use of the funds. The result is the borrower pays Sallie Mae twice - in two different ways - for being late on a single loan payment.

37.    Under California law, a liquidated damages clause such as Sallie Mae's Late Charge is an unlawful penalty if it bears no reasonable relationship to the actual costs that the parties could have anticipated would flow from a breach, or if the amount does not represent the result of a reasonable endeavor to estimate a fair average compensation for any loss that may be sustained. Cal.Civ.Code § 1671.  In a consumer contract, a liquidated damages clause such as Sallie Mae's Late Charge is only allowed if it was impracticable or extremely difficult to fix the actual damages resulting from a breach, which is not the case here.  Cal.Civ.Code § 1671(d).  Sallie Mae's Late Charge violates California Law under both of these principals.

11

38.     The Late Charge is not reasonably related to any damages actually suffered by Sallie Mae due to a late payment.  The accounting for payments made, interest charged, and payments missed is done by a computer with little, if any, human interaction.   Sallie Mae's servicing costs thus are the same no matter the amount of the overdue installment. Yet, Sallie Mae's Late Charge is a percentage of the amount owed, no matter the size of the installment.

39.     It is neither impossible nor extremely difficult for Sallie Mae to fix its actual costs resulting from a late payment.  Indeed, Sallie Mae already specifies in writing that its required late payment penalty may be as little as five dollars.

40.     The true purpose behind Sallie Mae's Late Charge is to punish borrowers who make a payment late, and to create an additional revenue stream for itself.  Sallie Mae is reaping hundreds of millions of dollars in profits from late fees alone. According to Sallie Mae's annual report filed with the Securities and Exchange Commission, Sallie Mae collects late fees as part of its servicing revenue for third party serviced loans, as well as loans in its own portfolio.  2010 10-K, p. F-21.  In its revenue statements, Sallie Mae considers late fees as part of its fee income and records it as "other income" along with forbearance fees in its consolidated statements of income.

41.     In 2007, Sallie Mae earned approximately $134 million from late fees alone, and along with forbearance fees, reported $135.6 million as "Other Income." Sallie Mae's 2007 10-K, pp. 86 and F-64.  In 2008, Sallie Mae collected approximately $143 million in late and forbearance fees (2008 10-K, p. 37), and $146 million in 2009 (2009 10-K, p. 42).

42.     During these same periods, Sallie Mae by comparison collected only a fraction of this amount as actual servicing fees on the loans it services.  In 2007, it collected just over $26 million (2007 10-K, p. F-64), $26 million in 2008 (2008 10-K, p. 37) and $53 million in 2009 (2009 10-K, p. 42).   Thus, Sallie Mae's revenue from late

12

1  fees was on average some 3 to 5 times greater than its actual fees for servicing the

2  loans.  This illustrates that Sallie Mae late fees were not merely compensatory, but

3  instead were a profit center for Sallie Mae and an unlawful liquidated damages

4  penalty charged to Plaintiffs and class members.

5      43.   Sallie Mae's 2010 10-K indicates that service revenue for its Consumer

6  Lending segment primarily includes late fees and forbearance fees.  2010 10-K, p. 49.

7  This is the segment that includes originating and servicing Private Loans specifically.

8  Sallie Mae netted service revenue for its Consumer Lending segment totaling $72

9  million in 2010, $70 million in 2009, and $65 million in 2008.

10      44.   Because Sallie Mae charges interest daily until it receives a payment, the

11  only actual cost of a late payment is the transactional cost associated with the late

12  payment.  The manner in which Sallie Mae computes the late fees its assesses on

13  Private Education Loans – as a percentage of the payment -- establishes that the late

14  fee is as a matter of fact and law not compensatory since its transactional costs do not

15  increase based on the amount of the late payment. It is rather a penalty exacted to

16  create a revenue source and, as such, it is an unlawful liquidated damages provision

17  under California law.  Plaintiffs further believe and therefore aver that the $5.00

18  minimum late charge itself still exceeds Sallie Mae's actual costs associated with late

19  payments on a Private Education Loan, and likewise is an unlawful liquidated

20  damages provision under California law.

21      **B.**   **SALLIE MAE CHARGES USURIOUS INTEREST RATES**

22      45.   California law limits the amount of interest that may be charged on loans

23  such as the Private Education Loans to 10% annually.  *See* Cal. Const., art. XV, § 1(1)

24  (Permitting the charging of interest based upon a written contract "[f]or any loan or

25  forbearance of any money, goods, or things in action, if the money, goods, or things in

26  action are for use primarily for personal, family, or household purposes, at a rate not

27  exceeding 10 percent per annum").  This limit applies not only to annual percentage

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

rates referred to by a lender as "interest" but also includes interest charged in the form of fees.  *Id.* ("No…corporation shall by charging any fee…or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action.").

46.     Sallie Mae's Private Education Loans accrue interest from the date of disbursal until payment in full at a "Variable Rate" set by Sallie Mae.  *See* Exh.1  ¶ C.1.

47.     The Variable Rate is defined as:

> the annual rate equal to the sum of the highest Prime Rate published in The Wall Street Journal Credit Markets' section, "Money Rates' table on the fifteenth day of the last month of the quarter prior to a borrower's Disbursement or Change Date plus or minus the percentage as identified on my Disclosure Statement, which is hereby incorporated into this Note, per annum (the "Margin") and rounded to the nearest one-eighth (0.125) of one percent.  (For example, the Variable Rate for each quarter beginning January 1st will be determined by the applicable Prime Rate published on the preceding December 14th.)  The Margin is based on my School, credit history and co-borrower-s credit history. Once set, the Margin does not change.  The actual interest rate during the quarter in which my loan is disbursed will be on my Disclosure Statement."

Exh.1  ¶ C.2.  Thus, in any given quarter, Sallie Mae charges interest on the Private Education Loans at a Variable Rate equal to the (variable) Prime Rate plus the (fixed) Margin set by Sallie Mae and identified in the borrower's disclosure statement.

48.     During the Class Period, the federal Prime Rate fluctuated between 3.25% and 9.5%. *See* historical data for Federal Prime Rate available at http://www.federalreserve.gov/releases/h15/data.htm.  The Prime Rate published in the Wall Street Journal reflects the federal Prime Rate, and, accordingly, also ranged between 3.25% and 9.5% during the Class Period.

49.     The fixed Margin added to the Prime Rate and charged to student borrowers was set between 1.5% snf 9.85% based upon Sallie Mae's estimation of

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

borrower's creditworthiness, as indicated in a Chart ("Table 1") provided by Sallie Mae to Career Education Services in 2002:

## CEC SIGNATURE LOANS

| Credit Tier | Interest Rate | Disbursement Fee | Repayment Fee |
|---|---|---|---|
| 1 | Prime + 1.5% | 4% | 0% |
| 2 | Prime + 2.5% | 4% | 0% |
| 3 | Prime + 4.0% | 4% | 0% |
| 4 | Prime + 5.5% | 6% | 0% |
| 5 with a co-borrower | Prime + 8.0% | 6% | 0% |
| 5 w/o a co-borrower | Prime + 9.85% | 6% | 0% |

(Exh.7, 08/20/02 Letter from Sallie Mae to CEC, at SNB00070).

50.     As reflected in the chart below ("Table 2"), the Variable Interest Rate charged borrowers who Sallie Mae placed in Credit Tiers 5 and 5 (w/o co-borrower) always exceeded the 10% annual limit during the class period, and has been as much as 19.35 percent per annum (nearly double the legal limit).



15

51.     In addition, the effective rate of interest charged by Sallie Mae on the Private Education Loans was in some cases even higher than the Variable Rate, because Sallie Mae assesses a variety of loan fees, including late fees, supplemental fees upon disbursement and repayment of the loan, and forbearance fees.

52.     Sallie Mae charges a "Late Charge" whenever a student borrower fails to make any part of an installment payment within 15 days after it becomes due. *See* Exh. 1, ¶ E.  Sallie Mae's Disclosure Statement identifies the Late Charge as follows: "If any part of an installment is more than 15 days late, you may have to pay a late charge of $5.00 or 5% of the installment, whichever is greater."

53.     Sallie Mae also charges a "Supplemental Fee" on the Private Education Loans upon disbursement of the loan proceeds, and/or when the loan entered repayment status (and after unpaid interest accrued while the student borrower was in school had been capitalized).   Exh. 1, ¶F(1,2).   The amount of the Supplemental Fees was set based upon "a percentage of the principal balance" of the loan and may include any capitalized interest.  *See id.*

54.     Sallie Mae's Late Charges and Supplemental Fees constitute additional forms of interest charged by Sallie Mae on the Private Education Loans. Cal. Const., art. XV, § 1.  These fees are devices by which Sallie Mae earns additional profit on the Private Education Loans rather than remuneration for any expense.

55.     Because Sallie Mae charged additional interest to student borrowers through its fees, including Late Charges and Supplemental Fees, even if the Variable Rate itself did not exceed the legal limit of 10 percent per annum, the overall interest charged by Sallie Mae on a student borrower's Private Education Loan could, and, upon information and belief, in many cases did, still exceed the legal limit.

56.     Thus, Sallie Mae has charged a large number of student borrowers usurious interest rates on the Private Education Loans, either directly through the assessment of the Variable Rate, or indirectly through the assessment of interest at

the Variable Rate in combination with the assessment of interest through fees such as Late Charges and/or Supplemental Fees that together create an effective rate of interest in excess of the 10 percent annual limit.

57.     Sallie Mae earned billions of dollars of interest on its Private Education Loans throughout the class period, both directly through the assessment of interest at the Variable Rate and indirectly through the assessment of fees, including millions of dollars in interest to which it was not entitled and which it was not permitted to charge under California law.

58.     In 2007, Sallie Mae earned approximately $2,582 million ($2.582 billion) in net interest income on its Private Education Loans, which constituted 36% of Sallie Mae's overall "Core Interest Income" prior to provision for loan losses.  (2009 10-K, pp. 15, 60)  Net interest income earned on the Private Education Loans was $1,551 million ($1.551 billion) in 2008 and $1,546 million ($1.546 billion) in 2009.  (2010 10-K, p.47)

59.     Sallie Mae cannot justify the usurious interest rate it charges borrowers on the Private Education Loans in violation of California law, and the interest it received unlawfully represents a windfall to Sallie Mae.  This is particularly true given that private education loans are not dischargeable in bankruptcy, *see* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (P.L. 109-8, 10/17/2005), codified at 11 U.S.C § 523(a)(8), thereby ensuring that Sallie Mae will be repaid its principal and any amounts of interest that it charged on the Private Education Loans.

**C.     SALLIE MAE USES NOMINEE BANKS AS PURPORTED LENDERS TO MANUFACTURE A PREMPTION DEFENSE TO EVADE STATE LAW**

60.     Sallie Mae attempts to evade California law and the protections it provides student loan borrowers against punitive, non-compensatory late fees and usurious interest rates by making it appear as if the loans are made by a National

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

Bank or state chartered bank located in a different state, and subject to the laws of the bank's home state, pursuant to the National Bank Act, 12 U.S.C. sections 85, 86, the Federal Deposit Insurance Act, or other similar laws. Sallie Mae does so by selecting a National Bank or state chartered bank and including its name in its preprinted loan application and referring to it as the lender. According to the terms of the promissory note, the loan contract is with the purported lender.

61.     Further, Sallie Mae includes a one-sided assignment clause in its copyrighted promissory notes, and by advance agreement and understanding, the nominee lender assigns the loan contract to Sallie Mae. Sallie Mae maintains the assignment includes a National Bank Act, Federal Deposit Insurance Act or similar preemption defense, which allows it to charge late fees and interest according to nominee bank's home state laws. In effect, the nominee bank monetizes its National Bank or state bank charter by allowing its name to be used by Sallie Mae, and Sallie Mae pays to use the name of the bank so that it may evade and violate California law. The assignment, however, does not include a National Bank Act preemption defense because the nominee bank did not make the loan and thus has no National Bank Act, Federal Deposit Insurance Act or similar preemption defense to assign in the first instance, as the loan is made by Sallie Mae, which is the *de facto* actual lender.

62.     Sallie Mae has financial relationships with banks which it refers to as "lender-partners."  Sallie Mae enters into what it has called and what in substance are "forward purchase commitment agreements" with these "lender-partner" banks. Under these agreements, the "lender-partner" bank purportedly acts as the lender of record, but in reality Sallie Mae makes the Private Education Loans by funding them through a standing credit arrangement with the "lender-partner" and/or by a standing obligation to purchase - immediately or shortly after complete disbursement of the loan is made - the Private Education Loans from the banks at rates set by the forward purchase commitment agreements. Moreover, the Private Education Loans also use

18

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

Sallie Mae's own underwriting, copyrighted forms, promissory notes, brands and/or proprietary platforms to initiate the loans and Sallie Mae services the Private Education Loans.

63.   For instance, Sallie Mae has cultivated such a financial relationship with "lender-partner" Stillwater National Bank ("Stillwater"), a national bank located in Oklahoma that Sallie Mae identified as the lender on Plaintiffs' application forms.  As reflected in the 10-K filed by Southwest Bancorp Inc. (Stillwater's parent company) for 2010:

> student lending … is substantially dependent on Student Loan Marketing Administration ("Sallie Mae"), which provides substantially all of the servicing for government guaranteed and private student loans and provides liquidity through its purchases of student loans and lines of credit.  Southwest makes government guaranteed student loans and private student loans.  At December 31, 2010, all private student loans were self-insured by Sallie Mae.

64.   Upon information and belief, national or state-chartered banks such as Stillwater have no true role or relationship to the loans that are made by Sallie Mae in their names, and merely maintain bank accounts from which Sallie Mae can issue disbursements and/or be reimbursed for the money it disperses directly to students. Sallie Mae also makes lines of credit available to its "lender-partners" with lines of credit that they can draw upon for the purpose of funding such loans as directed by Sallie Mae.  Moreover, because the third-party banks transfer the Private Education Loans to Sallie Mae after origination under a pre-arranged agreement as described herein, the third-party banks never truly undertake the risk of loss.

65.   Sallie Mae exerts control and ownership over all Private Education Loans in other ways as well.  Sallie Mae carries out all interactions with the borrowers applying for the Private Education Loans, establishes and controls the terms and conditions under which the Private Education Loans are offered. It approves or denies borrowers' Private Education Loan applications in accordance with its own underwriting policies, uses its own copyrighted forms, promissory notes, brands and

1  platforms, and disburses the payments to those borrowers who it approves for Private

2  Education Loans.

3     66.   Sallie Mae collects and keeps the vast majority of fees and interest on the

4  loans.   This arrangement is effectuated pursuant to materially-similar assignment

5  clauses that Sallie Mae includes in its copyrighted promissory notes for the Private

6  Education Loans.  The assignment provisions are one-sided, stating that the lender

7  (but not borrower) "may assign this loan at any time" and "if… assigned, the Assignee

8  will become the owner of this Note and will have all your rights to enforce this Note

9  against me."

10     67.   Sallie Mae bears the credit risk on all the Private Education Loans.

11  Sallie Mae insures and/or guarantees the Private Education Loans so that Sallie Mae

12  bears the risk of loss on the loans even prior to purchasing them.   Sallie Mae then

13  assumes the risk of loss directly when it executes the assignments of the Private

14  Education Loans pursuant to the forward purchase commitment agreements.

15     68.   In reality, Sallie Mae is the *de facto* actual lender for its Private

16  Education Loans.  Sallie Mae owns and markets the Private Education Loans brands,

17  and underwrites the loans, directs the terms of the loans, funds the loans directly or

18  indirectly, does all of the work to service the loans, bears the credit risk, and reaps

19  most or all of the fees and profits from the Private Education Loans.

20     69.   None of the Private Education Loans are made by national banks, within

21  the meaning or application of NBA §§ 85 and 86, nor are they made by qualifying bank

22  entities under parallel state charters as provided by the Federal Deposit Insurance

23  Act or other similar laws.

24  **D.   THE UNITED STATES DEPARTMENT OF THE TREASURY FOUND THAT
25     THE PRIVATE EDUCATION LOANS WERE MADE BY SALLIE MAE**

26     70.   In 2002, the Department of the Treasury determined that Sallie Mae

27  predecessor in interest Student Loan Marking Association (SLMA) was originating

28

20

loans (and incorrectly attributing these loans to its banking partners) even though it was a Government Sponsored Entity and forbidden to engage in loan origination activities.

71.     In correspondence dated August 30, 2002 to the Department of the Treasury Office of Sallie Mae Oversight (OSMO), Sallie Mae disputed the Treasury's draft findings, *see* Exhibit 4 at UST-Ubaldi 011, and explained its activities as follows:

> SLMF does not make Career Training Loans.  Rather, the GSE has entered into loan purchase agreements with various lenders under which the GSE provides loan origination services and loan servicing to the lenders and purchases loans from the lenders.  Copies of the various loan purchase agreements are available upon request.  The GSE in turn subcontracts the loan origination servicing and the loan servicing functions to SLMF. The loan purchase agreements between the GSE and its lender partners governing Career Training Loans are very similar to the ExportSS agreements that the GSE enters into with its FFELP lender clients.  In all cases, the Career Training Loans are actually made by federally chartered or state chartered lenders.  The lenders make these loans with their own funds. Further, each lender in the Career Training Loan program represents and warrants in the loan purchase agreements that it is the sole owner of the loans free and clear of any liens, claims or encumbrances of any nature, and is free to transfer title to the loans to the GSE.  Furthermore, the lenders have the right to retain 20 percent of the original principal balance of all Loans that they make under the Career Training Loan Program. This is consistent with the terms of the GSE's loan purchase agreements in the Signature Loan Program.

72.     Notwithstanding Sallie Mae's objections, in its final September 2002 Report of Examination of the Student Loan Marketing Association[2], the OSMO reiterated its initial determination that this activity as structured constituted loan origination by Sallie Mae, stating:

---

[2] Neither Sallie Mae's Aug. 2002 letter nor the OSMO's Sept. 2002 Report of Examination is publicly available.  These documents were obtained by Plaintiff Ubaldi through a subpoena served on the Department of Treasury in connection with this action.

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

**Origination versus Secondary Market Activity**.  The
GSE purchases loans in the secondary student loan market; it
generally does not originate student loans for its own account.
In 1998, SLM Corporation had extensive discussions with
Treasury about its plans to originate federally insured student
loans for its own account (the Origination Program).  Treasury
stressed the ban on direct and indirect funding of non-GSE
affiliate loan origination activity by the GSE.  In 1998, SLM
Corporation's Management represented to Treasury that the
Origination Program would be conducted separately from the
GSE.  In a legal memorandum dated March 31, 1998,
Management represented to OSMO that the Origination
Program would "not be funded with proceeds from debt issued
by the GSE and … loans made under the program [would] not be
sold to the GSE." Thus, all apparently understood and
acknowledged it would undermine the statutory restriction on
loan origination by the GSE, if a non-GSE affiliate originated
loans and the GSE then purchased the loans.  This point was
again acknowledged in the Nellie Mae acquisition in 1999, when
Management represented in a letter to Treasury dated May 21,
1999, that "no loans originated by [Nellie Mae] will be
transferred to the GSE."  Based on SLMF's relationship with its
banking partners, OSMO concluded that SLMF, in substance
originates loans.  Further, the Holding Company has
consistently represented, via its filings with the Securities and
Exchange Commission, that SLMF originates its loans.

Exhibit 5, September 2002 OSMO Report of Examination at 5.

73.     Subsequently, in a 2006 draft report first published on its website in

2011, the federal Office of Sallie Mae Oversight (OSMO) also stated:

Based on its examination of SLMA's relationship with its
funding bank partners, OSMO concluded that SLMA, in
substance, was originating certain private loans.  The funding
banks did not take long-term possession of the notes signed by
the student borrowers, nor did they assume the credit risk
associated with the notes.  The GSE [SLMA] unconditionally
purchased the notes, generally within a month, even in case of
the borrower's death.  Further, the economic substance of the
payments by SLMA to the funding banks reflected loan
origination via a "storefront" rather than second market activity.

Exhibit 6, Excerpts of OSMO 2006 Draft Report, at p.142.

22

74.     The OSMO Report further explained, "[i]n a true secondary market, a bank would sell its asset into the secondary market (i.e., to Sallie Mae) at its fair value.  However, in practice that was not how these loans 'sold' to Sallie Mae were priced." *Id*. at 142 n. 199. Instead, "[t]he loans were sold to Sallie Mae by its "storefront banks" at cost plus interest during the holding period rather than at fair value.  This was, in effect, origination by SLMA." *Id*.

**E.     DISCOVERY PRODUCED IN THIS ACTION CONFIRMS THAT SALLIE MAE MADE PLAINTIFFS' LOANS AND WAS THE *DE FACTO* ACTUAL LENDER FOR PLAINTIFFS' LOANS**

75.     Consistent with the OSMO's conclusion based upon its 2002 examination of Sallie Mae, discovery in this action to date, specifically including the ExportSS® form agreement between Sallie Mae and its lender partner Stillwater Bank, confirms Sallie Mae was the *de facto* actual lender for its Private Education Loans, including those loans made to Plaintiffs.

76.     On July 1, 2002, SLMA and Stillwater entered into an ExportSS® Agreement.  The ExportSS® is a form agreement that Sallie Mae used with multiple of its "lender-partners" in connection with the origination of the Private Education Loans.  A copy of the ExportSS® Agreement between Sallie Mae and Stillwater and amendments thereto is attached as Exhibit 7.

77.     The ExportSS® Agreement refers to Sallie Mae as the entity originating the Private Education Loans. *See* Exh. 7 at SNB000003 ("You and we agree that only we [Sallie Mae] and our affiliates will originate and process" the Private Education Loans).

78.     The ExportSS® Agreement establishes that Stillwater did not assume any risk of loss on the Private Education Loans.  Instead, Sallie Mae assumed the risk of loss on the Private Education Loans, since it required Stillwater to assign and sell the loans to Sallie Mae within a matter of months, and it required Sallie Mae to buy

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1  the entire interest in those Private Education Loans. *See* Exh. 7 at SNB000018 ("you

2  agree to offer to us on the sales schedule set forth below… all Eligible Private Loans

3  originated by us or our affiliate"); *id.* at SNB00019 ("we **will** purchase all Eligible

4  Private Loans that we originate on your behalf") (emph. added).

5      79.    The ExportSS® Agreement demonstrates that Sallie Mae controlled the

6  terms and conditions of the loans.  In particular, under the Agreement, Sallie Mae

7  could, but was not "obligated" to use its own underwriting standards and would

8  approve or deny borrowers without consulting Stillwater. Exh. 7 at SNB00004-5,

9  00079-81. Sallie Mae would supply the "design template" for the promissory note,

10 loan application forms, and related marketing materials, *id.* at SNB00011, and Sallie

11 Mae reserved final rights of approval on the forms.  *Id* ("You further agree that you

12 will not alter the content or description of Application Materials without our express

13 written consent. Sallie Mae shall have final approval of Application Materials prior to

14 distribution.").

15     80.    The ExportSS® Agreement establishes that the purported "lender"

16 identified on the loan application forms never actually paid any money to the schools

17 attended by the student borrowers.  Instead, the ExportSS® Agreement specifies that

18 loan monies are to be disbursed by Sallie Mae from its own accounts to the schools

19 attended by the students.  *See* Exh. 7 at SNB00005 ("We will disburse Loan

20 proceeds… Funds for these Loans will be drawn from a bank account maintained by

21 us").

22     81.    At the time that Sallie Mae predecessor in interest SLMA entered into

23 the ExportSS® Agreement with Stillwater Bank any loans it made would not be

24 protected by federal preemption as SLMA was not a bank.  Thus, as the ExportSS®

25 Agreement demonstrates, Sallie Mae and its lender partners engaged in a subterfuge

26 in which Stillwater was named as the lender of record, even though Sallie Mae made

27 the loan and was the *de facto* actual lender.

28

82.    Nominee lenders such as Stillwater made short-term business loans to Sallie Mae; nominee lenders such as Stillwater did **not** make loans to student borrowers.  Beginning in or about 2005, Sallie Mae in some instances paid the nominee lender a lower interest rate on the funds than it charged the borrowers (during the 90 to 180 day period between disbursement and assignment and sale of the loan to Sallie Mae), further demonstrating that the banks were effectively providing Sallie Mae with a short-term credit facility rather than making loans to student borrowers. (Stillwater Form 10-K, 2005, p. 26)

83.    In sum, as reflected in the ExportSS® form agreement between Sallie Mae and Stillwater Bank, national or state-chartered banks such as Stillwater have no true role or relationship to the loans that are made by Sallie Mae in their names.

### F.    SALLIE MAE INCLUDES AN UNENFORCEABLE CHOICE OF LAW PROVISION DESIGNED TO EVADE CONSUMER PROTECTION LAWS

84.    Sallie Mae includes a self-serving choice-of-law provision in its copyrighted promissory notes, selecting the law of the nominee lender's home state. The promissory note states: "I understand that you are located in the State listed on the front of the attached application and this Note will be entered into in the same State.  Consequently, the provisions of this Note will be governed by federal laws and the laws of that State, without regard to conflict of law rules."  Exh. 1, ¶L.3.

85.    The law selected by Sallie Mae's choice-of-law provision bears no substantial or reasonable relationship to the parties or the Private Education Loan transactions because the nominee banks have no involvement in the making of the Private Education Loans and are not the actual lenders for the Private Education Loans. The provision is therefore unenforceable.

86.    For instance, although Sallie Mae's promissory note would make Plaintiffs' loans subject to Oklahoma law, Sallie Mae does not maintain its principal place of business in Oklahoma.  Conversely, while nominee lender Stillwater Bank is

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1  located in Oklahoma, it has no involvement in making or servicing the loans, and has

2  no relationship whatsoever with the Plaintiffs.  In fact, under the arrangement

3  between Sallie Mae and Stillwater, the identity of individual borrowers only becomes

4  known to Stillwater (if ever) after the loan is made by Sallie Mae and after the funds

5  have been disbursed by Sallie Mae.  *See* Exh. 7, SNB 000005 ("we will send two

6  master checks to each school…together with a disbursement roster… and we will send

7  you a copy of the portion of the disbursement roster that lists information for your

8  borrowers").

9          87.    Under these circumstances, there is no nexus between the student

10  borrowers who took out the Private Education Loans in California and the foreign

11  state law chosen by Sallie Mae, and it would be contrary to law and equity for law

12  other than the law of California to apply.

**V.    REPRESENTATIVE PLAINTIFFS AND THE CLASSES**

14         **A.    PLAINTIFF TINA UBALDI**

15         88.    On June 24, 2003, Plaintiff Tina M. Ubaldi took out a Private Education

16  Loan in California referred to as a CEC Signature Education Loan in the total amount

17  of $22,765.00, which was disbursed to her as follows: $17,756.96 on June 24, 2003 and

18  $5,918.64 on October 13, 2003.  (Exh. 8).  This loan was co-signed by Lamoyne L.

19  Porter, II, who was at the time and has since then been a California resident.  (Exh.

20  9).  This loan was used to help Ms. Ubaldi pay for her education at the California

21  Culinary Academy in San Francisco, California.  This loan was made by Sallie Mae, or

22  its predecessor in interest, the Student Loan Marketing Association, pursuant to a

23  forward purchase commitment agreement with Stillwater National Bank intended to

24  disguise Sallie Mae's role as the *de facto* actual lender.

25         89.    On or before December 18, 2003, this loan was assigned to Sallie Mae or

26  its predecessor in interest, the Student Loan Marketing Association.

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

90.     On March 25, 2004, SLM PC Student Loan Trust 2004-A purchased Plaintiff Ubaldi's loan and remains the owner of her loan.

91.     Sallie Mae, operating as Sallie Mae Servicing LLP and later as Sallie Mae, Inc. has serviced Plaintiff Ubaldi's Private Education Loan since its inception. (Exh. 8).

92.     Plaintiff Ubaldi applied for her CEC Signature Education Loan using a loan application form copyrighted and written by Sallie Mae in May 2003.  The "CEC Loan Application" listed Sallie Mae's name and telephone number prominently on the top of the form, and directed Plaintiff to "Mail application to: Sallie Mae Servicing" in Panama City, Florida.  (Exh. 10).

93.     On May 30, 2003, Plaintiff Ubaldi received a letter from Sallie Mae's "Loan Origination Department" located in Panama City, Florida, that her application was approved and that Sallie Mae would disperse her loan funds in accordance with the schedule set by her school.  (Exh. 11).  This was some six (6) months before the loan was assigned to Sallie Mae.

**B.   PLAINTIFF CHANEE THURSTON**

94.     On October 10, 2001 and October 16, 2002, Plaintiff Chanee Thurston took out Private Education Loans in California referred to as CEC Signature Education Loans in the total amounts of $10,600.00 and $6,240, which included charges for supplemental disbursement fees in the amounts of 6% and 4% of the loans respectively.  (Exhs. 12, 13, and 14).  These loans were used to help Ms. Thurston pay for her education at Brooks College in Long Beach, California.  These loans were made by Sallie Mae, or its predecessor in interest, the Student Loan Marketing Association, pursuant to a forward purchase commitment agreement with Stillwater National Bank intended to disguise Sallie Mae's role as the *de facto* actual lender.

95.     Upon information and belief, Ms. Thurston's October 10, 2001 and October 16, 2002 Private Education Loans were assigned to Sallie Mae or its

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

1    predecessor in interest, the Student Loan Marketing Association, shortly after

2    disbursement.

3         96.    Sallie Mae, operating as Sallie Mae Servicing LLP and later as Sallie

4    Mae, Inc. has serviced Plaintiff's October 10, 2001 and October 16, 2002 Private

5    Education Loans since their inception.  (Exh. 12 and Exh. 14).

6         97.    On June 30, 2001 and October 16, 2002, Plaintiff Thurston received a

7    letters from Sallie Mae's "Loan Origination Department" located in Panama City,

8    Florida, stating that her applications were approved and that Sallie Mae would

9    disperse her loan funds in accordance with the schedule set by her school.  (Exhs. 12

10   and 14).  As reflected in the letters and/or enclosed Truth in Lending disclosure forms,

11   the marginal interest added to the prime rate on Plaintiff Thurston's October 10, 2001

12   and October 16, 2002 Private Education Loans was 8% and 1.5%, respectively.  (Exhs.

13   12, 13, and 14)

14        98.    Plaintiff Thurston was charged a Supplemental Fee at the time of

15   disbursement on both the June 30, 2001 and October 16, 2002 Private Education

16   Loans.  (Exhs. 12, 14 at 2)

17        **C.    PLAINTIFFS' PRIVATE EDUCATION LOANS**

18        99.    Like all other Private Education Loans made by Sallie Mae, Plaintiffs

19   Ubaldi and Thurston received a standard form promissory note copyrighted and

20   written by Sallie Mae for their CEC Signature Education Loans.[3]  (*See, e.g.,* Exh. 1).

21   This promissory note could not be modified or otherwise negotiated by Plaintiffs or

22   other borrowers since it was offered to them solely on a take it or leave it basis, and

23   included statements such as "THIS IS A NON-NEGOTIABLE CONSUMER NOTE."

24   (*Id.* at 3).

25

26

27   _____
     [3]   The "Signature Student Loan" name is a registered trademark of SLM Corporation
     (Sallie Mae).

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

100.   Like all other Private Education Loans made by Sallie Mae, Plaintiffs'
promissory notes included a *one-sided* assignment clause providing "If this Note is
assigned, the Assignee will become the owner of this Note and will have all your rights
to enforce this Note against me" and "I may not assign this Note or any of its benefits
or obligations.  You may assign this Note at any time."  (*See, e.g.,* Exh. 1 at ¶L.2 and
¶L.10)

101.   Like all other Private Education Loans made by Sallie Mae, Plaintiffs'
promissory notes included a choice-of-law clause providing "I understand that you are
located in the State listed on the front of the attached application and this Note will be
entered into in the same State.  Consequently, the provisions of this Note will be
governed by federal laws and the laws of that State, without regard to conflict of law
rules." (*See, e.g.,* Exh. 1 at ¶L.3)

102.   Like all other Private Education Loans made by Sallie Mae, Plaintiffs'
promissory notes for their Private Education Loans include a promise to pay such as "I
will make consecutive monthly payments during the Repayment Period in the
amounts and on or before the payment due dates shown on my statements until I have
paid all of the principal and interest and any other charges I may owe on this Note."
(*See, e.g., Id.* at ¶D.2).[4]  In the event Plaintiffs or other borrowers fail to make the full
monthly payment when due, the standard form promissory note permits Sallie Mae to
declare the loan in default and demand immediate payment of the entire loan balance,
including all Late Charges (*see, e.g., Id.* at ¶I.1), or continue the loan and assess a Late
Charge. (*See, e.g., Id.* at ¶E).  The standard form promissory note provides for a Late
Charge, and makes it clear that the Late Charge will be paid first from any future
payments from the borrower.  (*See, e.g., Id.* at ¶¶D.7; E).

---

[4]   Plaintiffs' promissory notes, like the promissory notes for all other Private
Education Loans, includes provisions for the deferment of payments during the
borrower's schooling and otherwise of which Plaintiff Ubaldi received several from
Sallie Mae since the loan was initiated.  (*See, e.g., Id.* at ¶¶B.1;D.1).

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

103.    Like all other Private Education Loans made by Sallie Mae, the Late Charge provided for under Plaintiffs' promissory notes was the greater of 5% of the installment or $5.00 for any payment not made within 15 days after the due date. While all promissory notes for the Private Education Loans require the materially same Late Charge, some promissory notes specifically state the greater of $5.00 or 5% language directly in the standard form promissory note, while other standard form promissory notes state that a Late Charge will be assessed if a payment was more than 15 days late, and that the terms of this Late Charge would be disclosed in a subsequent Disclosure Statement.

104.    Plaintiffs' promissory notes, like all other promissory notes of all other Sallie Mae Private Education Loans, provided that the interest would be determined, as follows:

> the annual rate equal to the sum of the highest Prime Rate published in The Wall Street Journal Credit Markets' section, "Money Rates' table on the fifteenth day of the last month of the quarter prior to a borrower's Disbursement or Change Date plus or minus the percentage as identified on my Disclosure Statement, which is hereby incorporated into this Note, per annum (the "Margin") and rounded to the nearest one-eighth (0.125) of one percent.  (For example, the Variable Rate for each quarter beginning January 1st will be determined by the applicable Prime Rate published on the preceding December 14th.)  The Margin is based on my School, credit history and co-borrower-s credit history.  Once set, the Margin does not change. The actual interest rate during the quarter in which my loan is disbursed will be on my Disclosure Statement."

Exh. 1 ¶C.2.

105.    Plaintiffs' promissory notes, like the promissory notes of all other Sallie Mae Private Education Loan borrowers, provided for the collection of Supplemental Fees, specifically including a disbursement fee based upon a "percentage of the principal balance of my loan" which Sallie Mae could either "deduct from the disbursement or add to the principal loan balance" of the loan, and a repayment fee

30

1   that would be "a percentage of the principal balance of my loan after unpaid interest

2   accrued during the Interim Period is capitalized." (*See, e.g.*, Exh. 1, ¶F.1,2)

3       106.   Plaintiffs received several standard form Disclosure Statements from

4   Sallie Mae for their Private Education Loans, each providing that a Late Charge of the

5   greater of 5% of the installment or $5.00 may be charged for any payment not made

6   within 15 days after the due date. (Exhs. 2, 4, 14). Whether specifically stated in the

7   standard form promissory note or in a separate Disclosure Statement incorporated

8   and made part of the promissory note by reference, all promissory notes for the

9   Private Education Loans serviced by Sallie Mae require materially the same Late

10  Charge. These Late Charges are collected and retained by Sallie Mae, whether it

11  owns and services or just services the Private Education Loans.

12      107.   Plaintiffs, like all other borrowers of Private Education Loans made by

13  Sallie Mae, did not know what costs Sallie Mae (and the named lender if purportedly

14  different than Sallie Mae) incurred as a result of borrowers' late payments. Neither

15  Sallie Mae nor the named lender (if purportedly different than Sallie Mae) disclosed to

16  Plaintiffs, borrowers or the public at large the costs associated with each late payment

17  for Private Education Loans. Nor did Plaintiffs or other borrowers of Private

18  Education Loans have any reason to suspect that the Late Charge assessed by Sallie

19  Mae exceeded the true costs associated with the late payment, or that the Late Charge

20  violated applicable law. Indeed, Sallie Mae is one of the largest educational loan

21  providers and servicers in the United States, providing and servicing millions of

22  education loans. Plaintiffs and other borrower class members' promissory notes and

23  related documents were replete with disclosures and other provisions touted therein

24  as being required by law. As such, Plaintiffs and other borrower class members' had

25  no reason to believe that Sallie Mae would fail to comply with applicable law with

26  respect to the Late Charges, and they reasonably trusted and relied on Sallie Mae to

27  assess any Late Charges on their Private Education Loans in accordance with

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1   applicable law.  As described throughout this Complaint, unbeknownst to Plaintiffs

2   and other borrower class members, Sallie Mae violated applicable California law by

3   assessing them an unlawful Late Charge in excess of its true costs of the late

4   payments.

5         108.    Sallie Mae charged Plaintiff Ubaldi 5% of the amount of the installment

6   each time Plaintiff Ubaldi was more than 15 days late in making a payment as a Late

7   Charge, as 5% of the payment was greater than the $5.00 minimum.  For example, on

8   August 12, 2007, Plaintiff had a "Past Due Amount" of $329.43 on her Private

9   Education Loan and was charged a "Late Fee" of $16.47 by Sallie Mae, which is 5% of

10   the late payment.  (Exhs. 15, 16).  Plaintiff incurred additional Late Charges for her

11   Private Education Loan that were assessed by Sallie Mae on the same basis on at

12   least the following occasions:  December 16, 2007, November 30, 2008, June 25, 2009

13   and September 25, 2009.  (Exhs. 17-21).

14         109.    Plaintiff Ubaldi paid Sallie Mae for each of the Late Charges set forth in

15   the preceding paragraph since she made subsequent payments on her Private

16   Education Loan.  (Exhs. 15-21).  Indeed, pursuant to her promissory note, Plaintiff

17   Ubaldi's subsequent payments made after being assessed a Late Charge were applied

18   first to pay the Late Charge before being applied to the interest and principal owed on

19   her loan. (Exh. 1, ¶D.7)

20         110.    Plaintiff Thurston has been charged Late Charges in the amount of $5.00

21   or 5%, whichever was greater, on repeated occasions throughout the duration of her

22   Private Education Loans up to the present day, and including in 2012.  Thurston paid

23   Late Charges on the Private Education Loans, including in 2012.

24         111.    The Late Charges Plaintiffs and other borrower class members incurred

25   had no reasonable relationship to the actual damages Sallie Mae suffered as a result

26   of Plaintiffs and other borrower class members making a payment late, and do not

27   represent an amount Sallie Mae estimated to be fair compensation for any losses it

28

sustained as a result of the late payment.  Instead, the Late Charges Plaintiffs and other borrower class members incurred were punitive, liquidated damages assessed for the sole purposes of encouraging Plaintiffs and other borrower class members to pay on time and to generate profit for Sallie Mae, which violates applicable California law.

112.    Sallie Mae also charged and received, and continues to charge and receive, interest from Plaintiff Thurston in excess of 10% per annum on her 2001 and 2002 Sallie Mae Private Education Loans.  (Exhs 13, 14 at 2)  Plaintiff Thurston was placed in credit tier 5 (with a co-borrower) and charged a Margin of 8% above the Prime Rate on her 2001 Private Education Loan. (Exh. 3; Exh. 12)  Since 2001, the Prime Rate has never fallen below 3.25%.  *See* Table 2 at ¶50, *supra*.  Accordingly, the Variable Rate (i.e., the Prime Rate plus the Margin) charged by Sallie Mae on Plaintiff Thurston's 2001 Private Education Loan has exceeded 10% per annum throughout its entire lifetime.  *See id.* (reflecting Variable Rate over time charged to Tier 5 borrowers).  Notably, the Variable Rate assessed by Sallie Mae and paid by Plaintiff Thurston on her 2001 Private Education Loan reached nearly 18% during those times when the Prime Rate was highest (Prime Rate of 9.5% plus Margin of 8% equals a Variable Rate of 17.5%), even before calculation of any additional interest in the form of fees.  Sallie Mae also charged interest in excess of 10% on Plaintiff Thurston's 2002 Private Education Loan, as a result of the charging of a Supplemental Fee.  (Exh. 14 at 2)

113.    Plaintiffs, like all other borrowers of Private Education Loans made by Sallie Mae, did not know, nor did they have reason to know, that Sallie Mae was not entitled to charge interest as such high rates.  Neither Sallie Mae nor the named lender (if purportedly different than Sallie Mae) disclosed to Plaintiffs, borrowers or the general public that the Private Education Loans had in fact been made by Sallie Mae and that, therefore, the interest rates on the loans were subject to California law.

1    Nor did Plaintiffs or other borrowers of Private Education Loans have any reason to

2    suspect that the Variable Rate assessed by Sallie Mae, either standing alone or in

3    conjunction with Late Charges and/or Supplemental Fees, exceeded the maximum

4    legal interest limit allowed by law.

5        114.   Plaintiffs and the other student borrowers' promissory notes and related

6    documents were replete with disclosures and other provisions touted therein as being

7    required by law.   As such, Plaintiffs and the other class members' had no reason to

8    believe that Sallie Mae would fail to comply with applicable law with respect to the

9    interest rate, and they reasonably trusted and relied on Sallie Mae to assess interest

10   on their Private Education Loans in accordance with applicable law.  As described

11   throughout this Complaint, unbeknownst to Plaintiffs and the other class members,

12   Sallie Mae violated applicable California law by assessing interest at usurious rates in

13   excess of the legal limit.

14       D.    PLAINTIFFS' AND THE CLASSES' CLAIMS ARE TOLLED BY
             OPERATION OF THE DISCOVERY RULE AND DOCTRINE OF
15           CONCEALMENT

16       115.   Plaintiffs and class members did not know, and had no reason to suspect,

17   until at least early March 2011, after the publication of the OSMO's draft report on its

18   website, that Sallie Mae and not a national and/or state chartered bank was the *de*

19   *facto* actual lender for the Private Education Loans.

20       116.   As explained above, Sallie Mae misrepresented in the loan application

21   forms that it provided to Plaintiffs and all other Private Education Loan student

22   borrowers that a national and/or state-chartered bank was the "lender" for the Private

23   Education Loans. *See* Exh. 10.  Since federal law provides that national and/or state-

24   chartered banks are entitled to charge interest (including in the form of fees) at the

25   highest rate permitted by their home states, and since federal law preempts

26   conflicting state consumer protection laws, the factual misrepresentation as to the

27   identity of the "lender" operated to conceal from Plaintiffs and other class members

28

34

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1    that the terms of the Private Education Loans were subject to California state law and

2    that the fees and interest charged by Sallie Mae were unlawful.

3        117.    Moreover, prior to early March 2011, there was no publicly available

4    information explaining that Sallie Mae and not its nominee banking partners was

5    actually making the Private Education Loans, from which Plaintiffs or class members

6    could have determined that their rights were being violated. While the OSMO

7    concluded in 2002 that Sallie Mae was in substance making the Private Education

8    Loans that Sallie Mae attributed to its banking partners, (*see* Exs. 4 and 5) the

9    OSMO's conclusion and the documents related to OSMO's examination of Sallie Mae

10   were never made publicly available. (These documents were obtained through a

11   subpoena to the Department of Treasury in this action after their existence was

12   disclosed by the OSMO's report published on its website.)

13       118.    The first public disclosure of Sallie Mae's true role as the *de facto* actual

14   lender did not come until the OSMO published the draft 2006 report on its website,

15   which upon information and belief occurred on or around March 8, 2011.  However,

16   even then, the disclosure was buried on the 142nd page of a 300 plus page draft report

17   that did not receive any media attention or publicity that was buried on a sub-page of

18   the Department of Treasury's website.  Given these circumstances, this draft report

19   did not provide adequate notice to borrowers of the need to investigate potential

20   claims against Sallie Mae. Indeed, Plaintiffs only learned of the existence of the draft

21   report and that Sallie Mae was the *de facto* actual lender for the Private Education

22   Loans through this litigation, after the identity of the lender for the Private Education

23   Loans was raised by SLM Corporation in its motion to dismiss filed on May 27, 2011.

24       119.    Until at least March 2011, as a result of Sallie Mae's concealment and

25   the lack of publicly available information, Plaintiffs and class members did not know

26   and had no reason to suspect that Sallie Mae was the *de facto* actual lender and

27   improperly charging fees and interest in violation of law.  Indeed, Sallie Mae assured

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1   ~~its student loan borrowers otherwise.  *See, e.g.*, Exh. 3 at 1 ("In no event will the~~

2   ~~interest rate exceed the maximum rate allowed by law.").~~

3   ~~120.    Accordingly, any otherwise applicable statutes of limitation for Plaintiffs~~

4   ~~and class members are tolled from the first unlawful charging of fees and/or interest~~

5   ~~by the Discovery Rule and/or concealment doctrine.~~

6   **VI.    CLASS ACTION ALLEGATIONS**

7   ~~121.~~115.    This action asserts claims on behalf of a class and two subclasses

8   pursuant to Federal Rules of Civil Procedure 23(a), and (b)(1), 23(b)(2) and 23(b)(3).

9   ~~122.~~116.    Plaintiffs Ubaldi and Thurston bring claims on behalf of

10  themselves and the Choice-of-Law Class, defined as:

11          All persons who on or after March 17, 2007~~January 1, 1996~~

12          obtained a Sallie Mae Private Education Loan for which Sallie Mae

13          was the *de facto* actual lender as described in this Third Amended

14          Complaint which included a choice-of-law provision, based upon a loan

15          application that listed California as the permanent residence of the

16          borrower if no temporary residence was identified, or based upon a

17          loan application that listed California as the temporary residence of

18          the borrower (the "**Choice of Law Class**").

19  ~~123.~~117.    Plaintiffs Ubaldi and Thurston bring claims on behalf of

20  themselves and the Late Charge Subclass, defined as:

21          All persons who at any time obtained a Sallie Mae Private

22          Education Loan for which Sallie Mae was the *de facto* actual lender as

23          described in this Third Amended Complaint, based upon a loan

24          application that listed California as the permanent residence of the

25          borrower if no temporary residence was identified, or based upon a

26          loan application that listed California as the temporary residence of

27

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1    the borrower, and who on or after March 17, 2007January 1, 1996 March 17,

2    2007, incurred a Late Charge from Sallie Mae (the "**Late Charge**

3    **Subclass**");

4        124.118.    Plaintiffs Thurston bring claims on behalf of herself and the Usury

5    Subclass, defined as:

6            All persons who at any time obtained a Sallie Mae Private

7        Education Loan for which Sallie Mae was the *de facto* actual lender as

8        described in this Third Amended Complaint, based upon a loan

9        application that listed California as the permanent residence of the

10        borrower if no temporary residence was identified, or based upon a

11        loan application that listed California as the temporary residence of

12        the borrower, and who on or after March 26, 2009 January 1, 1996,

13        were charged interest at an annual rate of more than 10% (the "**Usury**

14        **Subclass**").

15        125.119.    The Choice-of-Law Class, Late Charge Subclass, and Usury

16    Subclass are each subject to the following exclusions:

17            Excluded are Sallie Mae's officers, directors, managerial

18        employees and their immediate families, and any of the judges of the

19        Court before which this case is pending and their immediate families.

20            Excluded are Sallie Mae Private Education Loans made by

21        Sallie Mae Bank, since its inception in 2005.

22            Excluded are all Sallie Mae Private Education Loans with a

23        promissory note for the loan at issue that includes an arbitration

24        clause or class action waiver.[5]

---

25

26    [5] By deleting tolling allegations (¶¶ 115-120) and modifying the class periods

27    (¶¶121-125) alleged in the original TAC [Dkt. No. 126, Ex. A-1], Plaintiffs are
     conforming the TAC to the Court's November 15, 2013 Order [Dkt. No. 169].
     By so doing, and not re-alleging those portions in the Modified TAC,

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

**A.   THE CHOICE OF LAW CLASS**

~~126.~~120.      Upon information and belief, there are thousands of members in the Choice of Law Class who are geographically dispersed throughout California, as well as those who have re-located to other states.  Therefore, individual joinder of all members in the Choice of Law Class would be impracticable.

~~127.~~121.      Common questions of law or fact exist as to all members of the Choice of Law Class.  These questions predominate over the questions affecting only individual class members.  For the Choice of Law Class, these common legal or factual questions include:

a.      Whether Sallie Mae was the *de facto* actual lender for the Private Education Loans;

b.      Whether the Private Education Loans included among their terms a choice of law provision;

c.      Whether the law selected by the choice of law provision in the Private Education Loans had a substantial relationship to the parties or transactions; and

Plaintiffs are not waiving their rights to subsequently appeal the Court's decision. *Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. Ariz. 2012)(" We see no benefit in requiring plaintiffs to re-allege claims that the district courts have already dealt with on the merits and dismissed with prejudice. Even where the district court recognizes that plaintiffs are just following the *Forsyth* rule and preserving their options on appeal, the court will still be wasting resources in parsing old claims and reiterating its prior rulings, and there is no reason to make the court dismiss them a second time. Our stewardship requires better use of our limited judicial resources....  We therefore join our sister circuits and overrule in part the rule found in *Forsyth* and other cases "that a plaintiff waives all claims alleged in a dismissed complaint which are not re-alleged in an amended complaint." For claims dismissed with prejudice and without leave to amend, we will not require that they be re-pled in a subsequent amended complaint to preserve them for appeal" (citations omitted)

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

Formatted: Font: Italic

Formatted: Font: Italic

Formatted: Font: Italic

1      d.      Whether Plaintiffs and the Choice of Law Class are entitled to

2   Declaratory Relief that California law governs the rights and remedies of the

3   parties with respect to their Private Education Loans.

4      ~~128.~~122.   Plaintiffs' claims are typical of the claims of the Choice of Law

5   Class, in that Plaintiffs took out Sallie Mae Private Education Loans, the promissory

6   notes for their loans included a choice of law provision, and their loans were made in

7   California.  Plaintiffs, therefore, are no different in any relevant respect from any

8   other Choice of Law Class member, and the relief sought is common to the Choice of

9   Law Class.

10      ~~129.~~123.   Plaintiffs are adequate representatives of the Choice of Law Class

11  because their interests do not conflict with the interests of Choice of Law Class

12  members they seek to represent, and they have retained counsel competent and

13  experienced in conducting complex lending and class action litigation.  Plaintiffs and

14  their counsel will adequately protect the interests of the Choice of Law Class.

15      ~~130.~~124.   A class action is superior to other available means for the fair and

16  efficient adjudication of this dispute.  The damages suffered by each individual Choice

17  of Law Class member with respect to the declaratory relief claim are non-monetary,

18  while the burden and monetary expense needed to individually prosecute the choice-

19  of-law issue against Sallie Mae is substantial.  Thus, it would be virtually impossible

20  for Choice of Law Class members individually to redress effectively the wrongs done to

21  them.  Moreover, even if Choice of Law Class members could afford individual actions,

22  it would still not be preferable to class wide litigation.  Individualized actions present

23  the potential for inconsistent or contradictory judgments.

24      ~~131.~~125.   By contrast, a class action presents far fewer management

25  difficulties and provides the benefits of single adjudication, economies of scale, and

26  comprehensive supervision by a single court.  In the alternative, the Choice of Law

27  Class may be certified because Sallie Mae has acted or refused to act on grounds

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

generally applicable to the Choice of Law Class thereby making appropriate preliminary and final declaratory relief with respect to the Choice of Law Class.

~~132.~~126.    Upon information and belief, all records concerning each of the Sallie Mae Private Education Loans entered into by members of the Choice of Law Class are in the possession and control of Defendants and their agents and available through discovery.

**B.    THE LATE CHARGE SUBCLASS**

~~133.~~127.    Upon information and belief, there are thousands of members in the Late Charge Subclass who are geographically dispersed throughout California, as well as those who have re-located to other states.  Therefore, individual joinder of all members in the Late Charge Subclass would be impracticable.

~~134.~~128.    Common questions of law or fact exist as to all members of the Late Charge Subclass.  These questions predominate over the questions affecting only individual class members.  For the Late Charge Subclass, these common legal or factual questions include:

    a.    What the purpose is for the Late Charge assessed to Private Education Loan borrowers whose payments are not received by Sallie Mae within 15 days of the scheduled payment date;

    b.    What costs Sallie Mae actually incurs when it does not receive a payment within 15 days of the scheduled date for its Private Education Loans;

    c.    Whether Sallie Mae calculated the actual cost incurred when a borrower is more than 15 days late in making a payment at the time when the Private Education Loans were entered into;

    d.    Whether Sallie Mae charged Plaintiffs and the other Subclass member borrowers a Late Charge exceeding the costs Sallie Mae  actually incurs when it does not receive a payment within 15 days of the scheduled date for its Private Education Loans;

Field Code Changed

---

40

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1    e.    Whether and how much Sallie Mae profited by charging Late

2    Charges to borrowers with Private Education Loans;

3    f.    Whether Sallie Mae violated California Civil Code §§1671(b) or (d)

4    when it charged borrowers a Late Charge;

5    g.    Whether Sallie Mae's conduct violated California's Unfair

6    Competition Law, California Business and Practices Code § 17200, *et seq.*; and

7    h.    The appropriate measure of restitution and/or restitutionary

8    disgorgement.

9    ~~135.~~129.    Plaintiffs' claims are typical of the claims of the Late Charge

10   Subclass, in that Plaintiffs Ubaldi and Thurston were more than 15 days late in

11   making a payment on their Sallie Mae Private Education Loans on one or more

12   occasions, the loans were made in California, and they were charged a Late Charge

13   each time their payments were late.  Plaintiffs, therefore, are no different in any

14   relevant respect from any other Late Charge Subclass member, and the relief sought

15   is common to the Late Charge Subclass.

16   ~~136.~~130.    Plaintiffs are adequate representatives of the Late Charge

17   Subclass because their interests do not conflict with the interests of Late Charge

18   Subclass members they seek to represent, and they have retained counsel competent

19   and experienced in conducting complex lending and class action litigation.  Plaintiffs

20   and their counsel will adequately protect the interests of the Late Charge Subclass.

21   ~~137.~~131.    A class action is superior to other available means for the fair and

22   efficient adjudication of this dispute.  The damages suffered by each individual

23   Subclass member likely will be comparatively small, especially given the burden and

24   expense of individual prosecution of the complex litigation necessitated by Sallie Mae's

25   conduct.  Thus, it would be virtually impossible for Late Charge Subclass members

26   individually to redress effectively the wrongs done to them.  Moreover, even if Late

27   Charge Subclass members could afford individual actions, it would still not be

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1    preferable to class wide litigation.  Individualized actions present the potential for

2    inconsistent or contradictory judgments.

3        ~~138.~~132.    By contrast, a class action presents far fewer management

4    difficulties and provides the benefits of single adjudication, economies of scale, and

5    comprehensive supervision by a single court.  In the alternative, the Late Charge

6    Subclass may be certified because Sallie Mae has acted or refused to act on grounds

7    generally applicable to the Late Charge Subclass, thereby making appropriate

8    preliminary and final equitable relief with respect to the Subclass.

9        ~~139.~~133.    Upon information and belief, all records concerning each of the

10   Sallie Mae Private Education Loans entered into by members of the Late Charge

11   Subclass are in the possession and control of Defendants and their agents and

12   available through discovery.

13       **C.    THE USURY SUBCLASS**

14       ~~140.~~134.    Upon information and belief, there are thousands of members in

15   the Usury Subclass who are geographically dispersed throughout California, as well as

16   those who have re-located to other states.  Therefore, individual joinder of all members

17   in the Usury Subclass would be impracticable.

18       ~~141.~~135.    Common questions of law or fact exist as to all members of the

19   Usury Subclass.  These questions predominate over the questions affecting only

20   individual class members.  For the Usury Subclass, these common legal or factual

21   questions include:

22           a.    Whether Sallie Mae charged interest of its Private Education

23       Loans at rates in excess of 10 percent annually;

24           b.    Whether the Late Fees and Supplemental Fees Sallie Mae charged

25       to borrowers constitute forms of interest subject to California's Constitutional

26       prohibition on usury;

27

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1          c.     Whether Sallie Mae's conduct violated California's Unfair

2    Competition Law, California Business and Practices Code § 17200, *et seq*.; and

3          d.     The appropriate measure of restitution and/or restitutionary

4    disgorgement.

5    ~~142.~~136.    Plaintiff Thurston's claims are typical of the claims of the Usury

6    Subclass, in that Plaintiff Thurston was charged and paid interest at a rate of more

7    than 10% annually on one or more of her Sallie Mae Private Education Loan and paid

8    additional usurious interest in the form of Late Charges and Supplemental Fees, and

9    her loans were made in California.  Plaintiff Thurston, therefore, is no different in any

10   relevant respect from any other Usury Subclass member, and the relief sought is

11   common to the Usury Subclass.

12       ~~143.~~137.    Plaintiff Thurston is an adequate representative of the Usury

13   Subclass because her interests do not conflict with the interests of Usury Subclass

14   members she seeks to represent, and she has retained counsel competent and

15   experienced in conducting complex lending and class action litigation.  Plaintiff

16   Thurston and her counsel will adequately protect the interests of the Usury Subclass.

17       ~~144.~~138.    A class action is superior to other available means for the fair and

18   efficient adjudication of this dispute.  The damages suffered by each individual Usury

19   Subclass member likely will be comparatively small, especially given the burden and

20   expense of individual prosecution of the complex litigation necessitated by Sallie Mae's

21   conduct.  Thus, it would be virtually impossible for Usury Subclass members

22   individually to redress effectively the wrongs done to them.  Moreover, even if Usury

23   Subclass members could afford individual actions, it would still not be preferable to

24   class wide litigation.  Individualized actions present the potential for inconsistent or

25   contradictory judgments.

26       ~~145.~~139.    By contrast, a class action presents far fewer management

27   difficulties and provides the benefits of single adjudication, economies of scale, and

28

comprehensive supervision by a single court.  In the alternative, the Usury Subclass may be certified because Sallie Mae has acted or refused to act on grounds generally applicable to the Usury Subclass, thereby making appropriate preliminary and final equitable relief with respect to the Usury Subclass.

~~146.~~140.    Upon information and belief, all records concerning each of the Sallie Mae Private Education Loans entered into by members of the Usury Subclass are in the possession and control of Defendants and their agents and available through discovery.

## VII.   CLAIMS FOR RELIEF

### A.   FIRST CLAIM FOR RELIEF  - "UNLAWFUL" BUSINESS PRACTICES IN VIOLATION OF THE UNFAIR COMPETITION LAW,  BUS. & PROF. CODE § 17200, ET SEQ. FOR PLAINTIFFS AND THE LATE CHARGE SUBCLASS

~~147.~~141.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

~~148.~~142.    This claim is brought on behalf of Plaintiffs and the Late Charge Subclass.

~~149.~~143.    The Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq.*, defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

~~150.~~144.    A business act or practice is "unlawful" if it violates any established state or federal law.

~~151.~~145.    California Civil Code Section 1671 establishes the standards for determining if a liquidated damages clause in a contract is legitimate.  It states:

> (a) This section does not apply in any case where another statute expressly applicable to the contract prescribes the rules or standard for determining the validity of a provision in the contract liquidating the damages for the breach of the contract.

(b) Except as provided in subdivision (c), a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made.

(c) The validity of a liquidated damages provision shall be determined under subdivision (d) and not under subdivision (b) where the liquidated damages are sought to be recovered from either:

> (1) A party to a contract for the retail purchase, or rental, by such party of personal property or services, primarily for the party's personal, family, or household purposes; or

> (2) A party to a lease of real property for use as a dwelling by the party or those dependent upon the party for support.

(d) In the cases described in subdivision (c), a provision in a contract liquidating damages for the breach of the contract is void except that the parties to such a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage.

152.146.    A liquidated damages clause under § 1671(b) is unlawful if it bears no reasonable relationship to the actual damages that the parties could have anticipated would flow from a breach, or if the amount does not represent the result of a reasonable endeavor to estimate a fair average compensation for any loss that may be sustained.

153.147.    Likewise, under § 1671(d), a liquidated damages clause is unlawful in a consumer contract unless it is impracticable or extremely difficult to fix the actual damage, and the amount represents the result of a reasonable endeavor to estimate a fair average compensation for any loss that may be sustained.

154.148.    The Private Education Loans at issue in this action are either contracts for property or services primarily for the person's personal, family or

household purposes subject to § 1671(d), or, in the alternative, are subject to the
general prohibition against unlawful liquidated damages under § 1671(b).

155.149.    The limitations set forth in § 1671(d), or in the alternative, §
1671(b), apply to the Private Education Loans, as these loans were not made by a
national bank within the meaning of the National Bank Act §§ 85 and 86, nor are they
made by qualifying bank entities under parallel state charters as provided by the
Federal Deposit Insurance Act or other similar laws.  These limitations apply to Sallie
Mae, which is not a national or state-chartered bank.

156.150.    Sallie Mae's Late Charge is an unlawful liquidated damages
provision under §1671(b) because it bears no reasonable relationship to the amount of
money Sallie Mae could have anticipated would flow from a borrower failing to make a
payment within 15 days after the payment due date.  Given the manner in which
borrowers are penalized for not making a payment on time (*i.e.*, being charged daily
interest on the entire principal owed), Sallie Mae is more than compensated for any
actual damage it could have anticipated or actually suffers when a borrower does not
make a payment within 15 days after the payment due date.  To the extent Sallie Mae
incurs any additional administrative costs when a borrower does not make a payment
within 15 days after the payment due date, the Late Charge of the greater of $5.00 or
5% that Sallie Mae imposes on Private Education Loan borrowers exceeds the total
costs actually incurred as a result of the late payment.

157.151.    Alternatively, Sallie Mae's Late Charge is an unlawful liquidated
damages provision under § 1671(d) because it was not impossible or extremely difficult
for Sallie Mae to fix the actual damage it might suffer as a result of a borrower not
making an installment payment within 15 days after the payment due date.  Given
that the accounting of borrowers' accounts and the calculation of interest and principal
are automated and performed by computers, Sallie Mae sustains little, if any, actual
loss when a payment is made more than 15 days after its due date.  Any actual loss

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1   Sallie Mae might sustain could have been calculated when the Private Education

2   Loans were entered into, and the Late Charge of the greater of $5.00 or 5% that Sallie

3   Mae imposes on Private Education Loan borrowers exceeds the total costs actually

4   incurred as a result of the late payment.

5   ~~158.~~152.      Sallie Mae has and continues to violate the "unlawful" prong of the

6   UCL by charging borrowers liquidated damages in violation of § 1671.  By committing

7   the acts and practices alleged above, Sallie Mae has engaged, and continues to be

8   engaged, in unlawful business practices within the meaning of California Business

9   and Professions Code 17200, *et seq.*

10  ~~159.~~153.      Through its unlawful acts and practices Sallie Mae has obtained,

11  and continues to unfairly obtain, money from Plaintiffs and members of the Late

12  Charge Subclass.  As such, Plaintiffs requests for themselves and all Late Charge

13  Subclass members the relief set forth in the Prayer, including that this Court enjoin

14  Sallie Mae from continuing to violate the Unfair Competition Law as discussed herein.

15  Otherwise, the Late Charge Subclass may be irreparably harmed and/or denied an

16  effective and complete remedy if such an order is not granted.

17      **B.    Second Claim For Relief - "Unlawful" Business Practices in Violation of The Unfair Competition Law, Bus. & Prof. Code § 17200, et seq. For Plaintiff Thurston And The Usury Subclass**

18

19  ~~160.~~154.      Plaintiffs hereby incorporate the foregoing paragraphs of this

20  Complaint and restate them as if they were fully written herein.

21  ~~161.~~155.      This claim is brought on behalf of Plaintiff Thurston and the Usury

22  Subclass.

23  ~~162.~~156.      The Unfair Competition Law ("UCL"), California Business and

24  Professions Code § 17200, *et seq.*, defines unfair business competition to include any

25  "unlawful, unfair or fraudulent" act or practice.

26

27

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

163.157.    A business act or practice is "unlawful" if it violates any established state or federal law.

164.158.    California Constitution, Article XV sets a maximum legal rate for interest charged on loans such as the Private Education Loans of 10 percent per annum, including through the charging of fees.  In pertinent part, it states:

> Section 1.  The rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest:
> (1) For any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum; provided, however, that any loan or forbearance of any money, goods or things in action the proceeds of which are used primarily for the purchase, construction or improvement of real property shall not be deemed to be a use primarily for personal, family or household purposes.
> …
> No person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action.

165.159.    California's usury proscription is also set forth in a statute, an initiative measure that has not been codified. Stats.1919, p. lxxxiii, Deering's Uncod. Initiative Measures & Stats. (1973 ed.) 1919–1, p. 35]) (the "Usury Law").

166.160.    The Private Education Loans at issue in this action are loans of money primarily for personal, family, or household purposes subject to Cal. Const., art. XV, § 1(1).

167.161.    The Private Education Loans at issue in this action are loans of money expressed "in writing" within the meaning of the Usury Law.  Cal. Civ. Code § 1916-1.

48

168.162.   The limitations set forth in Cal. Const., art. XV, § 1(1) and the Usury Law apply to the Private Education Loans, as these loans were not made by a national bank within the meaning of the National Bank Act §§ 85 and 86, nor were they made by qualifying bank entities under parallel state charters as provided by the Federal Deposit Insurance Act or other similar laws.  These limitations apply to Sallie Mae, which is not a national or state-chartered bank, or subject to any other exception.

169.163.   Sallie Mae charges interest on the Private Education Loans at a Variable Rate that often exceeds 10 percent per annum, and also charges interest in the form of fees, including Late Charges and Supplemental Fees, such that even when the Variable Rate does not exceed 10 percent per annum, Sallie Mae charges an effective interest rate on the Private Education Loans that is in excess of the legal limit.

170.164.   Sallie Mae has and continues to violate the "unlawful" prong of the UCL by charging borrowers interest in violation of California's Constitution, art. XV, § 1(1) and the Usury Law.  By committing the acts and practices alleged above, Sallie Mae has engaged, and continues to be engaged, in unlawful business practices within the meaning of California Business and Professions Code 17200, *et seq.*

171.165.   Through its unlawful acts and practices Sallie Mae has obtained, and continues to unfairly obtain, money from Plaintiff Thurston and members of the Usury Subclass.  As such, Plaintiff Thurston requests on behalf of herself and all Usury Subclass members the relief set forth in the Prayer, including that this Court enjoin Sallie Mae from continuing to violate the Unfair Competition Law as discussed herein.  Otherwise, the Usury Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**C.**   <u>THIRD CLAIM FOR RELIEF</u> - "UNFAIR" BUSINESS PRACTICE IN VIOLATION OF THE UNFAIR COMPETITION LAW, BUS. & PROF. CODE §17200, ET SEQ. FOR PLAINTIFFS AND THE LATE CHARGE SUBCLASS

172.166.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

173.167.   This claim is brought on behalf of Plaintiffs and the Late Charge Subclass.

174.168.   A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

175.169.   Sallie Mae, a non-national and non-state-chartered bank, has and continues to violate the "unfair" prong of the UCL through its imposition of the Late Charge for Private Loans because Sallie Mae both penalizes borrowers by assessing a $5.00 or 5% fee when a payment has not been received, and also charges borrowers daily interest for use of the funds.

176.170.   Sallie Mae's imposition of its Late Charge violates the "unfair" prong of the UCL because the amount of the Late Charge, the greater of $5.00 or 5% of the amount of the installment owed, is disproportionate to the transaction cost to Sallie Mae due to a borrower not making a payment within 15 days after the payment is due.  The actual transaction cost to Sallie Mae resulting from a late payment is nominal because the application of the Late Charge, such as in re-calculating the principal and interest, are all computer functions requiring little, if any, human involvement.  In any event, such transaction costs are less than the greater of $5.00 or 5% of a missed payment that Sallie Mae charges.

177.171.   The gravity of the harm to Plaintiffs and members of Late Charge Subclass resulting from such unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Sallie Mae's conduct.  By committing the acts and practices alleged above, Sallie Mae has engaged, and continues to be engaged, in

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

1  unfair business practices within the meaning of California Business and Professions

2  Code 17200, *et seq*.

3  ~~178.~~172.    Through its unfair acts and practices Sallie Mae has obtained, and

4  continues to unfairly obtain, money from Plaintiffs and members of the Late Charge

5  Subclass.  As such, Plaintiffs requests for themselves and all Late Charge Subclass

6  members the relief set forth in the Prayer, including that this Court enjoin Sallie Mae

7  from continuing to violate the Unfair Competition Law as discussed herein.

8  Otherwise, the Late Charge Subclass may be irreparably harmed and/or denied an

9  effective and complete remedy if such an order is not granted.

10      **D.    FOURTH CLAIM FOR RELIEF - "UNFAIR" BUSINESS PRACTICE IN
             VIOLATION OF THE UNFAIR COMPETITION LAW, BUS. & PROF.**

11           **CODE §17200, ET SEQ. FOR PLAINTIFF THURSTON AND THE
             USURY SUBCLASS**

12      ~~179.~~173.    Plaintiffs hereby incorporate the foregoing paragraphs of this

13  Complaint and restate them as if they were fully written herein.

14      ~~180.~~174.    This claim is brought on behalf of Plaintiff Thurston and the Usury

15  Subclass.

16      ~~181.~~175.    A business act or practice is "unfair" under the UCL if the reasons,

17  justifications and motives of the alleged wrongdoer are outweighed by the gravity of

18  the harm to the alleged victims.

19      ~~182.~~176.    Sallie Mae, a non-national and non-state-chartered bank, has and

20  continues to violate the "unfair" prong of the UCL through its assessment of usurious

21  interest on the Private Education Loans of more than 10% annually.

22      ~~183.~~177.    Sallie Mae's assessment of the interest at effective rates of greater

23  than 10% annually violates the "unfair" prong of the UCL, because Sallie Mae is not

24  entitled to charge these amounts of interest, which are excessive and not justified by

25  any business need, and which create an onerous burden on Usury Subclass members.

26      ~~184.~~178.    The gravity of the harm to Plaintiffs and members of Usury

27  Subclass resulting from such unfair acts and practices outweighs any conceivable

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1   reasons, justifications and/or motives of Sallie Mae's conduct.  By committing the acts

2   and practices alleged above, Sallie Mae has engaged, and continues to be engaged, in

3   unfair business practices within the meaning of California Business and Professions

4   Code 17200, *et seq*.

5        ~~185.~~179.      Through its unfair acts and practices Sallie Mae has obtained, and

6   continues unfairly to obtain, money from Plaintiff Thurston and members of the Usury

7   Subclass.  As such, Plaintiff Thurston requests on behalf of herself and all Usury

8   Subclass members the relief set forth in the Prayer, including that this Court enjoin

9   Sallie Mae from continuing to violate the Unfair Competition Law as discussed herein.

10  Otherwise, the Usury Subclass may be irreparably harmed and/or denied an effective

11  and complete remedy if such an order is not granted.

12

13  **E.      FIFTH CLAIM FOR RELIEF - USURY IN VIOLATION OF ARTICLE XV
            SECTION 1 OF THE CALIFORNIA CONSTITUTION FOR PLAINTIFF
14          THURSTON AND THE USURY SUBCLASS**

15       ~~186.~~180.      Plaintiffs hereby incorporate the foregoing paragraphs of this

16  Complaint and restate them as if they were fully written herein.

17       ~~187.~~181.      This claim is brought on behalf of Plaintiff Thurston and the Usury

18  Subclass.

19       ~~188.~~182.      The California Constitution, art. XV, sec. 1, states "No person,

20  association, co-partnership or corporation shall by charging any fee, bonus,

21  commission, discount or other compensation receive from a borrower more than the

22  interest authorized by this section upon any loan or forbearance of any money, goods

23  or things in action."

24       ~~189.~~183.      For any loan, if the money, goods, or things in action are for use

25  primarily for personal, family, or household purposes, the authorized interest rate is

26  10 percent per annum or less.  Cal. Const., art. XV, § 1(1).

27

28

190.184.    Sallie Mae's Private Education Loans are "loans" for "money" for use "primarily for personal, family, or household purposes," within the meaning of the California Constitution, art. XV, § 1(1).

191.185.    Sallie Mae is not excluded or otherwise exempt from the constitutional provisions on usury.

192.186.    Sallie Mae charged Plaintiff Thurston and all members of the Usury Subclass interest in excess of the statutory maximum rate of 10 percent per annum, either directly through the assessment of interest at the Variable Rate, or indirectly through the assessment of interest at the Variable Rate and through the payment of additional fees.

193.187.    The Private Education Loans and interest thereon are absolutely repayable to Plaintiffs and the members of the Usury Subclass.

194.188.    Sallie Mae established the terms of the Private Education Loans, including the rates of interest to be charged to its student borrowers, and willfully intended to enter these transactions and to collect amounts in excess of the legal limit of 10 percent per annum.

195.189.    Through its usurious charges Sallie Mae has received, and continues to receive, money from Plaintiff Thurston and all members of the Usury Subclass in violation of California's Constitution. As such, Plaintiff Thurston requests on behalf of herself and all Usury Subclass members the relief set forth in the Prayer, including that this Court enter an order canceling all future interest on the Private Education Loans. Plaintiff Thurston also requests that this Court award any other relief that is just and proper.

**F.    SIXTH CLAIM FOR RELIEF - VIOLATION OF THE USURY LAW FOR PLAINTIFF THURSTON AND THE USURY SUBCLASS**

196.190.     Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

197.191.     This claim is brought on behalf of Plaintiff Thurston and the Usury Subclass.

198.192.     California's usury proscription is set forth in the Usury Law, an uncodified Initiative Measure adopted nearly 100 years ago. *See* Cal. Civ. Code § 1916-1 through 1916-3.

199.193.     The Usury Law provides:

> The rate of interest upon the loan or forbearance of any money, goods or things in action or on accounts after demand or judgments rendered in any court of this state, shall be seven dollars upon the one hundred dollars for one year and at that rate for a greater or less sum or for a longer or a shorter time; but it shall be competent for parties to contract for the payment and receipt of a rate of interest not exceeding twelve dollars on the one hundred dollars for one year and not exceeding that rate for a greater or less sum or for a longer or shorter time, in which case such rate exceeding seven dollars on one hundred dollars shall be clearly expressed in writing.

Cal. Civ. Code § 1916-1.

200.194.     As recognized in *Penziner v. West American Finance Co.*, 10 Cal. 2d 160, 174, 74 P.2d 252 (Cal. 1937), the 12 percent interest rate established by the Usury Law for contracts in writing was amended to 10 percent by adoption of the usury provisions of the California Constitution.

201.195.     Sallie Mae's Private Education Loans are "loans" for "money" expressed "in writing" within the meaning of the Usury Law.  Sallie Mae is not excluded or otherwise exempt from the Usury Law.

202.196.     Sallie Mae charged Plaintiff Thurston and all members of the Usury Subclass interest in excess of the statutory maximum rate of 10 percent per annum, either directly through the assessment of interest at the Variable Rate, or

54

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

indirectly through the assessment of interest at the Variable Rate and through the payment of additional fees.

~~203.~~197.     Sallie Mae established the terms of the Private Education Loans, including the rates of interest to be charged to its student borrowers, and willfully intended to enter these transactions and to collect amounts in excess of the legal limit of 10 percent per annum.

~~204.~~198.     Through its usurious charges Sallie Mae has received, and continues to receive, money from Plaintiff Thurston and all members of the Usury Subclass in violation of the Usury Law, as amended.  As such, Plaintiff Thurston requests on behalf of herself and all Usury Subclass members the relief set forth in the Prayer, including awarding three times the interest paid on the Private Education Loans as provided by the Usury Law, and that this Court enter an order canceling all future interest on the Private Education Loans.  Cal. Civ. Code § 1916-3(a).

**G.     SEVENTH CLAIM FOR RELIEF - CLAIM FOR DECLARATORY RELIEF FOR THE CHOICE OF LAW CLASS**

~~205.~~199.     Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

~~206.~~200.     This claim is brought on behalf of Plaintiffs and the Choice of Law Class.

~~207.~~201.     Sallie Mae included in the Private Education Loans a choice of law provision selecting the law of the home states of its banking partners.

~~208.~~202.     The law selected by operation of the choice of law provision has no substantial relationship to the parties or the Private Education Loan transactions.

~~209.~~203.     Plaintiffs and all members of the Choice-of-Law Class are entitled to declaratory relief holding that the choice of law provision in the Private Education Loans for which Sallie Mae was the *de facto* actual lender is unenforceable, and, that California law governs the rights of the parties.

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

## VIII.  PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and all class members, request award and relief as follows:

A.    An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs Ubaldi and Thurston be appointed Class Representatives for the Choice of Law Class and Late Charge Subclass, that Plaintiff Thurston be appointed Class Representative for the Usury Subclass, and that Plaintiffs' counsel be appointed Class Counsel.

B.    Restitution in such amount that Plaintiffs and all Late Charge Subclass members were charged for Late Charges by Sallie Mae on Private Education Loans, and the interest charged thereon.

C.    Restitution in such amount that Plaintiff Thurston and all Usury Subclass members paid directly or indirectly as interest on Private Education Loans or, alternatively, the amount of interest paid on Private Education Loans in excess of the 10% legal limit.

D.    Restitutionary disgorgement of the profits Sallie Mae made on the Late Charges it assessed to Plaintiffs and all Late Charge Subclass members on their Private Education Loans.

E.    Restitutionary disgorgement of the profits Sallie Mae made on the interest it assessed to Plaintiff Thurston and all Usury Subclass members on their Private Education Loans or, alternatively, the amount of interest assessed on Private Education Loans in excess of the 10% legal limit.

F.    An order awarding three times the interest paid on the Private Education Loans by Plaintiff Thurston and the Usury Subclass members as permitted by the Usury Law or, alternatively, three times the amount of interest paid on Private Education Loans in excess of the 10% legal limit as permitted by the Usury Law.

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

1     **G.**    An order enjoining Sallie Mae from charging a Late Charge that exceeds

2    its actual transaction cost or the actual damage Sallie Mae suffers as a result of a

3    borrower making a payment more than 15 days after the payment due date.

4     **H.**    An order enjoining and canceling all future interest payments on the

5    Private Education Loans for Plaintiff Thurston and the Usury Subclass or,

6    alternatively, the amount of interest assessed on Private Education Loans in excess of

7    the 10% legal limit.

8     **I.**    An order declaring that the choice of law provision in the Private

9    Education Loans of Plaintiffs and the Choice of Law Class for which Sallie Mae was

10   the *de facto* actual lender is unenforceable, and that California law governs their

11   rights.

12    **J.**    An order awarding Plaintiffs their costs of suit, including reasonable

13   attorneys' fees and pre and post-judgment interest.

14    **K.**    An order requiring an accounting for, and imposition of a constructive

15   trust upon, all monies received by Sallie Mae as a result of the unlawful, unfair and

16   fraudulent conduct alleged herein.

17    **L.**    Such other and further relief as may be deemed necessary or appropriate.

18  **IX.**    **DEMAND FOR JURY TRIAL**

19    Plaintiffs hereby demand a trial by jury on all causes of action and/or issues so

20   triable.

21

22  Dated: ~~March 26, 2013~~    ~~**STEMBER FEINSTEIN DOYLE**~~
                         ~~**PAYNE & KRAVEC, LLC**~~

23

24        ~~By:   s/Joseph N. Kravec, Jr.~~
               ~~Joseph N. Kravec, Jr.~~

25        ~~Stephen M. Pincus (*pro hac vice*)~~

26        ~~Wyatt A. Lison (*pro hac vice*)~~
        ~~Maureen Davidson Welling (*pro hac vice*)~~

27

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

**Formatted:** Justified, Tab stops: Not at 0.65"



1   ~~Allegheny Building, 17th Floor~~
    ~~429 Forbes Avenue~~
2   ~~Pittsburgh, Pennsylvania  15219~~
    ~~Telephone:  (412) 281-8400~~
3   ~~Facsimile:  (412) 281-1007~~

4   ~~Michael D. Braun (SBN 167416)~~
    **~~BRAUN LAW GROUP, P.C.~~**
5   ~~10680 West Pico Boulevard~~
    ~~Suite 280~~
6   ~~Los Angeles, California  90064~~
    ~~Telephone:  (310) 836-6000~~
7   ~~Facsimile:  (310) 836-6010~~

8                    Janet Lindner Spielberg (SBN 221926)
                     **LAW OFFICES OF JANET**
9                    **LINDNER SPIELBERG**
                     12400 Wilshire Boulevard, #400
10                   Los Angeles, California  90025
                     Telephone:  (310) 392-8801
11                   Facsimile:  (310) 278-5938

12
                     William J. Genego (SBN 103224)
13                   **LAW OFFICE OF WILLIAM GENEGO**
                     2115 Main Street
14                   Santa Monica, California 90405
                     Telephone:   310-399-3259
15

16                   ***Attorneys for Plaintiffs Tina M.***
                     ***Ubaldi and Chanee Thurston***

17

18

19

20

21

22

23

24

25

26

27

28

                                    58

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

Formatted: Justified

Formatted: Justified, Indent: Left:  0"

Formatted: Justified, Indent: Left:  0", Right:
-0.19", Line spacing:  Exactly 12 pt