1    Janet Lindner Spielberg (SBN 221926)    Michael D. Braun (SBN 167416)
**LAW OFFICES OF JANET**    **BRAUN LAW GROUP, P.C.**
2       **LINDNER SPIELBERG**    10680 West Pico Boulevard, Suite 280
12400 Wilshire Boulevard, # 400    Los Angeles, California 90064
3    Los Angeles, California  90025    Telephone: 310-836-6000
Telephone: 310-392-8801    Email: service@braunlawgroup.com
4    Email: jlspielberg@jlslp.com

5    Joseph N. Kravec, Jr. (*pro hac vice*)    William J. Genego (SBN103224)
Stephen M. Pincus (*pro hac vice*)    **LAW OFFICE OF WILLIAM**
6    Wyatt A. Lison (*pro hac vice*)    **GENEGO**
Maureen Davidson-Welling (*pro hac vice*)    2115 Main Street
7    **STEMBER FEINSTEIN DOYLE**    Santa Monica, California 90405
       **PAYNE & KRAVEC, LLC**    Telephone: 310-399-3259
8    429 Forbes Avenue    Email: bill@genegolaw.com
Allegheny Building, 17th Floor
9    Pittsburgh, Pennsylvania 15219
Telephone: 412-281-8400
10    Email: jkravec@stemberfeinstein.com
spincus@stemberfeinstein.com
11    wlison@stemberfeinstein.com
mdavidsonwelling@stemberfeinstein.com
12

13    *Attorneys for Plaintiffs Tina M.*
*Ubaldi and Chanee Thurston*
14

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TINA M. UBALDI and CHANEE THURSTON, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>    vs.<br><br>SLM CORPORATION; a Delaware Corporation; SALLIE MAE, INC.; and SLM PC STUDENT LOAN TRUST 2004-A<br>          Defendants. | **Case No. 3-11-cv-01320-EDL**<br><br>**CLASS ACTION**<br><br>**[MODIFIED] THIRD AMENDED COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO COURT ORDER [DKT. NO 169]**<br><br><u>DEMAND FOR JURY TRIAL</u> |

1   Plaintiffs Tina Ubaldi and Chanee Thurston, by their attorneys, bring this class

2   action against SLM Corporation and Sallie Mae Inc., (collectively referred to as "Sallie

3   Mae"), and Plaintiff Ubaldi brings this action against SLM PC Student Loan Trust

4   2004-A, on their own behalf and on behalf of all others similarly situated, and allege

5   as follows based upon the investigation of their counsel:

6   **I.   INTRODUCTION**

7   1.   This class action seeks relief on behalf of Plaintiffs and others similarly

8   situated who, while residing in California, were provided Sallie Mae Private

9   Education Loans for which Sallie Mae was the *de facto* actual lender as described

10  below.  Plaintiffs Ubaldi and Thurston bring claims under California Law seeking

11  relief on behalf of borrowers who were assessed a late fee by Sallie Mae.  Plaintiff

12  Thurston also brings claims under California Law on behalf of borrowers who were

13  charged usurious interest, i.e., a rate in excess of 10 percent per annum.

14  Additionally, Plaintiffs seek declaratory relief on behalf of all California borrowers

15  who were provided Private Education Loans for which Sallie Mae was the *de facto*

16  actual lender, and, specifically, a ruling that the choice of law provision in the Sallie

17  Mae Private Education Loans is unenforceable.

18  2.   Sallie Mae has been allowed to commit the wrongs this suit seeks to

19  remedy by disguising and keeping secret from unsuspecting student borrowers its true

20  role as the *de facto* actual lender for Sallie Mae Private Education Loans. By making

21  it appear that the loans were made by lending institutions subject to federal

22  regulation, and the oversight that comes with that regulation, Sallie Mae has been

23  able to evade and violate state law by charging usurious rates of interest and

24  assessing punitive late fees. It was not until March of 2011 when the Department of

25  Treasury released a draft report on Sallie Mae which revealed Sallie Mae's true role as

26  the *de facto* actual lender that the information first became publicly available which

27  revealed Sallie Mae's true role as the *de facto* actual lender. Even then the

28

1

1    information was buried and released without publicity, such that class members

2    continue not to have notice of facts that would allow them to pursue and enforce their

3    rights under state law. As a consequence of Sallie Mae's concealment, the class period

4    extends as far as back as Sallie Mae has engaged in its unlawful practices that are the

5    subject of this complaint and its heretofore successful effort at concealing them.

6            3.      As used herein, Sallie Mae "Private Education Loans" are loans made by

7    Sallie Mae to students to pay for the students' cost of education, including tuition,

8    fees, and associated costs and living expenses, commonly known and marketed by

9    such Sallie Mae brand names as CEC Signature Loans, and which are not Federal

10   Family Education Loans and are not guaranteed by the federal government. The loans

11   are made by Sallie Mae, in that Sallie Mae develops and markets the loans, creates

12   and copyrights the loan application forms and promissory notes, the loan applications

13   are returned to Sallie Mae, Sallie Mae underwrites and determines whether to

14   approve the loan to the borrower, Sallie Mae services the loans and receives all

15   payments, all payments are to be made to Sallie Mae as specified in the promissory

16   note, Sallie Mae provides the funding for the loans, directly and/or indirectly through

17   such means as credit extensions and forward purchase agreements, it directs and

18   controls the disbursement of the loan proceeds, and it insures the loans. In short,

19   Sallie Mae is the *de facto* actual lender.

20           4.      Sallie Mae charges class members a late fee of 5% of the payment amount

21   not received by the scheduled payment date or $5.00, whichever is greater, each time

22   any part of a payment is not received by Sallie Mae within 15 days of the scheduled

23   payment date.   This late fee, as determined and assessed by Sallie Mae, is a

24   liquidated damages penalty and is unlawful under California law.

25           5.      In order for a liquidated damages provision such as a late fee to be

26   lawful, it must be compensatory and not punitive, *i.e.*, it must compensate the lender

27   for the cost of not receiving a payment on the scheduled date, or represent a

28

reasonable attempt to anticipate the cost.  Sallie Mae's revenue from late fees far exceeds the costs it incurs as a result of late payments.

6.    The method by which Sallie Mae calculates the amount of a late fee – 5% of the payment amount not received or $5.00, whichever is greater -- establishes that it is not, nor is it intended to be compensatory, as the amount of the late fee increases according to the amount of the payment, but the transactional servicing costs do not. Moreover, the rate itself is exorbitant, as it is equivalent to an annual interest rate of 120%.

7.    For example, the transactional servicing costs for a monthly payment $1,321.51 (the monthly installment payment on education debt of $100,000 at 10% interest for a 10 year term) is the same as it is for a monthly payment of $330.38 (the monthly payment on a debt of $25,000 with the same terms), yet Sallie Mae assesses a late fee of $66.07 as to one, and $16.51 as to the other. Both are far in excess of what implicitly represents the highest cost Sallie Mae actually incurs, $5.00, although it is believed and therefore averred that $5.00 itself still exceeds Sallie Mae's actual costs associated with a late payment on a Private Education Loan.

8.    Sallie Mae's late fee charges are punitive in another respect, as well. Although Sallie Mae Private Education Loans are fixed term loans that are repaid in monthly installments of equal amount, Sallie Mae computes and charges daily interest on its Private Education Loans. Accordingly, Sallie Mae continues to earn daily interest on the outstanding principal every day until it is actually repaid. This means that Sallie Mae both assesses the borrower a $5.00 or 5% fee because s/he has not repaid the funds, and, additionally, continues to charge the borrower daily interest for use of the funds. The result is the borrower pays Sallie Mae twice – in two different ways - for being late on a single loan payment.

9.    Sallie Mae's late fee liquidated damages provision serves to create a revenue stream for Sallie Mae by unlawfully penalizing borrowers far in excess of its

true costs associated with the late payment. In other words, Sallie Mae's late fee does not serve to compensate Sallie Mae for its true damages resulting from not receiving a payment on the scheduled date.  The provision is nothing more than the illegal assessment of a penalty and is therefore unenforceable.

10.     Sallie Mae also violates the law and overcharges borrowers in other respects related to the Private Education Loans.  In particular, Sallie Mae charges interest on the Private Education Loans in excess of the maximum legal limit set by the California Constitution, which is 10 percent per annum.

11.     Sallie Mae determines the annual interest rate to be charged a borrower by taking the prime rate and increasing it by a set amount (referred to as the "margin") according to the credit tier in which Sallie Mae places the borrower at the time the loan is approved. The "margin" ranges from 1.5% to 9.85%.  For example, the margin for a borrower placed in credit tier 5 is 9.85%, and thus if the prime rate were 3%, the interest rate charged the borrower would be 12.85%, and if the prime rate were 10%, the interest charged the borrower would be $19.85%. The "margin" amount (i.e., the amount added to the prime rate) remains the same for the life of the loan.

12.     Because the prime rate fluctuates, the interest rate charged the borrower varies over time even though the margin set by Sallie Mae does not change. Depending upon the prime rate and the amount of the margin, the interest rate charged to student borrowers by Sallie Mae can and has exceeded the 10% legal limit established by the California Constitution   Given that the prime rate has been as high as 9% during the class period, even the most credit worthy borrowers (credit tier 1 with a margin of 1.5%) have been charged usurious interest. (*See* ¶50, Table 2, *infra*.) The interest rate charged student borrowers placed in credit tiers 4 and 5 have exceeded the lawful rate of 10% for the entire class period.

13.     In addition, the *effective rate of interest* on the Private Education Loans is often even higher than the stated annual rate because Sallie Mae assesses a variety

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

of loan fees, including late fees and supplemental fees upon disbursement and repayment of the loan.

14.     Both Sallie Mae's late fees and its supplemental fees charged upon disbursal or repayment of funds constitute additional forms of interest charged by Sallie Mae on the Private Education Loans. Cal. Const., art. XV, § 1.

15.     Thus, Sallie Mae has during the class period frequently charged student borrowers usurious interest rates on the Private Education Loans, either directly through the assessment of interest at the variable rate, or indirectly through the assessment of interest at the variable rate in combination with late and/or supplemental fees creating an effective rate of interest in excess of the 10 percent annual limit.

16.     As a result of its illegal liquidated damage penalty and usurious interest rates, Sallie Mae has collected and continues to collect millions of dollars from class members to which it is not entitled.  This class action seeks to stop Sallie Mae from continuing to assess these unlawful late payments and interest rates going forward, and to restore to Plaintiffs and class members the amount of unlawful late fees and interest paid on the Private Education Loans, or alternatively to disgorge Sallie Mae's profits from its unlawful conduct to Plaintiffs and class members.

17.     Sallie Mae attempts to evade California law and the protections it provides student loan borrowers against punitive, non-compensatory late fees and usurious interest rates by making it appear as if the loans are made by a National Bank or state chartered bank located in a different state, and subject to the laws of the bank's home state, pursuant to the National Bank Act, 12 U.S.C. sections 85, 86, the Federal Deposit Insurance Act, or similar laws. Sallie Mae does so by selecting a National Bank or state chartered bank to include its name on Sallie Mae's preprinted loan application and referring to it as the lender. According to the terms of the promissory note, the loan contract is with the nominee lender.

18.     Further, Sallie Mae includes a one-sided assignment clause in its copyrighted promissory notes, and by advance agreement and understanding, the nominee lender assigns the loan contract to Sallie Mae.  Sallie Mae maintains the assignment includes a National Bank Act, Federal Deposit Insurance Act or similar laws' preemption defense, which allows it to charge late fees and interest according to nominee bank's home state laws. In effect, the nominee bank monetizes its National Bank or state bank charter by allowing its name to be used by Sallie Mae, and Sallie Mae pays to use the name of the bank so that it may evade and violate California law. The assignment, however, does not include a National Bank Act or a Federal Deposit Insurance Act preemption defense because the nominee bank did not make the loan and thus has no National Bank Act, Federal Deposit Insurance Act or similar laws preemption defense to assign in the first instance, as the loan is made by Sallie Mae, which is the *de facto* actual lender.

19.     Sallie Mae also attempts to evade California law and the protections it provides student loan borrowers by including in its promissory notes a choice of law provision selecting the law of the state in which the nominee bank is located. However, Sallie Mae's nominee banks have no substantial relationship to the student loan borrowers or the Private Education Loans transactions, as the nominee banks do not set or control the terms and conditions of the loans, do not approve or disapprove borrowers, do not direct disbursement of the loan monies, and do not originate the loans.  As such, there is no nexus sufficient to support or justify application of the choice of law clause and it is unenforceable.

## II.     PARTIES

20.     Plaintiff Tina M. Ubaldi is a citizen of the State of California residing in San Mateo County, California.  On June 24, 2003, Ms. Ubaldi entered into a Private Education Loan agreement in the State of California that has been owned for most or all of the loan's lifetime by Sallie Mae, and serviced since it was made by Sallie Mae,

1    Inc. (or by Sallie Mae Servicing LLP until it was merged into Sallie Mae, Inc.), which

2    charged her late fees on several occasions. Ms. Ubaldi was a citizen and resident of the

3    State of California at the time she entered this loan on June 24, 2003, and has

4    continued to be a citizen and resident of the State of California at all times since then.

5        21.    Plaintiff Chanee Thurston is a citizen of the State of California residing

6    in Benicia in Solano County, California.  On October 10, 2001 and October 16, 2002,

7    Ms. Thurston entered into Private Education Loan agreements in the State of

8    California that have been owned for most or all of the life of the loans by Sallie Mae,

9    and serviced since they were made by Sallie Mae, Inc. (or by its predecessor that was

10   merged into Sallie Mae, Inc.), which charged her usurious interest as well as late fees

11   on multiple occasions.  Ms. Thurston was a citizen and resident of the State of

12   California at the time she entered into each of these Private Education Loan

13   agreements, and has continued to be a citizen and resident of the State of California at

14   all times since then.

15       22.    Defendant SLM Corporation is a publicly traded Delaware corporation

16   with its principle executive office at 300 Continental Drive,  in Newark, Delaware,

17   according to its 2012 Form 10-K.  Defendant SLM Corporation, directly and/or

18   through one or more of its subsidiaries, is engaged in the business of originating,

19   servicing and purchasing loans that finance the cost of a student's education.

20       23.    SLM Corporation, or its predecessor in interest, the Student Loan

21   Marketing Association, made, as the *de facto* actual lender, Plaintiffs' and other class

22   members' Private Education Loans and serviced them under the name Sallie Mae

23   Servicing LLP, which was a division of Defendant SLM Corporation until December

24   31, 2003, when Sallie Mae Servicing LLP was merged into Sallie Mae, Inc., and

25   thereafter Sallie Mae, Inc. serviced them. Sallie Mae owns Plaintiffs' and other

26   education loans under various names (*e.g.,* Sallie Mae Trust). Sallie Mae owns,

27   manages or services over 11 million student loans totaling more than $235 billion.

28

24.     Defendant Sallie Mae, Inc., a private company, is the corporate management and marketing subsidiary of Defendant SLM Corporation, and services Private Education Loans. Sallie Mae, Inc. has serviced Plaintiffs' loans and other class members' Private Education Loans since they were made to the present, either under its own name or through Sallie Mae Servicing LLP which was merged into Sallie Mae, Inc. in December, 2003. Sallie Mae, Inc. has assessed and collected Late Fees from Plaintiffs and other class members and has charged Plaintiff Thurston and other class members an annual interest rate in excess of 10 percent per annum.

25.     Defendant SLM PC Student Loan Trust 2004-A, purchased Plaintiff Ubaldi's loan on March 25, 2004 and remains the owner of her loan. As the owner of Plaintiff Ubaldi's loan and other Private Education Loans, SLM PC Student Loan Trust 2004-A has and continues to benefit from the assessment and collection of Late Fees and usurious interest.

## III.     JURISDICTION AND VENUE

26.     Jurisdiction of this Court is proper under 28 U.S.C. § 1332 as complete diversity between the parties exists.  Representative Plaintiff Tina M. Ubaldi is a citizen of California residing in San Mateo County.  Representative Plaintiff Chanee Thurston is a citizen of California residing in Solano County, California. Sallie Mae is incorporated in the State of Delaware and has its primary offices in Newark, Delaware.

27.     Upon information and belief, the amount in controversy exceeds $5,000,000 for Representative Plaintiffs and class members collectively, exclusive of interest and costs, by virtue of the revenue and profit reaped by Sallie Mae from its transactions with Plaintiffs and the class, as a direct and proximate result of the wrongful conduct alleged, and by virtue of the injunctive and equitable relief sought.

8

28.     Upon information and belief, based upon the number of Private Education Loans Sallie Mae services annually, the total number of class members is likely to number in the thousands if not hundreds of thousands.

29.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) and (c). Sallie Mae has agents, transacts business or is found within this judicial district. A substantial portion of the underlying transactions and events complained of occurred in this district, and affected persons who reside or resided, in this judicial district. Sallie Mae has received substantial compensation from such transactions and business activity in this judicial district, including as the result of servicing student loans for persons residing in this judicial district. Finally, Sallie Mae resides and/or may be found in this judicial district and the interstate trade and commerce described herein is and has been carried out in part within this judicial district.

**IV.     FACTUAL ALLEGATIONS**

30.     Sallie Mae makes "Private Education Loans" to students to pay for the students' cost of education, including tuition, fees, and associated costs and living expenses, commonly known and marketed by such Sallie Mae brand names as CEC Signature Loans, and which are not guaranteed by the federal government.

31.     Sallie Mae develops and markets its Private Education Loans, creates and copyrights the loan application forms and promissory notes, the loan applications are returned to Sallie Mae, Sallie Mae underwrites and determines whether to approve the borrower, Sallie Mae services the loans and receives all payments, all payments are to be made to Sallie Mae as specified in the promissory note, Sallie Mae provides the funding for the loans, directly and/or indirectly through such means as credit extensions and forward purchase agreements, it directs and controls the disbursement of the loan proceeds, and it insures the loans. In short, Sallie Mae is the *de facto* actual lender.

32.     Borrowers taking out Private Education Loans are required to sign a student loan promissory note.  These student loan promissory notes are standard form contracts of adhesion offered on a "take it or leave it" basis.  Borrowers taking out Private Education Loans have no opportunity to negotiate the terms of their student loan promissory notes.  Each promissory note for the Private Education Loans have the same or materially similar provisions, which, along with Sallie Mae's uniform loan servicing activities, form the basis of Plaintiffs' complaint.[1]

### A.     SALLIE MAE CHARGES UNLAWFUL FEES

33.     Private Education Loans that Sallie Mae services require borrowers to make a payment on or before a specific date as established by their repayment schedule.  If a payment is not received by the scheduled date, it is a breach of the promissory note.  Upon a breach for failing to make a payment on time, the borrower is considered in default and Sallie Mae can assess a "Late Charge" as defined by the promissory note.  *See* Exh. 1, ¶¶ A, D5, E and J.

34.     The Private Education Loans define "Late Charge" as follows:  "I will pay a Late Charge if I fail to make any part of an installment payment within 15 days after it becomes due.  The amount of the Late Charge will be identified on my Disclosures."  Exh. 1, ¶ E.   Sallie Mae's Disclosure Statement identifies the Late Charge as follows:  "If any part of an installment is more than 15 days late, you may have to pay a late charge of $5.00 or 5% of the installment, whichever is greater."  While the language in Sallie Mae's Disclosure Statement is *permissive*, Sallie Mae *always* assesses this Late Charge each time a payment is more than 15 days late in the amount of 5% of the amount due, with a minimum charge of $5.00.

---

[1]   An example of a promissory note from the time period in which Plaintiffs took out their loans is attached as Exhibit 1.   Plaintiff Ubaldi's substantively identical promissory note is attached at Exhibit 2.

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

35.     Sallie Mae's transactional servicing costs of a late payment are unaffected by, and have no relationship to, the amount of the payment. For example, the transactional servicing costs for a monthly payment of $1,321.51 (the monthly installment payment on education debt of $100,000 at 10% interest for a 10 year term) is the same as it is for a monthly payment of $330.38 (the monthly payment on a debt of $25,000 with the same terms), yet Sallie Mae assesses a late fee of $66.07 as to one, and $16.51 as to the other. Both of which are far in excess of what implicitly represents the highest cost Sallie Mae actually incurs, $5.00, although it is believed and therefore averred that $5.00 itself still exceeds Sallie Mae's actual costs associated with a late payments on a Private Education Loan.

36.     Although Sallie Mae Private Education Loans are fixed term loans that are repaid in monthly installments of equal amount, Sallie Mae computes and charges daily interest on its Private Education Loans. Accordingly, Sallie Mae continues to earn daily interest on the outstanding principal every day until it is actually repaid. This means that Sallie Mae both assesses the borrower a $5.00 or 5% fee because s/he has not repaid the funds, and, additionally continues to charge the borrower daily interest for use of the funds. The result is the borrower pays Sallie Mae twice - in two different ways - for being late on a single loan payment.

37.     Under California law, a liquidated damages clause such as Sallie Mae's Late Charge is an unlawful penalty if it bears no reasonable relationship to the actual costs that the parties could have anticipated would flow from a breach, or if the amount does not represent the result of a reasonable endeavor to estimate a fair average compensation for any loss that may be sustained.  Cal.Civ.Code § 1671.  In a consumer contract, a liquidated damages clause such as Sallie Mae's Late Charge is only allowed if it was impracticable or extremely difficult to fix the actual damages resulting from a breach, which is not the case here.  Cal.Civ.Code § 1671(d).  Sallie Mae's Late Charge violates California Law under both of these principals.

1    38.    The Late Charge is not reasonably related to any damages actually

2 suffered by Sallie Mae due to a late payment.  The accounting for payments made,

3 interest charged, and payments missed is done by a computer with little, if any,

4 human interaction.   Sallie Mae's servicing costs thus are the same no matter the

5 amount of the overdue installment. Yet, Sallie Mae's Late Charge is a percentage of

6 the amount owed, no matter the size of the installment.

7    39.    It is neither impossible nor extremely difficult for Sallie Mae to fix its

8 actual costs resulting from a late payment.  Indeed, Sallie Mae already specifies in

9 writing that its required late payment penalty may be as little as five dollars.

10    40.    The true purpose behind Sallie Mae's Late Charge is to punish borrowers

11 who make a payment late, and to create an additional revenue stream for itself.  Sallie

12 Mae is reaping hundreds of millions of dollars in profits from late fees alone.

13 According to Sallie Mae's annual report filed with the Securities and Exchange

14 Commission, Sallie Mae collects late fees as part of its servicing revenue for third

15 party serviced loans, as well as loans in its own portfolio.  2010 10-K, p. F-21.  In its

16 revenue statements, Sallie Mae considers late fees as part of its fee income and

17 records it as "other income" along with forbearance fees in its consolidated statements

18 of income.

19    41.    In 2007, Sallie Mae earned approximately $134 million from late fees

20 alone, and along with forbearance fees, reported $135.6 million as "Other Income."

21 Sallie Mae's 2007 10-K, pp. 86 and F-64.  In 2008, Sallie Mae collected approximately

22 $143 million in late and forbearance fees (2008 10-K, p. 37), and $146 million in 2009

23 (2009 10-K, p. 42).

24    42.    During these same periods, Sallie Mae by comparison collected only a

25 fraction of this amount as actual servicing fees on the loans it services.  In 2007, it

26 collected just over $26 million (2007 10-K, p. F-64), $26 million in 2008 (2008 10-K, p.

27 37) and $53 million in 2009 (2009 10-K, p. 42).   Thus, Sallie Mae's revenue from late

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

fees was on average some 3 to 5 times greater than its actual fees for servicing the loans. This illustrates that Sallie Mae late fees were not merely compensatory, but instead were a profit center for Sallie Mae and an unlawful liquidated damages penalty charged to Plaintiffs and class members.

43. Sallie Mae's 2010 10-K indicates that service revenue for its Consumer Lending segment primarily includes late fees and forbearance fees. 2010 10-K, p. 49. This is the segment that includes originating and servicing Private Loans specifically. Sallie Mae netted service revenue for its Consumer Lending segment totaling $72 million in 2010, $70 million in 2009, and $65 million in 2008.

44. Because Sallie Mae charges interest daily until it receives a payment, the only actual cost of a late payment is the transactional cost associated with the late payment. The manner in which Sallie Mae computes the late fees its assesses on Private Education Loans – as a percentage of the payment -- establishes that the late fee is as a matter of fact and law not compensatory since its transactional costs do not increase based on the amount of the late payment. It is rather a penalty exacted to create a revenue source and, as such, it is an unlawful liquidated damages provision under California law. Plaintiffs further believe and therefore aver that the $5.00 minimum late charge itself still exceeds Sallie Mae's actual costs associated with late payments on a Private Education Loan, and likewise is an unlawful liquidated damages provision under California law.

**B. SALLIE MAE CHARGES USURIOUS INTEREST RATES**

45. California law limits the amount of interest that may be charged on loans such as the Private Education Loans to 10% annually. *See* Cal. Const., art. XV, § 1(1) (Permitting the charging of interest based upon a written contract "[f]or any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum"). This limit applies not only to annual percentage

rates referred to by a lender as "interest" but also includes interest charged in the form of fees.  *Id.* ("No…corporation shall by charging any fee…or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action.").

46.    Sallie Mae's Private Education Loans accrue interest from the date of disbursal until payment in full at a "Variable Rate" set by Sallie Mae.  *See* Exh.1  ¶ C.1.

47.    The Variable Rate is defined as:

> the annual rate equal to the sum of the highest Prime Rate published in The Wall Street Journal Credit Markets' section, "Money Rates' table on the fifteenth day of the last month of the quarter prior to a borrower's Disbursement or Change Date plus or minus the percentage as identified on my Disclosure Statement, which is hereby incorporated into this Note, per annum (the "Margin") and rounded to the nearest one-eighth (0.125) of one percent.  (For example, the Variable Rate for each quarter beginning January 1st will be determined by the applicable Prime Rate published on the preceding December 14th.)  The Margin is based on my School, credit history and co-borrower·s credit history. Once set, the Margin does not change.  The actual interest rate during the quarter in which my loan is disbursed will be on my Disclosure Statement."

Exh.1  ¶ C.2.  Thus, in any given quarter, Sallie Mae charges interest on the Private Education Loans at a Variable Rate equal to the (variable) Prime Rate plus the (fixed) Margin set by Sallie Mae and identified in the borrower's disclosure statement.

48.    During the Class Period, the federal Prime Rate fluctuated between 3.25% and 9.5%. *See* historical data for Federal Prime Rate available at http://www.federalreserve.gov/releases/h15/data.htm.  The Prime Rate published in the Wall Street Journal reflects the federal Prime Rate, and, accordingly, also ranged between 3.25% and 9.5% during the Class Period.

49.    The fixed Margin added to the Prime Rate and charged to student borrowers was set between 1.5% snf 9.85% based upon Sallie Mae's estimation of

borrower's creditworthiness, as indicated in a Chart ("Table 1") provided by Sallie Mae to Career Education Services in 2002:

### CEC SIGNATURE LOANS

| Credit Tier | Interest Rate | Disbursement Fee | Repayment Fee |
|:---:|:---:|:---:|:---:|
| **1** | Prime + 1.5% | 4% | 0% |
| **2** | Prime + 2.5% | 4% | 0% |
| **3** | Prime + 4.0% | 4% | 0% |
| **4** | Prime + 5.5% | 6% | 0% |
| **5 with a co-borrower** | Prime + 8.0% | 6% | 0% |
| **5 w/o a co-borrower** | Prime + 9.85% | 6% | 0% |

(Exh.7, 08/20/02 Letter from Sallie Mae to CEC, at SNB00070).

50.    As reflected in the chart below ("Table 2"), the Variable Interest Rate charged borrowers who Sallie Mae placed in Credit Tiers 5 and 5 (w/o co-borrower) always exceeded the 10% annual limit during the class period, and has been as much as 19.35 percent per annum (nearly double the legal limit).



[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

51.     In addition, the effective rate of interest charged by Sallie Mae on the Private Education Loans was in some cases even higher than the Variable Rate, because Sallie Mae assesses a variety of loan fees, including late fees, supplemental fees upon disbursement and repayment of the loan, and forbearance fees.

52.     Sallie Mae charges a "Late Charge" whenever a student borrower fails to make any part of an installment payment within 15 days after it becomes due.  *See* Exh. 1, ¶ E.  Sallie Mae's Disclosure Statement identifies the Late Charge as follows: "If any part of an installment is more than 15 days late, you may have to pay a late charge of $5.00 or 5% of the installment, whichever is greater."

53.     Sallie Mae also charges a "Supplemental Fee" on the Private Education Loans upon disbursement of the loan proceeds, and/or when the loan entered repayment status (and after unpaid interest accrued while the student borrower was in school had been capitalized).  Exh. 1, ¶F(1,2).  The amount of the Supplemental Fees was set based upon "a percentage of the principal balance" of the loan and may include any capitalized interest.  *See id.*

54.     Sallie Mae's Late Charges and Supplemental Fees constitute additional forms of interest charged by Sallie Mae on the Private Education Loans. Cal. Const., art. XV, § 1.  These fees are devices by which Sallie Mae earns additional profit on the Private Education Loans rather than remuneration for any expense.

55.     Because Sallie Mae charged additional interest to student borrowers through its fees, including Late Charges and Supplemental Fees, even if the Variable Rate itself did not exceed the legal limit of 10 percent per annum, the overall interest charged by Sallie Mae on a student borrower's Private Education Loan could, and, upon information and belief, in many cases did, still exceed the legal limit.

56.     Thus, Sallie Mae has charged a large number of student borrowers usurious interest rates on the Private Education Loans, either directly through the assessment of the Variable Rate, or indirectly through the assessment of interest at

the Variable Rate in combination with the assessment of interest through fees such as Late Charges and/or Supplemental Fees that together create an effective rate of interest in excess of the 10 percent annual limit.

57. Sallie Mae earned billions of dollars of interest on its Private Education Loans throughout the class period, both directly through the assessment of interest at the Variable Rate and indirectly through the assessment of fees, including millions of dollars in interest to which it was not entitled and which it was not permitted to charge under California law.

58. In 2007, Sallie Mae earned approximately $2,582 million ($2.582 billion) in net interest income on its Private Education Loans, which constituted 36% of Sallie Mae's overall "Core Interest Income" prior to provision for loan losses. (2009 10-K, pp. 15, 60) Net interest income earned on the Private Education Loans was $1,551 million ($1.551 billion) in 2008 and $1,546 million ($1.546 billion) in 2009. (2010 10-K, p.47)

59. Sallie Mae cannot justify the usurious interest rate it charges borrowers on the Private Education Loans in violation of California law, and the interest it received unlawfully represents a windfall to Sallie Mae. This is particularly true given that private education loans are not dischargeable in bankruptcy, *see* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (P.L. 109-8, 10/17/2005), codified at 11 U.S.C § 523(a)(8), thereby ensuring that Sallie Mae will be repaid its principal and any amounts of interest that it charged on the Private Education Loans.

## C. SALLIE MAE USES NOMINEE BANKS AS PURPORTED LENDERS TO MANUFACTURE A PREMPTION DEFENSE TO EVADE STATE LAW

60. Sallie Mae attempts to evade California law and the protections it provides student loan borrowers against punitive, non-compensatory late fees and usurious interest rates by making it appear as if the loans are made by a National

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

Bank or state chartered bank located in a different state, and subject to the laws of the bank's home state, pursuant to the National Bank Act, 12 U.S.C. sections 85, 86, the Federal Deposit Insurance Act, or other similar laws. Sallie Mae does so by selecting a National Bank or state chartered bank and including its name in its preprinted loan application and referring to it as the lender. According to the terms of the promissory note, the loan contract is with the purported lender.

61.     Further, Sallie Mae includes a one-sided assignment clause in its copyrighted promissory notes, and by advance agreement and understanding, the nominee lender assigns the loan contract to Sallie Mae. Sallie Mae maintains the assignment includes a National Bank Act, Federal Deposit Insurance Act or similar preemption defense, which allows it to charge late fees and interest according to nominee bank's home state laws. In effect, the nominee bank monetizes its National Bank or state bank charter by allowing its name to be used by Sallie Mae, and Sallie Mae pays to use the name of the bank so that it may evade and violate California law. The assignment, however, does not include a National Bank Act preemption defense because the nominee bank did not make the loan and thus has no National Bank Act, Federal Deposit Insurance Act or similar preemption defense to assign in the first instance, as the loan is made by Sallie Mae, which is the *de facto* actual lender.

62.     Sallie Mae has financial relationships with banks which it refers to as "lender-partners."  Sallie Mae enters into what it has called and what in substance are "forward purchase commitment agreements" with these "lender-partner" banks. Under these agreements, the "lender-partner" bank purportedly acts as the lender of record, but in reality Sallie Mae makes the Private Education Loans by funding them through a standing credit arrangement with the "lender-partner" and/or by a standing obligation to purchase - immediately or shortly after complete disbursement of the loan is made - the Private Education Loans from the banks at rates set by the forward purchase commitment agreements. Moreover, the Private Education Loans also use

Sallie Mae's own underwriting, copyrighted forms, promissory notes, brands and/or proprietary platforms to initiate the loans and Sallie Mae services the Private Education Loans.

63.     For instance, Sallie Mae has cultivated such a financial relationship with "lender-partner" Stillwater National Bank ("Stillwater"), a national bank located in Oklahoma that Sallie Mae identified as the lender on Plaintiffs' application forms.  As reflected in the 10-K filed by Southwest Bancorp Inc. (Stillwater's parent company) for 2010:

> student lending … is substantially dependent on Student Loan Marketing Administration ("Sallie Mae"), which provides substantially all of the servicing for government guaranteed and private student loans and provides liquidity through its purchases of student loans and lines of credit.  Southwest makes government guaranteed student loans and private student loans.  At December 31, 2010, all private student loans were self-insured by Sallie Mae.

64.     Upon information and belief, national or state-chartered banks such as Stillwater have no true role or relationship to the loans that are made by Sallie Mae in their names, and merely maintain bank accounts from which Sallie Mae can issue disbursements and/or be reimbursed for the money it disperses directly to students. Sallie Mae also makes lines of credit available to its "lender-partners" with lines of credit that they can draw upon for the purpose of funding such loans as directed by Sallie Mae.  Moreover, because the third-party banks transfer the Private Education Loans to Sallie Mae after origination under a pre-arranged agreement as described herein, the third-party banks never truly undertake the risk of loss.

65.     Sallie Mae exerts control and ownership over all Private Education Loans in other ways as well.  Sallie Mae carries out all interactions with the borrowers applying for the Private Education Loans, establishes and controls the terms and conditions under which the Private Education Loans are offered. It approves or denies borrowers' Private Education Loan applications in accordance with its own underwriting policies, uses its own copyrighted forms, promissory notes, brands and

platforms, and disburses the payments to those borrowers who it approves for Private Education Loans.

66.     Sallie Mae collects and keeps the vast majority of fees and interest on the loans.   This arrangement is effectuated pursuant to materially-similar assignment clauses that Sallie Mae includes in its copyrighted promissory notes for the Private Education Loans.  The assignment provisions are one-sided, stating that the lender (but not borrower) "may assign this loan at any time" and "if… assigned, the Assignee will become the owner of this Note and will have all your rights to enforce this Note against me."

67.     Sallie Mae bears the credit risk on all the Private Education Loans. Sallie Mae insures and/or guarantees the Private Education Loans so that Sallie Mae bears the risk of loss on the loans even prior to purchasing them.   Sallie Mae then assumes the risk of loss directly when it executes the assignments of the Private Education Loans pursuant to the forward purchase commitment agreements.

68.     In reality, Sallie Mae is the *de facto* actual lender for its Private Education Loans.  Sallie Mae owns and markets the Private Education Loans brands, and underwrites the loans, directs the terms of the loans, funds the loans directly or indirectly, does all of the work to service the loans, bears the credit risk, and reaps most or all of the fees and profits from the Private Education Loans.

69.     None of the Private Education Loans are made by national banks, within the meaning or application of NBA §§ 85 and 86, nor are they made by qualifying bank entities under parallel state charters as provided by the Federal Deposit Insurance Act or other similar laws.

D.     **THE UNITED STATES DEPARTMENT OF THE TREASURY FOUND THAT THE PRIVATE EDUCATION LOANS WERE MADE BY SALLIE MAE**

70.     In 2002, the Department of the Treasury determined that Sallie Mae predecessor in interest Student Loan Marking Association (SLMA) was originating

loans (and incorrectly attributing these loans to its banking partners) even though it was a Government Sponsored Entity and forbidden to engage in loan origination activities.

71.     In correspondence dated August 30, 2002 to the Department of the Treasury Office of Sallie Mae Oversight (OSMO), Sallie Mae disputed the Treasury's draft findings, *see* Exhibit 4 at UST-Ubaldi 011, and explained its activities as follows:

> SLMF does not make Career Training Loans. Rather, the GSE has entered into loan purchase agreements with various lenders under which the GSE provides loan origination services and loan servicing to the lenders and purchases loans from the lenders. Copies of the various loan purchase agreements are available upon request. The GSE in turn subcontracts the loan origination servicing and the loan servicing functions to SLMF. The loan purchase agreements between the GSE and its lender partners governing Career Training Loans are very similar to the ExportSS agreements that the GSE enters into with its FFELP lender clients. In all cases, the Career Training Loans are actually made by federally chartered or state chartered lenders. The lenders make these loans with their own funds. Further, each lender in the Career Training Loan program represents and warrants in the loan purchase agreements that it is the sole owner of the loans free and clear of any liens, claims or encumbrances of any nature, and is free to transfer title to the loans to the GSE. Furthermore, the lenders have the right to retain 20 percent of the original principal balance of all Loans that they make under the Career Training Loan Program. This is consistent with the terms of the GSE's loan purchase agreements in the Signature Loan Program.

72.     Notwithstanding Sallie Mae's objections, in its final September 2002 Report of Examination of the Student Loan Marketing Association[2], the OSMO reiterated its initial determination that this activity as structured constituted loan origination by Sallie Mae, stating:

---

[2] Neither Sallie Mae's Aug. 2002 letter nor the OSMO's Sept. 2002 Report of Examination is publicly available. These documents were obtained by Plaintiff Ubaldi through a subpoena served on the Department of Treasury in connection with this action.

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

**Origination versus Secondary Market Activity**.  The GSE purchases loans in the secondary student loan market; it generally does not originate student loans for its own account. In 1998, SLM Corporation had extensive discussions with Treasury about its plans to originate federally insured student loans for its own account (the Origination Program).  Treasury stressed the ban on direct and indirect funding of non-GSE affiliate loan origination activity by the GSE.  In 1998, SLM Corporation's Management represented to Treasury that the Origination Program would be conducted separately from the GSE.  In a legal memorandum dated March 31, 1998, Management represented to OSMO that the Origination Program would "not be funded with proceeds from debt issued by the GSE and … loans made under the program [would] not be sold to the GSE." Thus, all apparently understood and acknowledged it would undermine the statutory restriction on loan origination by the GSE, if a non-GSE affiliate originated loans and the GSE then purchased the loans.  This point was again acknowledged in the Nellie Mae acquisition in 1999, when Management represented in a letter to Treasury dated May 21, 1999, that "no loans originated by [Nellie Mae] will be transferred to the GSE."  Based on SLMF's relationship with its banking partners, OSMO concluded that SLMF, in substance originates loans.  Further, the Holding Company has consistently represented, via its filings with the Securities and Exchange Commission, that SLMF originates its loans.

Exhibit 5, September 2002 OSMO Report of Examination at 5.

73.     Subsequently, in a 2006 draft report first published on its website in 2011, the federal Office of Sallie Mae Oversight (OSMO) also stated:

> Based on its examination of SLMA's relationship with its funding bank partners, OSMO concluded that SLMA, in substance, was originating certain private loans.  The funding banks did not take long-term possession of the notes signed by the student borrowers, nor did they assume the credit risk associated with the notes.  The GSE [SLMA] unconditionally purchased the notes, generally within a month, even in case of the borrower's death.  Further, the economic substance of the payments by SLMA to the funding banks reflected loan origination via a "storefront" rather than second market activity.

Exhibit 6, Excerpts of OSMO 2006 Draft Report, at p.142.

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

74.    The OSMO Report further explained, "[i]n a true secondary market, a bank would sell its asset into the secondary market (i.e., to Sallie Mae) at its fair value.  However, in practice that was not how these loans 'sold' to Sallie Mae were priced."  *Id.* at 142 n. 199. Instead, "[t]he loans were sold to Sallie Mae by its "storefront banks" at cost plus interest during the holding period rather than at fair value.  This was, in effect, origination by SLMA."  *Id.*

E.    **DISCOVERY PRODUCED IN THIS ACTION CONFIRMS THAT SALLIE MAE MADE PLAINTIFFS' LOANS AND WAS THE *DE FACTO* ACTUAL LENDER FOR PLAINTIFFS' LOANS**

75.    Consistent with the OSMO's conclusion based upon its 2002 examination of Sallie Mae, discovery in this action to date, specifically including the ExportSS® form agreement between Sallie Mae and its lender partner Stillwater Bank, confirms Sallie Mae was the *de facto* actual lender for its Private Education Loans, including those loans made to Plaintiffs.

76.    On July 1, 2002, SLMA and Stillwater entered into an ExportSS® Agreement.  The ExportSS® is a form agreement that Sallie Mae used with multiple of its "lender-partners" in connection with the origination of the Private Education Loans.  A copy of the ExportSS® Agreement between Sallie Mae and Stillwater and amendments thereto is attached as Exhibit 7.

77.    The ExportSS® Agreement refers to Sallie Mae as the entity originating the Private Education Loans. *See* Exh. 7 at SNB000003 ("You and we agree that only we [Sallie Mae] and our affiliates will originate and process" the Private Education Loans).

78.    The ExportSS® Agreement establishes that Stillwater did not assume any risk of loss on the Private Education Loans.  Instead, Sallie Mae assumed the risk of loss on the Private Education Loans, since it required Stillwater to assign and sell the loans to Sallie Mae within a matter of months, and it required Sallie Mae to buy

1  the entire interest in those Private Education Loans. *See* Exh. 7 at SNB000018 ("you

2  agree to offer to us on the sales schedule set forth below… all Eligible Private Loans

3  originated by us or our affiliate"); *id.* at SNB00019 ("we **will** purchase all Eligible

4  Private Loans that we originate on your behalf") (emph. added).

5       79.    The ExportSS® Agreement demonstrates that Sallie Mae controlled the

6  terms and conditions of the loans.  In particular, under the Agreement, Sallie Mae

7  could, but was not "obligated" to use its own underwriting standards and would

8  approve or deny borrowers without consulting Stillwater. Exh. 7 at SNB00004-5,

9  00079-81.  Sallie Mae would supply the "design template" for the promissory note,

10  loan application forms, and related marketing materials, *id.* at SNB00011, and Sallie

11  Mae reserved final rights of approval on the forms.  *Id* ("You further agree that you

12  will not alter the content or description of Application Materials without our express

13  written consent. Sallie Mae shall have final approval of Application Materials prior to

14  distribution.").

15       80.    The ExportSS® Agreement establishes that the purported "lender"

16  identified on the loan application forms never actually paid any money to the schools

17  attended by the student borrowers.  Instead, the ExportSS® Agreement specifies that

18  loan monies are to be disbursed by Sallie Mae from its own accounts to the schools

19  attended by the students.  *See* Exh. 7 at SNB00005 ("We will disburse Loan

20  proceeds… Funds for these Loans will be drawn from a bank account maintained by

21  us").

22       81.    At the time that Sallie Mae predecessor in interest SLMA entered into

23  the ExportSS® Agreement with Stillwater Bank any loans it made would not be

24  protected by federal preemption as SLMA was not a bank.  Thus, as the ExportSS®

25  Agreement demonstrates, Sallie Mae and its lender partners engaged in a subterfuge

26  in which Stillwater was named as the lender of record, even though Sallie Mae made

27  the loan and was the *de facto* actual lender.

28

82.    Nominee lenders such as Stillwater made short-term business loans to Sallie Mae; nominee lenders such as Stillwater did **not** make loans to student borrowers.  Beginning in or about 2005, Sallie Mae in some instances paid the nominee lender a lower interest rate on the funds than it charged the borrowers (during the 90 to 180 day period between disbursement and assignment and sale of the loan to Sallie Mae), further demonstrating that the banks were effectively providing Sallie Mae with a short-term credit facility rather than making loans to student borrowers. (Stillwater Form 10-K, 2005, p. 26)

83.    In sum, as reflected in the ExportSS® form agreement between Sallie Mae and Stillwater Bank, national or state-chartered banks such as Stillwater have no true role or relationship to the loans that are made by Sallie Mae in their names.

F.    **SALLIE MAE INCLUDES AN UNENFORCEABLE CHOICE OF LAW PROVISION DESIGNED TO EVADE CONSUMER PROTECTION LAWS**

84.    Sallie Mae includes a self-serving choice-of-law provision in its copyrighted promissory notes, selecting the law of the nominee lender's home state. The promissory note states: "I understand that you are located in the State listed on the front of the attached application and this Note will be entered into in the same State.  Consequently, the provisions of this Note will be governed by federal laws and the laws of that State, without regard to conflict of law rules."  Exh. 1, ¶L.3.

85.    The law selected by Sallie Mae's choice-of-law provision bears no substantial or reasonable relationship to the parties or the Private Education Loan transactions because the nominee banks have no involvement in the making of the Private Education Loans and are not the actual lenders for the Private Education Loans. The provision is therefore unenforceable.

86.    For instance, although Sallie Mae's promissory note would make Plaintiffs' loans subject to Oklahoma law, Sallie Mae does not maintain its principal place of business in Oklahoma.  Conversely, while nominee lender Stillwater Bank is

located in Oklahoma, it has no involvement in making or servicing the loans, and has no relationship whatsoever with the Plaintiffs.  In fact, under the arrangement between Sallie Mae and Stillwater, the identity of individual borrowers only becomes known to Stillwater (if ever) after the loan is made by Sallie Mae and after the funds have been disbursed by Sallie Mae.  *See* Exh. 7, SNB 000005 ("we will send two master checks to each school…together with a disbursement roster… and we will send you a copy of the portion of the disbursement roster that lists information for your borrowers").

87.     Under these circumstances, there is no nexus between the student borrowers who took out the Private Education Loans in California and the foreign state law chosen by Sallie Mae, and it would be contrary to law and equity for law other than the law of California to apply.

V.    **REPRESENTATIVE PLAINTIFFS AND THE CLASSES**

A.    **PLAINTIFF TINA UBALDI**

88.     On June 24, 2003, Plaintiff Tina M. Ubaldi took out a Private Education Loan in California referred to as a CEC Signature Education Loan in the total amount of $22,765.00, which was disbursed to her as follows: $17,756.96 on June 24, 2003 and $5,918.64 on October 13, 2003.  (Exh. 8).  This loan was co-signed by Lamoyne L. Porter, II, who was at the time and has since then been a California resident.  (Exh. 9).  This loan was used to help Ms. Ubaldi pay for her education at the California Culinary Academy in San Francisco, California.  This loan was made by Sallie Mae, or its predecessor in interest, the Student Loan Marketing Association, pursuant to a forward purchase commitment agreement with Stillwater National Bank intended to disguise Sallie Mae's role as the *de facto* actual lender.

89.     On or before December 18, 2003, this loan was assigned to Sallie Mae or its predecessor in interest, the Student Loan Marketing Association.

90.     On March 25, 2004, SLM PC Student Loan Trust 2004-A purchased Plaintiff Ubaldi's loan and remains the owner of her loan.

91.     Sallie Mae, operating as Sallie Mae Servicing LLP and later as Sallie Mae, Inc. has serviced Plaintiff Ubaldi's Private Education Loan since its inception. (Exh. 8).

92.     Plaintiff Ubaldi applied for her CEC Signature Education Loan using a loan application form copyrighted and written by Sallie Mae in May 2003.  The "CEC Loan Application" listed Sallie Mae's name and telephone number prominently on the top of the form, and directed Plaintiff to "Mail application to: Sallie Mae Servicing" in Panama City, Florida.  (Exh. 10).

93.     On May 30, 2003, Plaintiff Ubaldi received a letter from Sallie Mae's "Loan Origination Department" located in Panama City, Florida, that her application was approved and that Sallie Mae would disperse her loan funds in accordance with the schedule set by her school.  (Exh. 11).  This was some six (6) months before the loan was assigned to Sallie Mae.

**B.     PLAINTIFF CHANEE THURSTON**

94.     On October 10, 2001 and October 16, 2002, Plaintiff Chanee Thurston took out Private Education Loans in California referred to as CEC Signature Education Loans in the total amounts of $10,600.00 and $6,240, which included charges for supplemental disbursement fees in the amounts of 6% and 4% of the loans respectively.  (Exhs. 12, 13, and 14).  These loans were used to help Ms. Thurston pay for her education at Brooks College in Long Beach, California.  These loans were made by Sallie Mae, or its predecessor in interest, the Student Loan Marketing Association, pursuant to a forward purchase commitment agreement with Stillwater National Bank intended to disguise Sallie Mae's role as the *de facto* actual lender.

95.     Upon information and belief, Ms. Thurston's October 10, 2001 and October 16, 2002 Private Education Loans were assigned to Sallie Mae or its

predecessor in interest, the Student Loan Marketing Association, shortly after disbursement.

96.     Sallie Mae, operating as Sallie Mae Servicing LLP and later as Sallie Mae, Inc. has serviced Plaintiff's October 10, 2001 and October 16, 2002 Private Education Loans since their inception.  (Exh. 12 and Exh. 14).

97.     On June 30, 2001 and October 16, 2002, Plaintiff Thurston received a letters from Sallie Mae's "Loan Origination Department" located in Panama City, Florida, stating that her applications were approved and that Sallie Mae would disperse her loan funds in accordance with the schedule set by her school.  (Exhs. 12 and 14).  As reflected in the letters and/or enclosed Truth in Lending disclosure forms, the marginal interest added to the prime rate on Plaintiff Thurston's October 10, 2001 and October 16, 2002 Private Education Loans was 8% and 1.5%, respectively.   (Exhs. 12, 13, and 14)

98.     Plaintiff Thurston was charged a Supplemental Fee at the time of disbursement on both the June 30, 2001 and October 16, 2002 Private Education Loans.  (Exhs. 12, 14 at 2)

## C.   PLAINTIFFS' PRIVATE EDUCATION LOANS

99.     Like all other Private Education Loans made by Sallie Mae, Plaintiffs Ubaldi and Thurston received a standard form promissory note copyrighted and written by Sallie Mae for their CEC Signature Education Loans.[3]  (*See, e.g.,* Exh. 1). This promissory note could not be modified or otherwise negotiated by Plaintiffs or other borrowers since it was offered to them solely on a take it or leave it basis, and included statements such as "THIS IS A NON-NEGOTIABLE CONSUMER NOTE." (*Id.* at 3).

---

[3]   The "Signature Student Loan" name is a registered trademark of SLM Corporation (Sallie Mae).

100.   Like all other Private Education Loans made by Sallie Mae, Plaintiffs' promissory notes included a *one-sided* assignment clause providing "If this Note is assigned, the Assignee will become the owner of this Note and will have all your rights to enforce this Note against me" and "I may not assign this Note or any of its benefits or obligations.  You may assign this Note at any time."  (*See, e.g.,* Exh. 1 at ¶L.2 and ¶L.10)

101.   Like all other Private Education Loans made by Sallie Mae, Plaintiffs' promissory notes included a choice-of-law clause providing "I understand that you are located in the State listed on the front of the attached application and this Note will be entered into in the same State.  Consequently, the provisions of this Note will be governed by federal laws and the laws of that State, without regard to conflict of law rules."  (*See, e.g.*, Exh. 1 at ¶L.3)

102.   Like all other Private Education Loans made by Sallie Mae, Plaintiffs' promissory notes for their Private Education Loans include a promise to pay such as "I will make consecutive monthly payments during the Repayment Period in the amounts and on or before the payment due dates shown on my statements until I have paid all of the principal and interest and any other charges I may owe on this Note." (*See, e.g., Id.* at ¶D.2).[4]  In the event Plaintiffs or other borrowers fail to make the full monthly payment when due, the standard form promissory note permits Sallie Mae to declare the loan in default and demand immediate payment of the entire loan balance, including all Late Charges (*see, e.g., Id.* at ¶I.1), or continue the loan and assess a Late Charge. (*See, e.g., Id.* at ¶E).  The standard form promissory note provides for a Late Charge, and makes it clear that the Late Charge will be paid first from any future payments from the borrower.  (*See, e.g., Id.* at ¶¶D.7; E).

---

[4]   Plaintiffs' promissory notes, like the promissory notes for all other Private Education Loans, includes provisions for the deferment of payments during the borrower's schooling and otherwise of which Plaintiff Ubaldi received several from Sallie Mae since the loan was initiated.  (*See, e.g., Id.* at ¶¶B.1;D.1).

103.    Like all other Private Education Loans made by Sallie Mae, the Late Charge provided for under Plaintiffs' promissory notes was the greater of 5% of the installment or $5.00 for any payment not made within 15 days after the due date. While all promissory notes for the Private Education Loans require the materially same Late Charge, some promissory notes specifically state the greater of $5.00 or 5% language directly in the standard form promissory note, while other standard form promissory notes state that a Late Charge will be assessed if a payment was more than 15 days late, and that the terms of this Late Charge would be disclosed in a subsequent Disclosure Statement.

104.    Plaintiffs' promissory notes, like all other promissory notes of all other Sallie Mae Private Education Loans, provided that the interest would be determined, as follows:

> the annual rate equal to the sum of the highest Prime Rate published in The Wall Street Journal Credit Markets' section, "Money Rates' table on the fifteenth day of the last month of the quarter prior to a borrower's Disbursement or Change Date plus or minus the percentage as identified on my Disclosure Statement, which is hereby incorporated into this Note, per annum (the "Margin") and rounded to the nearest one-eighth (0.125) of one percent.  (For example, the Variable Rate for each quarter beginning January 1st will be determined by the applicable Prime Rate published on the preceding December 14th.)  The Margin is based on my School, credit history and co-borrower-s credit history.  Once set, the Margin does not change. The actual interest rate during the quarter in which my loan is disbursed will be on my Disclosure Statement."

Exh. 1 ¶C.2.

105.    Plaintiffs' promissory notes, like the promissory notes of all other Sallie Mae Private Education Loan borrowers, provided for the collection of Supplemental Fees, specifically including a disbursement fee based upon a "percentage of the principal balance of my loan" which Sallie Mae could either "deduct from the disbursement or add to the principal loan balance" of the loan, and a repayment fee

that would be "a percentage of the principal balance of my loan after unpaid interest accrued during the Interim Period is capitalized." (*See, e.g.*, Exh. 1, ¶F.1,2)

106.   Plaintiffs received several standard form Disclosure Statements from Sallie Mae for their Private Education Loans, each providing that a Late Charge of the greater of 5% of the installment or $5.00 may be charged for any payment not made within 15 days after the due date. (Exhs. 2, 4, 14). Whether specifically stated in the standard form promissory note or in a separate Disclosure Statement incorporated and made part of the promissory note by reference, all promissory notes for the Private Education Loans serviced by Sallie Mae require materially the same Late Charge. These Late Charges are collected and retained by Sallie Mae, whether it owns and services or just services the Private Education Loans.

107.   Plaintiffs, like all other borrowers of Private Education Loans made by Sallie Mae, did not know what costs Sallie Mae (and the named lender if purportedly different than Sallie Mae) incurred as a result of borrowers' late payments. Neither Sallie Mae nor the named lender (if purportedly different than Sallie Mae) disclosed to Plaintiffs, borrowers or the public at large the costs associated with each late payment for Private Education Loans. Nor did Plaintiffs or other borrowers of Private Education Loans have any reason to suspect that the Late Charge assessed by Sallie Mae exceeded the true costs associated with the late payment, or that the Late Charge violated applicable law. Indeed, Sallie Mae is one of the largest educational loan providers and servicers in the United States, providing and servicing millions of education loans. Plaintiffs and other borrower class members' promissory notes and related documents were replete with disclosures and other provisions touted therein as being required by law. As such, Plaintiffs and other borrower class members' had no reason to believe that Sallie Mae would fail to comply with applicable law with respect to the Late Charges, and they reasonably trusted and relied on Sallie Mae to assess any Late Charges on their Private Education Loans in accordance with

1   applicable law.  As described throughout this Complaint, unbeknownst to Plaintiffs

2   and other borrower class members, Sallie Mae violated applicable California law by

3   assessing them an unlawful Late Charge in excess of its true costs of the late

4   payments.

5          108.    Sallie Mae charged Plaintiff Ubaldi 5% of the amount of the installment

6   each time Plaintiff Ubaldi was more than 15 days late in making a payment as a Late

7   Charge, as 5% of the payment was greater than the $5.00 minimum.  For example, on

8   August 12, 2007, Plaintiff had a "Past Due Amount" of $329.43 on her Private

9   Education Loan and was charged a "Late Fee" of $16.47 by Sallie Mae, which is 5% of

10  the late payment.  (Exhs. 15, 16).  Plaintiff incurred additional Late Charges for her

11  Private Education Loan that were assessed by Sallie Mae on the same basis on at

12  least the following occasions:  December 16, 2007, November 30, 2008, June 25, 2009

13  and September 25, 2009.  (Exhs. 17-21).

14         109.    Plaintiff Ubaldi paid Sallie Mae for each of the Late Charges set forth in

15  the preceding paragraph since she made subsequent payments on her Private

16  Education Loan.  (Exhs. 15-21).  Indeed, pursuant to her promissory note, Plaintiff

17  Ubaldi's subsequent payments made after being assessed a Late Charge were applied

18  first to pay the Late Charge before being applied to the interest and principal owed on

19  her loan.  (Exh. 1, ¶D.7)

20         110.    Plaintiff Thurston has been charged Late Charges in the amount of $5.00

21  or 5%, whichever was greater, on repeated occasions throughout the duration of her

22  Private Education Loans up to the present day, and including in 2012.  Thurston paid

23  Late Charges on the Private Education Loans, including in 2012.

24         111.    The Late Charges Plaintiffs and other borrower class members incurred

25  had no reasonable relationship to the actual damages Sallie Mae suffered as a result

26  of Plaintiffs and other borrower class members making a payment late, and do not

27  represent an amount Sallie Mae estimated to be fair compensation for any losses it

28

32

1    sustained as a result of the late payment.  Instead, the Late Charges Plaintiffs and

2    other borrower class members incurred were punitive, liquidated damages assessed

3    for the sole purposes of encouraging Plaintiffs and other borrower class members to

4    pay on time and to generate profit for Sallie Mae, which violates applicable California

5    law.

6        112.    Sallie Mae also charged and received, and continues to charge and

7    receive, interest from Plaintiff Thurston in excess of 10% per annum on her 2001 and

8    2002 Sallie Mae Private Education Loans.  (Exhs 13, 14 at 2)  Plaintiff Thurston was

9    placed in credit tier 5 (with a co-borrower) and charged a Margin of 8% above the

10   Prime Rate on her 2001 Private Education Loan. (Exh. 3; Exh. 12)  Since 2001, the

11   Prime Rate has never fallen below 3.25%.  *See* Table 2 at ¶50, *supra*.  Accordingly, the

12   Variable Rate (i.e., the Prime Rate plus the Margin) charged by Sallie Mae on Plaintiff

13   Thurston's 2001 Private Education Loan has exceeded 10% per annum throughout its

14   entire lifetime.  *See id.* (reflecting Variable Rate over time charged to Tier 5

15   borrowers).  Notably, the Variable Rate assessed by Sallie Mae and paid by Plaintiff

16   Thurston on her 2001 Private Education Loan reached nearly 18% during those times

17   when the Prime Rate was highest (Prime Rate of 9.5% plus Margin of 8% equals a

18   Variable Rate of 17.5%), even before calculation of any additional interest in the form

19   of fees.  Sallie Mae also charged interest in excess of 10% on Plaintiff Thurston's 2002

20   Private Education Loan, as a result of the charging of a Supplemental Fee.  (Exh. 14

21   at 2)

22       113.    Plaintiffs, like all other borrowers of Private Education Loans made by

23   Sallie Mae, did not know, nor did they have reason to know, that Sallie Mae was not

24   entitled to charge interest as such high rates.  Neither Sallie Mae nor the named

25   lender (if purportedly different than Sallie Mae) disclosed to Plaintiffs, borrowers or

26   the general public that the Private Education Loans had in fact been made by Sallie

27   Mae and that, therefore, the interest rates on the loans were subject to California law.

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

1  Nor did Plaintiffs or other borrowers of Private Education Loans have any reason to

2  suspect that the Variable Rate assessed by Sallie Mae, either standing alone or in

3  conjunction with Late Charges and/or Supplemental Fees, exceeded the maximum

4  legal interest limit allowed by law.

5      114.   Plaintiffs and the other student borrowers' promissory notes and related

6  documents were replete with disclosures and other provisions touted therein as being

7  required by law.   As such, Plaintiffs and the other class members' had no reason to

8  believe that Sallie Mae would fail to comply with applicable law with respect to the

9  interest rate, and they reasonably trusted and relied on Sallie Mae to assess interest

10  on their Private Education Loans in accordance with applicable law.  As described

11  throughout this Complaint, unbeknownst to Plaintiffs and the other class members,

12  Sallie Mae violated applicable California law by assessing interest at usurious rates in

13  excess of the legal limit.

14  **VI.   CLASS ACTION ALLEGATIONS**

15      115.   This action asserts claims on behalf of a class and two subclasses

16  pursuant to Federal Rules of Civil Procedure 23(a), and (b)(1), 23(b)(2) and 23(b)(3).

17      116.   Plaintiffs Ubaldi and Thurston bring claims on behalf of themselves and

18  the Choice-of-Law Class, defined as:

19          All persons who on or after March 17, 2007obtained a Sallie Mae

20      Private Education Loan for which Sallie Mae was the *de facto* actual

21      lender as described in this Third Amended Complaint which included a

22      choice-of-law provision, based upon a loan application that listed

23      California as the permanent residence of the borrower if no temporary

24      residence was identified, or based upon a loan application that listed

25      California as the temporary residence of the borrower (the "**Choice of**

26      **Law Class**").

27

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

117.    Plaintiffs Ubaldi and Thurston bring claims on behalf of themselves and the Late Charge Subclass, defined as:

> All persons who at any time obtained a Sallie Mae Private Education Loan for which Sallie Mae was the *de facto* actual lender as described in this Third Amended Complaint, based upon a loan application that listed California as the permanent residence of the borrower if no temporary residence was identified, or based upon a loan application that listed California as the temporary residence of the borrower, and who on or after March 17, 2007, incurred a Late Charge from Sallie Mae (the "**Late Charge Subclass**");

118.    Plaintiffs Thurston bring claims on behalf of herself and the Usury Subclass, defined as:

> All persons who at any time obtained a Sallie Mae Private Education Loan for which Sallie Mae was the *de facto* actual lender as described in this Third Amended Complaint, based upon a loan application that listed California as the permanent residence of the borrower if no temporary residence was identified, or based upon a loan application that listed California as the temporary residence of the borrower, and who on or after March 26, 2009 , were charged interest at an annual rate of more than 10% (the "**Usury Subclass**").

119.    The Choice-of-Law Class, Late Charge Subclass, and Usury Subclass are each subject to the following exclusions:

> Excluded are Sallie Mae's officers, directors, managerial employees and their immediate families, and any of the judges of the Court before which this case is pending and their immediate families.

> Excluded are Sallie Mae Private Education Loans made by Sallie Mae Bank, since its inception in 2005.

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief; No. 3:11-cv-01320 EDL

1      Excluded are all Sallie Mae Private Education Loans with a

2      promissory note for the loan at issue that includes an arbitration

3      clause or class action waiver.[5]

4   **A.   THE CHOICE OF LAW CLASS**

5      120.   Upon information and belief, there are thousands of members in the

6   Choice of Law Class who are geographically dispersed throughout California, as well

7   as those who have re-located to other states.  Therefore, individual joinder of all

8   members in the Choice of Law Class would be impracticable.

9      121.   Common questions of law or fact exist as to all members of the Choice of

10  Law Class.  These questions predominate over the questions affecting only individual

11  class members.  For the Choice of Law Class, these common legal or factual questions

12  include:

13         a.      Whether Sallie Mae was the *de facto* actual lender for the Private

14      Education Loans;

15

16  _____

17  [5] By deleting tolling allegations (¶¶ 115-120) and modifying the class periods
    (¶¶121-125) alleged in the original TAC [Dkt. No. 126, Ex. A-1], Plaintiffs are

18  conforming the TAC to the Court's November 15, 2013 Order [Dkt. No. 169].
    By so doing, and not re-alleging those portions in the Modified TAC,

19  Plaintiffs are not waiving their rights to subsequently appeal the Court's
    decision.  *Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. Ariz. 2012)("

20  We see no benefit in requiring plaintiffs to re-allege claims that the district
    courts have already dealt with on the merits and dismissed with prejudice.

21  Even where the district court recognizes that plaintiffs are just following the
    *Forsyth* rule and preserving their options on appeal, the court will still be

22  wasting resources in parsing old claims and reiterating its prior rulings, and
    there is no reason to make the court dismiss them a second time. Our

23  stewardship requires better use of our limited judicial resources....  We
    therefore join our sister circuits and overrule in part the rule found in

24  *Forsyth* and other cases "that a plaintiff waives all claims alleged in a
    dismissed complaint which are not re-alleged in an amended complaint." For

25  claims dismissed with prejudice and without leave to amend, we will not
    require that they be re-pled in a subsequent amended complaint to preserve

26  them for appeal" (citations omitted)

27

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL

b.       Whether the Private Education Loans included among their terms a choice of law provision;

c.       Whether the law selected by the choice of law provision in the Private Education Loans had a substantial relationship to the parties or transactions; and

d.       Whether Plaintiffs and the Choice of Law Class are entitled to Declaratory Relief that California law governs the rights and remedies of the parties with respect to their Private Education Loans.

122.    Plaintiffs' claims are typical of the claims of the Choice of Law Class, in that Plaintiffs took out Sallie Mae Private Education Loans, the promissory notes for their loans included a choice of law provision, and their loans were made in California. Plaintiffs, therefore, are no different in any relevant respect from any other Choice of Law Class member, and the relief sought is common to the Choice of Law Class.

123.    Plaintiffs are adequate representatives of the Choice of Law Class because their interests do not conflict with the interests of Choice of Law Class members they seek to represent, and they have retained counsel competent and experienced in conducting complex lending and class action litigation.  Plaintiffs and their counsel will adequately protect the interests of the Choice of Law Class.

124.    A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by each individual Choice of Law Class member with respect to the declaratory relief claim are non-monetary, while the burden and monetary expense needed to individually prosecute the choice-of-law issue against Sallie Mae is substantial.  Thus, it would be virtually impossible for Choice of Law Class members individually to redress effectively the wrongs done to them.  Moreover, even if Choice of Law Class members could afford individual actions, it would still not be preferable to class wide litigation.  Individualized actions present the potential for inconsistent or contradictory judgments.

125.   By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  In the alternative, the Choice of Law Class may be certified because Sallie Mae has acted or refused to act on grounds generally applicable to the Choice of Law Class thereby making appropriate preliminary and final declaratory relief with respect to the Choice of Law Class.

126.   Upon information and belief, all records concerning each of the Sallie Mae Private Education Loans entered into by members of the Choice of Law Class are in the possession and control of Defendants and their agents and available through discovery.

**B.    THE LATE CHARGE SUBCLASS**

127.   Upon information and belief, there are thousands of members in the Late Charge Subclass who are geographically dispersed throughout California, as well as those who have re-located to other states.  Therefore, individual joinder of all members in the Late Charge Subclass would be impracticable.

128.   Common questions of law or fact exist as to all members of the Late Charge Subclass.  These questions predominate over the questions affecting only individual class members.  For the Late Charge Subclass, these common legal or factual questions include:

a.     What the purpose is for the Late Charge assessed to Private Education Loan borrowers whose payments are not received by Sallie Mae within 15 days of the scheduled payment date;

b.     What costs Sallie Mae actually incurs when it does not receive a payment within 15 days of the scheduled date for its Private Education Loans;

c.     Whether Sallie Mae calculated the actual cost incurred when a borrower is more than 15 days late in making a payment at the time when the Private Education Loans were entered into;

38

d.    Whether Sallie Mae charged Plaintiffs and the other Subclass member borrowers a Late Charge exceeding the costs Sallie Mae actually incurs when it does not receive a payment within 15 days of the scheduled date for its Private Education Loans;

e.    Whether and how much Sallie Mae profited by charging Late Charges to borrowers with Private Education Loans;

f.    Whether Sallie Mae violated California Civil Code §§1671(b) or (d) when it charged borrowers a Late Charge;

g.    Whether Sallie Mae's conduct violated California's Unfair Competition Law, California Business and Practices Code § 17200, *et seq.*; and

h.    The appropriate measure of restitution and/or restitutionary disgorgement.

129.    Plaintiffs' claims are typical of the claims of the Late Charge Subclass, in that Plaintiffs Ubaldi and Thurston were more than 15 days late in making a payment on their Sallie Mae Private Education Loans on one or more occasions, the loans were made in California, and they were charged a Late Charge each time their payments were late.  Plaintiffs, therefore, are no different in any relevant respect from any other Late Charge Subclass member, and the relief sought is common to the Late Charge Subclass.

130.    Plaintiffs are adequate representatives of the Late Charge Subclass because their interests do not conflict with the interests of Late Charge Subclass members they seek to represent, and they have retained counsel competent and experienced in conducting complex lending and class action litigation.  Plaintiffs and their counsel will adequately protect the interests of the Late Charge Subclass.

131.    A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by each individual Subclass member likely will be comparatively small, especially given the burden and

expense of individual prosecution of the complex litigation necessitated by Sallie Mae's conduct. Thus, it would be virtually impossible for Late Charge Subclass members individually to redress effectively the wrongs done to them. Moreover, even if Late Charge Subclass members could afford individual actions, it would still not be preferable to class wide litigation. Individualized actions present the potential for inconsistent or contradictory judgments.

132. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. In the alternative, the Late Charge Subclass may be certified because Sallie Mae has acted or refused to act on grounds generally applicable to the Late Charge Subclass, thereby making appropriate preliminary and final equitable relief with respect to the Subclass.

133. Upon information and belief, all records concerning each of the Sallie Mae Private Education Loans entered into by members of the Late Charge Subclass are in the possession and control of Defendants and their agents and available through discovery.

C. **THE USURY SUBCLASS**

134. Upon information and belief, there are thousands of members in the Usury Subclass who are geographically dispersed throughout California, as well as those who have re-located to other states. Therefore, individual joinder of all members in the Usury Subclass would be impracticable.

135. Common questions of law or fact exist as to all members of the Usury Subclass. These questions predominate over the questions affecting only individual class members. For the Usury Subclass, these common legal or factual questions include:

a. Whether Sallie Mae charged interest of its Private Education Loans at rates in excess of 10 percent annually;

b.      Whether the Late Fees and Supplemental Fees Sallie Mae charged to borrowers constitute forms of interest subject to California's Constitutional prohibition on usury;

c.      Whether Sallie Mae's conduct violated California's Unfair Competition Law, California Business and Practices Code § 17200, *et seq.*; and

d.      The appropriate measure of restitution and/or restitutionary disgorgement.

136.    Plaintiff Thurston's claims are typical of the claims of the Usury Subclass, in that Plaintiff Thurston was charged and paid interest at a rate of more than 10% annually on one or more of her Sallie Mae Private Education Loan and paid additional usurious interest in the form of Late Charges and Supplemental Fees, and her loans were made in California.  Plaintiff Thurston, therefore, is no different in any relevant respect from any other Usury Subclass member, and the relief sought is common to the Usury Subclass.

137.    Plaintiff Thurston is an adequate representative of the Usury Subclass because her interests do not conflict with the interests of Usury Subclass members she seeks to represent, and she has retained counsel competent and experienced in conducting complex lending and class action litigation.  Plaintiff Thurston and her counsel will adequately protect the interests of the Usury Subclass.

138.    A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by each individual Usury Subclass member likely will be comparatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Sallie Mae's conduct.  Thus, it would be virtually impossible for Usury Subclass members individually to redress effectively the wrongs done to them.  Moreover, even if Usury Subclass members could afford individual actions, it would still not be preferable to

41

1   class wide litigation.  Individualized actions present the potential for inconsistent or

2   contradictory judgments.

3          139.    By contrast, a class action presents far fewer management difficulties

4   and provides the benefits of single adjudication, economies of scale, and

5   comprehensive supervision by a single court.  In the alternative, the Usury Subclass

6   may be certified because Sallie Mae has acted or refused to act on grounds generally

7   applicable to the Usury Subclass, thereby making appropriate preliminary and final

8   equitable relief with respect to the Usury Subclass.

9          140.    Upon information and belief, all records concerning each of the Sallie

10  Mae Private Education Loans entered into by members of the Usury Subclass are in

11  the possession and control of Defendants and their agents and available through

12  discovery.

## VII.   CLAIMS FOR RELIEF

### A.   FIRST CLAIM FOR RELIEF  - "UNLAWFUL" BUSINESS PRACTICES IN VIOLATION OF THE UNFAIR COMPETITION LAW,  BUS. & PROF. CODE § 17200, ET SEQ. FOR PLAINTIFFS AND THE LATE CHARGE SUBCLASS

17         141.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint

18  and restate them as if they were fully written herein.

19         142.    This claim is brought on behalf of Plaintiffs and the Late Charge

20  Subclass.

21         143.    The Unfair Competition Law ("UCL"), California Business and

22  Professions Code § 17200, *et seq.*, defines unfair business competition to include any

23  "unlawful, unfair or fraudulent" act or practice.

24         144.    A business act or practice is "unlawful" if it violates any established state

25  or federal law.

26         145.    California Civil Code Section 1671 establishes the standards for

27  determining if a liquidated damages clause in a contract is legitimate.  It states:

28

(a) This section does not apply in any case where another statute expressly applicable to the contract prescribes the rules or standard for determining the validity of a provision in the contract liquidating the damages for the breach of the contract.

(b) Except as provided in subdivision (c), a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made.

(c) The validity of a liquidated damages provision shall be determined under subdivision (d) and not under subdivision (b) where the liquidated damages are sought to be recovered from either:

> (1) A party to a contract for the retail purchase, or rental, by such party of personal property or services, primarily for the party's personal, family, or household purposes; or

> (2) A party to a lease of real property for use as a dwelling by the party or those dependent upon the party for support.

(d) In the cases described in subdivision (c), a provision in a contract liquidating damages for the breach of the contract is void except that the parties to such a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage.

146.    A liquidated damages clause under § 1671(b) is unlawful if it bears no reasonable relationship to the actual damages that the parties could have anticipated would flow from a breach, or if the amount does not represent the result of a reasonable endeavor to estimate a fair average compensation for any loss that may be sustained.

147.    Likewise, under § 1671(d), a liquidated damages clause is unlawful in a consumer contract unless it is impracticable or extremely difficult to fix the actual

damage, and the amount represents the result of a reasonable endeavor to estimate a

fair average compensation for any loss that may be sustained.

148.   The Private Education Loans at issue in this action are either contracts

for property or services primarily for the person's personal, family or household

purposes subject to § 1671(d), or, in the alternative, are subject to the general

prohibition against unlawful liquidated damages under § 1671(b).

149.   The limitations set forth in § 1671(d), or in the alternative, § 1671(b),

apply to the Private Education Loans, as these loans were not made by a national

bank within the meaning of the National Bank Act §§ 85 and 86, nor are they made by

qualifying bank entities under parallel state charters as provided by the Federal

Deposit Insurance Act or other similar laws.  These limitations apply to Sallie Mae,

which is not a national or state-chartered bank.

150.   Sallie Mae's Late Charge is an unlawful liquidated damages provision

under §1671(b) because it bears no reasonable relationship to the amount of money

Sallie Mae could have anticipated would flow from a borrower failing to make a

payment within 15 days after the payment due date.  Given the manner in which

borrowers are penalized for not making a payment on time (*i.e.*, being charged daily

interest on the entire principal owed), Sallie Mae is more than compensated for any

actual damage it could have anticipated or actually suffers when a borrower does not

make a payment within 15 days after the payment due date.  To the extent Sallie Mae

incurs any additional administrative costs when a borrower does not make a payment

within 15 days after the payment due date, the Late Charge of the greater of $5.00 or

5% that Sallie Mae imposes on Private Education Loan borrowers exceeds the total

costs actually incurred as a result of the late payment.

151.   Alternatively, Sallie Mae's Late Charge is an unlawful liquidated

damages provision under § 1671(d) because it was not impossible or extremely difficult

for Sallie Mae to fix the actual damage it might suffer as a result of a borrower not

making an installment payment within 15 days after the payment due date.  Given

that the accounting of borrowers' accounts and the calculation of interest and principal

are automated and performed by computers, Sallie Mae sustains little, if any, actual

loss when a payment is made more than 15 days after its due date.  Any actual loss

Sallie Mae might sustain could have been calculated when the Private Education

Loans were entered into, and the Late Charge of the greater of $5.00 or 5% that Sallie

Mae imposes on Private Education Loan borrowers exceeds the total costs actually

incurred as a result of the late payment.

152.    Sallie Mae has and continues to violate the "unlawful" prong of the UCL

by charging borrowers liquidated damages in violation of § 1671.  By committing the

acts and practices alleged above, Sallie Mae has engaged, and continues to be

engaged, in unlawful business practices within the meaning of California Business

and Professions Code 17200, *et seq*.

153.    Through its unlawful acts and practices Sallie Mae has obtained, and

continues to unfairly obtain, money from Plaintiffs and members of the Late Charge

Subclass.  As such, Plaintiffs requests for themselves and all Late Charge Subclass

members the relief set forth in the Prayer, including that this Court enjoin Sallie Mae

from continuing to violate the Unfair Competition Law as discussed herein.

Otherwise, the Late Charge Subclass may be irreparably harmed and/or denied an

effective and complete remedy if such an order is not granted.

**B.    SECOND CLAIM FOR RELIEF - "UNLAWFUL" BUSINESS PRACTICES IN VIOLATION OF THE UNFAIR COMPETITION LAW,  BUS. & PROF. CODE § 17200, ET SEQ. FOR PLAINTIFF THURSTON AND THE USURY SUBCLASS**

154.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint

and restate them as if they were fully written herein.

155.    This claim is brought on behalf of Plaintiff Thurston and the Usury

Subclass.

156.    The Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq.*, defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

157.    A business act or practice is "unlawful" if it violates any established state or federal law.

158.    California Constitution, Article XV sets a maximum legal rate for interest charged on loans such as the Private Education Loans of 10 percent per annum, including through the charging of fees.  In pertinent part, it states:

> Section 1.  The rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest:
> (1) For any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum; provided, however, that any loan or forbearance of any money, goods or things in action the proceeds of which are used primarily for the purchase, construction or improvement of real property shall not be deemed to be a use primarily for personal, family or household purposes.
> …
> No person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action.

159.    California's usury proscription is also set forth in a statute, an initiative measure that has not been codified. Stats.1919, p. lxxxiii, Deering's Uncod. Initiative Measures & Stats. (1973 ed.) 1919–1, p. 35]) (the "Usury Law").

160.    The Private Education Loans at issue in this action are loans of money primarily for personal, family, or household purposes subject to Cal. Const., art. XV, § 1(1).

161.   The Private Education Loans at issue in this action are loans of money expressed "in writing" within the meaning of the Usury Law.  Cal. Civ. Code § 1916-1.

162.   The limitations set forth in Cal. Const., art. XV, § 1(1) and the Usury Law apply to the Private Education Loans, as these loans were not made by a national bank within the meaning of the National Bank Act §§ 85 and 86, nor were they made by qualifying bank entities under parallel state charters as provided by the Federal Deposit Insurance Act or other similar laws.  These limitations apply to Sallie Mae, which is not a national or state-chartered bank, or subject to any other exception.

163.   Sallie Mae charges interest on the Private Education Loans at a Variable Rate that often exceeds 10 percent per annum, and also charges interest in the form of fees, including Late Charges and Supplemental Fees, such that even when the Variable Rate does not exceed 10 percent per annum, Sallie Mae charges an effective interest rate on the Private Education Loans that is in excess of the legal limit.

164.   Sallie Mae has and continues to violate the "unlawful" prong of the UCL by charging borrowers interest in violation of California's Constitution, art. XV, § 1(1) and the Usury Law.  By committing the acts and practices alleged above, Sallie Mae has engaged, and continues to be engaged, in unlawful business practices within the meaning of California Business and Professions Code 17200, *et seq*.

165.   Through its unlawful acts and practices Sallie Mae has obtained, and continues to unfairly obtain, money from Plaintiff Thurston and members of the Usury Subclass.  As such, Plaintiff Thurston requests on behalf of herself and all Usury Subclass members the relief set forth in the Prayer, including that this Court enjoin Sallie Mae from continuing to violate the Unfair Competition Law as discussed herein. Otherwise, the Usury Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

C.   **THIRD CLAIM FOR RELIEF** - **"UNFAIR" BUSINESS PRACTICE IN VIOLATION OF THE UNFAIR COMPETITION LAW, BUS. & PROF. CODE §17200, ET SEQ. FOR PLAINTIFFS AND THE LATE CHARGE SUBCLASS**

166.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

167.   This claim is brought on behalf of Plaintiffs and the Late Charge Subclass.

168.   A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

169.   Sallie Mae, a non-national and non-state-chartered bank, has and continues to violate the "unfair" prong of the UCL through its imposition of the Late Charge for Private Loans because Sallie Mae both penalizes borrowers by assessing a $5.00 or 5% fee when a payment has not been received, and also charges borrowers daily interest for use of the funds.

170.   Sallie Mae's imposition of its Late Charge  violates the "unfair" prong of the UCL because the amount of the Late Charge, the greater of $5.00 or 5% of the amount of the installment owed, is disproportionate to the transaction cost to Sallie Mae due to a borrower not making a payment within 15 days after the payment is due.  The actual transaction cost to Sallie Mae resulting from a late payment is nominal because the application of the Late Charge, such as in re-calculating the principal and interest, are all computer functions requiring little, if any, human involvement.  In any event, such transaction costs are less than the greater of $5.00 or 5% of a missed payment that Sallie Mae charges.

171.   The gravity of the harm to Plaintiffs and members of Late Charge Subclass resulting from such unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Sallie Mae's conduct.  By committing the acts and practices alleged above, Sallie Mae has engaged, and continues to be engaged, in

48

unfair business practices within the meaning of California Business and Professions Code 17200, *et seq*.

172.   Through its unfair acts and practices Sallie Mae has obtained, and continues to unfairly obtain, money from Plaintiffs and members of the Late Charge Subclass.  As such, Plaintiffs requests for themselves and all Late Charge Subclass members the relief set forth in the Prayer, including that this Court enjoin Sallie Mae from continuing to violate the Unfair Competition Law as discussed herein. Otherwise, the Late Charge Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

D.   <u>FOURTH CLAIM FOR RELIEF</u> - "UNFAIR" BUSINESS PRACTICE IN VIOLATION OF THE UNFAIR COMPETITION LAW, BUS. & PROF. CODE §17200, ET SEQ. FOR PLAINTIFF THURSTON AND THE USURY SUBCLASS

173.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

174.   This claim is brought on behalf of Plaintiff Thurston and the Usury Subclass.

175.   A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

176.   Sallie Mae, a non-national and non-state-chartered bank, has and continues to violate the "unfair" prong of the UCL through its assessment of usurious interest on the Private Education Loans of more than 10% annually.

177.   Sallie Mae's assessment of the interest at effective rates of greater than 10% annually violates the "unfair" prong of the UCL, because Sallie Mae is not entitled to charge these amounts of interest, which are excessive and not justified by any business need, and which create an onerous burden on Usury Subclass members.

178.   The gravity of the harm to Plaintiffs and members of Usury Subclass resulting from such unfair acts and practices outweighs any conceivable reasons,

49

justifications and/or motives of Sallie Mae's conduct.  By committing the acts and practices alleged above, Sallie Mae has engaged, and continues to be engaged, in unfair business practices within the meaning of California Business and Professions Code 17200, *et seq*.

179.    Through its unfair acts and practices Sallie Mae has obtained, and continues unfairly to obtain, money from Plaintiff Thurston and members of the Usury Subclass.  As such, Plaintiff Thurston requests on behalf of herself and all Usury Subclass members the relief set forth in the Prayer, including that this Court enjoin Sallie Mae from continuing to violate the Unfair Competition Law as discussed herein. Otherwise, the Usury Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

E.    **FIFTH CLAIM FOR RELIEF** - USURY IN VIOLATION OF ARTICLE XV SECTION 1 OF THE CALIFORNIA CONSTITUTION FOR PLAINTIFF THURSTON AND THE USURY SUBCLASS

180.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

181.    This claim is brought on behalf of Plaintiff Thurston and the Usury Subclass.

182.    The California Constitution, art. XV, sec. 1, states "No person, association, co-partnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action."

183.    For any loan, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, the authorized interest rate is 10 percent per annum or less.  Cal. Const., art. XV, § 1(1).

184.   Sallie Mae's Private Education Loans are "loans" for "money" for use "primarily for personal, family, or household purposes," within the meaning of the California Constitution, art. XV, § 1(1).

185.   Sallie Mae is not excluded or otherwise exempt from the constitutional provisions on usury.

186.   Sallie Mae charged Plaintiff Thurston and all members of the Usury Subclass interest in excess of the statutory maximum rate of 10 percent per annum, either directly through the assessment of interest at the Variable Rate, or indirectly through the assessment of interest at the Variable Rate and through the payment of additional fees.

187.   The Private Education Loans and interest thereon are absolutely repayable to Plaintiffs and the members of the Usury Subclass.

188.   Sallie Mae established the terms of the Private Education Loans, including the rates of interest to be charged to its student borrowers, and willfully intended to enter these transactions and to collect amounts in excess of the legal limit of 10 percent per annum.

189.   Through its usurious charges Sallie Mae has received, and continues to receive, money from Plaintiff Thurston and all members of the Usury Subclass in violation of California's Constitution.  As such, Plaintiff Thurston requests on behalf of herself and all Usury Subclass members the relief set forth in the Prayer, including that this Court enter an order canceling all future interest on the Private Education Loans.  Plaintiff Thurston also requests that this Court award any other relief that is just and proper.

F.   SIXTH CLAIM FOR RELIEF - VIOLATION OF THE USURY LAW FOR PLAINTIFF THURSTON AND THE USURY SUBCLASS

190.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

191.   This claim is brought on behalf of Plaintiff Thurston and the Usury Subclass.

192.   California's usury proscription is set forth in the Usury Law, an uncodified Initiative Measure adopted nearly 100 years ago. *See* Cal. Civ. Code § 1916-1 through 1916-3.

193.   The Usury Law provides:

> The rate of interest upon the loan or forbearance of any money, goods or things in action or on accounts after demand or judgments rendered in any court of this state, shall be seven dollars upon the one hundred dollars for one year and at that rate for a greater or less sum or for a longer or a shorter time; but it shall be competent for parties to contract for the payment and receipt of a rate of interest not exceeding twelve dollars on the one hundred dollars for one year and not exceeding that rate for a greater or less sum or for a longer or shorter time, in which case such rate exceeding seven dollars on one hundred dollars shall be clearly expressed in writing.

Cal. Civ. Code § 1916-1.

194.   As recognized in *Penziner v. West American Finance Co.*, 10 Cal. 2d 160, 174, 74 P.2d 252 (Cal. 1937), the 12 percent interest rate established by the Usury Law for contracts in writing was amended to 10 percent by adoption of the usury provisions of the California Constitution.

195.   Sallie Mae's Private Education Loans are "loans" for "money" expressed "in writing" within the meaning of the Usury Law.  Sallie Mae is not excluded or otherwise exempt from the Usury Law.

196.   Sallie Mae charged Plaintiff Thurston and all members of the Usury Subclass interest in excess of the statutory maximum rate of 10 percent per annum, either directly through the assessment of interest at the Variable Rate, or indirectly

through the assessment of interest at the Variable Rate and through the payment of additional fees.

197.   Sallie Mae established the terms of the Private Education Loans, including the rates of interest to be charged to its student borrowers, and willfully intended to enter these transactions and to collect amounts in excess of the legal limit of 10 percent per annum.

198.   Through its usurious charges Sallie Mae has received, and continues to receive, money from Plaintiff Thurston and all members of the Usury Subclass in violation of the Usury Law, as amended.  As such, Plaintiff Thurston requests on behalf of herself and all Usury Subclass members the relief set forth in the Prayer, including awarding three times the interest paid on the Private Education Loans as provided by the Usury Law, and that this Court enter an order canceling all future interest on the Private Education Loans.  Cal. Civ. Code § 1916-3(a).

### G.   SEVENTH CLAIM FOR RELIEF - CLAIM FOR DECLARATORY RELIEF FOR THE CHOICE OF LAW CLASS

199.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

200.   This claim is brought on behalf of Plaintiffs and the Choice of Law Class.

201.   Sallie Mae included in the Private Education Loans a choice of law provision selecting the law of the home states of its banking partners.

202.   The law selected by operation of the choice of law provision has no substantial relationship to the parties or the Private Education Loan transactions.

203.   Plaintiffs and all members of the Choice-of-Law Class are entitled to declaratory relief holding that the choice of law provision in the Private Education Loans for which Sallie Mae was the *de facto* actual lender is unenforceable, and, that California law governs the rights of the parties.

# VIII.  PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and all class members, request award and relief as follows:

**A.**     An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs Ubaldi and Thurston be appointed Class Representatives for the Choice of Law Class and Late Charge Subclass, that Plaintiff Thurston be appointed Class Representative for the Usury Subclass, and that Plaintiffs' counsel be appointed Class Counsel.

**B.**     Restitution in such amount that Plaintiffs and all Late Charge Subclass members were charged for Late Charges by Sallie Mae on Private Education Loans, and the interest charged thereon.

**C.**     Restitution in such amount that Plaintiff Thurston and all Usury Subclass members paid directly or indirectly as interest on Private Education Loans or, alternatively, the amount of interest paid on Private Education Loans in excess of the 10% legal limit.

**D.**     Restitutionary disgorgement of the profits Sallie Mae made on the Late Charges it assessed to Plaintiffs and all Late Charge Subclass members on their Private Education Loans.

**E.**     Restitutionary disgorgement of the profits Sallie Mae made on the interest it assessed to Plaintiff Thurston and all Usury Subclass members on their Private Education Loans or, alternatively, the amount of interest assessed on Private Education Loans in excess of the 10% legal limit.

**F.**     An order awarding three times the interest paid on the Private Education Loans by Plaintiff Thurston and the Usury Subclass members as permitted by the Usury Law or, alternatively, three times the amount of interest paid on Private Education Loans in excess of the 10% legal limit as permitted by the Usury Law.

**G.** An order enjoining Sallie Mae from charging a Late Charge that exceeds its actual transaction cost or the actual damage Sallie Mae suffers as a result of a borrower making a payment more than 15 days after the payment due date.

**H.** An order enjoining and canceling all future interest payments on the Private Education Loans for Plaintiff Thurston and the Usury Subclass or, alternatively, the amount of interest assessed on Private Education Loans in excess of the 10% legal limit.

**I.** An order declaring that the choice of law provision in the Private Education Loans of Plaintiffs and the Choice of Law Class for which Sallie Mae was the *de facto* actual lender is unenforceable, and that California law governs their rights.

**J.** An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre and post-judgment interest.

**K.** An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Sallie Mae as a result of the unlawful, unfair and fraudulent conduct alleged herein.

**L.** Such other and further relief as may be deemed necessary or appropriate.

**IX.   DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all causes of action and/or issues so triable.


Dated: December 2, 2013

                                        **BRAUN LAW GROUP, P.C.**

                                        By: _____
                                                Michael D. Braun (SBN 167416)
                                                10680 West Pico Boulevard
                                                Suite 280
                                                Los Angeles, California  90064
                                                Telephone:  (310) 836-6000

55

1   Facsimile:  (310) 836-6010

2   Joseph N. Kravec *(pro hac vice)*
    Wyatt A. Lison (*pro hac vice*)
3   **FEINSTEIN DOYLE PAYNE &**
        **KRAVEC, LLC**
4   Allegheny Building, 17th Floor
    429 Forbes Avenue
5   Pittsburgh, Pennsylvania  15219
    Telephone:  (412) 281-8400
6   Facsimile:  (412) 281-1007

7   Janet Lindner Spielberg (SBN 221926)
    **LAW OFFICES OF JANET**
8       **LINDNER SPIELBERG**
9   12400 Wilshire Boulevard, #400
    Los Angeles, California  90025
10  Telephone:  (310) 392-8801
    Facsimile: (310) 278-5938
11
12  William J. Genego (SBN 103224)
    **LAW OFFICE OF WILLIAM GENEGO**
13  2115 Main Street
    Santa Monica, California 90405
14  Telephone:   310-399-3259

15  ***Attorneys for Plaintiffs Tina M.***
    ***Ubaldi and Chanee Thurston***

16

17

18

19

20

21

22

23

24

25

26

27

28

[Modified] Third Amended Complaint For Damages, Equitable, Declaratory and Injunctive Relief;
No. 3:11-cv-01320 EDL