**United States District Court**
For the Northern District of California

1
2
3
4
5  IN THE UNITED STATES DISTRICT COURT

6  FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8  TINA M. UBALDI and CHANEE THURSTON,

9           Plaintiffs,                          No. 11-01320 EDL

10      v.                                        **ORDER DENYING MOTION FOR**
                                                 **CLASS CERTIFICATION**
11  SLM CORPORATION, SALLIE MAE, INC.,
    and SLM PC STUDENT LOAN TRUST 2004-
12  A,

13           Defendants.
    _____/
14
         This is a putative class action asserting that Defendants Sallie Mae, Inc., SLM Corporation,
15
    and SLM PC Student Loan Trust 2004-A (collectively "Sallie Mae" or "Defendants") included
16
    unenforceable choice of law provisions in student loan promissory notes and imposed improper late
17
    charges and usurious interest. Plaintiffs move to certify a Choice of Law class, a Late Charge
18
    subclass, and a Usury subclass. The Court denies Plaintiffs' motion. The proposed class definitions
19
    are circular and render the classes unascertainable. Further, the Court cannot certify the Choice of
20
    Law class under 23(b)(3) on the current record, and Plaintiffs have not established that a 23(b)(2)
21
    class is appropriate. Plaintiffs have also not established that common issues predominate with
22
    respect to the Late Charge and Usury subclasses as proposed because the Sallie Mae-bank
23
    agreements that form the basis of Plaintiffs' *de facto* lender theory are insufficiently similar.
24
    Plaintiffs have failed to establish typicality as to the Usury subclass or that a Rule 23(b)(3) class
25
    action is appropriate as to that subclass. The denial of Plaintiffs' motion is without prejudice, as
26
    Plaintiff may be able to propose ascertainable classes of narrower scope that are certifiable.
27
28

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I.    Background**

 A. <u>Factual Background</u>

  1. *Plaintiffs' Loans and Payments*

 Plaintiff Chanee Thurston, a California citizen and resident, took out Private Education Loans known as CEC Signature Loans on October 10, 2001, and October 16, 2002, in the amounts of $10,600 and $6,240, respectively, to help pay for her education at Brooks College in Long Beach, California. (Third Amended Complaint ("TAC")  ¶¶  21, 94, Exs. 12, 14.)  She also took out two additional loans that were disbursed in April and May 2004, which are referred to as loans four and five.  (1/30/14 Genego Decl. ¶¶ 4, 5, Ex. LL.)  Plaintiff Tina Ubaldi is also a California citizen and resident.  She took out a Private Education Loan known as a CEC Signature Loan in the amount of $22,765, on June 24, 2003, to finance her education at the Culinary Academy in San Francisco.  (<u>Id.</u> ¶¶ 20, 88, Ex. 8.)  Plaintiffs' loan applications listed Stillwater National Bank ("Stillwater") in Oklahoma as the "lender."  (<u>Id.</u> ¶¶  63, 86, Ex. 10.)  The name "Sallie Mae" was printed on the top of the applications as was Sallie Mae's phone number, and the applications directed the borrowers to mail the applications to Sallie Mae Servicing in Panama City, Florida.  (<u>Id.</u> ¶ 92, Ex 10.)  The promissory notes for Plaintiffs' loans contained choice of law provisions stating that the notes would be governed by the laws of the state listed on the front of the note, which was Oklahoma in all of Plaintiffs' loans.  (<u>Id.</u> ¶ 101, Exs. 1 at 1-2  L.3, 2 at 1-2  L.3.)

 Plaintiffs learned that they were approved for their loans by way of letters sent from Panama City, Florida  that had "Stillwater National" printed on the top but notified Plaintiffs that they could check their disbursements at www.salliemae.com.  (<u>Id.</u> ¶¶ 93, 97, Exs. 11, 12, 14.)  The loans were serviced by Sallie Mae and were assigned to Sallie Mae shortly after disbursement.  (<u>Id.</u> ¶¶  88, 95, 96.)  Plaintiffs paid late charges on their loans based on a clause in the promissory notes providing for a late charge of the greater of 5% of the late installment payment or $5.00.  (<u>Id.</u> ¶ 103; Exs. 3, 8, 14.)  The interest rates on Plaintiff Thurston's October 2001 and October 2002 loans, at the time of disbursement, were the prime rate plus 8% and the prime rate plus 1.5%, respectively.  (<u>Id.</u> ¶¶ 97, 104.)

United States District Court
For the Northern District of California

2.    *Sallie Mae-Stillwater ExportSS Agreement*

The relationship between Stillwater, the designated lender on Plaintiffs' promissory notes, and Sallie Mae[1] was governed by a July 1, 2002 ExportSS agreement, which set forth the terms under which Sallie Mae will originate and service Stillwater student loans and the conditions under which Sallie Mae will purchase them. (Id. Ex. 7.) The ExportSS Agreement provided that only Sallie Mae or its affiliates would originate and process Private Education Loans on Stillwater's behalf. (Id. ¶ 77, Ex. 7 at 3.). The ExportSS agreement also defined Sallie Mae as an independent contractor acting as Stillwater's agent for the services described in the agreement. (Id. Ex. 7 at 16.) Under the ExportSS agreement, Stillwater was required to sell Sallie Mae 80% of its eligible loans, subject to certain limitations, within 90 days of disbursement. (Id. Ex. 7 at 17-18.) The agreement also provided that Stillwater could offer additional eligible loans for purchase. (Id.) Sallie Mae also agreed to service eligible loans that Stillwater chose not to sell. (Id. at 9.) Stillwater granted Sallie Mae a power of attorney to debit Stillwater's account for all loan disbursements, and Stillwater was responsible for ensuring that its account held sufficient funds for the disbursements and other fees. The ExportSS agreement further required Stillwater to, among other things: (1) prepare, review, and distribute loan application materials to assure compliance with all state laws and regulations; (2) repurchase unenforceable loans that violated state law; and (3) indemnify Sallie Mae for violations of applicable state laws. (Id. at 11, 26, and 15.) Sallie Mae provided the design template for the application materials, and Stillwater agreed not to alter their content of the application materials without Sallie Mae's consent. (Id.)

3.    *De Facto Lender Allegations*

Plaintiffs' primary theory is that despite Stillwater's status as the official designation as the lender on loan documents, Sallie Mae is the *de facto* lender of the student loans at issue, and banks such as Stillwater simply rent their charters to Sallie Mae so that it can avoid California's more stringent protection of borrowers. (TAC ¶¶ 2, 17, 19, 61.) Whether Sallie Mae or Stillwater is the

---

[1]The ExportSS agreement is between Stillwater and "Student Loan Marketing Association," which was located at "Sallie Mae Drive." (10/22/13 Genego Decl. Ex. F.) The parties refer to this agreement, however, as being between Stillwater and Sallie Mae. Further, the parties refer to the other agreements between banks and Sallie-Mae affiliated entities as being between the banks and Sallie Mae. The Court will therefore follow suit.

true lender affects, among other things, preemption under the National Bank Act and whether the choice of law provisions in the promissory notes are enforceable.

According to Plaintiffs, Sallie Mae enters into forward purchase agreements with lender banks such as Stillwater. (Id. ¶ 62.) Under agreements such as the ExportSS agreement, the bank purports to act as the lender, but Sallie Mae actually makes the loans via standing credit and purchase agreements with the bank. (Id.) Because of these credit arrangements and pre-arranged purchases, Plaintiffs allege, the banks never undertake any risk of loss. (Id. 64.) Plaintiffs' also point out that the Private Education Loans at issue use Sallie Mae's "underwriting, copyrighted forms, promissory notes, brands and/or proprietary platforms to initiate the loans." (Id. ¶ 62.) Additionally, Plaintiffs allege that Sallie Mae carries out all interactions with the borrowers, controls the terms and conditions of the loans, approves or denies the loans, and keeps the majority of the fees and interest on the loans. (Id. ¶¶ 65, 66.) Plaintiffs allege that Sallie Mae's *de facto* lender status is confirmed by the Department of the Treasury, which determined that Sallie Mae's predecessor was originating loans and incorrectly attributing the loans to its banking partners. (Id. ¶ 70.)

### 4. *Agreements between Sallie Mae and Other Banks*

In addition to asserting that Salle Mae, not Stillwater, is the *de facto* lender for Plaintiffs' loans, Plaintiffs assert that Sallie Mae is the *de facto* lender for thousands of other private student loans issued to borrowers in California. Plaintiffs contend that Sallie Mae has made 158,211 private student loans to California borrowers between approximately 2003 and 2012 via fourteen banks (including Stillwater) identified in the Table of Agreements attached to the October 22, 2013, Genego Declaration. Plaintiffs state that the banks identified in the table have all entered into agreements with Sallie Mae that are similar in relevant respects to the Stillwater ExportSS agreement. Plaintiffs maintain that these agreements all contain provisions relevant to their *de facto* lender allegations, including: (1) Sallie Mae's forward purchase commitment; (2) Sallie Mae's origination of the loans; (3) use of Sallie Mae application materials; (4) Sallie Mae's loan approval authority; (5) Sallie Mae's role in funding and disbursing loan proceeds, such as disbursing proceeds directly to schools; and (6) Sallie Mae's loan servicing responsibilities.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

5.    *Class Evidence*

In support of their motion for class certification, Plaintiffs submitted evidence purporting to show that the putative class members in this case were subject to similar choice of law provisions, late fees, and interest.  Exhibit I is a document produced by Sallie Mae as an "application and promissory note."  (10/22/13 Genego Decl. ¶18, Ex. I.)  This exemplar promissory note provided that the borrower will pay interest at a rate equal to an index plus or minus the percentage listed on the borrower's Disclosure.  (10/22/13 Genego Decl. Ex. I at SM04253; H-1 at SM00200 (Ubaldi); H-2 at SM06500 (Thurston).)  It also provided for a late charge to be imposed if a payment was untimely.  (Id. at SM04254; H-1 at SM00200 (Ubaldi); H-2 at SM06500 (Thurston).)  The late charge was $5.00 or 5% of the late installment payment that was due, whichever was greater.  (10/2214 Genego Decl. Ex. I, J-1 (Ubaldi); J-2 (Thurston).)  The exemplar promissory note also contained a choice of law provision like those in the promissory notes signed by Plaintiffs.  (Id. at SM04257, Ex. H-1 at SM00201 (Ubaldi); H-2 at SM06501.)

According to Plaintiffs, Sallie Mae charged Plaintiff Thurston an interest rate in excess of 10% per annum throughout the course of her loan.  It is undisputed that Sallie Mae assessed 75,166 borrowers  interest in excess of 10% on at least one occasion.  (10/22/13 Genego Decl. Ex. U. at 6.)  It is also undisputed that Plaintiffs were assessed late charges, and that during each year of the Late Charge class period, between 26,111 to 41,441 class members were assessed a late fee.  (Am. Ans. ¶¶ 108, 109, Dkt.176; 10/22/13 Genego Decl. Ex. S at 6.)

B.    Procedural History

Plaintiff Ubaldi filed a putative class action against Defendant SLM Corporation on March 18, 2011 on behalf of class members who incurred late charges on or after March 17, 2007.  Plaintiff Ubaldi filed a first amended complaint regarding late charges on August 29, 2011.  After the Court granted in part and denied in part Defendant SLM's motion to dismiss the first amended complaint, Plaintiff Ubaldi filed a second amended complaint adding Sallie Mae and SLM Student Loan Trust 2004-A as defendants.  On March 26, 2013, Plaintiff Ubaldi moved for leave to file a third amended complaint ("TAC") that: (1) added Plaintiff Thurston, who asserted class claims that Sallie Mae charged usurious interest on student loans; (2) alleged a claim for declaratory relief that the choice

1   of law provisions in the promissory notes were unenforceable; (3) added allegations based on facts

2   learned during discovery; and (4) "modif[ied] the class definition and extend[ed] the class period for

3   the current late charge class back prior to March 17, 2007." (Dkt. 126.)  Defendants opposed

4   Plaintiff Ubaldi's motion to amend, and the Court granted in part and denied in part the motion in

5   May 2013.  The Court permitted Plaintiff Ubaldi to add Plaintiff Thurston, usury claims, a choice of

6   law class, and allegations based on facts learned in discovery.  The Court denied leave to amend as

7   to tolling and did not permit extending the late charge class period.

8        The Court subsequently denied Defendants' motion to dismiss the TAC on August 5, 2013.  In

9   October 2013, Plaintiffs moved for clarification of the Court's order regarding leave to amend.  On

10   November 15, 2013, the Court clarified that its order denied Plaintiffs' tolling allegations in their

11   entirety.  Plaintiffs filed a modified TAC reflecting the Court's clarification on December 2, 2013,

12   which is the operative complaint.

13        In the TAC, Plaintiffs allege seven claims against Defendants on behalf of themselves, and

14   propose one class and two subclasses.  Plaintiffs allege that the choice of law provisions in the

15   promissory notes are unenforceable.  Plaintiffs also allege that the late charges that they were

16   assessed are unlawful under California Unfair Competition Law ("UCL"), California Business &

17   Professions Code section 17200 because they constitute  unlawful liquidated damages under

18   California Civil Code section 1671. Plaintiffs also claim that the late charges are an unfair business

19   practice under the UCL.  Plaintiff Thurston alleges that by charging interest on student loans that

20   often exceeds 10% per annum, Sallie Mae violates the California Usury Law, California Civil Code

21   sections 1916-1 to 1916-3, the unlawful and unfair prongs of the UCL, and the California

22   Constitution.  (Id. ¶¶ 154-165, 173-179, 180-189, 190-198.)

23        On October 22, 2013, Plaintiffs moved to certify one class and two subclasses.   The Court

24   held a hearing on the motion on March 4, 2014.

25   **II.**   **Discussion**

26        A.   <u>Proposed Class and Subclasses</u>

27        Plaintiffs seek certification of a Choice-of-Law Class defined as:

28           All persons who on or after March 17, 2007, obtained a Sallie Mae Private Education
             Loan for which Sallie Mae was the *de facto* actual lender as described in the Third

Amended Complaint which included a choice-of-law provision, based upon a loan application that listed California as the permanent residence of the borrower if no temporary residence was identified, or based upon a loan application that listed California as the temporary residence of the borrower (the "Choice of Law Class").

(TAC ¶ 116.)  Plaintiffs also seek to certify a Late Charge subclass defined as:

All persons who at any time obtained a Sallie Mae Private Education Loan for which Sallie Mae was the *de facto* actual lender as described in the Third Amended Complaint, based upon a loan application that listed California as the permanent residence of the borrower if no temporary residence was identified, or based upon a loan application that listed California as the temporary residence of the borrower, and who on or after March 17, 2007 incurred a Late Charge from Sallie Mae (the "Late Charge Subclass").

(TAC ¶ 117.)  Plaintiff Thurston seeks certification of a Usury subclass defined as:

All persons who at any time obtained a Sallie Mae Private Education Loan for which Sallie Mae was the *de facto* actual lender as described in the Third Amended Complaint, based upon a loan application that listed California as the permanent residence of the borrower if no temporary residence was identified, or based upon a loan application that listed California as the temporary residence of the borrower, and who on or after March 26, 2009, were charged interest at an annual rate of more than 10% (the "Usury Subclass").

(TAC ¶ 118.)

The proposed classes exclude certain Sallie Mae employees and their family members, certain loans made by Sallie Mae Bank since 2005, and "all Sallie Mae Private Education Loans with a promissory note for the loan at issue that includes an arbitration clause or class action waiver." (TAC ¶ 119.)

B.    Legal Standard

Plaintiffs seeking to represent a class must establish that the class is ascertainable, that it meets the requirements of Rule 23(a), and that it satisfies one of the subsections of Rule 23(b).  Plaintiffs bear the burden of demonstrating that each element of Rule 23 is satisfied.  See General Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 158-61 (1982); Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir.1977); In re Autozone, Inc. Wage & Hour Employment Practices Litig., 289 F.R.D. 526, 530 (N.D. Cal. 2012).  Rule 23 is not a "mere pleading standard."  Wal-Mart Stores, Inc. v. Dukes, __ U.S. __, 131 S.Ct. 2541, 2551 (2011).  Rather, a party seeking class certification must be prepared to prove the existence of the Rule 23(a) criteria.  Id.  "Sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'"  Id. (quoting Gen. Telephone Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982)).

**United States District Court**
For the Northern District of California

C.     Standing

Defendants argue that Plaintiffs lack standing to assert claims as to any loans involving any bank other than Stillwater.  According to Defendants, "[a]lthough Plaintiffs may have standing to assert claims against Sallie Mae on claims arising from their Stillwater loans, they have no stake in establishing liability, and no Article III standing, as to loans made by banks other than Stillwater or on claims against Sallie Mae with respect to those loans. "  (Defs.' Opp. at 19-20.)  As support for this argument, Defendants rely on cases involving mortgage backed securities class actions. Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762 (1st Cir. 2011); In re Wells Fargo Mortgage Backed Certificates Litigation, 712 F. Supp.2d 958, 963-64 (N.D. Cal. 2010); FDIC v. Countrywide Financial Corp., Case No. 12-4354, 2012 WL 5900973, at *10 (C.D. Cal. 2012); and In re Washington Mutual Mortgage-Backed Securities Litigation, 276 F.R.D. 658, 662 (W.D. Wash. 2011).

Plaintiffs do not lack standing.  "In a class action, standing is satisfied if at least one named plaintiff meets the requirements." Bates v. UPS, 511 F.3d 974, 985 (9th Cir. 2007).  Standing requires that: (1) the plaintiff suffered an injury in fact, i.e., one that is sufficiently "concrete and particularized" and "actual or imminent, not conjectural or hypothetical;" (2) the injury is "fairly traceable" to the challenged conduct; and (3) the injury is "likely" to be "redressed by a favorable decision." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  There is no dispute that Plaintiff satisfy these criteria as to Defendants.  Defendants' focus on Stillwater and the other banks ignores that Sallie Mae and affiliated entities' status are the defendants here, not the banks.

The mortgage-backed securities cases on which Defendants rely are not on point.  Moreover, the courts distinguished those cases from typical class actions.  The court in Countrywide noted that it differed from "mass tort or simple securities case where each plaintiff in the class complains of the same behavior by the defendant."  2012 WL 5900973, at *1.  Similarly, in Wells Fargo, Judge Illston distinguished cases where the lead plaintiffs undisputedly had individual standing and the dispute concerned whether they could sue on behalf of a class of persons who suffered different injuries stemming from the same conduct by the defendants, because those cases "did not address

1  whether plaintiffs in a class action may bring suit on behalf of persons who have purchased

2  securities through different offerings stemming from distinct offering documents." 712 F. Supp. 2d

3  at 965. This case is more like Munoz v. PHH Corp., Case No. 08-759, 2013 WL 2146925, at *19

4  (E.D. Cal. May 15, 2013), where the court found that the plaintiffs had standing to challenge the

5  actions of a lender and its affiliated reinsurer even though there were some intermediary insurers

6  with whom none of the plaintiffs had dealt, because the intermediary insurers were not defendants.

7  The court reasoned that ""[s]tanding concerns the relationship between the plaintiff and defendant;

8  not the relationship between a plaintiff and a third party that is not before the court." Id. at *19.

9           D.     Ascertainability

10        Defendants also argue that the proposed class and subclasses cannot be certified because they

11  are not ascertainable. Defendants point out that each class covers "[a]ll persons who . . . obtained a

12  Sallie Mae Private Education Loan for which Sallie Mae was the de facto actual lender as described

13  in the Third Amended Complaint." (TAC ¶¶ 116-118.) Defendants argue that "de facto actual

14  lender" is a legal conclusion based on disputed factual allegations that would need to be resolved to

15  ascertain the classes' compositions. Defendants further argue that the definition is improperly

16  failsafe because "if Sallie Mae establishes that it was not the de facto actual lender as alleged in the

17  Complaint (e.g., by demonstrating that it did not control the loan terms or fund the loans through

18  credit facilities, as Plaintiffs allege), there will be no members of the class to be bound by a

19  judgment." (Defs.' Opp. at 23.) Plaintiffs counter that the trier of fact's findings as to Sallie Mae's

20  de facto lender status will not impact class membership and will not unfairly burden Sallie Mae.

21  According to Plaintiffs, if the trier of fact concludes that the Sallie Mae was not the de facto lender

22  to Plaintiffs and the certified class members, Defendants will be protected against liability.

23        The class definitions are circular and thus the proposed classes are not ascertainable. Plaintiffs

24  must demonstrate that an identifiable and ascertainable class exists. "A class definition should be

25  precise, objective, and presently ascertainable", though it "need not be so ascertainable that every

26  potential member can be identified at the commencement of the action." O'Connor v. Boeing N.

27  Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal.1998) (internal quotations omitted). A "failsafe class" is a

28  "a way of labeling the obvious problems that exist when the class itself is defined in a way that

United States District Court
For the Northern District of California

precludes membership unless the liability of the defendant is established." <u>Kamar v. Radio Shack</u>

<u>Corp.</u>, 375 Fed. Appx. 734, 736 (9th Cir. 2010).  The problem with such a class is that "once it is

determined that a person, who is a possible class member, cannot prevail against the defendant, that

member drops out of the class." <u>Id.</u>  That is not only "palpably unfair to the defendant," but it is also

unmanageable because it is unclear in such cases to whom class notice should be sent.  <u>Id.</u>

The proposed classes here may not be true failsafe classes insofar as even if Sallie Mae is

determined to be the *de facto* lender, Plaintiffs would still need to prove that the choice of law

provisions are unenforceable, that the late charges are unlawful, and that the interest charged is

usurious, among other things.  If the class members lose on these liability issues, they would still be

bound by the judgment.  Nevertheless, the class definitions turn on a key legal issue in this case --

whether Sallie Mae is the *de facto* lender.  If the trier of fact were to find that Sallie Mae was not a

*de facto* lender, then there would be no class members.  The class definitions are therefore

improperly circular.  Plaintiffs do not explain how they intend to send class notice to those who

obtained a loan for which Sallie Mae was the *de facto* lender when the trier of fact has not decided

whether Sallie Mae was a *de facto* lender.  The Court therefore denies Plaintiffs' motion for class

certification.  Because it appears that Plaintiffs may be able to redefine the classes in terms of

attributes of class members or loans rather than legal conclusions, Plaintiffs have leave to amend the

class definitions.  <u>Heffelfinger v. Elec. Data Sys. Corp.</u>, Case No. 07-101, 2008 U.S. Dist. LEXIS

5296, at *46 (C.D. Cal. Jan. 7, 2008) ("Given the difficulties with the proposed class definition set

forth in plaintiffs' motion, the court has discretion either to redefine the class or to afford plaintiffs

an opportunity to do so.").

D.      <u>Arbitrability</u>

Defendants assert that because Sallie Mae included binding arbitration clauses and class action

waivers in its private loan promissory notes beginning in 2005, the Court should deny class

certification because a substantial number of the class members would likely be required to arbitrate

their claims on an individual, non-class basis.  The existence of arbitration clauses and class action

waivers does not preclude class certification, however, because the classes expressly exclude loans

with promissory notes including arbitration clauses or class action waivers.  Defendants do not argue

**United States District Court**
For the Northern District of California

1    that arbitration affects numerosity or the superiority of the class form.

2        E.    Rule 23(a) Requirements

3        Rule 23(a) sets forth four prerequisites for class certification: numerosity, commonality,

4    typicality, and adequacy of representation.

5            1.    *Numerosity*

6        Rule 23(a) requires that a class be "so numerous that joinder of all members is impracticable."

7    Defendants do not dispute that Plaintiffs' proposed classes meet this requirement.  For each of the

8    years of the Late Charge subclass period (March 2007 through 2012), between 26,111 and 41,441

9    class members were assessed a late charge.  (10/22/13 Genego Decl. Ex. S at 6.)  Moreover, the

10   Usury subclass contained 75,168 members as of the date motion for class certification was filed.

11   (10/22/13 Genego Decl. Ex. U at 6.)  The Choice of Law class has at least as many members as its

12   subclasses.  Accordingly, Plaintiffs have met the numerosity requirement.

13           2.    *Commonality*

14       Rule 23(a)(2) requires the existence of "questions of law or fact common to the class."  "All

15   questions of fact and law need not be common to satisfy the rule."  Hanlon v. Chrysler, 150 F.3d

16   1011, 1019 (9th Cir. 1998); see also Staton v. Boeing, 327 F.3d 938, 953 (9th Cir. 2003).  While a

17   single common question will suffice, the class members have suffered the same injury, and the class

18   claims must depend on a common contention that is "of such a nature that it is capable of classwide

19   resolution -- which means that determination of its truth or falsity will resolve an issue that is central

20   to the validity of each one of the claims in one stroke."  Dukes, 131 S.Ct. at 2551, 2556.   What

21   matters is the "'capacity of a classwide proceeding to generate common *answers* apt to drive the

22   resolution of the litigation."  Id. (quoting Nagareda, Class Certification in the Age of Aggregate

23   Proof, 84 N.Y.U. L. Rev. 97, 131-32 (2009)) (emphasis in original).  "Dissimilarities within the

24   proposed class are what have the potential to impede the generation of common answer."  Id.

25       Defendants do not dispute that Plaintiffs have established commonality, and Plaintiffs have met

26   this threshold.  Plaintiffs point out that issues common to the Choice of Law class include: "(1)

27   whether designating the state of the nominal lender is not reasonable given Sallie Mae's role as the

28   *de facto* lender; (2) whether enforcement of the choice of law provisions would violate a

11

fundamental policy of California as to which it has a greater interest; and (3) whether enforcement of the choice of law provisions would result in a substantial injustice in light of Sallie Mae's role as the *de facto* lender." (Pl.'s Mot. at 15.)  See Nedlloyd Lines B.V. v. Sup. Ct. of San Mateo Cnty., 3 Cal.4th 459, 464-66 (Cal.1992) (holding that to determine whether a choice of law provision is enforceable,  the court may need to determine "whether the chosen state's law is contrary to a fundamental policy of California" or "whether California "has a materially greater interest than the chosen state in the determination of the particular issue.").  Issues common to the Late Charge subclass include whether California Civil Code section 1671(b) or (c) applies to the promissory notes, whether the costs of servicing a late payment vary according to the amount of the payment, and whether assessing a late fee based on the amount of the late payment is per se unreasonable. Issues common to the Usury subclass include whether the supplemental fees charged by Sallie Mae constitute interest and whether the same interest accrual method applies to the class members' loans. Moreover, both the Late Charge and Usury subclasses depend on the whether Sallie Mae is a *de facto* lender.  Commonality may also exist where, as here, claims turn on standard documents. Lymburner v. U.S. Fin. Funds, Inc., 263 F.R.D. 534, 539-40 (N.D. Cal. 2010) (finding commonality satisfied and noting that the Court was "asked to focus on the loan documents, not representations made to each individual class member").

### 3.   *Typicality*

Rule 23(a) also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical."  Hanlon, 150 F.3d at 1020; see also Staton, 327 F.3d at 957.  Although the claims of the purported class representative need not be identical to the claims of other class members, the class representative "must be part of the class and possess the same interest and suffer the same injury as the class members."  General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982).  That injuries may differ in amount does not defeat typicality.  See William W. Schwarzer, et al., Federal Civil Procedure Before Trial, § 10:293 (Rutter Group 2009) (a plaintiff's claims may be typical although other members of the class suffered less or more injury).  "[T]he commonality and

United States District Court
For the Northern District of California

1    typicality requirements of Rule 23(a) tend to merge."  <u>Dukes</u>, 131 S. Ct. at 2541.

2        It is undisputed that Plaintiffs' claims are typical with respect to the Choice of Law class and

3    the Late Charge subclass.  There is no question that Plaintiffs are members of these classes

4    (assuming Stillwater is a *de facto* lender) and that their claims are coextensive with those of the

5    classes.

6        The parties dispute, however, whether Plaintiff Thurston's usury claims are typical of the

7    Usury subclass claims.  Defendants argue that Thurston was not charged usurious interest and thus

8    cannot be a member of the Usury subclass.  To fall within the Usury subclass, the borrower must

9    have been charged annual interest exceeding 10%.  (TAC ¶ 118.)  Defendants point out that

10   Thurston cannot rely on her first loan, the October 28, 2001 loan, because it contained an arbitration

11   clause and thus falls outside the scope of the class.  (TAC ¶ 119.)  Moreover, Defendants provide

12   unchallenged evidence that the interest rate on Thurston's second loan, dated October 16, 2002, did

13   not exceed 10% during the Usury subclass period, even if the late charges and supplemental fee

14   Thurston paid constituted interest.  (Potomis Decl. ¶¶ 5, 8, 10; Defs.' Opp. at 17 n.6.)  In any event,

15   late charges cannot make a loan usurious.  <u>Sw. Concrete Prods. v. Gost Constr. Corp.</u>, 51 Cal. 3d

16   701, 708-709 (Cal. 1990) (finding that a late charge in a contract was not subject to the usury law in

17   light of the "rule that a transaction that was not usurious at its inception cannot become usurious by

18   virtue of the debtor's voluntary default"); <u>Fox v. Federated Dep't Stores, Inc.</u>, 94 Cal. App. 3d 867,

19   884 (Cal. Ct. App. 1979) (noting that a finance charge assessed when a credit card holder fails

20   timely to make a payment is not usurious as it is only because of the customer's voluntary act in

21   failing to make the payment when due that a finance charge is levied).

22       Plaintiffs do not dispute that Thurston's first loan is irrelevant and that she has not been

23   charged usurious interest on her second loan.  Instead, Plaintiffs assert that she was charged interest

24   in excess of 10% on her fourth and fifth loans.  (1/30/14 Genego Decl. 4, 5, Ex. KK.)  However,

25   Plaintiffs do not assert that Thurston actually paid usurious interest on these loans and would be

26   entitled to money damages.  <u>Bistro Exec., Inc. v. Rewards Network, Inc.</u>, Case No. 04-4640, 2006

27   U.S. Dist. LEXIS 100770, at *45 (C.D. Cal. July 20, 2006) (noting that under California law those

28   who did not pay usurious interest are entitled only to declaratory relief).  Rather, Plaintiffs contend

United States District Court
For the Northern District of California

1   that because the interests rates on loans four and five were above 10% at various times during the

2   class period, Thurston was charged interest and thus has a claim for declaratory relief.  (1/30/14

3   Genego Decl. Ex. KK at 3, 5, 15, 16.)

4        Plaintiffs are correct that Thurston was charged interest above 10% on loans four and five and

5   thus falls within the definition of the Usury subclass.  This does not, however, end the typicality

6   inquiry.  Not only must Thurston be a member of the Usury subclass to satisfy the typicality

7   requirement, but her claims must be "reasonably coextensive" with those of absent class members.

8   Because Thurston only has a claim for declaratory relief for usury, her claim is not reasonably

9   coextensive with any class members who paid usurious interest and would have damages.  This is

10  important because, as discussed in greater detail below, Plaintiffs did not move to certify their

11  classes under 23(b)(2), and it is unclear whether Plaintiffs are seeking certification only under Rule

12  23(b)(3) or whether they are proposing a hybrid class action.  Plaintiffs have not established that

13  Thurston claims are typical, and this precludes certification of the Usury subclass in its present form.

14

15            4.    *Adequacy of Representation*

16       Rule 23(a)(4) permits the certification of a class action only if "the representative parties will

17  fairly and adequately protect the interests of the class."  "The adequacy inquiry under Rule 23(a)(4)

18  serves to uncover conflicts of interest between named parties and the class they seek to represent."

19  Amchem Prods. v. Windsor, 521 U.S. 591, 625-26 (1997).  Representation is adequate if: (1) the

20  class representative and counsel do not have any conflicts of interest with other class members; and

21  (2) the representative plaintiff and counsel will prosecute the action vigorously on behalf of the

22  class.  See Staton v. Boeing, 327 F.3d 938, 957 (9th Cir. 2003).  A class representative must also

23  suffer the same injury as the class members and be part of the class.  Amchem, 521 U.S. at 626

24  (quoting East Tex. motor Freight Sys., Inc. v. Rodriquez, 431 U.S. 395, 403 (1977)).

25       There is no dispute that Plaintiffs' counsel would adequately represent the class.  Counsel are

26  experienced class action attorneys, and they have actively litigated this case by, among other things,

27  opposing several motions to dismiss and engaging in discovery.  (10/22/13 Genego Decl. Ex. BB,

28  CC, DD, EE (resumes of Plaintiffs' counsels' firms).)  Plaintiff Thurston, as noted above, does not

United States District Court
For the Northern District of California

1   adequately represent the Usury subclass.  Plaintiffs are otherwise adequate representatives for the

2   Choice of Law and Late Charge subclasses.  Although Plaintiffs did not provide declarations, they

3   testified at their depositions that they reviewed the documents filed in this case, understood the

4   nature of the their claims, and understood that they were representing a class of individuals based on

5   choice of law provisions, usurious interests, and late fees.  (1/30/13 Genego Decl. Ex. NN (excerpts

6   of Thurston Dep.); Ex. OO (excerpts of Ubaldi Dep.).)  Plaintiff Ubaldi testified that she was not

7   expecting something for herself out of the lawsuit but that she wanted the class of people she was

8   representing to get the money they allegedly overpaid back.  (10/22/13 Genego Decl. Ex. OO.)

9       F.      Rule 23(b) Criteria

10      Although Plaintiffs alleged class actions under all three subsections of Rule 23(b) in the TAC,

11  their motion for class certification only addresses Rule 23(b)(3).  Nevertheless, Plaintiffs seek only

12  declaratory relief for the Choice of Law class, and, as noted above, the Usury subclass includes at

13  least one member whose claim is solely for  declaratory relief.  Plaintiffs do not distinguish between

14  the different kinds of Rule 23(b) classes in their motion, and it is unclear whether Plaintiff is seeking

15  "to shift the entire case to (b)(3) certification because of the presence of money damages" or is

16  requesting certification of a hybrid class action such that the Court would certify a (b)(2) class for

17  the portion of the case concerning declaratory relief and a (b)(3) class for the portion of the case

18  requesting monetary damages.  See Lemon v. Int'l Union of Operating Eng'rs, 216 F.3d 577, 581

19  (7th Cir. 2000); William B. Rubenstein, Newberg on Class Actions § 4:38 (5th ed.).  Plaintiffs do

20  not specify their intent and instead only address Rule 23(b)(3).  The Court therefore follows suit.

21      A class action may be maintained under this subsection if "the court finds that questions of law

22  or fact common to class members predominate over any questions affecting only individual

23  members, and that a class action is superior to other available methods for fairly and efficiently

24  adjudicating the controversy."  Certification under Rule 23(b)(3) is appropriate "whenever the actual

25  interests of the parties can be served best by settling their differences in a single action."  Hanlon,

26  150 F.3d at 1022 (quoting 7A Wright & Miller, Federal Practice and Procedure, § 1777 (2d ed.

27  1986)).  Specifically, "when common questions present a significant aspect of the case and they can

28  be resolved for all members of the class in a single adjudication, there is clear justification for

handling the dispute on a representative rather than on an individual basis." <u>Hanlon</u>, 150 F.3d at 1022 (quoting 7A Wright & Miller, Federal Practice and Procedure, § 1778 (2d ed. 1986)).

The test for predominance asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Hanlon</u>, 150 F.3d at 1022 (quoting <u>Amchem</u>, 117 S. Ct. at 2249). In contrast to the commonality requirement of Rule 23(a), Rule 23(b)(3) "focuses on the relationship between the common and individual issues." <u>Hanlon</u>, 150 F.3d at 1022. Claims need not be identical for common issues of law and fact to predominate, they need only be reasonably coextensive with those of absent class members. <u>Hanlon</u>, 150 F.3d at 1020. The predominance standard is similar to and more stringent than the commonality standard. <u>Newburg</u> § 3.27.

In determining whether a class action is superior to other adjudicatory methods, courts must consider the four factors set forth in Rule 23(b)(3): "(A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Courts addressing superiority focus on the efficiency and economy elements of the class action. <u>Zinser v. Accufix Res. Institute, Inc.</u>, 253 F.3d 1180, 1190 (9th Cir. 2001).

1. *De facto Lender Allegations*

Plaintiffs argue that common issues predominate because whether Sallie Mae is a *de facto* lender is common to all class members. Plaintiffs assert that the *de facto* lender inquiry does not involve any individual issues: "If Salle Mae's *de facto* lender status is proved as to any one member of the putative classes, it will be proved to all of them." (Pls.' Mot. at 21.) Defendants counter that "Plaintiffs' theory of the case requires that a *de facto* lender analysis be made for each lender based on the particular terms of the agreement with each bank." (Defs.' Opp. at 20.) According to Defendants, the terms of the agreements between Sallie Mae and the banks listed in the Table of Agreements attached to the October 22, 2014, Genego Declaration (the "Sallie Mae-bank agreements") are not uniform and vary in important respects. Namely, unlike the ExportSS agreement between Sallie Mae and Stillwater, three of the fourteen Sallie Mae-bank agreements do

United States District Court
For the Northern District of California

1    not include a provision allowing Sallie Mae to advance funds on the lender's behalf, thereby directly

2    funding the loans.  (10/22/13 Genego Decl. Exs. GG (Sallie Mae-Sterling Bank agreement), HH

3    (Sallie Mae-First Penn Bank agreement), II (Sallie Mae - Independent Banks Bank agreement).)

4    These same three agreements differ from the other Sallie Mae-bank agreements because they allow

5    the bank to decide whether to have Sallie Mae disburse the funds to the schools or to do so itself.

6    Defendants also point out that the length of time from disbursement of the loan to purchase by Sallie

7    Mae varied from bank to bank: four banks have no express timeframe (10/22/13 Genego Decl. Exs.

8    A-2, A-3, A-4, G); one bank required purchase within 330-365 days after disbursement (Ex. A-1);

9    one bank required purchase between 90 to 120 days after disbursement (Ex. D); one bank required

10   purchase within 60 to 95 days after disbursement (Ex. JJ); one bank required purchase within 60 to

11   90 days before repayment (Ex. B.); one bank required purchase within 90 days before repayment

12   (Ex. E); one bank required payment within 90 days of disbursement (Ex. F); one bank required

13   payment not later than 60 days after disbursement (Ex. C); and three banks required purchase one

14   business day after disbursement (Exs. GG, HH, II).  Defendants further argue that the Court would

15   also need to look at the banks' and Sallie Mae's actual course of practice to determine whether Sallie

16   Mae was a *de facto* lender with respect to a particular bank.

17       Plaintiff argues that these differences pale in comparison to the common features of the Sallie

18   Mae-bank agreements that are relevant to *de facto* lender status.  According to Plaintiffs, the

19   variation between banks regarding when Sallie Mae was obligated to purchase their loans is

20   irrelevant; the key fact is that Sallie Mae was obligated to purchase the loans.  Plaintiffs also assert

21   that Sallie Mae and the banks' actual practices are irrelevant because the Sallie Mae-bank

22   agreements govern their actual practices.

23       The Court finds that Plaintiffs have not established that common issues predominate with

24   respect to all fourteen Sallie Mae-bank agreements.  For example, the agreements between Sallie

25   Mae and Sterling Bank, First Penn Bank, and Independent Bankers Bank different significantly from

26   the agreements between Sallie Mae and other banks in relevant respects.  The former do not permit

27   Sallie Mae to advance funds on the banks' behalf as does the Stillwater agreement, they provide for

28   a different method of loan disbursement than the other eleven agreements, and they  provide that

17

**United States District Court**
For the Northern District of California

1  Sallie Mae will purchase loans within one business day of disbursement, a much shorter time than in

2  the other agreements.  The amount of time between disbursement and Sallie Mae's purchase of loans

3  is not irrelevant; the longer the delay in Sallie Mae's purchase, the greater a bank's exposure to risk

4  from the loans.  Moreover, contrary to Plaintiffs' assertion, the actual practices of Sallie Mae and the

5  banks are relevant to *de facto* lender status because the Sallie Mae-bank agreements do not govern

6  every detail.  It may be, however, that Plaintiffs could seek to certify a class involving multiple

7  banks upon a proper showing.

8                           2.      *Choice of Law Class*

9        Plaintiffs have not established that common issues predominate with respect to the Choice of

10 Law Class.  Other than noting that their promissory notes select Oklahoma law, Plaintiffs do not

11 identify which states' laws are implicated by the choice of law provisions.  It is important to know

12 which states' laws are at issue.  To determine whether a choice of law provision is enforceable, a

13 court must "determine either: (1) whether the chosen state has a substantial relationship to the parties

14 or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law."

15  Nedlloyd Lines B.V. v. Superior Court of San Mateo Cnty.,3 Cal.4th 459, 464-66 (Cal.1992).  If

16 neither test is met, the analysis stops, and the court will not enforce the choice-of-law provision.  Id.

17 If either test is met, "the court must next determine whether the chosen state's law is contrary to a

18 *fundamental* policy of California." Id. (emphasis in original).  If there is a fundamental conflict with

19 California law, the court must determine whether California "has a materially greater interest than

20 the chosen state in the determination of the particular issue." Id.

21        Applying this test requires knowing the identity of the chosen state and the contours of its

22 relevant law. Plaintiffs have not provided the Court with sufficient information regarding which state

23 laws are at issue and have thus failed to meet their burden to show predominance.  Plaintiffs may be

24 able to show that the class members' promissory notes all select the same or substantially the same

25 state law, and the Court is not precluding a choice of law subclass limited, for instance, to

26 promissory notes with choice of law clauses selecting Oklahoma law.  On the current record,

27 however, there is no evidence upon which the Court can certify the Choice of Law class under Rule

28 23(b)(3), and Plaintiffs make no arguments regarding Rule 23(b)(2).

                                              18

United States District Court
For the Northern District of California

3.     *Late Charge Subclass Claims*

In addition to arguing that the Late Charge subclass should not be certified because of lack of ascertainability and because the common issues do not predominate as to the *de facto* lender allegations, Defendants argue that individual issues predominate because: (1) any recovery based on a violation of California Civil Code section 1671 must be reduced by administrative and other costs incurred by Sallie Mae, which will vary from borrower to borrower; and (2) the voluntary payment doctrine is a defense to the class members' late charge claims and to avoid that defense each class members would have to show fraud, duress, or coercion, which are necessarily individual inquiries.

Plaintiffs have established that common issues predominate with respect to the Late Charge subclass.  Under California Civil Code section 1671(b), a liquidated damages provision is "valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made."  A more stringent standard applies to contracts that fall under section 1671(c), which applies to retail purchase or rental contracts for personal property or services under certain circumstances.  Under those circumstances, a liquidated damages provision is void unless it would be "impracticable or extremely difficult to fix the actual damage." § 1671(d).  Under section 1671(d), unlike section 1671(b), "the proponent of the liquidated damages clause has the burden of proof."  In re DirectTV Early Cancellation Litig., 738 F. Supp. 2d 1062, 1087 (C.D. Cal. 2010).  As noted above, there are numerous questions common to the Late Charge subclass, including the whether section 1671(b) or (c) applies to the late charges, what costs Sallie Mae actually incurs when a payment is late, whether the late charge exceeds these costs, and whether Sallie Mae's late charge of the greater of $5.00 or 5% of the missed payment is an unlawful liquidated damages provision.  A class action is also a superior form of action with respect to the Late Charge subclass because there is no other class litigation regarding late charges, the damages for each class member are comparatively small (e.g., Plaintiff Ubaldi's late charges total $106.5 (TAC Exs. 15, 17-21)), and this is an appropriate forum because Sallie Mae's conduct occurred in this district and elsewhere in California.

Defendants' argument that their right to an offset against unlawful late charges presents individual issues that defeat class certification is also unpersuasive.  Even if Defendants would have

United States District Court
For the Northern District of California

1    varying offsets against the class members' damages claims, this is an aspect of damages, and

2    damages calculations alone cannot defeat certification. <u>Leyva v. Medline Indus. Inc.</u>, 716 F.3d 510,

3    513 (9th Cir. 2013); <u>see also</u> <u>Dukes</u>, 131 S.Ct. at 2558 (noting that "individualized monetary claims

4    belong in Rule 23(b)(3)").   Here, any offset against class members' recoveries appears readily

5    calculable.  Defendants admittedly track and maintains records of servicing, collection and IT

6    operations expenses for student loans.  (Hinko Decl. ¶ 2.)

7       Defendants' argument that the application of the voluntary payment doctrine necessarily

8    involves individual issues that defeat class certification is also unpersuasive.  "The voluntary

9    payment doctrine bars the recovery of money that was voluntarily paid will full knowledge of the

10   facts." <u>Parino v. BidRack, Inc.</u>, 838 F. Supp. 2d 900, 908 (N.D. Cal. 2011).  In some circumstances,

11   the applicability of the doctrine could require an individualized analysis as to each class member.

12   <u>Endres v. Wells Fargo Bank</u>, Case No. 06-7019, PJH, 2008 WL 344204, at *12 (N.D. Cal. Feb. 6,

13   2008).  Here, however, Plaintiffs' argue that the class members could not have had full knowledge of

14   the facts associated with paying late charges because Sallie Mae hid the fact that it was the actual

15   lender by partnering with banks.  Determining whether Sallie Mae is a *de facto* lender does not

16   require an class member-by-class member inquiry, though it may involve a bank-by-bank inquiry.

17            4.     *Usury Subclass Claims*

18       Defendants argue that individual issues predominate with respect to the Usury subclass

19   because Plaintiffs and the other class members would have to show that they paid usurious interest,

20   not merely that they were charged such amounts.  According to Defendants, determining whether a

21   class member paid interest will require an examination, for each class member, of the interest rate,

22   payment, and capitalization history of the loan, which will vary from borrower to borrower.

23   (Potomis Decl. ¶¶ 7, 9.)

24       An individual need not have paid usurious interest, however, to have been charged it.  "The

25   usurious character of the contract is not determined by the amount of interest the borrower has paid

26   thereon, but by the amount of interest he has agreed to pay on his said indebtedness. <u>Westman v.</u>

27   <u>Dye</u>, 214 Cal. 28, 39 (Cal. 1931).  "He may not have paid a dollar of interest on his indebtedness,

28   yet, if the contract calls for a greater rate of interest than that permitted by the statute, the transaction

is usurious, and no interest can be collected thereon." Id.  Although Defendants rely on the statement in Domarad v. Fisher & Burke, Inc., 270 Cal. App. 2d 543, 560 (Cal. Ct. App. 1969), that "[a] transaction is not usurious, so as to require the lender to refund usurious interest received by him until there has been an actual payment of usurious interest," later courts have made clear that this means that one cannot recover monetary relief for usury unless one has paid interest, not that a usury claim requires payment as a prerequisite.  See, e.g., Bistro Exec., Inc. v. Rewards Network, Inc., Case No. 04-4640, 2006 U.S. Dist. LEXIS 100770, at *45 (C.D. Cal. July 20, 2006) (noting that under California law, transactions can be usurious on execution, and those who paid no interest on their usurious loans would have a claim for a declaratory judgment canceling any outstanding interest obligations, even though they could not recover monetarily).

Although the difference between being charged usurious interest and having paid usurious interest does not necessarily affect the predominance of common issues as to the Usury subclass, the difference raises a host of other issues.  The Usury subclass covers both those who were only charged usurious interest and those who were charged and paid usurious interest.  Because those who are only charged interest are entitled only to declaratory relief, the Court would have to distinguish between those who had paid usurious interest and those who had not.  Additionally, declaratory relief is forward looking, so the Court would also need to distinguish between class members whose loans are active and whose loans had terminated.  Although declaratory relief can be sought under Rule 23(b)(3), Newberg § 4:38, it is more typically and appropriately sought under rule 23(b)(2), which Plaintiffs do not address.  As structured, the Usury subclass does not appear superior to other available methods for fairly and efficiently adjudicating the controversy.  Although some sort of Usury class might be appropriate, the Court cannot certify the present one.

**III.  Conclusion**

The Court denies Plaintiffs' motion for class certification with leave to amend.

**IT IS SO ORDERED.**

Dated: March 24, 2014

_Elizabeth D. Laporte_

ELIZABETH D. LAPORTE
United States Chief Magistrate Judge