1   Janet Lindner Spielberg (SBN 221926)   Michael D. Braun (SBN 167416)
    **LAW OFFICES OF JANET**                **BRAUN LAW GROUP, P.C.**
2       **LINDNER SPIELBERG**               10680 West Pico Boulevard, Suite 280
    12400 Wilshire Boulevard, # 400         Los Angeles, California 90064
3   Los Angeles, California  90025          Telephone: 310-836-6000
    Telephone: 310-392-8801                 Email: service@braunlawgroup.com
4   Email: jlspielberg@jlslp.com

5   Joseph N. Kravec, Jr. (*pro hac vice*)  William J. Genego (SBN103224)
    Wyatt A. Lison (*pro hac vice*)         **LAW OFFICE OF WILLIAM**
6   **FEINSTEIN DOYLE PAYNE**               **GENEGO**
        **& KRAVEC, LLC**                   2115 Main Street
7   429 Forbes Avenue                       Santa Monica, California 90405
    Allegheny Building, 17th Floor          Telephone: 310-399-3259
8   Pittsburgh, Pennsylvania 15219          Email: bill@genegolaw.com
    Telephone: 412-281-8400
9   Email: jkravec@fdpklaw.com
    wlison@fdpklaw.com
10

11  *Attorneys for Plaintiffs Dana L.*
    *Barone and Sara Bachman-Williams*

12                UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                  SAN FRANCISCO DIVISION

15

16  DANA L. BARONE and SARA           Case No. 3-11-cv-01320-EDL
    BACHMAN-WILLIAMS on behalf
17  of themselves and all others      CLASS ACTION
    similarly situated,
18                                     **COMPLAINT IN INTERVENTION**
19                    Plaintiffs,      **OF DANA L. BARONE AND SARA**
                                       **BACHMAN-WILLIAMS**
20            vs.
                                       DEMAND FOR JURY TRIAL
21
    SLM CORPORATION; a Delaware
22  Corporation;  SALLIE MAE, INC.,
    and SLM PC STUDENT LOAN
23  TRUST 2004-A
24                    Defendants.
25

26

27

28

1    Plaintiffs Dana L. Barone and Sara Bachman-Williams, by their attorneys,

2    bring this Complaint in Intervention against SLM Corporation,  Sallie Mae Inc., and

3    SLM PC Student Loan Trust 2004-A (collectively referred to as "Sallie Mae"), on their

4    own behalf and on behalf of all others similarly situated, and allege as follows based

5    upon the investigation of their counsel:

6    **I.    INTRODUCTION**

7        1.    This class action seeks relief on behalf of Plaintiffs and others similarly

8    situated who, while residing in California, were provided Sallie Mae private loans

9    (hereafter "Private Loans" or "Private Student Loans") for which Sallie Mae was the

10   *de facto* actual lender as described below.  Plaintiffs bring claims under California

11   Law on behalf of borrowers who were charged interest at a usurious rate as well as

12   borrowers who were charged interest at a usurious rate who made payments that

13   Sallie Mae attributed to interest.

14       2.    Sallie Mae has been allowed to commit the wrongs this suit seeks to

15   remedy by disguising and keeping secret from unsuspecting borrowers of student

16   loans its true role as the *de facto* actual lender for Sallie Mae Private Loans. By

17   making it appear that the loans were made by lending institutions subject to federal

18   regulation, and the oversight that comes with that regulation, Sallie Mae has been

19   able to evade and violate state laws by charging interest at usurious rates.  It was not

20   until March of 2011 when the Department of Treasury released a draft report on

21   Sallie Mae which revealed Sallie Mae's true role as the *de facto* actual lender that the

22   information first became publicly available which revealed Sallie Mae's true role as

23   the *de facto* actual lender. Even then the information was buried and released without

24   publicity, such that class members continue not to have notice of facts that would

25   allow them to pursue and enforce their rights under state law.

26       3.    As used herein, Sallie Mae "Private Loans" are loans made by Sallie Mae

27   to borrowers to pay for the students' cost of education, including tuition, fees, and

28   associated costs and living expenses, commonly known and marketed by such Sallie

1

Mae brand names as CEC Signature Loans, and which are not Federal Family Education Loans and are not guaranteed by the federal government. The loans are made by Sallie Mae, in that Sallie Mae develops and markets the loans, creates and copyrights the loan application forms and promissory notes, the loan applications are returned to Sallie Mae, Sallie Mae underwrites and determines whether to approve the loan to the borrower, Sallie Mae services the loans and receives all payments, all payments are to be made to Sallie Mae as specified in the promissory note, Sallie Mae provides the funding for the loans, directly and/or indirectly through such means as credit extensions and forward purchase agreements, it directs and controls the disbursement of the loan proceeds, and it insures the loans. In short, Sallie Mae is the *de facto* actual lender.

4.      Sallie Mae violates the law and overcharges borrowers related to the Private Loans.  In particular, Sallie Mae charges interest on the Private Loans in excess of the maximum legal limit set by the California Constitution, which is 10 percent per annum.

5.      Sallie Mae determines the annual interest rate to be charged a borrower by taking the prime rate and increasing it by a set amount (referred to as the "margin") according to the credit tier in which Sallie Mae places the borrower at the time the loan is approved. The "margin" ranges from 1.5% to 9.85%.  For example, the margin for a borrower placed in credit tier 5 is 9.85%, and thus if the prime rate were 3%, the interest rate charged the borrower would be 12.85%, and if the prime rate were 10%, the interest charged the borrower would be $19.85%. The "margin" amount (i.e., the amount added to the prime rate) remains the same for the life of the loan.

6.      Because the prime rate fluctuates, the interest rate charged the borrower varies over time even though the margin set by Sallie Mae does not change. Depending upon the prime rate and the amount of the margin, the interest rate charged to student borrowers by Sallie Mae can and has exceeded the 10% legal limit established by the California Constitution.  The interest rate charged student

2

borrowers placed in credit tier 5 has exceeded the lawful rate of 10% for the entire class period.

7.      As a result of its usurious interest rates, Sallie Mae has collected and continues to collect millions of dollars from class members to which it is not entitled. This class action seeks to stop Sallie Mae from continuing to assess these unlawful interest charges going forward, and to restore to Plaintiffs and class members the amount of unlawful interest paid on the Private Loans, or alternatively to disgorge Sallie Mae's profits from its unlawful conduct to Plaintiffs and class members.

8.      Sallie Mae attempts to evade California law and the protections it provides student loan borrowers against usurious interest rates by making it appear as if the loans are made by a National Bank or state chartered bank located in a different state, and subject to the laws of the bank's home state, pursuant to the National Bank Act, 12 U.S.C. sections 85, 86, the Federal Deposit Insurance Act, or similar laws. Sallie Mae does so by selecting a National Bank or state chartered bank to include its name on Sallie Mae's preprinted loan application and referring to it as the lender. According to the terms of the promissory note, the loan contract is with the nominee lender.

9.      Further, Sallie Mae includes a one-sided assignment clause in its copyrighted promissory notes, and by advance agreement and understanding, the nominee lender assigns the loan contract to Sallie Mae.  Sallie Mae maintains the assignment includes a National Bank Act, Federal Deposit Insurance Act or similar laws' preemption defense, which allows it to charge interest according to nominee bank's home state laws. In effect, the nominee bank monetizes its National Bank or state bank charter by allowing its name to be used by Sallie Mae, and Sallie Mae pays to use the name of the bank so that it may evade and violate California law. The assignment, however, does not include a National Bank Act or a Federal Deposit Insurance Act preemption defense because the nominee bank did not make the loan and thus has no National Bank Act, Federal Deposit Insurance Act or similar laws

preemption defense to assign in the first instance, as the loan is made by Sallie Mae, which is the *de facto* actual lender.

10.     Sallie Mae also attempts to evade California law and the protections it provides student loan borrowers by including in its promissory notes a choice of law provision selecting the law of the state in which the nominee bank is located. However, Sallie Mae's nominee banks have no substantial relationship to the student loan borrowers or the Private Loans transactions, as the nominee banks do not set or control the terms and conditions of the loans, do not approve or disapprove borrowers, do not direct disbursement of the loan monies, and do not originate the loans.  As such, there is no nexus sufficient to support or justify application of the choice of law clause and it is unenforceable.

## II.     PARTIES

11.     Plaintiff Dana L. Barone is a citizen of the State of California, residing in Torrance, California.  In or around September of 2003, Ms. Barone entered into a Private Loan agreement in the State of California that has been owned for most or all of the Loan's lifetime by Sallie Mae, and serviced since it was made by Sallie Mae, Inc. (or by Sallie Mae Servicing LLP until it was merged into Sallie Mae, Inc.), which charged her usurious interest on multiple occasions.  Ms. Barone was a citizen and resident of the State of California at the time she entered into the Private Loan agreement, and has continued to be a citizen and resident of the State of California at all times since.

12.     Plaintiff Sara Bachman-Williams is currently a citizen of the State of Arizona, residing in Tucson.  In December of 2003, Ms. Bachman-Williams entered into two Private Loan agreements in the State of California that were owned for most or all of the Loans' lifetimes by Sallie Mae, and serviced since they were made by Sallie Mae, Inc. (or by Sallie Mae Servicing LLP until it was merged into Sallie Mae, Inc.), which charged her usurious interest on multiple occasions.  Ms. Bachman-Williams was a citizen and resident of Mission Hills California at the time she entered

1   into the Private Loan agreements, remaining a resident of California until the loans

2   were re-paid in full.

3        13.    Defendant SLM Corporation is a publicly traded Delaware corporation

4   with its principle executive office at 300 Continental Drive,  in Newark, Delaware,

5   according to its 2012 Form 10-K.  Defendant SLM Corporation, directly and/or

6   through one or more of its subsidiaries, is engaged in the business of originating,

7   servicing and purchasing loans that finance the cost of a student's education.

8        14.    SLM Corporation, or its predecessor in interest, the Student Loan

9   Marketing Association, made, as the *de facto* actual lender, Plaintiffs' and other class

10  members' Private Loans and serviced them under the name Sallie Mae Servicing LLP,

11  which was a division of Defendant SLM Corporation until December 31, 2003, when

12  Sallie Mae Servicing LLP was merged into Sallie Mae, Inc., and thereafter Sallie Mae,

13  Inc. serviced them. Sallie Mae owns Plaintiffs' and other education loans under

14  various names (*e.g.,* Sallie Mae Trust). Sallie Mae owns, manages or services over 11

15  million student loans totaling more than $235 billion.

16       15.    Defendant Sallie Mae, Inc., a private company, is the corporate

17  management and marketing subsidiary of Defendant SLM Corporation, and services

18  Private Loans. Sallie Mae, Inc. has serviced Plaintiffs' loans and other class members'

19  Private Loans since they were made to the present, either under its own name or

20  through Sallie Mae Servicing LLP which was merged into Sallie Mae, Inc. in

21  December, 2003. Sallie Mae, Inc. has charged Plaintiffs and other class members an

22  annual interest rate in excess of 10 percent per annum.

23  **III.    JURISDICTION AND VENUE**

24       16.    Jurisdiction of this Court is proper under 28 U.S.C. § 1332 as complete

25  diversity between the parties exists.  Representative Plaintiff Barone is a citizen of

26  California residing in Los Angeles County.  Representative Plaintiff Bachman-

27  Williams is a citizen of Arizona. Sallie Mae is incorporated in the State of Delaware

28  and has its primary offices in Newark, Delaware.

17.     Upon information and belief, the amount in controversy exceeds $5,000,000 for Representative Plaintiffs and class members collectively, exclusive of interest and costs, by virtue of the revenue and profit reaped by Sallie Mae from its transactions with Plaintiffs and the class, as a direct and proximate result of the wrongful conduct alleged, and by virtue of the injunctive and equitable relief sought.

18.     Upon information and belief, based upon the number of Private Loans Sallie Mae services annually, the total number of class members is likely to number in the thousands if not hundreds of thousands.

19.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).  Sallie Mae has agents, transacts business or is found within this judicial district.  A substantial portion of the underlying transactions and events complained of occurred in this district, and affected persons who reside or resided, in this judicial district.  Sallie Mae has received substantial compensation from such transactions and business activity in this judicial district, including as the result of servicing student loans for persons residing in this judicial district.  Finally, Sallie Mae resides and/or may be found in this judicial district and the interstate trade and commerce described herein is and has been carried out in part within this judicial district.

## IV.     FACTUAL ALLEGATIONS

20.     Sallie Mae makes "Private Loans" to borrowers to pay for the students' cost of education, including tuition, fees, and associated costs and living expenses, commonly known and marketed by such Sallie Mae brand names as CEC Signature Loans, and which are not guaranteed by the federal government.

21.     Sallie Mae develops and markets its Private Loans, creates and copyrights the loan application forms and promissory notes, the loan applications are returned to Sallie Mae, Sallie Mae underwrites and determines whether to approve the borrower, Sallie Mae services the loans and receives all payments, all payments are to be made to Sallie Mae as specified in the promissory note, Sallie Mae provides

the funding for the loans, directly and/or indirectly through such means as credit extensions and forward purchase agreements, it directs and controls the disbursement of the loan proceeds, and it insures the loans. In short, Sallie Mae is the *de facto* actual lender.

22.     Borrowers taking out Private Loans are required to sign a student loan promissory note.  These student loan promissory notes are standard form contracts of adhesion offered on a "take it or leave it" basis.  Borrowers taking out Private Loans have no opportunity to negotiate the terms of their student loan promissory notes. The promissory notes (and/or the application page for each loan), signed by the borrowers, specify the name of a lender partner associated with the respective loan. Each promissory note for the Private Loans have the same or materially similar provisions, which, along with Sallie Mae's uniform loan servicing activities, form the basis of Plaintiffs' complaint.[1]

### A.   SALLIE MAE CHARGES USURIOUS INTEREST RATES

23.     California law limits the amount of interest that may be charged on loans such as the Private Loans to 10% annually.  *See* Cal. Const., art. XV, § 1(1) (Permitting the charging of interest based upon a written contract "[f]or any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum").  This limit applies not only to annual percentage rates referred to by a lender as "interest" but also includes interest charged in the form of fees.  *Id.* ("No…corporation shall by charging any fee…or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action.").

24.     Sallie Mae's Private Loans accrue interest from the date of disbursal until payment in full at a "Variable Rate" set by Sallie Mae.  *See* Exh.1  ¶ C.1.

---

[1]   An example of a promissory note from the time period in which Plaintiffs took out their loans is attached as Exhibit 1.

25.    The Variable Rate is defined as:

the annual rate equal to the sum of the highest Prime Rate published in
The Wall Street Journal Credit Markets' section, "Money Rates' table
on the fifteenth day of the last month of the quarter prior to a
borrower's Disbursement or Change Date plus or minus the percentage
as identified on my Disclosure Statement, which is hereby incorporated
into this Note, per annum (the "Margin") and rounded to the nearest
one-eighth (0.125) of one percent.  (For example, the Variable Rate for
each quarter beginning January 1st will be determined by the applicable
Prime Rate published on the preceding December 14th.)  The Margin is
based on my School, credit history and co-borrower-s credit history.
Once set, the Margin does not change.  The actual interest rate during
the quarter in which my loan is disbursed will be on my Disclosure
Statement."

Exh.1  ¶ C.2.  Thus, in any given quarter, Sallie Mae charges interest on the Private

Loans at a Variable Rate equal to the (variable) Prime Rate plus the (fixed) Margin set

by Sallie Mae and identified in the borrower's disclosure statement.

26.    During the Class Period, the federal Prime Rate was 3.25%. *See* historical

data for Federal Prime Rate available at

http://www.federalreserve.gov/releases/h15/data.htm.  The Prime Rate published in

the Wall Street Journal reflects the federal Prime Rate, and, accordingly, also was

3.25% during the Class Period.

27.    The fixed Margin added to the Prime Rate and charged to student

borrowers was set between 1.5% snf 9.85% based upon Sallie Mae's estimation of

borrower's creditworthiness, as indicated in a Chart ("Table 1") provided by Sallie Mae

to Career Education Services in 2002:

## CEC SIGNATURE LOANS

| Credit Tier | Interest Rate | Disbursement Fee | Repayment Fee |
|:---:|:---:|:---:|:---:|
| 1 | Prime + 1.5% | 4% | 0% |
| 2 | Prime + 2.5% | 4% | 0% |
| 3 | Prime + 4.0% | 4% | 0% |
| 4 | Prime + 5.5% | 6% | 0% |

8

| 5 with a co-borrower | Prime + 8.0% | 6% | 0% |
| 5 w/o a co-borrower | Prime + 9.85% | 6% | 0% |

(Exh.2, 08/20/02 Letter from Sallie Mae to CEC, at SNB00070).

28.    As reflected in the chart below ("Table 2"), the Variable Interest Rate charged borrowers who Sallie Mae placed in Credit Tiers 5 and 5 (w/o co-borrower) always exceeded the 10% annual limit during the class period, and has been as much as 19.35 percent per annum (nearly double the legal limit).



29.    Sallie Mae earned billions of dollars of interest on its Private Loans throughout the class period, including millions of dollars in interest to which it was not entitled and which it was not permitted to charge under California law.

30.    In 2007, Sallie Mae earned approximately $2,582 million ($2.582 billion) in net interest income on its Private Loans, which constituted 36% of Sallie Mae's overall "Core Interest Income" prior to provision for loan losses.  (2009 10-K, pp. 15, 60)  Net interest income earned on the Private Loans was $1,551 million ($1.551 billion) in 2008 and $1,546 million ($1.546 billion) in 2009.  (2010 10-K, p.47)

9

Complaint in Intervention of Dana L. Barone and Sara Bachman-Williams; No. 3:11-cv-01320 EDL

31.     Sallie Mae cannot justify the usurious interest rate it charges borrowers on the Private Loans in violation of California law, and the interest it received unlawfully represents a windfall to Sallie Mae.  This is particularly true given that private loans are not dischargeable in bankruptcy, *see* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (P.L. 109-8, 10/17/2005), codified at 11 U.S.C § 523(a)(8), thereby ensuring that Sallie Mae will be repaid its principal and any amounts of interest that it charged on the Private Loans.

### B.   SALLIE MAE USES NOMINEE BANKS AS PURPORTED LENDERS TO MANUFACTURE A PREEMPTION DEFENSE TO EVADE STATE LAW

32.     Sallie Mae attempts to evade California law and the protections it provides student loan borrowers against usurious interest rates by making it appear as if the loans are made by a National Bank or state chartered bank located in a different state, and subject to the laws of the bank's home state, pursuant to the National Bank Act, 12 U.S.C. sections 85, 86, the Federal Deposit Insurance Act, or other similar laws. Sallie Mae does so by selecting a National Bank or state chartered bank and including its name in its preprinted loan application and referring to it as the lender. According to the terms of the promissory note, the loan contract is with the purported lender.

33.     Further, Sallie Mae includes a one-sided assignment clause in its copyrighted promissory notes, and by advance agreement and understanding, the nominee lender assigns the loan contract to Sallie Mae. Sallie Mae maintains the assignment includes a National Bank Act, Federal Deposit Insurance Act or similar preemption defense, which allows it to charge late fees and interest according to nominee bank's home state laws. In effect, the nominee bank monetizes its National Bank or state bank charter by allowing its name to be used by Sallie Mae, and Sallie Mae pays to use the name of the bank so that it may evade and violate California law. The assignment, however, does not include a National Bank Act preemption defense because the nominee bank did not make the loan and thus has no National Bank Act,

1  Federal Deposit Insurance Act or similar preemption defense to assign in the first

2  instance, as the loan is made by Sallie Mae, which is the *de facto* actual lender.

3       34.    Sallie Mae has financial relationships with banks which it refers to as

4  "lender-partners."  Sallie Mae enters into what it has called and what in substance are

5  "forward purchase commitment agreements" with these "lender-partner" banks.

6  Under these agreements, the "lender-partner" bank purportedly acts as the lender of

7  record, but in reality Sallie Mae makes the Private Loans by funding them through a

8  standing credit arrangement with the "lender-partner" and/or by a standing obligation

9  to purchase - immediately or shortly after complete disbursement of the loan is made -

10  the Private Loans from the banks at rates set by the forward purchase commitment

11  agreements. Moreover, the Private Loans also use Sallie Mae's own underwriting,

12  copyrighted forms, promissory notes, brands and/or proprietary platforms to initiate

13  the loans and Sallie Mae services the Private Loans.

14       35.    For instance, Sallie Mae has cultivated such a financial relationship with

15  "lender-partner" Stillwater National Bank ("Stillwater"), a national bank located in

16  Oklahoma that Sallie Mae identified as the lender on Plaintiffs' application forms.  As

17  reflected in the 10-K filed by Southwest Bancorp Inc. (Stillwater's parent company) for

18  2010:

19            student lending … is substantially dependent on Student Loan
          Marketing Administration ("Sallie Mae"), which provides substantially

20            all of the servicing for government guaranteed and private student
          loans and provides liquidity through its purchases of student loans and

21            lines of credit.  Southwest makes government guaranteed student
          loans and private student loans.  At December 31, 2010, all private

22            student loans were self-insured by Sallie Mae.

23

24       36.    Upon information and belief, national or state-chartered banks such as

25  Stillwater have no true role or relationship to the loans that are made by Sallie Mae in

26  their names, and merely maintain bank accounts from which Sallie Mae can issue

27  disbursements and/or be reimbursed for the money it disperses directly to students.

28  Sallie Mae also makes lines of credit available to its "lender-partners" with lines of

Complaint in Intervention of Dana L. Barone and Sara Bachman-Williams; No. 3:11-cv-01320 EDL

credit that they can draw upon for the purpose of funding such loans as directed by Sallie Mae.  Moreover, because the third-party banks transfer the Private Loans to Sallie Mae after origination under a pre-arranged agreement as described herein, the third-party banks never truly undertake the risk of loss.

37.     Sallie Mae exerts control and ownership over all Private Loans in other ways as well.  Sallie Mae carries out all interactions with the borrowers applying for the Private Loans, establishes and controls the terms and conditions under which the Private Loans are offered. It approves or denies borrowers' Private Loan applications in accordance with its own underwriting policies, uses its own copyrighted forms, promissory notes, brands and platforms, and disburses the payments to those borrowers who it approves for Private Loans.

38.     Sallie Mae collects and keeps the vast majority of fees and interest on the loans.   This arrangement is effectuated pursuant to materially-similar assignment clauses that Sallie Mae includes in its copyrighted promissory notes for the Private Loans.  The assignment provisions are one-sided, stating that the lender (but not borrower) "may assign this loan at any time" and "if… assigned, the Assignee will become the owner of this Note and will have all your rights to enforce this Note against me."

39.     Sallie Mae bears the credit risk on all the Private Loans.  Sallie Mae insures and/or guarantees the Private Loans so that Sallie Mae bears the risk of loss on the loans even prior to purchasing them.   Sallie Mae then assumes the risk of loss directly when it executes the assignments of the Private Loans pursuant to the forward purchase commitment agreements.

40.     In reality, Sallie Mae is the *de facto* actual lender for its Private Loans. Sallie Mae owns and markets the Private Loans brands, and underwrites the loans, directs the terms of the loans, funds the loans directly or indirectly, does all of the work to service the loans, bears the credit risk, and reaps most or all of the fees and profits from the Private Loans.

41.     None of the Private Loans are made by national banks, within the meaning or application of NBA §§ 85 and 86, nor are they made by qualifying bank entities under parallel state charters as provided by the Federal Deposit Insurance Act or other similar laws.

## C.     THE UNITED STATES DEPARTMENT OF THE TREASURY FOUND THAT THE PRIVATE LOANS WERE MADE BY SALLIE MAE

42.     In 2002, the Department of the Treasury determined that Sallie Mae predecessor in interest Student Loan Marking Association (SLMA) was originating loans (and incorrectly attributing these loans to its banking partners) even though it was a Government Sponsored Entity and forbidden to engage in loan origination activities.

43.     In correspondence dated August 30, 2002 to the Department of the Treasury Office of Sallie Mae Oversight (OSMO), Sallie Mae disputed the Treasury's draft findings, *see* Exhibit 3 at UST-Ubaldi 011, and explained its activities as follows:

> SLMF does not make Career Training Loans.  Rather, the GSE has entered into loan purchase agreements with various lenders under which the GSE provides loan origination services and loan servicing to the lenders and purchases loans from the lenders.  Copies of the various loan purchase agreements are available upon request.  The GSE in turn subcontracts the loan origination servicing and the loan servicing functions to SLMF. The loan purchase agreements between the GSE and its lender partners governing Career Training Loans are very similar to the ExportSS agreements that the GSE enters into with its FFELP lender clients.  In all cases, the Career Training Loans are actually made by federally chartered or state chartered lenders.  The lenders make these loans with their own funds. Further, each lender in the Career Training Loan program represents and warrants in the loan purchase agreements that it is the sole owner of the loans free and clear of any liens, claims or encumbrances of any nature, and is free to transfer title to the loans to the GSE.  Furthermore, the lenders have the right to retain 20 percent of the original principal balance of all Loans that they make under the Career Training Loan Program. This is consistent with the terms of the GSE's loan purchase agreements in the Signature Loan Program.

44.     Notwithstanding Sallie Mae's objections, in its final September 2002

Report of Examination of the Student Loan Marketing Association[2], the OSMO

reiterated its initial determination that this activity as structured constituted loan

origination by Sallie Mae, stating:

> **<u>Origination versus Secondary Market Activity</u>**.  The
> GSE purchases loans in the secondary student loan market; it
> generally does not originate student loans for its own account.
> In 1998, SLM Corporation had extensive discussions with
> Treasury about its plans to originate federally insured student
> loans for its own account (the Origination Program).  Treasury
> stressed the ban on direct and indirect funding of non-GSE
> affiliate loan origination activity by the GSE.  In 1998, SLM
> Corporation's Management represented to Treasury that the
> Origination Program would be conducted separately from the
> GSE.  In a legal memorandum dated March 31, 1998,
> Management represented to OSMO that the Origination
> Program would "not be funded with proceeds from debt issued
> by the GSE and … loans made under the program [would] not be
> sold to the GSE."  Thus, all apparently understood and
> acknowledged it would undermine the statutory restriction on
> loan origination by the GSE, if a non-GSE affiliate originated
> loans and the GSE then purchased the loans.  This point was
> again acknowledged in the Nellie Mae acquisition in 1999, when
> Management represented in a letter to Treasury dated May 21,
> 1999, that "no loans originated by [Nellie Mae] will be
> transferred to the GSE."  Based on SLMF's relationship with its
> banking partners, OSMO concluded that SLMF, in substance
> originates loans.  Further, the Holding Company has
> consistently represented, via its filings with the Securities and
> Exchange Commission, that SLMF originates its loans.

Exhibit 4, September 2002 OSMO Report of Examination at 5.

45.     Subsequently, in a 2006 draft report first published on its website in

2011, the federal Office of Sallie Mae Oversight (OSMO) also stated:

> Based on its examination of SLMA's relationship with its
> funding bank partners, OSMO concluded that SLMA, in

---

[2] Neither Sallie Mae's Aug. 2002 letter nor the OSMO's Sept. 2002 Report of Examination is publicly available.  These documents were obtained by Plaintiff Ubaldi through a subpoena served on the Department of Treasury in connection with this action.

> substance, was originating certain private loans.  The funding banks did not take long-term possession of the notes signed by the student borrowers, nor did they assume the credit risk associated with the notes.  The GSE [SLMA] unconditionally purchased the notes, generally within a month, even in case of the borrower's death.  Further, the economic substance of the payments by SLMA to the funding banks reflected loan origination via a "storefront" rather than second market activity.

Exhibit 5, Excerpts of OSMO 2006 Draft Report, at p.142.

46.     The OSMO Report further explained, "[i]n a true secondary market, a bank would sell its asset into the secondary market (i.e., to Sallie Mae) at its fair value.  However, in practice that was not how these loans 'sold' to Sallie Mae were priced."  *Id.* at 142 n. 199. Instead, "[t]he loans were sold to Sallie Mae by its "storefront banks" at cost plus interest during the holding period rather than at fair value.  This was, in effect, origination by SLMA."  *Id.*

### D.     DISCOVERY PRODUCED IN THIS ACTION CONFIRMS THAT SALLIE MAE MADE PLAINTIFFS' LOANS AND WAS THE *DE FACTO* ACTUAL LENDER FOR PLAINTIFFS' LOANS

47.     Consistent with the OSMO's conclusion based upon its 2002 examination of Sallie Mae, discovery in this action to date, specifically including the ExportSS® form agreement between Sallie Mae and its lender partner Stillwater Bank, confirms Sallie Mae was the *de facto* actual lender for its Private Loans, including those loans made to Plaintiffs.

48.     For example, on July 1, 2002, SLMA and Stillwater entered into an ExportSS® Agreement.  The ExportSS® is a form agreement that Sallie Mae used with multiple of its "lender-partners" in connection with the origination of the Private Loans.  A copy of the ExportSS® Agreement between Sallie Mae and Stillwater and amendments thereto is attached as Exhibit 2.

49.     The ExportSS® Agreement refers to Sallie Mae as the entity originating the Private Loans. *See* Exh. 2 at SNB000003 ("You and we agree that only we [Sallie Mae] and our affiliates will originate and process" the Private Loans).

50.     The ExportSS® Agreement establishes that Stillwater did not assume any risk of loss on the Private Loans.  Instead, Sallie Mae assumed the risk of loss on the Private Loans, since it required Stillwater to assign and sell the loans to Sallie Mae within a matter of months, and it required Sallie Mae to buy the entire interest in those Private Loans. *See* Exh. 2 at SNB000018 ("you agree to offer to us on the sales schedule set forth below… all Eligible Private Loans originated by us or our affiliate"); *id.* at SNB00019 ("we **will** purchase all Eligible Private Loans that we originate on your behalf") (emph. added).

51.     The ExportSS® Agreement demonstrates that Sallie Mae controlled the terms and conditions of the loans.  In particular, under the Agreement, Sallie Mae could, but was not "obligated" to use its own underwriting standards and would approve or deny borrowers without consulting Stillwater. Exh. 2 at SNB00004-5, 00079-81.  Sallie Mae would supply the "design template" for the promissory note, loan application forms, and related marketing materials, *id.* at SNB00011, and Sallie Mae reserved final rights of approval on the forms.  *Id* ("You further agree that you will not alter the content or description of Application Materials without our express written consent. Sallie Mae shall have final approval of Application Materials prior to distribution.").

52.     The ExportSS® Agreement establishes that the purported "lender" identified on the loan application forms never actually paid any money to the schools attended by the student borrowers.  Instead, the ExportSS® Agreement specifies that loan monies are to be disbursed by Sallie Mae from its own accounts to the schools attended by the students.  *See* Exh. 2 at SNB00005 ("We will disburse Loan proceeds… Funds for these Loans will be drawn from a bank account maintained by us").

53.     At the time that Sallie Mae predecessor in interest SLMA entered into the ExportSS® Agreement with Stillwater Bank any loans it made would not be protected by federal preemption as SLMA was not a bank.  Thus, as the ExportSS®

16

Agreement demonstrates, Sallie Mae and its lender partners engaged in a subterfuge in which Stillwater was named as the lender of record, even though Sallie Mae made the loan and was the *de facto* actual lender.

54.      Nominee lenders such as Stillwater made short-term business loans to Sallie Mae; nominee lenders such as Stillwater did **not** make loans to student borrowers.  Beginning in or about 2005, Sallie Mae in some instances paid the nominee lender a lower interest rate on the funds than it charged the borrowers (during the 90 to 180 day period between disbursement and assignment and sale of the loan to Sallie Mae), further demonstrating that the banks were effectively providing Sallie Mae with a short-term credit facility rather than making loans to student borrowers. (Stillwater Form 10-K, 2005, p. 26)

55.      In sum, as reflected in the ExportSS® form agreement between Sallie Mae and Stillwater Bank, national or state-chartered banks such as Stillwater have no true role or relationship to the loans that are made by Sallie Mae in their names.

## V.      REPRESENTATIVE PLAINTIFFS AND THE CLASSES

### A.      PLAINTIFF DANA L. BARONE

56.      On September 2, 2003, Plaintiff Dana L. Barone took out a Private Loan in California referred to as a CEC Signature Education Loan in the total amount of $8,639.00.  Exh. 6.  This loan was used to help Ms. Barone pay for her education at American InterContinental University in Los Angeles, California.  This loan was made by Sallie Mae, or its predecessor in interest, the Student Loan Marketing Association, pursuant to a forward purchase commitment agreement with Stillwater National Bank intended to disguise Sallie Mae's role as the *de facto* actual lender.

57.       Upon information and belief, Ms. Barone's September 2, 2003 Private Loan was assigned to Sallie Mae or its predecessor in interest, the Student Loan Marketing Association, shortly after disbursement.

58.      Sallie Mae, operating as Sallie Mae Servicing LLP and later as Sallie Mae, Inc. serviced Plaintiff Barone's Private Loan since its inception.

59.     Plaintiff Barone applied for her CEC Signature Education Loan using a loan application form copyrighted and written by Sallie Mae in 2003.  The "CEC Loan Application" listed Sallie Mae's name and telephone number prominently on the top of the form, and directed Plaintiff Barone to "Mail application to: Sallie Mae Servicing" in Panama City, Florida.  Exh. 7.

60.     Upon information and belief, Plaintiff Barone received a letter from Sallie Mae's "Loan Origination Department" located in Panama City, Florida, stating that her application was approved and that Sallie Mae would disperse her loan funds in accordance with the schedule set by her school.  As reflected in the letters and/or enclosed Truth in Lending disclosure forms, the marginal interest added to the prime rate on Plaintiff Barone's September 2, 2003 Private Loans was 9.85%.

61.     Plaintiff Barone was charged a Supplemental Fee at the time of disbursement on September 2, 2003 Private Loans.

**B.     PLAINTIFF SARA BACHMAN-WILLIAMS**

62.     Plaintiff Sara Bachman-Williams took out at least one Private Loan in California referred to as a CEC Signature Education Loan, which included charges for supplemental disbursement fees.  Plaintiff Bachman-Williams loan was used to help Ms. Bachman-Williams pay for her education at American InterContinental University in Los Angeles, California.  Plaintiff Bachman-Williams' loan made by Sallie Mae, or its predecessor in interest, the Student Loan Marketing Association, pursuant to a forward purchase commitment agreement with Stillwater National Bank intended to disguise Sallie Mae's role as the *de facto* actual lender.

63.     Upon information and belief, Ms. Bachman-Williams' December 12, 2003 Private Loans were assigned to Sallie Mae or its predecessor in interest, the Student Loan Marketing Association, shortly after disbursement.

64.     Sallie Mae, operating as Sallie Mae Servicing LLP and later as Sallie Mae, Inc. serviced Plaintiff Bachman-Williams' December 12, 2003 Private Loans since their inception.

65.     In or around January, 2004 Plaintiff Bachman-Williams received letters from Sallie Mae's "Loan Origination Department" located in Panama City, Florida, stating that her applications were approved and that Sallie Mae would disperse her loan funds in accordance with the schedule set by her school.

66.     Plaintiff Bachman-Williams was charged a Supplemental Fee at the time of disbursement on both the December of 2003 Private Loans.

C.     **PLAINTIFFS' PRIVATE LOANS**

67.     Like all other Private Loans made by Sallie Mae, Plaintiffs Barone and Bachman-Williams received a standard form promissory note copyrighted and written by Sallie Mae for their CEC Signature Education Loans.[3]  (*See, e.g.,* Exh. 1).  This promissory note could not be modified or otherwise negotiated by Plaintiffs or other borrowers since it was offered to them solely on a take it or leave it basis, and included statements such as "THIS IS A NON-NEGOTIABLE CONSUMER NOTE."  (*Id.* at 3).

68.     Like all other Private Loans made by Sallie Mae, Plaintiffs' promissory notes included a *one-sided* assignment clause providing "If this Note is assigned, the Assignee will become the owner of this Note and will have all your rights to enforce this Note against me" and "I may not assign this Note or any of its benefits or obligations.  You may assign this Note at any time." (*See, e.g.,* Exh. 1 at ¶L.2 and ¶L.10)

69.     Like all other Private Loans made by Sallie Mae, Plaintiffs' promissory notes included a choice-of-law clause providing "I understand that you are located in the State listed on the front of the attached application and this Note will be entered into in the same State.  Consequently, the provisions of this Note will be governed by federal laws and the laws of that State, without regard to conflict of law rules." (*See, e.g.*, Exh. 1 at ¶L.3)

---

[3]   The "Signature Student Loan" name is a registered trademark of SLM Corporation (Sallie Mae).

70.     Like all other Private Loans made by Sallie Mae, Plaintiffs' promissory notes for their Private Loans include a promise to pay such as "I will make consecutive monthly payments during the Repayment Period in the amounts and on or before the payment due dates shown on my statements until I have paid all of the principal and interest and any other charges I may owe on this Note." (*See, e.g., Id.* at ¶D.2).  In the event Plaintiffs or other borrowers fail to make the full monthly payment when due, the standard form promissory note permits Sallie Mae to declare the loan in default and demand immediate payment of the entire loan balance, including all Late Charges (*see, e.g., Id.* at ¶I.1), or continue the loan and assess a Late Charge. (*See, e.g., Id.* at ¶E).  The standard form promissory note provides for a Late Charge, and makes it clear that the Late Charge will be paid first from any future payments from the borrower.  (*See, e.g., Id.* at ¶¶D.7; E).

71.     Plaintiffs' promissory notes, like all other promissory notes of all other Sallie Mae Private Loans, provided that the interest would be determined, as follows:

> the annual rate equal to the sum of the highest Prime Rate published in The Wall Street Journal Credit Markets' section, "Money Rates' table on the fifteenth day of the last month of the quarter prior to a borrower's Disbursement or Change Date plus or minus the percentage as identified on my Disclosure Statement, which is hereby incorporated into this Note, per annum (the "Margin") and rounded to the nearest one-eighth (0.125) of one percent.  (For example, the Variable Rate for each quarter beginning January 1st will be determined by the applicable Prime Rate published on the preceding December 14th.)  The Margin is based on my School, credit history and co-borrower-s credit history.  Once set, the Margin does not change.  The actual interest rate during the quarter in which my loan is disbursed will be on my Disclosure Statement."

Exh. 1 ¶C.2.

72.     Plaintiffs' promissory notes, like the promissory notes of all other Sallie Mae Private Loan borrowers, provided for the collection of Supplemental Fees, specifically including a disbursement fee based upon a "percentage of the principal balance of my loan" which Sallie Mae could either "deduct from the disbursement or

add to the principal loan balance" of the loan, and a repayment fee that would be "a percentage of the principal balance of my loan after unpaid interest accrued during the Interim Period is capitalized." (*See, e.g.*, Exh. 1, ¶F.1,2)

73.     Sallie Mae charged and received interest from Plaintiffs in excess of 10% per annum on their Sallie Mae Private Loans.  (Exh. 6)  Plaintiff Barone was placed in credit tier 5 (w/out a co-borrower) and charged a Margin of 9.85% above the Prime Rate on her 2003 Private Loan.  Since 2001, the Prime Rate has never fallen below 3.25%.  *See* Table 2 at ¶28, *supra*.  Accordingly, the Variable Rate (i.e., the Prime Rate plus the Margin) charged by Sallie Mae on Plaintiff Barone's 2003 Private Loan has exceeded 10% per annum throughout its entire lifetime.  *See id.* (reflecting Variable Rate over time charged to Tier 5 borrowers).  Notably, the Variable Rate assessed by Sallie Mae and paid by Plaintiff Barone on her 2003 Private Loan reached over 19% during those times when the Prime Rate was highest (Prime Rate of 9.5% plus Margin of 9.85% equals a Variable Rate of 19.35%), even before calculation of any additional interest in the form of fees.

74.     Upon information and belief, Plaintiff Bachman-Williams was placed in credit tier 5 and charged more than 10% interest for the life of her loans.  Notably, the interest rate assessed by Sallie Mae and paid by Plaintiff Bachman-Williams was before calculation of any additional interest in the form of fees.

75.     Plaintiffs, like all other borrowers of Private Loans made by Sallie Mae, did not know, nor did they have reason to know, that Sallie Mae was not entitled to charge interest as such high rates.  Neither Sallie Mae nor the named lender (if purportedly different than Sallie Mae) disclosed to Plaintiffs, borrowers or the general public that the Private Loans had in fact been made by Sallie Mae and that, therefore, the interest rates on the loans were subject to California law.  Nor did Plaintiffs or other borrowers of Private Loans have any reason to suspect that the Variable Rate assessed by Sallie Mae, either standing alone or in conjunction with Late Charges and/or Supplemental Fees, exceeded the maximum legal interest limit allowed by law.

76.     Plaintiffs and the other student borrowers' promissory notes and related documents were replete with disclosures and other provisions touted therein as being required by law.   As such, Plaintiffs and the other class members' had no reason to believe that Sallie Mae would fail to comply with applicable law with respect to the interest rate, and they reasonably trusted and relied on Sallie Mae to assess interest on their Private Loans in accordance with applicable law.  As described throughout this Complaint, unbeknownst to Plaintiffs and the other class members, Sallie Mae violated applicable California law by assessing interest at usurious rates in excess of the legal limit.

## VI.     CLASS ACTION ALLEGATIONS

77.     This action asserts claims on behalf of a class pursuant to Federal Rules of Civil Procedure 23(a), and (b)(1), 23(b)(2) and 23(b)(3).

78.     Plaintiffs bring claims on behalf of themselves and the Usury Class, defined as:

> All persons who obtained a Sallie Mae Private Loan where the lender identified in the loan application is  either  Stillwater, Bank One, or First National Bank in Sioux Falls that was, based upon a loan application that listed California as the permanent residence of the borrower if no temporary residence was identified, or based upon a loan application that listed California as the temporary residence of the borrower, and who on or after March 26, 2009, were charged interest by Sallie Mae or its related entities at an annual rate of more than 10% (the "**Usury Class**").

79.     The Usury Class is subject to the following exclusions:

> Excluded are Sallie Mae's officers, directors, managerial employees and their immediate families, and any of the judges of the Court before which this case is pending and their immediate families.

Complaint in Intervention of Dana L. Barone and Sara Bachman-Williams; No. 3:11-cv-01320 EDL

1    Excluded are Sallie Mae Private Loans made by Sallie Mae

2    Bank, since its inception in 2005.

3    Excluded are any Private Loans that were not assigned to or

4    otherwise acquired by Sallie Mae or its related entities.

5    Excluded are all Sallie Mae Private Loans with a promissory

6    note for the loan at issue that includes an arbitration clause or class

7    action waiver.[4]

8    **A.   THE USURY CLASS**

9    80.    Upon information and belief, there are thousands of members in the

10   Usury Class who are geographically dispersed throughout California, as well as those

11   who have re-located to other states.  Therefore, individual joinder of all members in

12   the Usury Class would be impracticable.

13   81.    Common questions of law or fact exist as to all members of the Usury

14   Class.  These questions predominate over the questions affecting only individual class

15   members.  For the Usury Class, these common legal or factual questions include:

16   a.    Whether Sallie Mae charged interest of its Private Loans at rates

17   in excess of 10 percent annually;

18   b.    Whether Sallie Mae's conduct violated California's Unfair

19   Competition Law, California Business and Practices Code § 17200, *et seq*.; and

20   c.    The appropriate measure of restitution and/or restitutionary

21   disgorgement.

22   82.    Plaintiffs' claims are typical of the claims of the Usury Class, in that

23   Plaintiffs were charged and paid interest at a rate of more than 10% annually on one

24

25   [4] Plaintiffs incorporate and allege the tolling allegations in the original Third
26   Amended Complaint in the underlying *Ubaldi, et al. v. SLM Corp., et al.*
     [Dkt. No. 126, Ex. A-1] action, (¶¶ 115-120) and the modified class periods
27   (¶¶121-125) alleged.  These allegations have not been included as separate
     paragraphs in this Complaint in Intervention to conform with the Court's
28   November 15, 2013 Order [Dkt. No. 169].

1    or more of their Sallie Mae Private Loan, their loans were made in California, and

2    they have made interest payments on, or paid off their Sallie Mae Private Loans, on or

3    after March 26, 2009.  Plaintiffs, therefore, are no different in any relevant respect

4    from any other Usury Class member, and the relief sought is common to the Usury

5    Class.

6            83.     Plaintiffs are adequate representatives of the Usury Class because their

7    interests do not conflict with the interests of Usury Class members they seek to

8    represent, and they have retained counsel competent and experienced in conducting

9    complex lending and class action litigation.  Plaintiffs and their counsel will

10   adequately protect the interests of the Usury Class.

11           84.     A class action is superior to other available means for the fair and

12   efficient adjudication of this dispute.  The damages suffered by each individual Usury

13   Class member likely will be comparatively small, especially given the burden and

14   expense of individual prosecution of the complex litigation necessitated by Sallie Mae's

15   conduct.  Thus, it would be virtually impossible for Usury Class members individually

16   to redress effectively the wrongs done to them.  Moreover, even if Usury Class

17   members could afford individual actions, it would still not be preferable to class wide

18   litigation.  Individualized actions present the potential for inconsistent or

19   contradictory judgments.

20           85.     By contrast, a class action presents far fewer management difficulties

21   and provides the benefits of single adjudication, economies of scale, and

22   comprehensive supervision by a single court.  In the alternative, the Usury Class may

23   be certified because Sallie Mae has acted or refused to act on grounds generally

24   applicable to the Usury Class, thereby making appropriate preliminary and final

25   equitable relief with respect to the Usury Class.

26           86.     Upon information and belief, all records concerning each of the Sallie

27   Mae Private Loans entered into by members of the Usury Class are in the possession

28   and control of Defendants and their agents and available through discovery.

VII.   **CLAIMS FOR RELIEF**

  A.   <u>First Claim For Relief</u> - "Unlawful" Business Practices in Violation of The Unfair Competition Law, Bus. & Prof. Code § 17200, et seq. For Plaintiffs And The Usury Class

87.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

88.   This claim is brought on behalf of Plaintiffs and the Usury Class.

89.   The Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq.*, defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

90.   A business act or practice is "unlawful" if it violates any established state or federal law.

91.   California Constitution, Article XV sets a maximum legal rate for interest charged on loans such as the Private Loans of 10 percent per annum, including through the charging of fees.  In pertinent part, it states:

> Section 1.  The rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest:
>
> (1) For any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum; provided, however, that any loan or forbearance of any money, goods or things in action the proceeds of which are used primarily for the purchase, construction or improvement of real property shall not be deemed to be a use primarily for personal, family or household purposes.
> …
> No person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the

25

interest authorized by this section upon any loan or
forbearance of any money, goods or things in action.

92.    California's usury proscription is also set forth in a statute, an initiative measure that has not been codified. Stats.1919, p. lxxxiii, Deering's Uncod. Initiative Measures & Stats. (1973 ed.) 1919–1, p. 35]) (the "Usury Law").

93.    The Private Loans at issue in this action are loans of money primarily for personal, family, or household purposes subject to Cal. Const., art. XV, § 1(1).

94.    The Private Loans at issue in this action are loans of money expressed "in writing" within the meaning of the Usury Law.  Cal. Civ. Code § 1916-1.

95.    The limitations set forth in Cal. Const., art. XV, § 1(1) and the Usury Law apply to the Private Loans, as these loans were not made by a national bank within the meaning of the National Bank Act §§ 85 and 86, nor were they made by qualifying bank entities under parallel state charters as provided by the Federal Deposit Insurance Act or other similar laws.  These limitations apply to Sallie Mae, which is not a national or state-chartered bank, or subject to any other exception.

96.    Sallie Mae charges interest on the Private Loans at a Variable Rate that often exceeds 10 percent per annum,.

97.    Sallie Mae has and continues to violate the "unlawful" prong of the UCL by charging borrowers interest in violation of California's Constitution, art. XV, § 1(1) and the Usury Law.  By committing the acts and practices alleged above, Sallie Mae has engaged, and continues to be engaged, in unlawful business practices within the meaning of California Business and Professions Code 17200, *et seq.*

98.    Through its unlawful acts and practices Sallie Mae has obtained, and continues to unfairly obtain, money from Plaintiffs and members of the Usury Class. As such, Plaintiffs request on behalf of themselves and all Usury Class members the relief set forth in the Prayer, including that this Court enjoin Sallie Mae from continuing to violate the Unfair Competition Law as discussed herein.  Otherwise, the

Usury Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### B. SECOND CLAIM FOR RELIEF - "UNFAIR" BUSINESS PRACTICE IN VIOLATION OF THE UNFAIR COMPETITION LAW, BUS. & PROF. CODE §17200, ET SEQ. FOR PLAINTIFFS AND THE USURY CLASS

99.     Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

100.     This claim is brought on behalf of Plaintiffs and the Usury Class.

101.     A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

102.     Sallie Mae, a non-national and non-state-chartered bank, has and continues to violate the "unfair" prong of the UCL through its assessment of usurious interest on the Private Loans of more than 10% annually.

103.     Sallie Mae's assessment of the interest at effective rates of greater than 10% annually violates the "unfair" prong of the UCL, because Sallie Mae is not entitled to charge these amounts of interest, which are excessive and not justified by any business need, and which create an onerous burden on Usury Class members.

104.     The gravity of the harm to Plaintiffs and members of Usury Class resulting from such unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Sallie Mae's conduct.  By committing the acts and practices alleged above, Sallie Mae has engaged, and continues to be engaged, in unfair business practices within the meaning of California Business and Professions Code 17200, *et seq.*

105.     Through its unfair acts and practices Sallie Mae has obtained, and continues unfairly to obtain, money from Plaintiffs and members of the Usury Class. As such, Plaintiffs request on behalf of themselves and all Usury Class members the relief set forth in the Prayer, including that this Court enjoin Sallie Mae from

continuing to violate the Unfair Competition Law as discussed herein. Otherwise, the Usury Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### C. THIRD CLAIM FOR RELIEF – USURY IN VIOLATION OF ARTICLE XV SECTION 1 OF THE CALIFORNIA CONSTITUTION FOR PLAINTIFFS AND THE USURY CLASS

106. Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint and restate them as if they were fully written herein.

107. This claim is brought on behalf of Plaintiffs and the Usury Class.

108. The California Constitution, art. XV, sec. 1, states "No person, association, co-partnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action."

109. For any loan, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, the authorized interest rate is 10 percent per annum or less. Cal. Const., art. XV, § 1(1).

110. Sallie Mae's Private Loans are "loans" for "money" for use "primarily for personal, family, or household purposes," within the meaning of the California Constitution, art. XV, § 1(1).

111. Sallie Mae is not excluded or otherwise exempt from the constitutional provisions on usury.

112. Sallie Mae charged Plaintiffs and all members of the Usury Class interest in excess of the statutory maximum rate of 10 percent per annum.

113. The Private Loans and interest thereon are absolutely repayable to Plaintiffs and the members of the Usury Class.

114. Sallie Mae established the terms of the Private Loans, including the rates of interest to be charged to its student borrowers, and willfully intended to enter these

28

1   transactions and to collect amounts in excess of the legal limit of 10 percent per

2   annum.

3         115.   Through its usurious charges Sallie Mae has received, and continues to

4   receive, money from Plaintiffs and all members of the Usury Class in violation of

5   California's Constitution.  As such, Plaintiffs request on behalf of themselves and all

6   Usury Class members the relief set forth in the Prayer, including that this Court enter

7   an order canceling all future interest on the Private Loans.  Plaintiffs also request

8   that this Court award any other relief that is just and proper.

9

10        **D.**     **FOURTH CLAIM FOR RELIEF - VIOLATION OF THE USURY LAW**
                        **FOR PLAINTIFFS AND THE USURY CLASS**

11

12        116.   Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint

13  and restate them as if they were fully written herein.

14        117.   This claim is brought on behalf of Plaintiffs and the Usury Class.

15        118.   California's usury proscription is set forth in the Usury Law, an

16  uncodified Initiative Measure adopted nearly 100 years ago. *See* Cal. Civ. Code § 1916-

17  1 through 1916-3.

18        119.   The Usury Law provides:

19            The rate of interest upon the loan or forbearance of any
20  money, goods or things in action or on accounts after demand or
    judgments rendered in any court of this state, shall be seven
21  dollars upon the one hundred dollars for one year and at that
    rate for a greater or less sum or for a longer or a shorter time;
22  but it shall be competent for parties to contract for the payment
    and receipt of a rate of interest not exceeding twelve dollars on
23  the one hundred dollars for one year and not exceeding that rate
    for a greater or less sum or for a longer or shorter time, in which
24  case such rate exceeding seven dollars on one hundred dollars
    shall be clearly expressed in writing.
25

26

27  Cal. Civ. Code § 1916-1.

28

120.    As recognized in *Penziner v. West American Finance Co.*, 10 Cal. 2d 160, 174, 74 P.2d 252 (Cal. 1937), the 12 percent interest rate established by the Usury Law for contracts in writing was amended to 10 percent by adoption of the usury provisions of the California Constitution.

121.    Sallie Mae's Private Loans are "loans" for "money" expressed "in writing" within the meaning of the Usury Law.  Sallie Mae is not excluded or otherwise exempt from the Usury Law.

122.    Sallie Mae charged Plaintiffs and all members of the Usury Class interest in excess of the statutory maximum rate of 10 percent per annum,.

123.    Sallie Mae established the terms of the Private Loans, including the rates of interest to be charged to its student borrowers, and willfully intended to enter these transactions and to collect amounts in excess of the legal limit of 10 percent per annum.

124.    Through its usurious charges Sallie Mae has received, and continues to receive, money from Plaintiffs and all members of the Usury Class in violation of the Usury Law, as amended.  As such, Plaintiffs request on behalf of themselves and all Usury Class members the relief set forth in the Prayer, including awarding three times the interest paid on the Private Loans as provided by the Usury Law, and that this Court enter an order canceling all future interest on the Private Loans.  Cal. Civ. Code § 1916-3(a).

## VIII.  PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and all class members, request award and relief as follows:

A.    An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs Barone and Bachman-Williams be appointed Class Representatives for the Usury Class, and that Plaintiffs' counsel be appointed Class Counsel.

**B.**      Restitution in such amount that Plaintiffs and all Usury Class members paid as interest on Private Loans or, alternatively, the amount of interest paid on Private Loans in excess of the 10% legal limit.

**C.**      Restitutionary disgorgement of the profits Sallie Mae made on the interest it assessed to Plaintiffs and all Usury Class members on their Private Loans or, alternatively, the amount of interest assessed on Private Loans in excess of the 10% legal limit.

**D.**      An order awarding three times the interest paid on the Private Loans by Plaintiffs and the Usury Class members as permitted by the Usury Law or, alternatively, three times the amount of interest paid on Private Loans in excess of the 10% legal limit as permitted by the Usury Law.

**E.**      An order enjoining and canceling all future interest payments on the Private Loans for Plaintiffs and the Usury Class or, alternatively, the amount of interest assessed on Private Loans in excess of the 10% legal limit.

**F.**      An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre and post-judgment interest.

**G.**      An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Sallie Mae as a result of the unlawful, unfair and fraudulent conduct alleged herein.

**H.**      Such other and further relief as may be deemed necessary or appropriate.

## IX.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all causes of action and/or issues so triable.

Dated:  May 6, 2014

**BRAUN LAW GROUP, P.C.**

By: _____
       Michael D. Braun (SBN 167416)
10680 West Pico Boulevard
Suite 280
Los Angeles, California  90064
Telephone:  (310) 836-6000
Facsimile:  (310) 836-6010

Joseph N. Kravec, Jr. *(pro hac vice)*
Wyatt A. Lison (*pro hac vice*)
**FEINSTEIN DOYLE PAYNE &**
    **KRAVEC, LLC**
Allegheny Building, 17th Floor
429 Forbes Avenue
Pittsburgh, Pennsylvania  15219
Telephone:  (412) 281-8400
Facsimile:  (412) 281-1007

Janet Lindner Spielberg (SBN 221926)
**LAW OFFICES OF JANET**
    **LINDNER SPIELBERG**
12400 Wilshire Boulevard, #400
Los Angeles, California  90025
Telephone:  (310) 392-8801
Facsimile:  (310) 278-5938

William J. Genego (SBN 103224)
**LAW OFFICE OF WILLIAM GENEGO**
2115 Main Street
Santa Monica, California 90405
Telephone:   310-399-3259

***Attorneys for Plaintiffs Dana L.***
***Barone and Sara Bachman-Williams***

Complaint in Intervention of Dana L. Barone and Sara Bachman-Williams; No. 3:11-cv-01320 EDL