Sonya D. Winner (SBN 200348)
David M. Jolley (SBN 191164)
Ashley Simonsen (SBN 275203)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile:  (415) 591-6091
E-mail: SWinner@cov.com
E-mail: DJolley@cov.com
E-mail: ASimonsen@cov.com

Emily Johnson Henn (SBN 269482)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
E-mail: EHenn@cov.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TINA M. UBALDI, et al.,<br><br>     Plaintiffs,<br><br>     v.<br><br>NAVIENT SOLUTIONS, INC.; NAVIENT, LLC; and SLM PC STUDENT LOAN TRUST 2004-A,<br><br>     Defendants. | Case No.: 3:11-cv-01320-EDL<br><br>**OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>DATE:    October 14, 2014<br><br>TIME:    2:00 p.m.<br><br>CTRM:   E |

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     BACKGROUND ......................................................................................................... 1

III.    ARGUMENT .............................................................................................................. 6

      A.      Plaintiffs' Class Definitions Remain Fatally Flawed............................................ 7

            1.      The Prior Ascertainability Problem Remains and Cannot Be Readily Cured.................................................................................................................. 7

            2.      The Proposed Classes Include Persons Who Lack Article III Standing..... 9

            3.      Plaintiffs Have Not Demonstrated That They Possess a Manageable Methodology for Identifying Class Members........................................... 11

            4.      The Proposed Class Definitions Lack Appropriate Time Limitations...... 13

      B.      Plaintiffs Have Not Established Numerosity. ...................................................... 13

      C.      Plaintiffs Have Not Shown the Existence of Common Issues. ........................... 16

            1.      The *De Facto* Lender Issue Does Not Present a Common Question........ 16

            2.      There is No Commonality to the Threshold Choice of Law Issue. .......... 18

      D.      The Named Plaintiffs Are Not Typical................................................................ 20

      E.      Conflicts of Interest Within the Late Fee Classes Preclude a Finding of Adequacy of Representation for those Classes..................................................... 21

      F.      The Requirements of Rule 23(b)(3) Are Not Satisfied....................................... 22

IV.     CONCLUSION......................................................................................................... 25

# SUPPORTING DECLARATIONS (SEPARATELY FILED)

Declaration of Emily Johnson Henn

Declaration of Bill Hinko

Declaration of Jerry Maher

Declaration of Mark Perrault

Declaration of Patricia Mae Potomis

Declaration of Patrick Theurer

Declaration of Jason Wheeler

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bieneman v. City of Chicago*,
   864 F.2d 463 (7th Cir. 1988) ............................................................................................21

*Bova v. City of Medford*,
   564 F.3d 1093 (9th Cir. 2009) ..........................................................................................10

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
   631 F.3d 939 (9th Cir. 2011) ............................................................................................10

*Clarke v. Horany*,
   212 Cal. App. 2d 307 (1963) ..............................................................................................9

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013)..............................................................................................24, 25

*Creative Ventures, LLC v. Jim Ward & Assocs.*,
   195 Cal. App. 4th 1430 (2011) ...........................................................................................9

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006)................................................................................................9

*In re Flash Memory Antitrust Litig.*,
   2010 WL 2332081 (N.D. Cal. June 9, 2010) ....................................................................11

*Garrett v. Coast & S. Fed. Savings & Loan Ass'n*,
   9 Cal. 3d 731 (1973) .........................................................................................................22

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ............................................................................................20

*Jacks v. DirectSat USA, LLC*,
   2012 WL 2374444 (N.D. Ill. June 9, 2012) ......................................................................13

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ....................................................................................................10

*Kraemer v. Coward*,
   2 Cal. App. 2d 506 (1934) ................................................................................................19

*Leyva v. Medline Industries, Inc.*,
   716 F.3d 510 (9th Cir. 2013) ............................................................................................25

*Liebelt v. Carney*,
   213 Cal. 250 (1931) ............................................................................................................9

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...........................................................................................................10

*Mathews v. ALC Partner, Inc.*,
   2009 WL 2591497 (E.D. Mich. Aug. 24, 2009) ...................................................................13

*Mayfield v. Dalton*,
   109 F.3d 1423 (9th Cir. 1997) ..........................................................................................22

*Mazur v. eBay, Inc.*,
   257 F.R.D. 563 (N.D. Cal. 2009) .........................................................................................8

*Mazza v. Am. Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) ..................................................................................6, 19, 20

*Nelsen v. King County*,
   895 F.2d 1248 (9th Cir. 1990) ...........................................................................................10

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ..........................................................................................................11

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*,
   622 F.3d 1307 (11th Cir. 2010) .........................................................................................22

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000) ....................................................................................21, 22

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) ...........................................................................................25

*Sanders v. Apple, Inc.*,
   672 F. Supp. 2d 978 (N.D. Cal. 2009) .................................................................................9

*Sanford v. MemberWorks, Inc.*,
   625 F.3d 550 (9th Cir. 2010) .............................................................................................21

*Schwartz v. Upper Deck Co.*,
   183 F.R.D. 672 (S.D. Cal. 1999) ..................................................................................13, 15

*Shannon-Vail Five, Inc. v. Bunch*,
   270 F.3d 1207 (9th Cir. 2001) .......................................................................................19, 20

*Stearns v. Select Comfort Retail Corp.*,
   763 F. Supp. 2d 1128 (N.D. Cal. 2010) ...............................................................................9

*Strike v. Trans-West Discount Corp.*,
   92 Cal. App. 3d 735 (1979) .................................................................................................9

*Tietsworth v. Sears, Roebuck & Co.*,
   2013 WL 1303100 (N.D. Cal. Mar. 28, 2013) ...................................................................11

*Vega v. T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) .........................................................................................13

*Vincent v. Lindsey Mgmt. Co., Inc.*,
   2013 WL 6732661 (N.D. Okla. Dec. 19, 2013) ..............................................................9, 10

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2001) ...................................................................................6, 9, 16, 18, 22

*Wolph v. Acer Am. Corp.,*
    272 F.R.D. 477 (N.D. Cal. 2011) ................................................................................8

*Xavier v. Philip Morris USA, Inc.,*
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) ....................................................................11

**Statutes**

Nev. Rev. Stat. §§ 97A.090, 99.050 ............................................................................20

**Rules**

Fed. R. Civ. P. 23 ................................................................................ *passim*

## I.    INTRODUCTION

This Court has already denied class certification once in this case.  *See* Dkt. No. 187 ("March 24 Order").  Plaintiffs' renewed motion abandons their overbroad attempt to include as class members borrowers whose loans were made by multiple banks, and they have added two new plaintiffs as proposed class representatives.  But multiple barriers to class certification remain.

Plaintiffs have revised the wording of their class definitions in an effort to address the Court's finding that their original definitions were fatally circular.  Ultimately, this effort was unsuccessful.  Not only does the same circularity problem the Court found in the original definitions still exist, but the new definitions carry with them a host of new deficiencies.  Plaintiffs have failed to present evidence to satisfy even the most fundamental requirements of Rule 23 for their newly defined classes.  Even numerosity – typically the easiest Rule 23 factor to satisfy – has not been demonstrated.

These threshold defects are alone sufficient to preclude certification of any class in this case.  But a close examination of plaintiffs' claims – and, in particular, their *de facto* lender theory – reveals that those claims simply do not present common questions that can be effectively resolved in a class action.  Regardless of whether the *de facto* lender theory has any merit, the question it presents is not the same for all class members, given the very different circumstances under which their loans were originated and sold.  There is not even a common question as to which states' laws will apply to assess class members' claims.  Moreover, most class members – including some of the plaintiffs themselves – lack standing even to present claims against these particular defendants.

There are other barriers to class certification as well.  The claims of the named plaintiffs are not typical of the classes they propose to represent, and even if a genuinely common issue could be identified in this case, it would be swamped by a host of questions that are most definitely *not* common across the entire class.  There is also a substantial question about adequacy of representation, particularly for the late fee classes, which have profoundly conflicting interests in this case.

Plaintiffs' motion should be denied.

## II.    BACKGROUND

Plaintiffs challenge, under California law, the interest and late fees assessed (and, in some instances, paid) on what they refer to as "Sallie Mae Private Loan[s]."  *See* Dkt. No. 207 ("Mot.") at 1.

Plaintiffs bring this suit against these defendants on the theory that the "de facto lender" on their loans is not Stillwater National Bank ("Stillwater"), the national bank that funded their loans and is identified as the lender on their loan documents, but rather "Sallie Mae."  This is so, plaintiffs assert, because "Sallie Mae" had a contract with Stillwater through which "Sallie Mae" performed certain services associated with the loans (including processing the loan applications), and because "Sallie Mae" also contracted in advance to purchase the loans from Stillwater.  Plaintiffs further allege that they and members of the proposed classes have paid interest and/or late fees on their loans to "Sallie Mae."  *Id.* at 5-7.

Plaintiffs' complaints define "Sallie Mae" as referring *collectively* to the three defendants, Dkt. No. 172-2 at 1; Dkt. No. 206 at 1, but each of them is in fact a separate legal entity. *See* Wheeler Dec. ¶ 2.  Moreover, it is beyond dispute that the key activities on which the claims of most class members would be based, even under plaintiffs' theory, were not performed by any of these defendants.  And with no more than a small number of exceptions, the payments challenged in this case were made pursuant to obligations that class members owe exclusively to non-parties.

"Sallie Mae" was originally a nickname given to the Student Loan Marketing Association ("SLMA"), a government sponsored enterprise created by Congress to provide liquidity for banks' lending to students by facilitating a secondary market for student loans.  *See* Maher Dec. ¶¶ 3-4; Wheeler Dec. ¶ 3.  Plaintiffs' claims focus on a contract that SLMA entered into with Stillwater.  Under that contract, Stillwater retained SLMA to act as the bank's agent for various services relating to the origination, processing, and management of the bank's student loans.  Maher Dec. ¶¶ 22, 25 & Ex. 1 at 16.  SLMA also agreed to purchase student loans made by Stillwater; Stillwater in return promised to sell to SLMA 100 percent of its federally guaranteed student loans and at least 80 percent of its "private" loans (with certain important exceptions discussed below).  *Id.* ¶¶ 21, 23-24 & Ex. 1 at 17-18.  It is the combination of these various functions undertaken by SLMA under the contract with Stillwater – including, most critically, SLMA's pre-commitment to purchase the student loans that Stillwater made – that forms the basis for plaintiffs' "de facto lender" allegation in this case.  *See* Mot. at 6-7.[1]

---

[1] Plaintiffs also point to a provision in the contract through which a line of credit was available to fund Stillwater's loan disbursements if the bank had a cash-flow shortfall.  However, a Stillwater witness has (continued…)

In early 2004, SLMA was winding down its operations, and the contract with Stillwater was amended.  Wheeler Dec. ¶ 10; Maher Dec. ¶¶ 29, 31.  No single successor entity took over all of SLMA's obligations under the contract; instead, two different entities undertook different aspects of SLMA's role.  Defendant Sallie Mae, Inc. ("SMI") became a party to the contract and undertook to perform servicing operations for Stillwater.  (SMI was recently renamed Navient Solutions, Inc., but to avoid confusion it is referred to herein by its old name.)  Importantly, ***SMI did not undertake to buy any loans from Stillwater***; rather, it focused solely on loan servicing, for which it was compensated by Stillwater and subsequent owners of the loans.  Wheeler Dec. ¶¶ 10-11; Maher Dec. ¶ 31.  SMI has never bought or owned any of the student loans at issue.  *See* Wheeler Dec. ¶ 11.

SLMA's loan purchasing business was undertaken by a different entity, called SLM Education Credit Finance Corporation ("ECFC").  *Id.* ¶ 12.  ECFC also became a party to the contract with Stillwater and agreed to undertake the purchasing of Stillwater's student loans.  Maher Dec. ¶ 31.  ECFC is not a defendant in this case.  Some of the plaintiffs' loans were purchased from Stillwater by SLMA; the rest were purchased by ECFC.  Potomis Dec. ¶ 4.  None of the defendants in this case ever bought any student loans from Stillwater.  Wheeler Dec. ¶¶ 8, 11, 15.

When SLMA bought loans from Stillwater, it typically re-sold them to other entities, including trusts and other securitization vehicles, in the secondary market.  *Id.* ¶ 4.  Defendant SLM PC Student Loan Trust 2004-A ("2004-A Trust") owns the private loan of plaintiff Ubaldi and one low-interest loan of plaintiff Thurston.  Potomis Dec. ¶¶ 13, 17 & Ex. 1.  None of plaintiffs' other loans are owned, or have ever been owned, by any of the three defendants.  *Id.* Ex. 1.  Plaintiffs have presented no evidence of how many loans of absent class members are owned by the 2004-A Trust, but it cannot be more than a small fraction of the total, as the private loans bought by SLMA and ECFC were re-sold to dozens of different entities.  Wheeler Dec. ¶ 12.  At least nine different entities own, or have owned, the private loans of just the four named plaintiffs.  *See* Potomis Dec. Ex. 1.

---

now confirmed under oath that Stillwater's loans were made with its own funds and that it never used any such credit arrangement.  *See* Henn Dec. Ex. E at 89-90.  Plaintiffs' *de facto* lender theory thus hinges on the contention that the buyer of Stillwater's loans was the *de facto* lender for those loans.

SMI has been a servicer for plaintiffs' loans, acting as agent for the loan owners in managing communications with borrowers, processing payments, forwarding payments to the loan owners, and related activities.  Maher Dec. ¶ 31; Wheeler Dec. ¶¶ 7, 12-13; Potomis Dec. ¶ 12.

The four plaintiffs in this case were students of schools operated by Career Education Corporation ("CEC"), and the claims of all four relate to loans issued by Stillwater under a private loan program specially designed for CEC students with CEC's participation.  Potomis Dec. ¶ 3; Maher Dec. ¶¶ 17, 33.  Each plaintiff received from her CEC school's financial aid office a package setting forth the aid for which she qualified and recommending that she apply for a CEC Signature Loan.  The office provided each plaintiff a loan application (supplied to it by Stillwater), with an attached promissory note.  Plaintiffs filled out and returned the applications, which were then processed and approved.  *See* Henn Dec. Exs. A at 10, 23-24, 26-27; B at 58-59; C at 190-191; D at 25-26, 76; E at 55-56, 59; *see also* Potomis Dec. ¶¶ 6, 8.  The loans of the named plaintiffs that are at issue were all CEC Signature Loans approved and funded between 2001 and 2005.  Potomis Dec. ¶¶ 3, 13-25; Maher Dec. ¶ 33.

The CEC Signature Loan program was one of several special student loan programs sponsored by CEC.  Maher Dec. ¶¶ 16-19.  Under the governing contracts, CEC committed to offer Stillwater's loans to its students.  SLMA (and then later ECFC) committed to purchasing CEC Signature Loans after full disbursement, subject to certain qualifications (including Stillwater's right to retain ownership of 20 percent of its private student loans).  *Id.* ¶ 24 & Ex. 1 at 18, 35-36.[2]  Like most private student loans, CEC Signature Loans bore a variable interest rate tied to the Prime Rate.  However, unlike many private loans (which typically carried rates ranging from Prime minus 2% to Prime plus 2%), CEC Signature Loans, which were offered to a higher-risk student population, carried interest rates ranging from Prime plus 1.5% to Prime plus 9.85 %.  *Id.* ¶¶ 13, 17.  Each of the three plaintiffs who assert usury

---

[2] Loans were eligible for sale only after they had been *fully* disbursed – *i.e.*, the full loan amount had been forwarded to the school.  Maher Dec. ¶ 27.  Disbursement was often made in installments, spread over the school year.  Potomis Dec. ¶ 4.

claims had one or more loans falling in the highest-risk category, with interest rates in the top tier.  *See* Potomis Dec. ¶¶ 18-19, 21, 24-25.[3]

Stillwater also made private student loans through other loan programs.  These loans varied substantially from CEC Signature Loans in respects directly pertinent to this case.  For example, under the CEC ELF Loan program, CEC (not SLMA or ECFC) committed to buy the loans from Stillwater.  Maher Dec. ¶ 16.  Under another program, the CEC Recourse Loan program, CEC did not buy the loans, but it guaranteed their payment, thus taking on the risk of loss.  *Id.* ¶ 18.  Stillwater also made other types of private loans to students at other schools.  The terms and sponsors of these loan programs varied.  *Id.* ¶¶ 20, 14.

The promissory notes for the loans at issue require the borrower to make payments (including interest payments and any late fees) to the loan owner.  *See, e.g.*, Potomis Dec. ¶ 12 & Ex. 2 at SM06507.  Thus, for example, plaintiff Ubaldi's contractual obligation for the payments on her loan, including interest and fees, has been to defendant 2004-A Trust throughout the repayment period. (2004-A Trust bought the loan before the repayment period began.  *Id.* ¶ 12.)  SMI has collected the payments from Ubaldi as agent for the Trust and remitted them to the Trust.  *Id.*  SMI has in turn been compensated by the Trust for this and other services in connection with the loan  *See* Wheeler Dec. ¶ 7. SMI had similar arrangements with the numerous other entities that own the loans of plaintiffs and other putative class members.  *Id.* ¶ 13.[4]

---

[3] The Prime Rate has remained steady at 3.25% throughout the statute of limitations period.  *See* Potomis Dec. ¶ 9.  It was slightly higher in the period when plaintiffs' loans were made in the early 2000s and then rose briefly before falling to its current level.  *Id.* Ex. 4.  Some borrowers with rates in lower interest tiers could technically fall within plaintiffs' definition for the 23(b)(2) usury class because their interest rates briefly exceeded 10% eight years ago, but they have not been charged interest in excess of 10% since that time.

[4] SMI's contracts with some loan owners provided that SMI could keep late fees received on the loans it serviced as a portion of its compensation from the loan owner.  *See* Wheeler Dec. ¶ 13.  However, SMI collected those fees from the borrower in the first instance in its capacity as agent for the loan owner. *Id.*  SMI's actual costs incurred in connection with late payments varied depending on the circumstances, duration, and frequency of the late payment, among other factors, and were often greater than the actual amounts of the late fees charged.  *See* Hinko Dec. ¶¶ 4, 7; Potomis Dec. ¶ 8.

1    Substantially all private student loans made by Stillwater in 2006 and thereafter contained

2    provisions requiring the arbitration of any disputes concerning the loans.  *See* Dkt. No. 177-2 ¶ 2.  Such

3    provisions were also included in the promissory notes for many of Stillwater's earlier loans, such as

4    plaintiff Thurston's Loan # 1, made in 2001.  Potomis Dec. ¶¶ 7, 15 & Ex. 3.

5    CEC Signature Loans typically had a repayment period of 15 years.  *Id.* ¶ 11.  Over the

6    years, many private loan borrowers have met their payment obligations, but a significant number

7    defaulted.  *Id.*  The assessment of late fees ceases once a loan has been delinquent for an extended

8    period.  *Id.*  There are, accordingly, loans that have not been "paid off in full" (as stated in plaintiffs'

9    proposed 23(b)(2) class definitions) but for which no future late fees will accrue, as well as some such

10   loans for which there is no prospect that borrowers will make future payments of any kind.

## III.   ARGUMENT

12   Plaintiffs have asked the Court to certify four broad classes of student borrowers under

13   Fed. R. Civ. P. 23(b)(2) and 23(b)(3).  Mot. at 1.  In addressing this request, the Court must perform a

14   "rigorous analysis" to ensure that all pertinent requirements of Rule 23 are satisfied for each class.  *Wal-*

15   *Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2001).  When necessary, this includes an evaluation

16   of merits issues to the extent they are "enmeshed" with the determinations required under Rule 23.  *Id.* at

17   2551-52; *see also Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012); March 24

18   Order at 7.  Plaintiffs bear the burden of establishing that each separate requirement of Rule 23 is

19   satisfied.  *Mazza*, 666 F.3d at 588.

20   The Court has already rejected class certification once in this case because, *inter alia*,

21   plaintiffs' class definitions were legally defective.  *See* March 24 Order at 9-10.  That defect has not

22   been cured.  Moreover, plaintiffs' new motion and class definitions contain multiple additional defects

23   that the Court has not yet had occasion to address, including a failure of proof on even the threshold

24   elements of Rule 23(a), as well as the additional requirements of Rule 23(b).[5]

---

[5] The Court's March 24 Order found in plaintiffs' favor on a few issues, but the only such issues that are addressed again here present fundamentally different questions in light of the new class definitions.  In any event, those earlier findings were not dispositive, as the Court denied the motion.  *See also* Fed. R. Civ. P. 23(c)(1)(C) (confirming that class certification finding may be revisited at any time).

### A. Plaintiffs' Class Definitions Remain Fatally Flawed.

Plaintiffs' original class definitions based class membership in part on whether a person "obtained a Sallie Mae Private Education Loan for which Sallie Mae was the *de facto* actual lender…." March 24 Order at 9. The Court found this definition to be "circular," presenting an improper "failsafe class" in which membership was dependent on resolution of plaintiffs' disputed *de facto* lender theory. *Id.* at 9-10. As such, the proposed class definitions failed to satisfy the threshold requirement of ascertainability. *Id.* Plaintiffs' new class definitions have been rephrased, but they contain the same flaw identified by the Court previously, as well as other fatal defects.

### 1. The Prior Ascertainability Problem Remains and Cannot Be Readily Cured.

Although plaintiffs' new class definitions no longer refer explicitly to Sallie Mae as the "de facto lender," they continue to do so implicitly, defining each class as consisting of persons who obtained "Sallie Mae Private Loans." No objective definition is offered for this term, which appears to refer to the "Sallie Mae Private Loans" that are described in the pleadings as loans for which Sallie Mae is alleged to have been the *de facto* lender. *See, e.g.*, Dkt. No. 206 ¶¶ 1-2, 71-73. Thus, plaintiffs' new class definitions merely eliminate a redundancy; the fatal circularity remains.

Any effort to cure this defect would just create new ones. For example, if one were to alter this portion of each class definition to refer instead to persons for whose loans one or more of the defendants performed all of the functions attributed to "Sallie Mae" in the complaint (thus avoiding the need to assume that those activities turned the loans into "Sallie Mae loans"), the classes would have no members. This is due to another sleight-of-hand attempted by plaintiffs, this time in their references to "Sallie Mae." Their pleadings define "Sallie Mae" as a collective reference to the three named defendants: SMI, SLM Corp. and the 2004-A Trust. *See, e.g.*, Dkt. No. 206 at 1. But plaintiffs have identified not a single loan – much less a group of loans corresponding to the classes they apparently have in mind – for which all of the cited activities were performed by these entities. Most significantly, ***none of these three defendants ever bought a single loan from Stillwater.*** Moreover, although defendant 2004-A Trust currently owns Ubaldi's loans, which it purchased from SLMA, Potomis Dec.

¶ 13, the vast majority of the loans plaintiffs apparently wish to include in their class definitions are not owned by any defendant – and never have been.[6]

Plaintiffs might intend "Sallie Mae Private Loans" to refer to loans with which any of the defendants ever had *any* connection.  Such a definition would encompass loans that were purchased from Stillwater by non-party ECFC and are now owned by other non-party entities but have been serviced by defendant SMI.  (Most of the plaintiffs' own loans are in that category.  *See* Potomis Dec. Ex. 1.)  This approach would still present ascertainability problems, however, as it offers no guidance on exactly *what* functions by a defendant would qualify a loan for inclusion in the class.  *See Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011) (a class definition "must be sufficiently definite so that it is administratively feasible to determine whether a particular person is a class member"); *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567-68 (N.D. Cal. 2009) (rejecting indefinite class definition).

Yet another potential ascertainability question arises from the reference to "Private Loans."  Plaintiffs presumably use this term in order to exclude federally guaranteed loans.  But Stillwater made several types of "private" student loans that were very different from plaintiffs' loans with respect to the facts plaintiffs rely upon for their *de facto* lender allegation.  For example, one category of "private loans" made by Stillwater was sold to CEC; those loans were serviced by SLMA and/or SMI but were not bought by *any* "Sallie Mae" entity.  It seems unlikely that plaintiffs intended to include borrowers with these loans in their class definitions, as doing so poses insuperable commonality and other problems.  (*See* pp. 16, 20-21 below.)  But the definitions on their face appear to include them.

Instead of relying on the phrase "Sallie Mae Private Loans," plaintiffs could have simply defined the classes more narrowly with reference to the loan program through which their own loans were made:  *i.e.*, CEC Signature Loans.  A class defined in that manner would avoid the problems

---

[6]  When SLMA was dissolved, some liabilities relating to its prior loan purchases were assumed by SLM Corp.  Wheeler Dec. ¶ 15.  Plaintiffs may intend to argue that this makes SLM Corp. (which was recently merged into Navient, LLC) a proper target of claims relating to loans that SLMA bought from Stillwater.  Even if one were to credit such an argument (which defendants would contest), it would not account for the loans that were purchased by CEC or ECFC, not SLMA.  There is no basis for attributing the actions of those entities to defendants.

1    addressed above, but other problems under Rule 23 would become more acute.  (For example, plaintiffs

2    offer no evidence to support a finding of numerosity for any such class.)  In any event, their choice of

3    clearly unascertainable definitions justifies denial of their motion at the threshold.

4            2.        **The Proposed Classes Include Persons Who Lack Article III Standing.**

5            As the Supreme Court has made clear, the class action mechanism may not be used to

6    afford substantive rights to absent class members that they would not have had in a suit brought

7    individually.  *Wal-Mart*, 131 S. Ct. at 2556.  Most fundamentally, a class may not be defined to include

8    as members persons who have no case or controversy with the defendants and thus lack Article III

9    standing.  *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 263-64 (2d Cir. 2006) (holding that "no class

10   may be certified that contains members lacking Article III standing. … The class must therefore be

11   defined in such a way that anyone within it would have standing."); *Sanders v. Apple, Inc.*, 672 F. Supp.

12   2d 978, 991 (N.D. Cal. 2009) (rejecting class definition as impermissibly overbroad because it included

13   individuals who lacked standing); *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1152

14   (N.D. Cal. 2010) (same).  Plaintiffs' class definitions violate this principle in two important respects.

15           *First*, all four classes include persons whose claims lie solely, if at all, against non-

16   parties.  The California Supreme Court has held that a usury claim must be brought against the loan

17   owner to whom the interest is paid; it cannot be brought against the original lender (regardless of who

18   that is deemed to be).  *Liebelt v. Carney*, 213 Cal. 250, 255 (1931); *see also Creative Ventures, LLC v.

19   Jim Ward & Assocs.*, 195 Cal. App. 4th 1430, 1449 (2011).[7]  An agent acting on behalf of the lender or

20   loan owner is not liable, even if he assists in exacting a usurious charge.  *Clarke v. Horany*, 212 Cal.

21   App. 2d 307, 310-11 (1963).  Similarly, a claim challenging a term of a contract (such as plaintiffs'

22   claim that the late fee provisions constitute improper liquidated damages provisions) must be brought

23   against the counter-party to the contract, to whom the challenged obligation is owed.  *See Vincent v.*

24   _____

25   [7] The underlying legal status of the interest rate on a loan as usurious or non-usurious looks to the
     identity of the original lender.  *See Strike v. Trans-West Discount Corp.*, 92 Cal. App. 3d 735, 745

26   (1979) (a loan contract that is "not usurious in its inception, does not become usurious by subsequent
     events").  However, if the loan is then assigned, any subsequent usury claim must be brought against the

27   assignee who actually receives the challenged interest.

28

*Lindsey Mgmt. Co., Inc.*, 2013 WL 6732661, at *8 (N.D. Okla. Dec. 19, 2013) (declaratory judgment action seeking to invalidate liquidated damages clause could not proceed against "non-party" to contract).  Thus, while Ubaldi has standing to sue the 2004-A Trust, as the owner of her loan, a class member who was contractually bound to pay late fees or interest only to CEC, to ECFC, or to other non-parties has no case or controversy *in this action* with *these defendants*.[8]

Second, there are separate standing issues with respect to the proposed 23(b)(2) classes, for which plaintiffs seek declaratory and injunctive relief.  Standing to seek such relief requires a threat of "imminent" harm.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  And there must be a showing "that there is a very significant possibility that the future harm will ensue."  *Nelsen v. King County*, 895 F.2d 1248, 1250 (9th Cir. 1990) (internal marks omitted); *see also Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (en banc) ("[T]o establish standing to pursue injunctive relief … [plaintiffs] must demonstrate a real and immediate threat of repeated injury in the future.") (internal marks omitted).  Plaintiffs cannot merely point to "contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009).

Plaintiffs have not shown that members of the proposed 23(b)(2) late fee class face imminent harm.  Borrowers have no legal right to make late payments.  To the contrary, they are contractually obligated to pay on time, and most class members presumably have every intention of doing so.  A borrower cannot obtain standing to seek equitable relief based on the proposition that *he himself* will commit future wrongdoing.  Nor can standing be established for an entire class based on the assumption that *everyone* in the class will violate their obligations.  The mere fact that a person has been

---

[8] The analysis is the same for plaintiffs' claims under the UCL.  The only monetary relief available under the UCL is restitution – repayment of amounts the responding party possesses that are "owned" by the plaintiff.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144-45 (2003).  Damages, which might be calculated under other theories, are not available.  *Id.* at 1144.  The challenged payments here were made to the loan owners, pursuant to the loan contracts (*see* Potomis Dec. ¶ 12 & Ex. 2 at SM06507), so it is from them that any restitution would need to be sought.  Similarly, equitable relief limiting future enforcement of the contracts can only be granted against the current counter-parties to those contracts.  *See Vincent*, 2013 WL 6732661, at *8.

charged a late fee in the past – perhaps the distant past – provides no basis for such an assumption.  *See O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("[p]ast exposure to illegal conduct does not in itself show a present case or controversy … if unaccompanied by any continuing, present adverse effects").

Substantial standing issues also exist for some members of the 23(b)(2) usury class.  Even if the two proposed representatives of that class are being charged interest at challenged rates on an ongoing basis today, that is not the case for all members of this proposed class.  The proposed 23(b)(2) classes sweep in *any* borrower who has *ever* been charged a late fee or interest above 10%, so long as the loan has not been fully repaid.  *See* Mot. at 1.  Thus, for example, they would include a borrower whose loan bears an interest rate of Prime plus 2% – and whose interest rate briefly spiked above 10% eight years ago – but who has not been charged interest in excess of 10% since that time.  Such a person faces no imminent threat of allegedly usurious charges.  For that to occur, the Prime rate would have to more than double – and no evidence has been offered that this is likely to occur before most such loans are paid off.  Such borrowers therefore cannot show the *imminent* risk of harm necessary for Article III standing.

Finally, standing issues are also created by the fact that plaintiffs' overbroad 23(b)(2) class definitions sweep in borrowers whose loans have long been in default.  Late fees are not assessed on such loans, *see* Potomis Dec ¶ 12, so those borrowers would lack standing to seek relief on future late fee charges.  For many defaulted borrowers, moreover, the prospect of payment of either late fees or interest in the future is vanishingly small.  Plaintiffs offer no proof that such borrowers face imminent risk of harm from charges they will never pay.

**3.  Plaintiffs Have Not Demonstrated That They Possess a Manageable Methodology for Identifying Class Members.**

Ascertainability requires not only objective criteria for *defining* a class; it must be reasonably possible to apply those criteria to *identify* who the class members are.  Plaintiffs need not identify class members in moving for certification, but they must present a method for doing so that is administratively feasible.  *See Tietsworth v. Sears, Roebuck & Co.*, 2013 WL 1303100, at *3-4 (N.D. Cal. Mar. 28, 2013); *Xavier v. Philip Morris USA, Inc.*, 787 F. Supp. 2d 1075, 1089-90 (N.D. Cal. 2011); *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at * 14-15 (N.D. Cal. June 9, 2010).

Plaintiffs' class definitions require identification of sets of borrowers who meet very specific criteria.  Facts relating to some of these criteria (such as identification of Stillwater as the lender) can be readily derived from defendants' computer systems.  But other components of the class definitions are not readily tracked in those systems.  As a result, there is no computer program in existence that could generate a list of class members from the proffered definitions; nor have plaintiffs demonstrated the ability to create such a program, which would have to solve numerous challenges.

*First*, all loans that are subject to arbitration clauses must be excluded.  SMI's computer systems do not record whether a particular loan is subject to an arbitration clause.  *See* Theurer Dec. ¶ 3.  Except for borrowers whose loans were issued in 2006 or later (all of whom have arbitration obligations and are therefore excluded), identifying which borrowers are excluded on this basis will require an individual examination of each promissory note.

*Second,* the class definitions require reference to the address each borrower wrote on his or her loan application.  Mot. at 1.  Navient's servicing systems, which are focused on servicing of the loans, reflect the addresses to which statements are sent during repayment.  Theurer Dec. ¶ 4.  The addresses on the original application – upon which the class definitions depend – are not maintained in any of SMI's systems, other than in the non-searchable image of the application itself.  *Id.*  An authoritative identification of the addresses on the applications would therefore, again, require individual review of each application.

*Third*, only persons who actually paid the challenged charges are included in the 23(b)(3) classes.  Navient's computer systems include fields from which one may be able to ascertain what interest rate and fees a borrower has been *charged* at a given point in time.  Potomis Dec. ¶ 26.  But it does *not* contain any field indicating whether a borrower has necessarily *paid* those amounts if – as is often the case – the borrower has not made timely and complete payments.  *Id.* ¶¶ 26-27.  The example of plaintiff Thurston proves this.  On two of her loans that are at issue, she received invoices that charged her interest in excess of 10%, but her payments were small and sporadic and were allocated to different components of her obligation (fees, interest, and principal) in such a way that she never actually paid any interest on those loans.  *Id.* ¶¶ 18-19.  Assessing this issue for each class member who did not consistently make full and timely payments will require a complex individual examination of

12

how much the borrower was charged at each point in time, how much he paid, when the payments were made, and how the payments were allocated.  *See id.* ¶¶ 26-27.  Plaintiffs have made no showing that they possess an accurate model for that calculation, much less a methodology for applying that model to the available data to identify class members.

### 4. The Proposed Class Definitions Lack Appropriate Time Limitations.

Plaintiffs' 23(b)(2) class definitions fail to include any beginning dates for the class periods, thus sweeping in borrowers whose allegedly excessive charges occurred long ago and who have no genuine claim at this time.  (*See* p. 11 above.)  The use of such unbounded definitions is improper.[9]

All four of plaintiffs' class definitions have the additional defect of failing to identify an *end point* for the class period; this would appropriately be the date of the filing of the complaint.  *See Jacks v. DirectSat USA, LLC*, 2012 WL 2374444, at *8 (N.D. Ill. June 9, 2012) (using filing date of complaint as class "end date" when date was lacking in plaintiffs' class definition); *Mathews v. ALC Partner, Inc.*, 2009 WL 2591497, at *9 (E.D. Mich. Aug. 24, 2009) (same).

### B. Plaintiffs Have Not Established Numerosity.

Plaintiffs have the burden of establishing each requirement of Rule 23(a), including numerosity.  Numerosity is often easy to show, but it may not simply be assumed based on speculation or conclusory allegations.  *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009); *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 681 (S.D. Cal. 1999).  Defendants did not contest numerosity for plaintiffs' original class definitions, which encompassed loans made by more than a dozen different banks.  But the question is different for plaintiffs' new class definitions.

Plaintiffs' showing on numerosity is largely confined to two footnotes in their motion.  *See* Mot. at 11 & nn.5, 6.  For the usury classes, they begin with a number, taken from an interrogatory answer, of all current California residents who had records of private loans – regardless of lender – in SMI's servicing system and were charged interest in excess of 10% between 2003 and 2012.  To reduce

---

[9] The 23(b)(3) classes include beginning dates, apparently tied to plaintiffs' contention as to the applicable statute of limitations periods.  That contention is incorrect, at least for the usury class, but that issue need not be resolved at this stage.

that number to reflect Stillwater borrowers only, plaintiffs multiply it by 11%, which they calculate (from another interrogatory answer) as the percentage of all private loans in SMI's servicing system that were made by Stillwater.  *Id*. at 11 & n.5.  Plaintiffs contend that the resulting figure – 8,268 – is a reasonable estimate of the size of the usury classes.  *Id.*  Applying a similar methodology, plaintiffs offer a range of between 2,872 and 4,558 borrowers for the late fee classes.  *Id.* at 11 & n.6.[10]

Even if one accepts, *arguendo*, that this methodology is a reasonable basis for estimating the numbers of Stillwater borrowers in each group addressed in the interrogatory answers, it fails to take into account substantial *additional* adjustments that would be needed to estimate the number of persons who actually fit the class definitions.

*First*, as the Court observed in its March 24 Order (at 10-11), it has always been undisputed that plaintiffs' class definitions exclude persons whose loan agreements included arbitration clauses.  (Plaintiffs' current motion does not expressly mention this, but the exclusion is stated in their Proposed Order.  *See* Dkt. No. 207-1.)  The numbers on which plaintiffs rely include borrowers who are subject to arbitration clauses.  Perrault Dec. ¶ 8.  Those borrowers must be subtracted from the totals, but plaintiffs have provided no basis for estimating the size of this adjustment.[11]

*Second*, the interrogatory responses upon which plaintiffs rely report loans on which late fees or interest above 10% were *assessed*.  *See* Genego Dec. Exs. J, L.  They do not report the numbers of borrowers who *paid* those specific charges, as required for the 23(b)(3) classes.  The Court

---

[10]  The interrogatory answers reported numbers of borrowers with current California addresses, as those are the addresses that are readily obtained from SMI's systems.  *See* Perrault Dec. ¶¶ 3-5; Theurer Dec. ¶ 4.  Plaintiffs' class definitions, in contrast, focus on addresses *on loan applications*.  This discrepancy may not affect class size, as it seems reasonable to assume that in the intervening years people moved in and out of California in similar numbers, but it is important on other points.

[11]  Plaintiffs' interrogatories described groups of borrowers as to which data was sought but did not ask how many of those borrowers were subject to arbitration clauses.  *See* Henn Dec. Exs. F-H.  If that question had been asked, defendants could not have readily answered it, as that characteristic is not tracked in a manner that permits generation of aggregate statistics.  *See* Theurer Dec. ¶ 3.  However, given the fact that some proportion of borrowers before 2006 – and *all* borrowers from 2006 onward – had arbitration clauses in their contracts, there can be no question that this factor alone requires a significant downward adjustment to plaintiffs' figures.

emphasized this point in its March 24 Order, which confirmed (at 13-14) that class members could only recover monetary relief for amounts they actually paid.  Plaintiffs offer no adjustment to reflect this distinction; nor do they identify any basis upon which the size of the adjustment can be estimated.

*Third*, plaintiffs' starting figure for the calculation of their 23(b)(3) usury class size includes customers who were assessed interest in excess of 10% going all the way back to January 1, *2003* – a period extending back years before the beginning of the class period.  *See* Genego Dec. Ex. L at 6.  This further inflates plaintiffs' totals.[12]

The failure to account for these three issues alone takes plaintiffs' estimation of class size – which was already rough at best – well into the zone of outright speculation.  Plaintiffs must provide actual evidence from which the Court, in its searching examination of the record, can reasonably conclude that numerosity is satisfied.  *Schwartz*, 183 F.R.D. at 681.  They have failed to do so.

Finally, and perhaps most significantly, if the class definitions were adjusted to address even some of the glaring deficiencies discussed in Section III.A above, the failure of proof on numerosity would be absolute.  If, for example, the class were limited to borrowers of CEC Signature Loans, the record contains no evidence from which the Court could determine how many such borrowers there were, much less how many fit the other requirements of the class definition (such as a California application address, no arbitration clause, and the assessment and/or payment of late fees and/or interest at challenged rates).  If the class were further limited to CEC Signature Loan borrowers who fit the other requirements of the class definition and whose loans are owned by a party that is a defendant in this case, there is no record evidence that the late fee classes would have *any* members other than Ubaldi and Thurston – and none of the plaintiffs would be members of the usury classes.

---

[12]  Adjustment for this last factor would not alone eliminate numerosity if no other adjustments were required, as applying plaintiffs' formula to the number of borrowers reported as having been charged interest above 10% in 2010 results in a number that is sufficiently high.  But that number is nonetheless significantly lower than the one plaintiffs calculate using the totals going back to 2003, and when one then considers the other needed adjustments for which the record reflects no basis for estimation, it is clear that plaintiffs have not satisfied their burden.

C.      **Plaintiffs Have Not Shown the Existence of Common Issues.**

To satisfy the requirement of commonality, plaintiffs must show the existence of one or more issues material to the claims of all class members that can be resolved "in one stroke" through common evidence.  *Wal-Mart*, 131 S. Ct. at 2551.  It is not sufficient for plaintiffs simply to posit an abstract, conclusory question that is common to class members; rather, the question must be one for which a common *answer* can be derived for all class members on the basis of common evidence.  *Id.*

1.      **The *De Facto* Lender Issue Does Not Present a Common Question.**

While plaintiffs' motion identifies a list of purportedly common issues, all ultimately rely on the existence of commonality as to one threshold question:  whether "Sallie Mae" was the *de facto* lender for class members' loans.  If commonality does not exist as to that issue, it will not exist for any other issue either.  Plaintiffs' ability to satisfy this element of Rule 23(a) thus depends on their ability to show that the *de facto* lender issue presents a common question that is susceptible to a common answer.

Plaintiffs' *de facto* lender theory relies upon a distinct set of factual and legal contentions.  The theory presupposes that an entity plaintiffs refer to as "Sallie Mae" performed a series of specific functions under the ExportSS contract with Stillwater, including designing loan applications, processing the applications, servicing the loans in repayment – and, critically, committing in advance to purchase the loans from Stillwater.  *See, e.g.*, Dkt. No. 206 ¶¶ 48-52.  This theory does not present a common question for plaintiffs' proposed classes, for several reasons.

*First*, the *de facto* lender issue is clearly not "common" with respect to loans made by Stillwater that were contractually designated for purchase (and were in fact purchased) by CEC, the company that operated plaintiffs' schools.  Since the core of plaintiffs' *de facto* lender theory is the contention that "Sallie Mae" largely eliminated Stillwater's risk of loss through its pre-purchase commitment, that theory plainly presents a very different set of questions for the loans as to which no "Sallie Mae" entity made any such commitment.

Similarly distinct are the factual and legal questions underlying the *de facto* lender question as it applies to loans that CEC guaranteed.  To the extent that plaintiffs argue that Stillwater was not the real lender because it did not carry a significant risk of loss on those loans, that was, again, in many instances as a result of CEC's undertakings rather than any action by "Sallie Mae."

*Second*, even apart from the role of CEC with respect to some loans, the *de facto* lender theory presents a distinct set of factual and legal questions with respect to loans made before early 2004 and those made thereafter.  During the early period, when SLMA was the sole counter-party to the ExportSS agreement, it was responsible for all of the functions plaintiffs ascribe to "Sallie Mae" for their *de facto* lender theory.  But that changed in early 2004.  After that, the activities to which plaintiffs point were undertaken separately by two different entities.  The servicing operations became the contractual responsibility of defendant SMI (now Navient).  But the critical loan purchasing operations – the cornerstone of plaintiffs' theory – were undertaken by a completely different entity, ECFC.  The facts and legal considerations necessary to resolve the *de facto* lender theory will be materially different for a situation in which all of the pertinent functions were performed by the same entity than for one in which those functions were undertaken by multiple different entities.[13]

*Third*, no matter who purchased the loans from Stillwater, there is considerable variation on the critical question of how *quickly* that purchase occurred.  The Court stressed the importance of this point when it rejected plaintiffs' effort to include in their proposed classes borrowers whose loans were issued by many different banks that had different contractual commitments – and, potentially, actual practices – with respect to the length of time between the funding of a loan and the sale of that loan:

> The amount of time between disbursement and Sallie Mae's purchase of loans is not irrelevant; the longer the delay in Sallie Mae's purchase, the greater a bank's exposure to risk from the loans.  Moreover, contrary to Plaintiff's assertion, the actual practices of Sallie Mae and the banks are relevant to *de facto* lender status because the Sallie Mae-bank agreements do not govern every detail.

March 24 Order at 18.

Plaintiffs have always understated the period of time when Stillwater was at risk of loss, focusing only on the period of time after *full* disbursement when Stillwater's right to sell its loans was triggered, and ignoring the fact that the disbursement process often occurred over a period of several months, putting the bank at risk for at least a portion of the loan proceeds for much longer.  *See* Maher

---

[13] Plaintiffs' complaints allege no basis for ignoring the separate existence and operations of these distinct corporate entities.  Nor does any such basis otherwise exist in the record.

Dec. ¶ 27.  The amount of time Stillwater was at risk on the private loans of just the named plaintiffs varied significantly, ranging from two months to more than eight months.  Potomis Dec. Ex. 1. Stillwater retained ownership of some loans for even longer periods.  *See* Maher Dec. ¶ 27.

In short, regardless of how one regards the merits of plaintiffs' *de facto* lender theory, it does not present a uniform question that can be decided "in one stroke" for all class members.  This case is in this respect analogous to *Wal-Mart v. Dukes*.  There, certification was sought for a nationwide class of female employees who were allegedly discriminated against in promotions.  The evidence showed that Wal-Mart's promotion decisions were made at the local level, so the facts needed to prove actual discrimination would vary for different employees or groups of employees.  The Supreme Court recognized that class members might have in "common" the overarching question of whether they were all victims of discrimination, but that did not constitute a "common question" for purposes of Rule 23(a), since it could not be resolved "in one stroke" for the entire class through common evidence.  131 S. Ct. at 2551.  Similarly, plaintiffs here may contend that, for various reasons, one or more defendants were "de facto lenders" for the loans of all class members, but that question cannot be decided "in one stroke" on a common basis for the entire class, as the fact pattern to be assessed in deciding that issue – and even the identity of the alleged *de facto* lender itself – varies substantially across the class.

## 2. There is No Commonality to the Threshold Choice of Law Issue.

A finding of commonality is independently precluded by the fact that *any* legal determination in this case must include a threshold determination of whether California law would apply to class members' claims if plaintiffs were to prevail on their *de facto* lender theory.  Each class member's promissory note includes a choice of law clause providing for the application of Oklahoma law.  *See* Potomis Dec. ¶ 8 & Ex. 2 at SM06508.  Plaintiffs contend that California law would preclude enforcement of these provisions if Stillwater is not the genuine lender, and the Court has found that resolution of that question is intertwined with the *de facto* lender question.  Dkt. No. 146.

Importantly, however, the Court's prior decision did not address which state's law would apply if the contractual choice of law is not enforced.  For the named plaintiffs, this may not have seemed to present a difficult question, as they were California citizens and long-time residents whose loans were applied for and approved while they resided in California and were disbursed to schools in

California.  But regardless of whether these facts would provide a sufficient basis to apply California law to *plaintiffs'* claims, the analysis will be different for at least some members of the proposed classes.

Notwithstanding the reference to "California" in plaintiffs' class definitions, the proposed classes would be, in effect, nationwide classes.  Members of these proposed classes are by definition a particularly mobile population (students), yet the only connection with California plaintiffs propose to require is the recording of a California address – even a temporary address – on the loan application. *See* Mot. at 1.  There is no requirement that the borrower have resided in California at the time the loan was approved and the contract made, that the contract have been made in California, that the contract have been performed in California, or that the class member have resided in the state when the challenged amounts were assessed and/or paid.  Yet it is factors such as these – not the mere recording of a temporary California address on the *application* – that will govern the choice of law.

The details of the choice of law analysis that would be needed here are complex and largely beyond the purview of this memorandum.  For current purposes, it should be sufficient to observe that the Ninth Circuit has explicitly confirmed that, under both California choice of law rules and basic principles of federalism, one cannot simply apply California consumer protection laws automatically in a class action certified in California.  *Mazza*, 666 F.3d at 590 ("California law may only be used on a classwide basis if the interests of other states are not found to outweigh California's interest in having its law applied.") (internal marks omitted).  If the laws of other states whose interests are at issue are different from California's (as they indisputably are here), the court must determine whether the interests of each such state are more or less "impaired" than California's by application of the other state's law under the particular circumstances presented.  *Id.*[14]

Applying this test, the claims of an Oklahoma or Nevada citizen who put down a California address on his application but whose contract was made and performed elsewhere will not be

---

[14] The determination of which states' interests must be considered is typically made based on traditional choice of law principles.  In a case involving contract and usury claims, a court would typically look at factors such as the place of performance, the place where the contract was made, and/or the domiciles of the parties.  *See Shannon-Vail Five, Inc. v. Bunch*, 270 F.3d 1207 (9th Cir. 2001); *Kraemer v. Coward*, 2 Cal. App. 2d 506, 510-11 (1934).

governed by California law, regardless of whether the contractual choice-of-law provision is enforced. Importantly, the Ninth Circuit emphasized in *Mazza* that a court cannot simply apply California law on the theory that it is most protective; rather, the court must recognize and respect the different choices made by different states in balancing consumer protection and the advancement of business activities that make goods and services more broadly available. *Mazza*, 666 F.3d at 592-94. Here, it is undisputed that different states have made very different choices about the balance to be struck between protecting their citizens from high interest rates and the desire to promote lending activities so as to make credit more broadly available. California law may not permit a loan to be made if the borrower can only qualify for an interest rate above 10 percent. The laws of many other states where class members likely reside (and may have resided at the time they obtained their loans) take a different view. *See, e.g.*, Nev. Rev. Stat. §§ 97A.090, 99.050 (providing that parties may agree to any interest rates and late fee amounts); *see also Shannon-Vail*, 270 F.3d at 1213 (discussing Nevada's substantial interest in the application of its liberal law on usury).

Because the choice of law analysis does not present a common question – and will not generate a common answer – for all members of the proposed classes, certification is improper.

### D.     The Named Plaintiffs Are Not Typical.

To satisfy the typicality requirement, the plaintiffs' claims must be "reasonably co-extensive with those of absent class members." March 24 Order at 12 (internal marks and citation omitted). Their claims must be susceptible of proof through the same common evidence that will be used to prove the class claims, without the need to address and resolve significant individual issues that are not common to the class. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Here, many of the same factors that render plaintiffs' proposed classes overbroad and/or that preclude a finding of commonality similarly prevent these plaintiffs from satisfying the requirement of typicality. For example, the CEC Signature Loans obtained by these plaintiffs had unique characteristics, material to their *de facto* lender contention, that are not found in the loans of other class members. The facts and evidence that will be presented in support of the *de facto* lender theory as to plaintiffs' loans will not be "co-extensive" with those that must be considered with respect to, for

1    example, borrowers who received CEC ELF Loans, which were purchased from Stillwater by CEC, the

2    CEC Recourse Loans that CEC guaranteed, or different loan programs at other schools.

3            Typicality is absent in other respects as well.  Ubaldi's loan was purchased by SLMA

4    when it was the sole counterparty to the ExportSS agreement with Stillwater.  For the reasons discussed

5    above, her claims cannot be viewed as typical of the many borrowers whose loans were instead

6    purchased from Stillwater by ECFC.  By the same token, the loans of Barone and Bachman-Williams,

7    the two proposed representatives of the 23(b)(3) usury class, were all purchased by ECFC; they are

8    accordingly not typical of members of that class whose loans were purchased by SLMA.

9            Moreover, the challenged loans of all three of the proposed representatives of the usury

10   classes (Barone, Bachman-Williams, and Thurston) are all owned (and have been owned throughout the

11   repayment periods) by non-parties.  *See* Potomis Dec. Ex. 1.  These plaintiffs accordingly face

12   significant individual standing issues (*see* pp. 9-10 above) – always a barrier to approval of a class

13   representative.  *See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 560 (9th Cir. 2010).

14           Plaintiffs are not typical of major segments of their open-ended 23(b)(2) classes for

15   additional reasons.  For example, although the two proposed representatives of the 23(b)(2) usury class

16   will continue to receive billing statements reflecting an interest charge in excess of 10%, many members

17   of that class will not.  (*See* p. 11 above.)  And even if the proposed representatives of the late fee classes

18   seek to maintain their own standing to pursue injunctive and declaratory relief by planning future late

19   payments, it is a near-certainty that most members of those classes have no such plans.

20           **E.    Conflicts of Interest Within the Late Fee Classes Preclude a Finding of Adequacy of
                     Representation for those Classes.**

21           There is a fundamental conflict of interest within the proposed late fee classes, because

22   some class members have affirmatively *benefitted* – and will continue to benefit – from the late-fee

23   provisions of their contracts that plaintiffs seek to invalidate.  Such a conflict of interest precludes a

24   finding of adequacy of representation under Rule 23(a).  *See Pickett v. Iowa Beef Processors*, 209 F.3d

25   1276, 1280 (11th Cir. 2000) ("[A] class cannot be certified when its members have opposing interests or

26   when it consists of members who benefit from the same acts alleged to be harmful to other members of

27   the class."); *Bieneman v. City of Chicago*, 864 F.2d 463, 464-65 (7th Cir. 1988) (same); *see also*

28

*Mayfield v. Dalton*, 109 F.3d 1423, 1427 (9th Cir. 1997) (former service member challenging policy could not adequately represent class that included persons who approved of and supported the policy).

Under California law, a successful challenge to a contractual charge as an improper measure of liquidated damages (the theory plaintiffs assert here) merely precludes enforcement of the provision *as a binding basis for measuring the damages to be paid.* The breaching party – in this case the late-paying borrower – "remains liable for the actual damages resulting from his default." *Garrett v. Coast & S. Fed. Savings & Loan Ass'n*, 9 Cal. 3d 731, 741 (1973). Thus, if the late fee provision were deemed unenforceable, defendants would be entitled to recover the reasonable costs associated with the late payments at issue.

The contractual late fees charged to at least some class members were *less* than the actual costs incurred as a result of their late payments. *See* Hinko Dec. ¶ 7; Potomis Dec. ¶ 8. Such class members would receive no benefit if plaintiffs' claims were successful; indeed, in those instances in which the costs incurred exceeded the fees paid, class members might even be subject to counterclaims. *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*, 622 F.3d 1307, 1326-27 (11th Cir. 2010). And any determination that the late fee provision was unenforceable as an improper measure of liquidated damages would free defendants to seek to recover *larger* amounts from some class members in the future. Under these circumstances, class certification is inappropriate. *Pickett*, 209 F.3d at 1280.

## F.     The Requirements of Rule 23(b)(3) Are Not Satisfied.

To seek monetary relief, a class must be certified under Rule 23(b)(3). *Wal-Mart*, 131 S. Ct. at 2557. That rule requires plaintiffs to demonstrate both that common questions predominate and that a class action is "superior" to other methods of adjudicating the issues. Fed. R. Civ. P. 23(b)(3). The rule identifies four factors that are "pertinent" to the superiority determination, but as a practical matter that inquiry usually focuses on "the likely difficulties in managing a class action" and is closely intertwined with the predominance question. Fed. R. Civ. P. 23(b)(3)(D).

Predominance has not, and cannot be, established here. Even if the Court were to determine that the *de facto* lender contention was sufficiently common for the class as a whole to satisfy the threshold commonality requirement of Rule 23(a), the critical issues that are *not* common for the class easily swamp any such generalized commonality. The issues that will need to be evaluated

separately, either for different segments of the class or, in some instances, for each individual class member, include the following questions addressed above (among others):

      1.  For class members' loans, what entity or entities were responsible for each of the activities cited in the complaint as supporting plaintiffs' *de facto* lender theory – including purchase of the loans from Stillwater – and are any of those entities' actions attributable to the defendants?

      2.  How long was Stillwater at risk for amounts it provided to fund each class member's loans before it sold those loans?

      3.  What was the role of the borrower's school (*e.g.*, CEC) with respect to each loan, including its role in originating the loan with the borrower, determining the borrower's eligibility to receive the loan, guaranteeing the loan, committing to purchase the loan, and other pertinent factors?

      4.  Is the entity to which each class member has or had an obligation to make the challenged payments (*i.e.*, the loan owner) a defendant in this action?

      5.  What are the facts as to each class member on the pertinent considerations that will govern the choice of law analysis if the choice of law provisions in the contracts are not enforced?

      6.  What are the legal standards on late fees and/or usury in each of the states whose laws might apply to class members' claims, and what are the facts as to those class members that bear on application of those standards?

Moreover, if plaintiffs manage to prevail on the *de facto* lender theory, and if they can prove that California law applies to all class members' claims, that will not be the end of the inquiry. Plaintiffs will still have to prove an entitlement to relief under the pertinent statutes. This will in turn require consideration of additional individualized issues of fact and/or law.

For example, members of the late fee class, even if they prevail on the *de facto* lender issue, must still demonstrate that the contract provisions under which their late fees were charged violated applicable law. And no matter what standard is applied in answering that question, class members would still be liable for the actual costs imposed by their late payments. (*See* p. 22 above.) Quantifying those costs will require consideration of questions such as, *inter alia*, the length of time the amount due remained unpaid and the measures taken to pursue payment. *See* Hinko Dec. ¶¶ 3-4. Taking these and other pertinent factors into account, the resulting calculation will vary substantially for

different class members.  *See id.* ¶ 4.  Indeed, as discussed above, some class members will owe more for their late payments than they paid.

Finally, plaintiffs have failed utterly to prove that they possess a model through which actual injury and damages can be established for these classes.  For the late fee class, it will be necessary to analyze the costs of late fees under a variety of fact patterns, to allot the late payments of class members to determine the amount attributable to late fees, and to calculate (a) whether the class member is owed money or vice versa and (b) how much is owed.  Plaintiffs have identified no methodology for performing this task, as they are required to do.

For the usury class, it may be a relatively simple matter in most instances to assess whether a class member has been *charged* interest at a given rate, but whether that class member has actually *paid* that interest is a different matter, even if the borrower has made some payments on her loan.  As discussed above (at pp. 12-13), assessing this issue for each class member will require a complex calculation.  Plaintiffs' only mention of this point is an assertion that SMI's computer systems contain detailed data on the loans and payments of class members.  Mot. at 11-12.  As the discussion above makes clear, plaintiffs are simply wrong in assuming that all of the data they will need is readily available from those systems.  *See also* Potomis Dec. ¶¶ 26-27.  Moreover, plaintiffs do not even allege, much less prove, that they actually possess any model that can use the available data to generate an accurate, class-wide analysis that will prove the specific injury allegedly suffered by each class member.

In the past, courts often accepted at the class certification stage a bare-bones assertion that some kind of model for proving class injury and damages was hypothetically possible.  But more is required following the Supreme Court's holding in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  In *Comcast*, the Court overturned the certification of a class for which the plaintiffs had failed to provide a model that would use the available data to generate a calculation of injury and damages for each class member that was consistent with their claims.  *Id.* at 1433-35.  The Court explicitly *rejected* the plaintiffs' contention that it was permissible to certify a class based on the assumption that they would be able to develop the necessary methodology at a later stage.  *Id.* at 1433.

In its March 24 Order (at 20), this Court referred to the oft-stated principle that the need for individualized proof of damages does not alone preclude certification.  This proposition remains

24

good law after *Comcast* to the extent – *but only to the extent* – that class certification is not sought with respect to damages issues.  If plaintiffs seek an order from this Court certifying class claims for which damages issues will be tried, they must demonstrate *now* that they have the capacity to try those claims on a class basis with common proof.  *Comcast*, 133 S. Ct. at 1433.  Such common proof may rely on individual *data* for each class member, but plaintiffs have the burden of demonstrating that they possess a methodology that can use that data in a manageable fashion to generate accurate results.  *Id.*; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification."); *Leyva v. Medline Industries, Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (finding *Comcast* satisfied because the defendant had itself presented a model for calculating damages based on its data).

Plaintiffs have not even attempted to satisfy this requirement.  The Court accordingly has no basis to conclude that proof of actual injury to each alleged class member can be demonstrated without extensive individualized inquiries, much less that it will be possible to calculate the restitution and/or damages to which each class member is allegedly entitled.  Indeed, as discussed in Part III.A.3 above, plaintiffs have not shown that they possess a workable way to identify who the class members even are.  For this reason also, class certification should be denied.

## IV.     CONCLUSION

For the foregoing reasons, class certification should be denied.

Respectfully submitted,

DATED:  August 22, 2014                          COVINGTON & BURLING LLP


By:     /s/ Sonya D. Winner
                                                     SONYA D. WINNER
                                                Attorneys for Defendants